# 25-952

---

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

JENNIFER VITSAXAKI,

*Plaintiff-Appellant,*

v.

SKANEATELES CENTRAL SCHOOL DISTRICT; SKANEATELES CENTRAL
SCHOOLS' BOARD OF EDUCATION,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Northern District of New York
Case No. 5:24-cv-001155

---

## BRIEF OF PLAINTIFF-APPELLANT JENNIFER VITSAXAKI

---

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Katherine L. Anderson
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
kanderson@ADFlegal.org

Vincent M. Wagner
Laurence J. Wilkinson
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
(571) 707-4655
vwagner@ADFlegal.org
lwilkinson@ADFlegal.org

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

Raymond J. Dague
DAGUE LAW OFFICE
4874 Onondaga Road
Syracuse, NY
(315) 422-2052
Raymond@DagueLaw.com

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

Table of Authorities ..................................................................... iv

Statement Regarding Oral Argument ...................................... ix

Statement of Jurisdiction .......................................................... 1

Statement of Issues .................................................................... 2

Introduction ................................................................................ 4

Statement of the Case ............................................................... 5

    A.    The Vitsaxakis move to Skaneateles Central School District .............................................................................. 6

    B.    Applying official policy, the School District socially transitions Mrs. Vitsaxaki's daughter in secret by treating her as a boy. ..................................................... 7

    C.    Exercising its discretion, the School District finally tells Mrs. Vitsaxaki about the secret social transition. ....... 10

    D.    Based on School District policy, staff refuse to follow Mrs. Vitsaxaki's instruction to stop socially transitioning her daughter. ................................................... 11

    E.    Mrs. Vitsaxaki sues, alleging the secret social transition violated her constitutional rights. ...................... 13

    F.    The district court incorrectly dismisses the complaint. ....... 16

Standard of Review ................................................................... 19

Summary of the Argument ...................................................... 19

Argument .................................................................................... 21

I.    The complaint plausibly alleges that the School District violated Mrs. Vitsaxaki's fundamental parental rights. ............... 22

A.   The School District's secret social transition violated Mrs. Vitsaxaki's fundamental right to direct her daughter's upbringing, education, and healthcare. .............23

    1.   Mrs. Vitsaxaki has a deeply rooted fundamental right that a public school must honor..........................24

        i.   Supreme Court precedent establishes a broad, fundamental parental right....................25

        ii.   Mrs. Vitsaxaki did not lose her fundamental right by sending her daughter to public school. ................................................................26

    2.   The School District infringed Mrs. Vitsaxaki's fundamental right by socially transitioning her daughter in secret. .......................................30

    3.   Because the alleged infringement of Mrs. Vitsaxaki's fundamental right would trigger strict scrutiny, dismissal was inappropriate. .......................35

B.   The district court's contrary decision departed from history, tradition, and precedent. .........................................37

C.   Applying other Fourteenth Amendment tests would be inconsistent with binding precedent, although the complaint also states a claim under those tests..................43

    1.   This Court does not apply the "shocks the conscience" test in cases like this one..........................43

    2.   Regardless, the complaint alleges conscience-shocking conduct by the School District.....................48

II.   The complaint plausibly alleges that the School District violated Mrs. Vitsaxaki's free-exercise rights. .............................50

A.   Because the School District's policy requires discretionary decisionmaking, it is not generally applicable..............................................................................52

B.    The School District conditioned a public benefit on Mrs. Vitsaxaki violating her religious beliefs. ..............................57

III.   The complaint plausibly alleges that the School District violated Mrs. Vitsaxaki's procedural-due-process rights. .............59

IV.   Mrs. Vitsaxaki has standing to seek declaratory relief.................61

Conclusion .................................................................................63

Certificate of Compliance.........................................................64

Certificate of Service ...............................................................65

# TABLE OF AUTHORITIES

## Cases

*Akins v. Epperly,*
   588 F.3d 1178 (8th Cir. 2009) ........................................................ 48

*Alexander v. City of Syracuse,*
   132 F.4th 129 (2d Cir. 2025) ......................................................... 21

*Arnold v. Board of Education of Escambia County,*
   880 F.2d 305 (11th Cir. 1989) ................................................. 29, 34

*Bangs v. Smith,*
   84 F.4th 87 (2d Cir. 2023) ............................................................ 59

*Barnette v. West Virginia State Board of Education,*
   47 F. Supp. 251 (S.D. W. Va. 1942) ............................................. 28

*Bartell v. Lohiser,*
   215 F.3d 550 (6th Cir. 2000) ......................................................... 60

*Brandon v. Royce,*
   102 F.4th 47 (2d Cir. 2024) ........................................................... 50

*Carson ex rel. O.C. v. Makin,*
   596 U.S. 767 (2022) ................................................................. 57, 58

*Carter v. HealthPort Technologies, LLC,*
   822 F.3d 47 (2d Cir. 2016) ............................................................ 19

*Chavez v. Martinez,*
   538 U.S. 760 (2003) ....................................................................... 44

*Collins v. Daniels,*
   916 F.3d 1302 (10th Cir. 2019) ..................................................... 61

*County of Sacramento v. Lewis,*
   523 U.S. 833 (1998) ............................................... 43, 44, 48, 49

*Crue v. Aiken,*
   370 F.3d 668 (7th Cir. 2004) ......................................................... 61

iv

*Department of State v. Muñoz,*
    602 U.S. 899 (2024) .................................................. 23, 24, 35, 45

*Dobbs v. Jackson Women's Health Organization,*
    597 U.S. 215 (2022) ................................................................ 25, 26

*Doe v. Franklin Square Union Free School District,*
    100 F.4th 86 (2d Cir. 2024) ........................................................ 46

*Doe v. Uthmeier,*
    2025 WL 1386707 (Fla. Dist. Ct. App. May 14, 2025).................. 60

*Dorce v. City of New York,*
    2 F.4th 82 (2d Cir. 2021) ............................................................ 61

*Employment Division v. Smith,*
    494 U.S. 872 (1990) .................................................................... 52

*Espinoza v. Montana Department of Revenue,*
    591 U.S. 464 (2020) .................................................................... 57

*Farrington v. Tokushige,*
    273 U.S. 284 (1927) .................................................................... 28

*Foote v. Ludlow School Committee,*
    128 F.4th 336 (1st Cir. 2025) ............................................... passim

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) .............................................................. passim

*Goe v. Zucker,*
    43 F.4th 19 (2d Cir. 2022) ..................................................... 46, 47

*Gruenke v. Seip,*
    225 F.3d 290 (3d Cir. 2000)......................................... 29, 33, 34, 49

*H.L. v. Matheson,*
    450 U.S. 398 (1981) .................................................................... 25

*J.S. ex rel. Snyder v. Blue Mountain School District,*
    650 F.3d 915 (3d Cir. 2011)................................................ 30, 31, 34

*Jeffery v. City of New York,*
113 F.4th 176 (2d Cir. 2024) ................................................. 23, 35

*John & Jane Parents 1 v. Montgomery County Board of Education,*
78 F.4th 622 (4th Cir. 2023) ................................................... 32, 37

*K.A. v. Barnes,*
134 F.4th 1067 (10th Cir. 2025) ..................................................... 61

*Kane v. De Blasio,*
19 F.4th 152 (2d Cir. 2021) .......................................................... 52

*Kanuszewski v. Michigan Department of Health & Human Services,*
927 F.3d 396 (6th Cir. 2019) ......................................................... 33

*Kennedy v. Bremerton School District,*
597 U.S. 507 (2022) ................................................................. 50

*Littlejohn v. School Board of Leon County,*
132 F.4th 1232 (11th Cir. 2025) ..................................................... 47

*Matican v. City of New York,*
524 F.3d 151 (2d Cir. 2008) .......................................................... 48

*Meyer v. Nebraska,*
262 U.S. 390 (1923) .............................................................. 25, 28

*Miller v. McDonald,*
130 F.4th 258 (2d Cir. 2025) ...................................................... 52, 55

*Mirabelli v. Olson,*
761 F. Supp. 3d 1317 (S.D. Cal. 2025) ............................................. 41

*Monell v. Department of Social Services,*
436 U.S. 658 (1978) ................................................................. 22

*New Hope Family Services, Inc. v. Poole,*
966 F.3d 145 (2d Cir. 2020) .......................................................... 19

*Parham v. J.R.,*
442 U.S. 584 (1979) ........................................................... passim

*Pierce v. Society of Sisters,*
    268 U.S. 510 (1925) ...................................................... 25, 26, 28

*Radwan v. Manual,*
    55 F.4th 101 (2d Cir. 2022) ........................................................ 59

*Regino v. Staley,*
    133 F.4th 951 (9th Cir. 2025)................................... 22, 45, 46, 60

*Reno v. Flores,*
    507 U.S. 292 (1993) .................................................................... 23

*Rochin v. California,*
    342 U.S. 165 (1952) .................................................................... 43

*Southerland v. City of New York,*
    680 F.3d 127 (2d Cir. 2012)........................................................ 59

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. 449 (2017) .................................................................... 57

*Troxel v. Granville,*
    530 U.S. 57 (2000) ...................................................... 22, 25, 39, 45

*Walker v. Senecal,*
    130 F.4th 291 (2d Cir. 2025) ............................................. 5, 19, 40

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) .............................................................. 23, 44

*We The Patriots USA, Inc. v. Connecticut Office of Early Childhood Development,*
    76 F.4th 130 (2d Cir. 2023) ................................................ passim

*West Virginia State Board of Education v. Barnette,*
    319 U.S. 624 (1943) .................................................................... 28

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972) .................................................. 25, 31, 36, 37

**<u>Statutes</u>**

28 U.S.C. § 1291 ................................................................... 1

28 U.S.C. § 1331 ................................................................... 1

28 U.S.C. § 1343 ................................................................... 1

42 U.S.C. § 1983 ............................................................. 1, 21

**<u>Other Authorities</u>**

1 William Blackstone, *Commentaries on the Laws of England*
    (10th ed. 1787) ......................................................... 29, 49

Eric A. DeGroff, *Parental Rights & Public School Curricula:*
    *Revisiting* Mozert *after 20 Years*,
    38 J.L. & Educ. 83 (2009) ............................................ 27

2 James Kent, *Commentaries on American Law* (5th ed. 1844) ........... 27

Rosalie Berger Levinson, *Time to Bury the Shocks the Conscience*
    *Test*,
    13 Chap. L. Rev. 307 (2010) ....................................... 43

World Professional Association for Transgender Health, *Standards of*
    *Care for the Health of Transgender and Gender Diverse People:*
    *Version 8* (Sept. 15, 2022) ........................................ 32

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Jennifer Vitsaxaki requests oral argument. This case is about whether a school district violated her constitutional rights. Acting under official policy, the school district treated her 12-year-old daughter as a boy for months—without giving Mrs. Vitsaxaki notice, without obtaining her consent, and while actively concealing it from her. The school district's policy and its conduct raise important questions under the First and Fourteenth Amendments to the U.S. Constitution about Mrs. Vitsaxaki's fundamental rights as a parent, her right to exercise her religion, and her right to procedural due process. Oral argument will help the Court resolve those questions.

# STATEMENT OF JURISDICTION

Plaintiff-Appellant Jennifer Vitsaxaki sued Defendants-Appellees Skaneateles Central School District and Skaneateles Central Schools' Board of Education under 42 U.S.C. § 1983 for deprivations of her federal constitutional rights, which gave the district court jurisdiction under 28 U.S.C. §§ 1331 and 1343. The district court dismissed the complaint on March 20, 2025. JA117. That was a final order, disposing of all Mrs. Vitsaxaki's claims. She timely appealed on April 15, 2025. JA119. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.     Jennifer Vitsaxaki alleged that, acting under an official policy, Defendants Skaneateles Central School District and Skaneateles Central Schools' Board of Education treated her daughter as a boy and affirmatively concealed that treatment from her. According to Mrs. Vitsaxaki's complaint, this went on for months—without her knowledge or consent. Do her allegations state a plausible claim that Defendants' policy is unconstitutional facially or as applied because it, and Defendants' actions under it, violated Mrs. Vitsaxaki's fundamental parental rights under the Fourteenth Amendment?

2.     Based on the same facts, Mrs. Vitsaxaki alleged that Defendants violated her sincerely held religious beliefs. Do her allegations state a plausible claim that Defendants' policy is unconstitutional facially or as applied because it, and Defendants' actions under it, violated Mrs. Vitsaxaki's rights under the Free Exercise Clause?

3.     By making decisions about Mrs. Vitsaxaki's daughter without Mrs. Vitsaxaki's consent and concealing those decisions from her, Defendants deprived her of a protected liberty interest. But she alleged that, according to their official policy, Defendants provided her no procedural protections before depriving her of that interest. Do her allegations state a plausible claim that Defendants' policy is unconstitutional

2

facially or as applied because it, and Defendants' actions under it, violated Mrs. Vitsaxaki's right to procedural due process under the Fourteenth Amendment?

4. Both the district court and Defendants agreed that Mrs. Vitsaxaki has standing to seek damages caused by Defendants' alleged violations of her constitutional rights. Does she also have standing, premised on her alleged past injury, to seek retrospective declaratory relief?

## INTRODUCTION

For parents, few things matter more than their children. That's why there's a great deal of trust in sending their children to school. They trust the school will take care of their child. They trust the school will let them know if their child is struggling or something is wrong.

For Jennifer Vitsaxaki, that trust was betrayed. Acting under a school-district policy, employees of the Skaneateles Central School District and Board of Education treated her 12-year-old daughter as a boy for months—using a masculine name and third-person plural pronouns. The employees did not notify Mrs. Vitsaxaki of their actions. Nor did they try to obtain her consent. Worse, they actively concealed what they were doing, making sure to use the correct name and pronouns when communicating with Mrs. Vitsaxaki. And even after she repeatedly asked employees if they had noticed anything troubling going on with her daughter, they told her no. In short, employees intentionally deceived Mrs. Vitsaxaki in carrying out the School District's official policy.

That policy gave staff the discretion to *secretly* engage in a "social transition," a controversial psychosocial intervention, of young students. Staff could socially transition a student without parental notice or consent and actively conceal their actions. Applying that policy, the School District not only betrayed Mrs. Vitsaxaki's trust, but also violated her constitutional rights.

The School District infringed Mrs. Vitsaxaki's fundamental right as a parent to direct the upbringing, education, and healthcare of her daughter—a right long recognized as protected by the Fourteenth Amendment. It violated her free-exercise rights by applying a discretionary policy to burden her sincerely held religious beliefs and by conditioning a public benefit on her violating those beliefs. And the School District disregarded Mrs. Vitsaxaki's procedural-due-process rights by not providing her any process whatsoever before depriving her of a protected liberty interest in parenting her daughter.

The complaint plausibly alleges each of those claims. So the district court erred in dismissing it. A school district cannot socially transition a student to the opposite gender while lying to her parent—not under our Constitution.

## STATEMENT OF THE CASE

This is an appeal from the decision of the Honorable David N. Hurd dismissing Mrs. Vitsaxaki's complaint against the School District. JA5–49 (complaint); JA85–116 (decision, available at *Vitsaxaki v. Skaneateles Cent. Sch. Dist.*, No. 5:24-CV-155, 2025 WL 874838 (N.D.N.Y. Mar. 20, 2025)). So the following facts all come from that complaint, and the Court must accept them as true. *Walker v. Senecal*, 130 F.4th 291, 297 (2d Cir. 2025) (per curiam).

5

### A.  The Vitsaxakis move to Skaneateles Central School District.

The complaint paints an alarming picture. Before the Greek economy collapsed, Mrs. Vitsaxaki, her husband, Michael Vitsaxakis, and their three daughters lived in Greece. JA10. Then in 2017, Mrs. Vitsaxaki and the girls moved to Skaneateles, New York, to live with her parents. *Id.* Mr. Vitsaxakis remained in Greece for work. *Id.* When they moved, one of the girls was nine years old. *Id.* To respect her privacy, the parties and the district court referred to her throughout the proceedings below as "Jane," a pseudonym.

The move to America was hard for Jane. She had to adapt to a new culture and a new school. JA10–11. Mrs. Vitsaxaki enrolled her in elementary school in the School District. JA11. It was difficult adjusting—speaking English regularly, making new friends, and adapting to American school. *Id.* Jane struggled with both anxiety and academics. JA11–12. That's why, when Jane entered middle school, Mrs. Vitsaxaki spoke with the school counselor, Christopher Viggiano, and school psychologist, Vicky Powers. JA13. Both assured her they would keep an eye on Jane. *Id.*

Jane continued to struggle. Her anxiety increased. *Id.* She became depressed and withdrawn. *Id.* She gained weight. *Id.* And she talked negatively about herself. *Id.* So Mrs. Vitsaxaki brought her concerns to Mr. Viggiano, Ms. Powers, and the principal, Michael Caraccio. *Id.*

6

Mrs. Vitsaxaki worried that Jane might be being bullied. *Id.* But each time she spoke with staff, they assured her that Jane was doing just fine. *Id.* Those assurances weren't true.

Unbeknownst to Mrs. Vitsaxaki, Mr. Viggiano, the middle-school counselor, regularly met with Jane to discuss bullying and peer conflict. JA14. But even when Mrs. Vitsaxaki directly—and repeatedly—asked him whether Jane was being bullied or having conflict with her peers, he disclosed nothing. *Id.*

### B.  Applying official policy, the School District socially transitions Mrs. Vitsaxaki's daughter in secret by treating her as a boy.

The School District's deceit deepened in early 2021. JA17. At that point, Jane was 12 and in seventh grade. JA16–17. She had seen first-hand several of her peers take on new gender identities at her school, with staff calling them by different names and pronouns. JA17. So like her peers, she met with Mr. Viggiano—still without Mrs. Vitsaxaki's knowledge or consent—and asked that middle-school staff refer to her by a masculine name and different pronouns. *Id.* Mr. Viggiano and other staff members readily obliged. In fact, they encouraged Jane to use the masculine name and incorrect pronouns and facilitated her doing so while at school. *Id.*

7

By treating Jane as a boy, the School District's staff engaged in a psychosocial intervention for gender dysphoria that is often called "social transition." JA31. More on that in a moment. *See infra* pp. 13–14. Despite engaging in that intervention, staff told Jane that her parents did not need to be notified of her social transition. JA17–18.

The School District's staff thus took it upon themselves to decide how to address Jane's expressed gender confusion. JA17–19. No one at the School District notified Mrs. Vitsaxaki before socially transitioning Jane. JA17, 19, 30–31. No one sought Mrs. Vitsaxaki's consent. *Id.*

Even though the School District hid its actions from her, Mrs. Vitsaxaki could still see Jane struggling. JA18. So she repeatedly spoke with Jane's school counselors and teachers. *Id.* She asked if they saw any potential source for her daughter's struggles. *Id.* They consistently told her no: They "saw no struggles at school or anything that could explain what Mrs. Vitsaxaki was observing in Jane at home." *Id.* But that wasn't true.

Then, on February 10, Mr. Viggiano emailed other middle-school staff members after a counseling session with Jane. *Id.* He told them that they should call Jane by a masculine name and use third-person plural pronouns to refer to her. *Id.* And they did just that—still without notifying Mrs. Vitsaxaki or obtaining her consent. JA19. In fact, they actively hid the social transition from her. Whenever they spoke with Mrs. Vitsaxaki, staff referred to Jane by her given name and female

8

pronouns, all the while using the masculine name and incorrect pronouns at school. *Id.*

That covert social transition went on for months. Meanwhile, Mrs. Vitsaxaki continued asking the School District's staff about her daughter's well-being, and staff continued to lie to her, telling her they had noticed no changes in Jane at school. JA18–19, 21–22. They took these actions pursuant to the School District's policy. JA30–31.

Not only that, the School District also took further steps to transition Jane. First, Ms. Powers, the school psychologist, and Michele Rogala, the school social worker, both met often with Jane—alone and in groups—to discuss her and other students' gender identities. JA19.

Second, Ms. Rogala started an LGBTQ club at lunch and encouraged Jane and others to attend. *Id.* There, Ms. Rogala encouraged Jane to socially transition, told her that changing biological sex was a choice, and gave her resources on medical transitions. JA19–20. Those resources included a document with lists of contact information for nearby hormone clinics and surgeons. JA20; *see* JA63–66 (list of "Cross Hormone Providers" and "Surgeons" given to Jane). That same document contained information about where to obtain breast binders. JA20; *see* JA68 (list of organizations that provide "Binders"). It even included a list of "Faith Communities" for Jane to consider. JA69–70.

Third, consistent with Mr. Viggiano's February email, Ms. Powers completed a "Gender Support Plan." JA23 (complaint) (citing JA78,

which reproduces a redacted copy of that plan). It noted that there was "no solid plan" to "come out" to family. *Id.* And it instructed all middle-school staff to use the masculine name and third-person plural pronouns when speaking to or about Jane at school—but her given name and female pronouns when speaking with Mrs. Vitsaxaki. *Id.*

### C. Exercising its discretion, the School District finally tells Mrs. Vitsaxaki about the secret social transition.

In the following weeks, staff continued to refer to Jane as a boy at school and as a girl to Mrs. Vitsaxaki. But Jane's English teacher became uncomfortable with how the School District was forcing staff to deceive Mrs. Vitsaxaki. JA26. That teacher pressured Mr. Caraccio, the principal, to end the deception and inform Mrs. Vitsaxaki. *Id.*

On May 11, at least three months after the School District began to treat Jane as a boy, Mr. Caraccio finally called Mrs. Vitsaxaki. JA23–24. He had Mrs. Vitsaxaki on speakerphone, with Jane listening in. JA24. But he didn't mention Jane's presence to Mrs. Vitsaxaki. *Id.* Mr. Caraccio told Mrs. Vitsaxaki that the School District had socially transitioned Jane in secret, creating the Gender Support Plan and changing her name and pronouns at school. *Id* And he explained that the School District took those actions according to its official policy. *Id.*

Naturally, Mrs. Vitsaxaki was shocked. She had never heard Jane or anyone else question Jane's gender before. *Id.* So she strongly objected. *Id.* But when she realized that Jane was listening in, Mrs. Vitsaxaki consoled her daughter and ended the call. *Id.*

The next day, Ms. Powers emailed several staff members about Jane. JA25 (citing JA80, which reproduces a redacted copy of that email). She noted how it "was getting increasingly difficult to balance [masculine name]'s readiness and privacy with [masculine name]'s mother's right to know" what had been happening at school. *Id.* (alterations in original).[1] And Ms. Powers explained that staff had consulted with a school attorney to "navigate the most appropriate and safe approach to these disclosures" before Mr. Caraccio revealed the secret social transition to Mrs. Vitsaxaki. *Id.* Ms. Powers did not attribute the School District's disclosure of its secret social transition to any decision by Jane.

### D. Based on School District policy, staff refuse to follow Mrs. Vitsaxaki's instruction to stop socially transitioning her daughter.

The next week, Mrs. Vitsaxaki and her husband met with Mr. Caraccio and other middle-school staff about the School District's social transition of Jane. JA26. The staff present at that meeting apologized

---

[1] To protect Jane's privacy and avoid needing to seek leave to file documents under seal, both her given name and the School District's masculine name for her were redacted from the complaint and its exhibits.

about the situation. *Id.* But they explained that they had consulted with the school attorney and acted in accordance with the School District's policy in concealing Jane's social transition. *Id.* Mrs. Vitsaxaki asked them to stop calling Jane by any names or pronouns while she assessed the situation. *Id.* Mr. Caraccio agreed, but the School District's staff continued to use the masculine name for Jane while she finished out the year in online classes. JA27.

On June 16, 2021, Mrs. Vitsaxaki met with the School District's superintendent and its attorney. *Id.* Again, they confirmed that middle-school staff had followed the School District's official policy. *Id.* From the meeting, Mrs. Vitsaxaki understood that staff would continue to refer to Jane by the masculine name and incorrect pronouns despite her instructions otherwise—in accord with the policy. JA28–29.

That policy was School District Policy 7552, "Student Gender Identity." JA30–31; *see* JA82–84 (reproducing policy). Its stated purpose is to provide a "safe and supportive educational environment." JA82. And it expressly states that the School District will "assess and address the specific needs of each student on a case-by-case basis." *Id.*

For names and pronouns, Policy 7552 then explains that when notified of a student's transgender or gender-nonconforming status, the School District "*will endeavor* to engage the student and his or her parents or guardians, *as appropriate*, in an effort to agree upon a plan that

12

will accommodate the student's individual needs at school." JA83 (emphasis added). But the policy makes no promises to parents. It notes that students "have the right to discuss and convey their gender identity and expression openly and to decide when, with whom, and how much to share this confidential information." *Id.* So a Gender Support Plan "*may*" include "when and how to initiate the student's preferred name and associated pronoun use and if, when, and how this is communicated to others." *Id.* (emphasis added). But the School District's staff *must* "use the name and pronoun that corresponds to the gender identity the student consistently asserts at school." *Id.*

After the school year ended, Mrs. Vitsaxaki enrolled Jane in private school for the next year. JA29. There, Jane's health and well-being began to improve. *Id.* And she has not expressed any desire to use a masculine name or incorrect pronouns. *Id.*

### E. Mrs. Vitsaxaki sues, alleging the secret social transition violated her constitutional rights.

In January 2024, Mrs. Vitsaxaki sued the School District. She claimed that the School District violated her constitutional rights by socially transitioning Jane in secret.

The complaint contains dozens of paragraphs alleging specific facts—supported by citations to relevant scientific literature—to explain what a social transition is. A social transition is a psychosocial in-

tervention for gender dysphoria. JA31. Experts agree that it is a power-ful approach that greatly reduces the chance a minor will stop experi-encing gender dysphoria and increases the chance she will proceed down a path that includes puberty blockers and cross-sex hormones. JA35. In other words, a "social transition puts the child on a difficult-to-escape pathway to medicalized transition." *Id.*

According to the complaint, by socially transitioning Jane, the School District put her at risk of long-term medical interventions and of deepening her gender confusion. JA35–36. Because a social transition thus implicated decisions about Jane's healthcare, untrained school staff should not have decided to socially transition her, particularly not without first consulting her parents. JA33–34.

The complaint also details Mrs. Vitsaxaki's religious beliefs. She is a Greek Orthodox Christian. JA36. As part of her faith, she believes that God created two sexes, male and female. JA37. She believes that a person's biological sex, which is a gift from God, is fixed. *Id.* And she be-lieves that it is her "God-given responsibility" to care for and raise her children consistent with her faith. *Id.* So Mrs. Vitsaxaki believes the best way to help her child experiencing discomfort with her given sex is by noninvasive therapeutic support. JA38. That includes affirming that her child is "fearfully and wonderfully made," that God's love is unfail-ing, and that her love is unfailing. *Id.* (quoting *Psalm* 139:14). Socially

transitioning her child violates those and others of Mrs. Vitsaxaki's sincerely held religious beliefs. JA40.

The complaint brings three facial and as-applied claims. And it requests nominal, compensatory, and declaratory relief. JA47. First, Mrs. Vitsaxaki claims that the School District violated her free-exercise rights under the First Amendment. JA39. The School District's actions substantially burdened Mrs. Vitsaxaki's ability to exercise her sincerely held religious beliefs in raising her daughter. JA40. It subjected Jane to a social transition that directly violated Mrs. Vitsaxaki's beliefs. *Id.* Compounding that burden on her beliefs, the School District concealed its actions. *Id.* During the three-month period of concealment, Mrs. Vitsaxaki couldn't respond to the School District's treatment of Jane by providing her with appropriate religious instruction. *Id.*

Second, Mrs. Vitsaxaki claims that the School District violated her fundamental right to direct her daughter's upbringing, education, and healthcare protected by the Fourteenth Amendment. JA42. According to the complaint, the School District needed to notify her of the social transition. JA43. But it failed to do so. *Id.* And it needed to get her consent to socially transition Jane. *Id.* But again it failed to do so. *Id.* Worse, the School District actively concealed its actions from Mrs. Vitsaxaki. JA44. All three actions related to the social transition—the failure to notify, the failure to get consent, and the active concealment—independently violated Mrs. Vitsaxaki's fundamental parental rights.

15

Third, the School District violated Mrs. Vitsaxaki's procedural-due-process rights. It deprived her of a protected liberty interest in parenting her daughter. JA45. And it gave her no process before doing so—acting without any notice or opportunity to be heard. JA46.

## F. The district court incorrectly dismisses the complaint.

The School District moved to dismiss the complaint. And the district court granted that motion. *See* JA85–116. To begin, it ruled that Mrs. Vitsaxaki lacked standing to seek declaratory relief. JA99. In the court's view, because Jane is no longer attending school in the School District, Mrs. Vitsaxaki could not get such relief even for the School District's past actions. *Id.* But given Mrs. Vitsaxaki's request for damages for those past actions, the court still considered whether the complaint plausibly stated her three claims. *Id.* And the court did so only under the as-applied standard. JA100 n.8.

Considering Mrs. Vitsaxaki's free-exercise claim, the district court recognized that "Mrs. Vitsaxaki has plausibly alleged the existence of a sincerely held religious belief." JA101. It also recognized that both the School District's policy and its actions under that policy burdened her belief. JA102. But the court thought that only rational-basis review applied, which it said the School District could satisfy even on a motion to dismiss.

16

It gave three reasons. First, as the court saw it, the School District did not condition the availability of a public benefit on violating those religious beliefs. JA103–05. Confusingly, the court analyzed that question under the Establishment Clause, rather than the Free Exercise Clause. JA104–05. Second, in the district court's view, Policy 7552 was neutral and generally applicable. JA106. As to general applicability, the court read the policy to allow the student alone to decide whether to inform her parents of a social transition. *Id.* But it did not try to square that reading with the rest of the policy, which tells the School District to act on a "case-by-case basis," "endeavor to engage" students and parents, and specify if the plan includes informing others. JA82–83. Third, the court rejected any hybrid-rights arguments based on this Court's precedent. JA106–07.

To dismiss Mrs. Vitsaxaki's fundamental-rights claim under the Fourteenth Amendment, the district court mostly relied on this Court's decision in *We The Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*, 76 F.4th 130 (2d Cir. 2023). Under it, the district court thought that Mrs. Vitsaxaki could not "challenge the manner of instruction employed by the district"—despite her not challenging any *instruction* at all. JA110. In the court's view, the policy was instructional, because it was "like a civility code." JA111.

The court then rejected any interference with Mrs. Vitsaxaki's right to direct Jane's healthcare, because it said the complaint did not

17

allege that the School District "attempted to diagnose or 'treat'" her. JA111. But it cited no authority from this Court or the Supreme Court limiting parents' healthcare decisionmaking right to "diagnosis" or "treatment." JA111–12. Importantly at the motion-to-dismiss stage, the district court did not credit the complaint's extensive allegations about the healthcare implications of social transition. JA31–36. Nor did it address Mrs. Vitsaxaki's allegation that the School District's actions amounted to "a psychotherapeutic intervention for gender dysphoria that scientific evidence demonstrates has a powerful psychological effect on the development and outcomes of a child." JA44.

Closing its fundamental-rights analysis, the court concluded that it didn't matter that the School District actively concealed its actions from Mrs. Vitsaxaki, because she had no "right to information" about her daughter. JA112. So the court again applied rational-basis review.

Finally, the district court dismissed Mrs. Vitsaxaki's procedural-due-process claim. Largely based on a cross-reference to its fundamental-rights analysis, the district court ruled that she had failed to allege the deprivation of a protected liberty interest. JA116. So the School District didn't need to afford Mrs. Vitsaxaki any process before socially transitioning her daughter. She had no right to notice or an opportunity to be heard.

At bottom, the district court concluded that parents like Mrs. Vitsaxaki have no plausible constitutional claim against a public school

18

district that—without parental knowledge or consent—socially transitions a student and actively conceals doing so. It thus dismissed the complaint. Because that was error, Mrs. Vitsaxaki appeals.

## STANDARD OF REVIEW

This Court reviews the grant of a motion to dismiss de novo. *Walker*, 130 F.4th at 297. That applies both to the district court's decision under Federal Rule of Civil Procedure 12(b)(1) and its decision under Rule 12(b)(6). *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016); *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 160 (2d Cir. 2020). At this stage, the questions are just whether the complaint alleges facts that "plausibly suggest" standing, *Carter*, 822 F.3d at 56 (citation omitted), or that state a plausible claim, *Walker*, 130 F.4th at 297. In considering both, the Court accepts all the factual allegations as true and draws all reasonable inferences in Mrs. Vitsaxaki's favor. *Id.*

## SUMMARY OF THE ARGUMENT

The complaint plausibly alleges that the School District's secret social transition violated Mrs. Vitsaxaki's constitutional rights—in three ways. And she has standing to seek declaratory relief.

First, Mrs. Vitsaxaki alleges that, acting under official policy, the School District violated her fundamental parental rights protected by the Fourteenth Amendment. Specifically, she alleges that it treated her

daughter as a boy—a psychotherapeutic intervention called "social tran-
sition"—without notifying her or getting her consent while actively con-
cealing its actions from her. Those allegations easily fall within Su-
preme Court precedent affirming her parental right to direct her daugh-
ter's upbringing and formation by raising her as a girl and by making
decisions that implicate her healthcare in response to gender struggles.
Plus, there is a history and tradition of parents directing their chil-
dren's upbringing, education, and healthcare even while at public
school. Taken as true, the complaint's allegations state a plausible fun-
damental-rights claim that would trigger strict scrutiny. So the district
court shouldn't have dismissed this claim.

Second, the complaint alleges that the School District, acting un-
der official policy, violated Mrs. Vitsaxaki's free-exercise rights. It bur-
dened her sincerely held religious belief that God created two fixed
sexes by hindering her from raising her daughter in accord with those
beliefs. On the one hand, the School District did so by applying a policy
that is not generally applicable. Its policy vested staff with discretion
whether to inform parents of a social transition. On the other hand, the
School District conditioned a publicly available benefit—a state-subsi-
dized public education—on Mrs. Vitsaxaki violating her religious be-
liefs. To receive the benefit of a public education Mrs. Vitsaxaki must
violate her religious beliefs by allowing Jane to be socially transitioned.

So again, under the well-pleaded allegations, strict scrutiny would apply. And again, that made it error for the district court to dismiss this claim.

Third, Mrs. Vitsaxaki's allegations state a plausible procedural-due-process claim. When the School District socially transitioned Mrs. Vitsaxaki's daughter without notice or consent, and with active concealment, it deprived Mrs. Vitsaxaki of a protected liberty interest in parenting her daughter without providing any process whatsoever. Those allegations state a plausible Fourteenth Amendment claim independent of her fundamental-rights claim.

Finally, the district court erred in ruling that Mrs. Vitsaxaki lacks standing for declaratory relief. She can obtain retrospective declaratory relief for the School District's past actions. She has a cognizable interest in an order declaring it unconstitutional for the School District to have socially transitioned her daughter behind her back.

## ARGUMENT

This Court should reverse. Starting off correctly, the district court concluded that Mrs. Vitsaxaki properly pleaded her damages claims against the School District itself, rather than any individuals, because she "challenges the validity of a public school's school policy." JA97 n.6; *see Alexander v. City of Syracuse*, 132 F.4th 129, 160 (2d Cir. 2025) (explaining municipal liability under 42 U.S.C. § 1983 as interpreted by

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). But the district court incorrectly dismissed the complaint for failing to state a damages claim.[2]

The only question for this Court is whether the complaint plausibly alleges that the School District's policy and the actions taken under it violated Mrs. Vitsaxaki's constitutional rights. Because the complaint plausibly alleges valid claims, this Court should reverse. And because Mrs. Vitsaxaki had standing to seek damages, this Court should hold that she also had standing for declaratory relief.

## I. The complaint plausibly alleges that the School District violated Mrs. Vitsaxaki's fundamental parental rights.

The complaint alleges that the School District secretly treated Mrs. Vitsaxaki's daughter as a boy for months and actively concealed that conduct. JA17–28. Those allegations state a plausible claim that the School District violated Mrs. Vitsaxaki's fundamental right to direct her daughter's upbringing, education, and healthcare—"perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.).

---

[2] The district court considered only Mrs. Vitsaxaki's as-applied claims. JA100 n.8. It rejected her facial claims based only on its dismissal of her as-applied claims. JA108 n.9, 114 n.11. Thus, if this Court reverses that dismissal, it should also reverse the facial claims' dismissal. *See Regino v. Staley*, 133 F.4th 951, 967–68 (9th Cir. 2025).

As a result, the School District would need to satisfy strict scrutiny to justify its secret-transition policy and application of that policy to Mrs. Vitsaxaki. *Dep't of State v. Muñoz*, 602 U.S. 899, 910–11 (2024). But that test is unfit for resolution at the motion-to-dismiss stage. *See Jeffery v. City of New York*, 113 F.4th 176, 188 (2d Cir. 2024) ("[W]hen a constitutional challenge to a law triggers heightened scrutiny—whether strict or intermediate—dismissal 'will rarely, if ever, be appropriate at the pleading stage.'" (citation omitted)). And in any event, the School District has made little effort to satisfy it. So the district court should not have dismissed the parental-rights claim.

### A. The School District's secret social transition violated Mrs. Vitsaxaki's fundamental right to direct her daughter's upbringing, education, and healthcare.

Analyzing a substantive-due-process claim begins with "a 'careful description of the asserted fundamental liberty interest'" to determine whether it is "deeply rooted in this Nation's history and tradition." *Muñoz*, 602 U.S. at 910 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)). If the asserted right, carefully described, is deeply rooted, it is fundamental. And a court must then ask whether the challenged government action "infringe[s]" that right. *Reno v. Flores*, 507 U.S. 292, 302 (1993); *see Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 348 (1st Cir. 2025) (per curiam) (asking first whether plaintiffs "identified a right recognized as fundamental" and second whether they

pleaded that government "conduct did, in fact, restrict that right"). If so, then strict scrutiny applies: "the Government can act only by narrowly tailored means that serve a compelling state interest." *Muñoz*, 602 U.S. at 910.

The complaint here plausibly alleges facts sufficient to satisfy each of those inquiries. The Supreme Court has already held that parents' right to direct their children's upbringing, education, and health-care is "deeply rooted" in our history and tradition. And contrary to the district court's view, *see* JA110–11, precedent and common-law sources confirm that this right exists in a public school. So the question is whether secretly treating Mrs. Vitsaxaki's daughter as a boy suffices to state a claim for infringing or restricting that right. Because it does, strict scrutiny would apply to the School District's policy and application of it. So the district court should not have dismissed this claim.

### 1. Mrs. Vitsaxaki has a deeply rooted fundamental right that a public school must honor.

Considering a parental-rights claim similar to Mrs. Vitsaxaki's, another court of appeals has already concluded that a secret social transition like this one "fell within the broader, well-established parental right to direct the upbringing of one's child." *Foote*, 128 F.4th at 348. Longstanding Supreme Court precedent, lower courts' decisions, and common-law history confirm the correctness of that conclusion.

24

i.  *Supreme Court precedent establishes a broad, funda-mental parental right.*

For over a century, the Supreme Court has affirmed that parents have a fundamental right to direct their children's upbringing. *Troxel*, 530 U.S. at 65 (plurality op.) (citing *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). Half a century ago, the Supreme Court already said that the "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). When it comes to "important decisions," the Court has protected parents' "guiding role" in their children's lives. *H.L. v. Matheson*, 450 U.S. 398, 410 (1981) (citation omitted).

That includes decisions about their children's upbringing, education, and healthcare. Parents have a fundamental right to "make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66 (plurality op.). They have the right to "establish a home and bring up children," which includes "the right of control" over those children. *Meyer*, 262 U.S. at 399–400. They have the right "to direct the upbringing and education of children under their control." *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925); *accord Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 256 (2022). And they have the right to make judgments about their children's "need for medical care or treatment." *Parham v. J.R.*, 442 U.S. 584, 603 (1979).

25

The reason is simple. The "child is not the mere creature of the state." *Pierce*, 268 U.S. at 535. Instead, western civilization has long recognized a "presumption" that parents will "act in the best interests of their children." *Parham*, 442 U.S. at 602–03. And our society thus empowers parents to make decisions for their children—even when a child might object. *Id.* at 603–04.

In short, the Supreme Court has left no doubt that the Fourteenth Amendment guarantees to parents a fundamental right to direct their children's upbringing, education, and healthcare. And it has rooted that fundamental right in substantive due process.[3] *See Dobbs*, 597 U.S. at 240 n.22. Even as the Supreme Court has overruled other substantive-due-process caselaw, it has not retreated from its parental-rights caselaw. *See id.* at 256 (contrasting that caselaw with now-overruled precedent creating a right to abortion).

> ii. *Mrs. Vitsaxaki did not lose her fundamental right by sending her daughter to public school.*

The district court thought the public-school context in which Mrs. Vitsaxaki's case arose placed her claims outside that "broader, well-established parental right." *Foote*, 128 F.4th at 348; *see* JA110. But under

---

[3] Some Justices and scholars have argued for transplanting the fundamental-rights doctrine to the Privileges or Immunities Clause. *See Dobbs*, 597 U.S. at 240 n.22. The merits of their arguments are for the Supreme Court to consider. Binding precedent grounds parents' fundamental rights in substantive due process. *Id.*

our history and tradition, sending Jane to public school did not strip Mrs. Vitsaxaki of her fundamental right to direct her daughter's up-bringing, education, and healthcare. And the district court erred in concluding otherwise.

At common law, parents had "both the responsibility and the authority to guide their children's development and make important decisions on their behalf." Eric A. DeGroff, *Parental Rights & Public School Curricula: Revisiting* Mozert *after 20 Years*, 38 J.L. & Educ. 83, 108 (2009). This common-law parental right included a right to make educational decisions. *Id.* at 110–12 & n.178. And that right persisted as public schooling became the norm. *Id.* at 113.

Thus, in the mid-19th Century, when James Kent again revised his *Commentaries on American Law* to include a discussion of state-funded education, he added that discussion to his chapter on parental rights and duties. 2 James Kent, *Commentaries on American Law* *195–203 (5th ed. 1844), https://bit.ly/3FbwIfi. He rightly viewed the public school as helping parents exercise their right—and fulfill their duty—to educate their children. *Id.* at *201–02. Unlike the district court, *see* JA110, Chancellor Kent did not treat parental rights as ending when a child entered a public schoolhouse.

Likewise, the Supreme Court's early parental-rights cases all concerned schooling decisions and reflect the historical primacy of parents'

right to make decisions for their children. *Meyer* turned in part on parents' right to engage a teacher in instructing their children in a foreign language—that is, this parental right existed in the school context. 262 U.S. at 400. The same is seen in *Pierce*, where parents' fundamental right conflicted with a mandatory public-school requirement. 268 U.S. at 535. And where a scheme for regulating private schools "den[ied] both owners and patrons reasonable choice and discretion in respect of teachers, curriculum and text-books," it violated parents' "right to direct the education of [their] own child without unreasonable restrictions." *Farrington v. Tokushige*, 273 U.S. 284, 298 (1927).

Not long after *Meyer*, *Pierce*, and *Tokushige*, the Court made clear that parents don't forfeit their right to direct their children's upbringing in exchange for a public education. *See generally W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943). Although most often remembered for protecting public-school *students'* free-speech rights, *Barnette* also protected *parents*. Walter Barnette and the other plaintiffs were parents of "children attending the public schools of West Virginia." *Barnette v. W. Va. State Bd. of Educ.*, 47 F. Supp. 251, 252 (S.D. W. Va. 1942). They brought the lawsuit on "behalf of themselves and their children" to defend their "religious liberty." *Id.* So when the Supreme Court protected the "right to differ as to things that touch the heart of the existing order," it not only protected public-school students from compelled speech. 319 U.S. at 642. It protected their parents, too.

28

That explains why other courts of appeals hold that parental rights cover actions by public-school officials. For example, the Eleventh Circuit has held that school officials who coerce a minor to have an abortion and not discuss it with her parents infringed on parents' right to direct their child's care. *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 313 (11th Cir. 1989). And the Third Circuit has held that school officials violated parental rights by withholding information of a student's suspected pregnancy, indirectly pushing her to take a pregnancy test, and spreading gossip about her suspected pregnancy. *Gruenke v. Seip*, 225 F.3d 290, 306–07 (3d Cir. 2000). As the court explained, "[p]ublic schools must not forget that '*in loco parentis*' does not mean 'displace parents.'" *Id.* at 307.

That's exactly right. The common law has long recognized that schools have only such power over a child as a parent might delegate. A father could "delegate part of his parental authority, during his life, to the tutor or schoolmaster, of his child; who is then *in loco parentis*, and has such a portion of the power of the parent committed to his charge." 1 William Blackstone, *Commentaries on the Laws of England* \*453 (10th ed. 1787), http://bit.ly/3leX7za. The schoolmaster could restrain and correct, "as may be necessary to answer the purposes for which he is employed." *Id.* But because his authority was delegated to him by parents, he could not act without their authorization.

29

In short, history and tradition teach that parental rights apply inside public school no less than outside it. If a public school's actions deprive parents "of their right to make decisions concerning their child" on "matters of the greatest importance," then there is a violation of that right. *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 934 (3d Cir. 2011) (en banc) (citation omitted). History, tradition, and precedent show that fundamental parental rights are implicated here and why the district court was wrong to conclude otherwise. JA110.

> ### 2. The School District infringed Mrs. Vitsaxaki's fundamental right by socially transitioning her daughter in secret.

Mrs. Vitsaxaki has alleged facts showing the School District, acting according to an official policy, infringed her "right to make decisions concerning" Jane on a "matter[] of the greatest importance." *J.S.*, 650 F.3d at 934 (citation omitted). So the complaint states a plausible claim that the School District's policy and its application of that policy here infringe her right to direct Jane's upbringing, education, and healthcare.

Recall that the policy instructs School District staff to "use the name and pronoun that corresponds to the gender identity the student consistently asserts at school." JA83. That might happen with parental involvement "as appropriate." *Id.* But not necessarily. Under the policy, the School District can socially transition a student without (1) parental

notice or (2) consent and (3) with active concealment. Each of those three actions violates the right to direct a child's upbringing, education, and healthcare while at school. Because the complaint alleges the policy allows those actions, and because it alleges the School District in fact took those actions in Mrs. Vitsaxaki's case, it has plausibly alleged both facial and as-applied parental-rights claims.

**First**, the policy empowers the School District to socially transition a student without notifying her parents. *E.g.*, JA30–31. That necessarily deprives parents "of their right to make decisions concerning their child" on a matter "of the greatest importance." *J.S.*, 650 F.3d at 934 (citation omitted). Whether a child is raised and treated consistent with her biological sex is critical to her care and upbringing. It goes to the child's formation or moral education—the nature of reality and what is right and wrong. *E.g.*, JA43; *see Yoder*, 406 U.S. at 233 (explaining that a parent's duty includes "the inculcation of moral standards, religious beliefs, and elements of good citizenship").

Likewise, whether to socially transition a child experiencing questions with her gender is a healthcare decision and, at the very least, implicates healthcare matters. The Constitution presumes that parents get to "mak[e] life's difficult decisions," including those related to healthcare. *Parham*, 442 U.S. at 584.

The allegations in the complaint—which are all that matter on a motion to dismiss—are clear about the healthcare implications of social

transition. Although a social transition "typically includes changes in the use of names and pronouns," JA33, that is not all it entails. It can also include a "[c]hange in sex/gender markers" on "school … documentation" and "bathroom and locker room use," among other conduct. World Prof'l Ass'n for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People: Version 8*, at S76 (Sept. 15, 2022)[4] (cited in JA34 n.12).

That course of conduct, the complaint alleges, is performed as a psychosocial intervention for gender dysphoria. JA31. According to dozens of factually detailed (and footnoted) allegations, a social transition is a form of so-called treatment. JA31–36 & nn.2–21. A social transition itself can "'lock[]' the child into discomfort with his or her biological sex" and "put[] the child on a difficult-to-escape pathway to medicalized transition." JA35. Indeed, as part of socially transitioning Jane, the School District gave her lists of "Primary Care Physicians," "Cross Hormone Providers," and even "Surgeons." JA61–66; *see* JA20. Because of the healthcare implications of a social transition, the School District should not socially transition a child without guidance from her properly trained mental health professionals—and certainly not without her parents. JA32–34.

---

[4] https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644

By socially transitioning students like Jane, the School District's policy implicated "very personal decisionmaking about [her] health, nurture, welfare, and upbringing." *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 646 (4th Cir. 2023) (Niemeyer, J., dissenting). And by depriving Mrs. Vitsaxaki and other parents of notice of social transitions—as a matter of official policy—the School District deprived them of their right to make decisions directing their children's upbringing, education, and healthcare. JA31, 36, 43–44.

**Second**, the policy empowers the School District to socially transition a child without parental consent. JA30–31. That equally deprives parents of their right to make those important decisions. If a parent doesn't consent to critical decisions about a child's upbringing, education, and healthcare, then by definition she is not directing those aspects of her child's life. *See Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 420 (6th Cir. 2019) (holding that retaining and using children's blood samples without parental consent violates "parents' fundamental right to direct the medical care of their children"). It is the school that is doing the directing. But of course, "*in loco parentis*" does not mean schools "displace parents." *Gruenke*, 225 F.3d at 307.

Parents get to direct key decisions about their own children. They cannot do so if school officials act without their consent. Because the complaint alleges that the School District's policy took those decisions

33

away from parents like Mrs. Vitsaxaki, JA30–31, it states a plausible claim that the policy facially violates parental rights.

*Third*, under the policy, the School District can actively conceal a social transition from parents. *Id.* That concealment also violates a parent's right to direct her child's upbringing, education, and healthcare. Indeed, doing so looks a lot like the officials in *Arnold* coercing the student not to tell her parents that she got an abortion. 880 F.2d at 313. And it's a lot worse than the official's conduct in *Gruenke* of not telling parents he suspected their daughter was pregnant, indirectly pushing her to take a pregnancy test, and spreading gossip of her suspected pregnancy. 225 F.3d at 306–07. It is "manipulative" conduct *intended* to deprive parents "of their right to make decisions concerning their child." *J.S.*, 650 F.3d at 934 (citation omitted). If that doesn't infringe on parents' right to direct their children's care, upbringing, and healthcare, then it's hard to see what would.

As required by its official policy, the School District did not give Mrs. Vitsaxaki notice when it socially transitioned Jane for months. JA19–23. It did not obtain Mrs. Vitsaxaki's consent before doing that. *Id.* And the School District actively concealed the secret social transition from her. *Id.* Because the School District's policy allowed for all three—no notice, no consent, and active concealment—it facially infringes parents' fundamental rights. And because the complaint alleges

34

that the School District did all three of these things in applying the policy to Mrs. Vitsaxaki, it states a plausible claim that the policy also infringes those rights as applied to her.

### 3. Because the alleged infringement of Mrs. Vitsaxaki's fundamental right would trigger strict scrutiny, dismissal was inappropriate.

That means the game is up. Assuming the allegations in the complaint are true, strict scrutiny would apply. The School District must show that its actions are narrowly tailored to serve a compelling state interest. *Muñoz*, 602 U.S. at 910. And that test is ill suited for a motion to dismiss. *See Jeffery*, 113 F.4th at 188. Regardless, the School District hasn't come close to satisfying it.

First, the School District has asserted only broad interests in "protecting the physical and emotional well-being of youth," JA100 (citation omitted), and preventing "discrimination and harassment," JA107 (citation omitted). Those broadly formulated interests aren't good enough. *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021). The School District must show that it has a compelling interest in socially transitioning a student without parental notice, without parental consent, and with active concealment from parents. And that goes for both parents in general (for the facial claim) and for Mrs. Vitsaxaki in particular (for the as-applied claim). *Id.* It has done neither.

35

Second, the School District fares worse on narrow tailoring. At a minimum, the policy is underinclusive. It grants discretion for staff not to give notice, not to obtain consent, and to actively hide a social transition from any parent—without any particularized analysis. For the policy, it doesn't even matter whether the School District can rebut "the traditional presumption that the parents act in the best interests of their children." *Parham*, 442 U.S. at 604. The School District can still transition a child in secret without rebutting that presumption. That is not narrowly tailored to the School District's asserted interests. Plus, for the as-applied claim, there is no suggestion in the record that telling Mrs. Vitsaxaki about the social transition would have endangered Jane or that Mrs. Vitsaxaki would discriminate against her daughter. *See Yoder*, 406 U.S. at 234 (suggesting limits to the parental right if "parental decisions will jeopardize the health or safety of the child").

Just the opposite. The complaint alleges that Mrs. Vitsaxaki would love her daughter no matter what. JA38. That explains why, when Mrs. Vitsaxaki finally found out about the social transition, she consoled her daughter. JA24. And she took affirmative steps to help her, including enrolling Jane in private school. JA29. The result: Jane's health and well-being have improved. *Id.* At this stage in the case, the School District can't show that the policy is narrowly tailored to serve a compelling state interest.

36

## B.   The district court's contrary decision departed from history, tradition, and precedent.

The district court concluded that Mrs. Vitsaxaki had not stated even a plausible claim that the School District's secret social transition of her daughter violated her fundamental rights. That conclusion largely rested on two decisions: this Court's decision in *We The Patriots*, 76 F.4th at 159, and the First Circuit's decision in *Foote*, 128 F.4th at 350. Neither supports dismissing Mrs. Vitsaxaki's parental-rights claim.

***First***, the district court reasoned that under *We The Patriots* there is no parental right to direct *how* a school teaches. JA110 (citing *We The Patriots*, 76 F.4th at 159). But that is beside the point. The School District's conduct here had nothing to do with how a school teaches. It was about how Mrs. Vitsaxaki's daughter was *cared for*—how she was to be brought up. JA43–44.

To the extent that the School District's conduct related to Jane's education, it implicated her moral formation: the nature of reality and what is right and wrong. *See* JA43 (alleging it implicates, for example, questions about "what [her] identity means for [her] li[fe]"). But those aspects of her education go well beyond how a school teaches. They "include the inculcation of moral standards, religious beliefs, and elements of good citizenship." *Yoder*, 406 U.S. at 233. Put differently, "developing and implementing a gender transition plan for minor children without

37

their parents' knowledge and consent do not simply implicate a school's curricular decisions." *John & Jane Parents 1*, 78 F.4th at 646 (Niemeyer, J., dissenting). Those actions "go much further to implicate the very personal decisionmaking about children's health, nurture, welfare, and upbringing, which are fundamental rights of the Parents." *Id.*

The district court's only reasoning otherwise was to say that the policy went to the "subject and manner of instruction," because it operated "like a civility code." JA111. But that's wrong. For one thing, the policy says nothing about how other students must refer to a student who is socially transitioned by the School District. And that would be the focus of a civility code applying throughout the school.

For another, by its terms, the policy's purpose is to provide a so-called "safe and supportive educational environment." JA82. The point is for *the School District* to affirm a student's chosen gender. That is not about instruction. It's about how to care for a student. *We The Patriot*'s statement that there is not a parental right to "direct *how* a public school teaches" has no purchase here. 76 F.4th at 159.

Neither does its holding that the plaintiffs in that case had not asserted a "liberty interest in the rearing of their children that [was] not encompassed in their free exercise claim." *Id.* In *We The Patriots*, the "gravamen of the complaint" was the plaintiffs' free-exercise claim. *Id.* at 144. The parental-rights claim was just a differently packaged vari-

ant. The argument was that the vaccination requirement at issue interfered with the plaintiffs' "right to decide what is best for their children's health and to raise them according to their religious beliefs." *Id.* at 159 (citation omitted). In other words, the parental-rights claim in *We The Patriots* precisely mirrored the free-exercise claim.

Mrs. Vitsaxaki's parental-rights claim is different. It does not depend on her religious beliefs having been violated. *See* JA43–45. It focuses on her "fundamental right to direct the upbringing, education, and healthcare of her daughter about important topics like her identity as a young woman." JA43. All parents, no matter their religious beliefs, have that right. *Cf., e.g.*, *Troxel*, 530 U.S. at 68–69 (plurality op.) (discussing a parent's right "to make the best decisions concerning the rearing of that parent's children" without mentioning religion). So it cannot be true that the parental-rights claim here is "encompassed" by the free-exercise claim. *We The Patriots*, 76 F.4th at 159.

**Second**, the district court thought that the School District didn't interfere with Mrs. Vitsaxaki's right to make healthcare decisions, because the complaint did not allege the School District attempted "to diagnose or 'treat'" Jane. JA111.

For starters, parents' right to make healthcare decisions is not limited to diagnosis or treatment. *See Parham*, 442 U.S. at 603. Even if the School District did not diagnose or treat Jane, it still interfered with Mrs. Vitsaxaki's parental right to make decisions that directly implicate

39

her daughter's healthcare. Social transition may "put[] her on a difficult-to-escape pathway to medicalized transition," with many risks of lifelong harm. JA35. And without notifying Mrs. Vitsaxaki or seeking her consent, the School District provided Jane with information about local surgeons and hormone providers. JA20 (citing JA63–66). It thus infringed Mrs. Vitsaxaki's right to decide whether to pursue an intervention for her daughter with clear healthcare implications. *See* JA34.

In addition to interfering with Mrs. Vitsaxaki's ability to make those decisions, the complaint clearly alleges that the School District made decisions for Jane with healthcare implications—decisions reserved for her parents to make. The School District socially transitioned Jane. JA17, 19–20, 31. And it's clear, based on the many studies cited in the complaint, that a social transition is a "power psychosocial intervention" for gender dysphoria. *See* JA31–36. Experts agree that it "greatly reduces the chances" a minor will stop experiencing gender dysphoria. JA35. And a social transition is the first step "on a difficult-to-escape pathway to medicalized transition." *Id.* Schools thus generally aren't qualified to put children on that pathway—certainly not without parental consent. JA33.

Those allegations describe a decision with clear healthcare implications. And the district court should have taken them as true. To say the least, they support the "reasonable inference" that the School District treated Jane. *Walker*, 130 F.4th at 297 (citation omitted). After all,

an intervention is done for the purposes of treating something. *See* JA33 (alleging that "assistance with social transition" is part of "professional intervention" for gender dysphoria). Because the School District socially transitioned Jane, it is more than a reasonable inference from the complaint's allegations that the School District made a healthcare decision for Jane. It logically follows.

Relying on *Foote*, the district court failed to credit Mrs. Vitsaxaki's allegations by saying they "merely *label*[*ed*]" social transition as healthcare. JA111–12 (citing *Foote*, 128 F.4th at 349–50). Yet even *Foote* left open the possibility that, "under certain circumstances, acceding to a student's use of a chosen name and pronouns" might "constitute medical treatment." 128 F.4th at 350 n.18. And the complaint here alleges just such circumstances. It did not "merely label" social transition as an intervention or treatment. It alleged detailed scientific evidence to establish the healthcare implications of the School District's official policy of secret social transitions and application of that policy to Jane. *See* JA31–35.

Besides, the district court's reasoning blinks reality. A "child's gender incongruity is a matter of health." *Mirabelli v. Olson*, 761 F. Supp. 3d 1317, 1331 (S.D. Cal. 2025). That should be obvious. Insofar as *Foote* suggests otherwise, it is simply wrong. And *Foote* is wrong to suggest that the parental right to make decisions affecting healthcare extends only to a clinical setting. 128 F.4th at 350. *Parham* is clear that

41

parents have the right to make judgments as to their children's "need for medical care or treatment." 442 U.S. at 603. It did not confine those decisions to a hospital or clinical setting.

Of course, now is not the time to debate the healthcare-based or scientific allegations in the complaint. But the fact that the complaint contains them is more than enough to survive a motion to dismiss.

**Third**, again relying on *Foote*, the district court reasoned that the School District's concealing its actions did not violate Mrs. Vitsaxaki's parental rights. JA112–13. But *Foote* cuts the other way here. The First Circuit accepted the view that "deceptive communication to the Parents about a child's expression of gender in school" could violate their parental rights. *Foote*, 128 F.4th at 353. There, it found the theory "unavailing," but only because the complaint had contradictory allegations about the school using the student's "newly identified name" for home communication. *Id.* Plus, there was no allegation that staff misrepresented the student's name used in school to parents. *Id.*

The complaint here paints a different picture. The School District's staff repeatedly lied to Mrs. Vitsaxaki when she asked about Jane. JA18–19, 21–22. While they socially transitioned Jane, staff told Mrs. Vitsaxaki that they "saw no struggles at school or anything that could explain what Mrs. Vitsaxaki was observing in Jane at home." JA18. They intentionally called Jane by her given name and female pronouns whenever they talked with Mrs. Vitsaxaki. JA19.

42

The School District consistently concealed the social transition of Mrs. Vitsaxaki's daughter through deceptive communication. That goes well beyond not just notifying Mrs. Vitsaxaki or getting her consent. And it removes all doubt that the School District violated her parental rights.

### C.   Applying other Fourteenth Amendment tests would be inconsistent with binding precedent, although the complaint also states a claim under those tests.

The Supreme Court has allowed certain substantive-due-process cases against executive officials—usually police officers—to proceed based on "conduct that shocks the conscience" without regard to *Glucksberg*'s fundamental-rights analysis. *Rochin v. California*, 342 U.S. 165, 172 (1952); *see* Rosalie Berger Levinson, *Time to Bury the Shocks the Conscience Test*, 13 Chap. L. Rev. 307, 319 (2010) ("[C]onscience-shocking behavior that deprives a person of liberty itself violates substantive due process."). Although the shocks-the-conscience test does not apply in a case like this one, the complaint here plausibly alleges conduct by the School District that would satisfy it—certainly on a motion to dismiss.

### 1.   This Court does not apply the "shocks the conscience" test in cases like this one.

To understand why that test does not apply here, contrast this case with the Supreme Court's most recent major shocks-the-conscience

43

case, *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). The petition in *Lewis* asked the Court only to decide the state of mind for "a police pursuit case": whether "deliberate indifference" or "reckless disregard" would suffice, or whether "shocks the conscience" needed to be satisfied. *Id.* at 855–56 (Rehnquist, C.J., concurring). So the Court considered only "whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." *Id.* at 836 (majority opinion). It held that the police officer did not violate the Fourteenth Amendment, because even if he had acted unreasonably, his conduct did "not shock the conscience." *Id.* at 855.

Despite following only a year after *Glucksberg*, *Lewis* never asked whether the police officer's deliberately or recklessly indifferent action violated a fundamental right. *Lewis* asked only whether the high-speed chase in question was an "abuse of power" that "shocks the conscience." *Id.* at 846. The term "fundamental rights" appeared only in a concurrence. *See id.* at 860–61 (Scalia, J., concurring in the judgment).

Read in harmony, *Glucksberg* and *Lewis* represent independent bases for substantive-due-process claims. And that's exactly how a plurality of the Court treated them five years after *Lewis* in *Chavez v. Martinez*, 538 U.S. 760 (2003). There, it described the shocks-the-conscience test as designed for "abusive police behavior." *Id.* at 774 (plurality op.).

44

And although the police conduct there did not shock the conscience, *id.* at 774–75, the Court still analyzed it under *Glucksberg*, *id.* at 775–76. It said "the Due Process Clause *also* protects certain 'fundamental liberty interest[s].'" *Id.* at 775 (emphasis added) (quoting *Glucksberg*, 521 U.S. at 721). But no such interests were implicated there.

*Chavez* demonstrates that the shocks-the-conscience test was designed for specific kinds of substantive-due-process cases—namely, ones challenging police misconduct. It is not an all-purpose replacement for *Glucksberg*'s fundamental-rights test. *Cf. Regino v. Staley*, 133 F.4th 951, 960 n.5 (9th Cir. 2025) (holding that the "fundamental rights" test and the "shocks the conscience" test are independent substantive-due-process theories under which a plaintiff may proceed).

As a result, the Supreme Court has applied the fundamental-rights test—and not the shocks-the-conscience test—in cases regarding parents' right to direct their children's upbringing, education, and healthcare. In *Troxel* itself, which the Court decided just two years after *Lewis*, not one of the *six* separate opinions issued even cited *Lewis* or used the term "shocks the conscience," although the plurality expressly relied on *Glucksberg*'s fundamental-rights test. 530 U.S. at 65 (plurality op.). And the Court's most recent substantive-due-process decision relies heavily on *Glucksberg* but does not cite *Lewis* or invoke the shocks-the-conscience test. *See Muñoz*, 602 U.S. at 909–12. Like *Troxel*—and

45

this case, for that matter—*Muñoz* lacked any allegations of police misconduct.

Thus, in the Supreme Court's cases most closely resembling this one, it has not applied *Lewis* but only *Glucksberg*'s fundamental-rights test. Consistent with that, this Court has recently cited *Troxel* and applied the fundamental-rights test to a parental-rights claim without mentioning *Lewis* or "shocks the conscience." *See We The Patriots*, 76 F.4th at 159. Even more recently, this Court proceeded with the parties' framing of a substantive-due-process claim under *Glucksberg*, while noting it did not decide whether the shocks-the-conscience test was more appropriate. *Doe v. Franklin Square Union Free Sch. Dist.*, 100 F.4th 86, 94 n.4 (2d Cir. 2024).

The Court should apply *Glucksberg*'s fundamental-rights test to Mrs. Vitsaxaki's claim and not the shocks-the-conscience test. Where this Court has used the shocks-the-conscience test, it was analyzing an as-applied claim against "individual school district officials, based on their implementation of [certain] new regulations." *Goe v. Zucker*, 43 F.4th 19, 34 (2d Cir. 2022). By contrast, it considered a challenge to those regulations themselves under just the fundamental-rights test. *Id.* at 30–34. Mrs. Vitsaxaki's claim more closely resembles the latter, because it challenges the School District's policy itself—not just actions by individual employees. *See* JA30–31. So the Court should apply *Glucksberg*, not *Lewis*.

46

In fact, earlier this year both the First and Ninth Circuits held that *Glucksberg* rather than *Lewis* applied to secret-transition claims like Mrs. Vitsaxaki's. *See Foote*, 128 F.4th at 347 (applying *Glucksberg* to a school's secret-transition policy, including its application to the plaintiffs' child); *Regino*, 133 F.4th at 960 n.5 (holding that the "fundamental rights" test and the "shocks the conscience" test are independent substantive-due-process theories under which a plaintiff may proceed). Although the Eleventh Circuit reached a contrary conclusion in another case, it did so in part because the plaintiffs there "waived their general challenges to the" relevant policy, "its adoption, and its broad implementation." *Littlejohn v. Sch. Bd. of Leon Cnty.*, 132 F.4th 1232, 1243 n.8 (11th Cir. 2025). Even so, *Littlejohn*'s application of *Lewis* instead of *Glucksberg* drew a strong dissent arguing that the majority should have applied the fundamental-rights test. *Id.* at 1287–1309 (Tjoflat, J., dissenting).

This case more closely resembles *Foote* than *Littlejohn*. The *Foote* plaintiffs challenged "a general policy and its routine applications" and thus triggered the fundamental-rights test, according to *Littlejohn*. 132 F.4th at 1243 n.8. The same is true here. In any case, because the complaint here brings a facial parental-rights challenge against the policy itself alongside an as-applied challenge, JA47, the Court can't bypass the fundamental-rights test entirely. *See Goe*, 43 F.4th at 30. At a minimum, that test—and only that test—applies to the facial challenge.

47

## 2. Regardless, the complaint alleges conscience-shocking conduct by the School District.

All that said, the complaint here plausibly alleges conduct by the School District that shocks the conscience. On this point, consider particularly the School District's active concealment of its social transition from Mrs. Vitsaxaki. Not only did the School District socially transition Jane without notifying Mrs. Vitsaxaki or obtaining her consent. JA17. It "hid [that transition] from her." JA19.

When Mrs. Vitsaxaki repeatedly asked Jane's school counselors and teachers if they had noticed anything that could be causing her struggles, they repeatedly told her that they had not. JA18. But that was a lie. Those same staff members had already begun to treat Jane as a boy. JA18–19. Yet they lied to Mrs. Vitsaxaki again and again when she asked about her daughter's well-being. JA19, 21–22. They took pains to call Jane by her given name and female pronouns whenever they talked with Mrs. Vitsaxaki. JA19. And they did all that as part of Jane's Gender Support Plan, created under the School District's policy. JA23.

In short, the School District intentionally concealed from Mrs. Vitsaxaki its social transition of her daughter. It engaged in conduct intended to stop her from exercising her fundamental right to direct her daughter's upbringing, education, and healthcare. If the as-applied

claim requires conscious-shocking conduct, then that intentional concealment surely suffices. *See, e.g., Matican v. City of New York*, 524 F.3d 151, 158 (2d Cir. 2008) ("intentional infliction of injury is the conduct 'most likely to rise to the conscience-shocking level'") (quoting *Lewis*, 523 U.S. at 849); *Akins v. Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009) (explaining that intentional or reckless conduct shocks the conscience).

That conclusion is shored up by the principle that the shocks-the-conscience test considers the traditional scope of the executive power at issue. *Lewis*, 523 U.S. at 847 n.8. It "may be informed by a history of liberty protection, but it necessarily reflects an understanding of traditional executive behavior, of contemporary practice, and of the standards of blame generally applied to them." *Id.* Indeed, the test is the starting point to determine whether "the objective character of certain conduct is consistent with our traditions, precedents, and historical understanding." *Id.* at 857 (Kennedy, J., concurring). Even for executive action, "objective considerations, including history and precedent, are the controlling principle." *Id.* at 858.

The traditional scope of executive power has never allowed school officials to supplant fit parents' right to make key decisions for their children. And it certainly has never allowed school officials to actively conceal doing so. Remember, at common law, a school had only such power over a child as a parent might delegate. Blackstone, *supra*, at *453; *Gruenke*, 225 F.3d at 307 ("Public schools must not forget that '*in*

*loco parentis*' does not mean 'displace parents.'"). That understanding—that schools exercise only whatever authority parents may delegate to them—is inconsistent with public-school officials making important decisions about a child without notifying her parents or seeking their consent. It is also inconsistent with hiding those decisions from parents.

In other words, there is no historical analogue for a public school actively concealing its social transition of a student. Yet that's what the School District did here. When Mrs. Vitsaxaki asked if anything had changed with her daughter at school, it lied to her. JA18–19, 21–22. It told her nothing had changed. JA18, 21–22. But something had changed. The School District was treating the girl as a boy. JA16–19.

Those allegations confirm that the School District's actions here shock the conscience. No matter whether that test applies to Mrs. Vitsaxaki's as-applied claim, the allegations about the School District's policy, and actions under it, plausibly allege a parental-rights violation.

## II. The complaint plausibly alleges that the School District violated Mrs. Vitsaxaki's free-exercise rights.

Turn to the free-exercise claim. The Free Exercise Clause protects "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022). The starting point for any such claim is a showing that the government has "burdened" someone's "sincere religious practice." *Id.* at 525. That burden need not be substantial. *Brandon v. Royce*, 102 F.4th

47, 55 (2d Cir. 2024). Indeed, the showing is easy. *See, e.g.*, *Fulton*, 593 U.S. at 532 ("[I]t is plain that the City's actions have burdened CSS's religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs."). All a plaintiff must allege is that she has a sincerely held religious belief and that government conduct or policy negatively affected it.

That's true here. Thus, the district court correctly recognized both that "Mrs. Vitsaxaki has plausibly alleged the existence of a sincerely held religious belief," and that the School District's actions and its policy burdened her belief. JA101. Those conclusions are hard to dispute. Mrs. Vitsaxaki has alleged that she has sincerely held religious beliefs. She believes that God created two biological sexes, that God made a person's biological sex fixed, and that she has the responsibility as a parent to raise her children consistent with her faith. JA36–37.

The School District's policy and application of it burden those sincerely held religious beliefs. Under both, Mrs. Vitsaxaki could not raise her daughter consistent with her beliefs that God created two biological sexes that are fixed. JA40–41. That occurred when the School District failed to provide her notice, failed to obtain her consent, and actively hid the social transition from her. *E.g.*, JA19, 21–22. And it occurred after she found out about the social transition when employees continued to call Jane a masculine name—despite Mrs. Vitsaxaki's instructions

otherwise. JA27, 29. And as the School District's superintendent and attorney made clear, the policy required staff to do just that. JA28.

The question then becomes whether that burden is "constitutionally permissible." *Fulton*, 593 U.S. at 533. It's not, because the complaint alleges that the policy triggers strict scrutiny—and fails it, *see supra* pp. 35–36—for at least two reasons. First, the policy is not generally applicable. Second, the School District conditioned Mrs. Vitsaxaki's receipt of a public benefit on her violating her religious beliefs.[5] Consider both in turn.

## A. Because the School District's policy requires discretionary decisionmaking, it is not generally applicable.

Under *Employment Division v. Smith*, 494 U.S. 872 (1990), if a law or policy incidentally burdening religion is not neutral and generally applicable, then it must pass strict scrutiny.[6] *Miller v. McDonald*, 130 F.4th 258, 265 (2d Cir. 2025) (per curiam). A policy isn't generally

---

[5] The policy also triggers strict scrutiny, because it involves the "hybrid situation" of a free-exercise claim and a parental-rights claim. *Smith*, 494 U.S. at 882. Mrs. Vitsaxaki recognizes that this Court has held that it does "not apply heightened scrutiny to 'hybrid rights' claims." *We The Patriots*, 76 F.4th at 159 (citation omitted). So for now Mrs. Vitsaxaki merely preserves that claim.

[6] That's the current state of the law under *Smith*. And of course, this Court must follow *Smith* until the Supreme Court says otherwise. But *Smith*'s neutral-and-generally-applicable test is wrong. *E.g.*, *Fulton*, 593 U.S. at 545–618 (Alito, J., concurring). Mrs. Vitsaxaki preserves for further appeal the argument that *Smith* should be overruled.

applicable if it "treats comparable secular conduct more favorably than religious activity," or if it gives the government discretion on whether to grant an individualized exemption or to apply the policy at all. *Id.* at 267; *see Kane v. De Blasio*, 19 F.4th 152, 169 (2d Cir. 2021) (per curiam) (holding procedures not generally applicable because officials "had substantial discretion"). The School District's policy here falls into the latter category. It grants staff discretion to decide whether to notify parents, seek their consent, or actively conceal from them their child's social transition.

Just take a look at its plain language. Off the bat, the policy states that the School District will "assess and address the specific needs of each student on a case-by-case basis." JA82. So the starting point is that the School District has discretion to decide what to do for each student based on an individualized assessment of their circumstances. Regardless of how the School District has actually used that discretion, its simple existence renders the policy not generally applicable. *See Fulton*, 593 U.S. at 537 (holding that it didn't matter "whether any exceptions have been given" under a policy's discretionary provisions).

The discretion in the policy doesn't stop there. It also says that if informed of a transgender or gender-nonconforming student, the School District "will endeavor to engage the student and his or her parents or guardians, as appropriate." JA83. "Endeavor" means the School District

will try but has no obligation to do so. The School District will try to engage the student (and maybe her parents) "in an effort to agree upon a plan." *Id.* Again, the School District is to try to—but does not have to—agree on a plan with the student. The School District remains in the driver's seat. And it is the School District that decides whether it is "appropriate" to engage the student's parents.

Then the policy says that students "have the right to discuss and convey their gender identity and expression openly and to decide when, with whom, and how much to share this confidential information." *Id.* To be sure, the policy refers to that as a "right." Critically though, it never says that the right binds the School District. At best, the language is exhortatory—the School District *should* honor it. But it doesn't have to.

That's made clear by the next sentence: "The plan *may* therefore include when and how to initiate the student's preferred name and associated pronoun use and if, when, and how this is communicated to others." *Id.* (emphasis added). The School District—under the permissive "may"—still has discretion to decide whether the plan includes how the student's preferred name and pronouns are communicated to others. The School District still retains the discretion whether to inform the student's parents, even if it *should* take into account the student's wishes.

54

Indeed, the policy includes obligatory language in the next line—markedly different language from above. The only obligation it imposes on School District staff is that they "*will* use the name and pronoun that corresponds to the gender identity the student consistently asserts at school." *Id.* (emphasis added). So the School District must do that, but it may do the rest. It may notify parents—but doesn't have to.

In short, the policy gives the School District discretion about whether to socially transition a student without parental notice or consent and with active concealment. It "'invites' the government to consider the particular reasons for" whether to keep parents in the dark about their child. *Miller*, 130 F.4th at 267 (citation omitted). So it is not generally applicable.

The School District's actions here bear out the policy's grant of discretion. The complaint alleges that the School District informed Mrs. Vitsaxaki about the social transition after one of Jane's teachers pressured Mr. Caraccio. JA26. And "Mr. Caraccio chose to finally" tell Mrs. Vitsaxaki. *Id.* The complaint is clear that he made that choice, not Jane.

That's confirmed by Ms. Powers's email. That email noted how it was difficult balancing Jane's "readiness and privacy" with Mrs. Vitsaxaki's "right to know." JA25. There is no suggestion that Jane's readiness changed. Rather, after consulting with the school attorney, the *School District* decided on "the most appropriate and safe approach" to the disclosure. *Id.* Put differently, the School District exercised its

discretion under the policy to finally tell Mrs. Vitsaxaki about the secret social transition. That confirms the plain language of the policy: the School District had that discretion the whole time.

The district court's only reasoning otherwise was its view that the policy vests decisionmaking authority with the student, not the School District. JA106. It latched onto the line that students "have the right to discuss and convey their gender identity and expression openly and to decide when, with whom, and how much to share this confidential information." *Id.*; *see* JA83. But as discussed, that line does not limit the School District's discretion—which is confirmed by the surrounding lines. The School District "endeavor[s]" to engage the student. JA83. It "may" include how information is communicated to others. And it does so on "a case-by-case basis." JA82–83. The district court did not read the policy as a whole.

It also failed to consider how the School District's actions under that policy demonstrate its discretion. It never even tried to explain the complaint's allegation that "Mr. Caraccio chose to finally" tell Mrs. Vitsaxaki, that he did so after consulting with the school attorney, and that it was the School District balancing Jane's "readiness" with Mrs. Vitsaxaki's right to know. JA25–26.

At a minimum, the complaint plausibly alleges that the policy is not generally applicable. So strict scrutiny would apply. And the School

District can't satisfy that standard at the motion-to-dismiss phase for the same reasons already discussed. *See supra* pp. 35–36.

### B. The School District conditioned a public benefit on Mrs. Vitsaxaki violating her religious beliefs.

Strict scrutiny also would apply, because the School District conditioned a public benefit on Mrs. Vitsaxaki violating her religious beliefs. In a series of recent cases, the Supreme Court has made clear that the government may not exclude "religious observers from otherwise available public benefits." *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 778 (2022). In *Trinity Lutheran Church of Columbia, Inc. v. Comer*, the Court held that a state could not deny a public benefit—grants to resurface playgrounds with recycled tires—to a religious organization simply because of its religious character. 582 U.S. 449, 462 (2017). In *Espinoza v. Montana Department of Revenue*, the Court held the same for a state program giving tax credits for private school scholarships. 591 U.S. 464, 476 (2020). The state could not bar "religious schools from public benefits solely because of the religious character of the schools." *Id.* And in *Carson*, the Court went even further. It held that a state could not exclude religious schools from receiving tuition-assistance funds based on their religious use. 596 U.S. at 787.

The takeaway is that if there's a public benefit, the government cannot deprive people of it "on the basis of their religious exercise." *Id.*

at 789. The government cannot condition a public benefit on someone violating a sincerely held religious belief without passing strict scrutiny.

Yet that is just what the School District did. No doubt, public education is a public benefit. *See id.* at 782. Everyone can partake. But under the School District's policy, to receive that public benefit, parents must accept that it will socially transition their children upon a child's request. The policy allows the School District to socially transition a student even if a parent instructs otherwise. In fact, School District staff continued to socially transition Jane against Mrs. Vitsaxaki's instructions, which they said complied with the policy. JA28–29.

That is exactly what the superintendent and the School District's attorney made clear about the policy as applied to Mrs. Vitsaxaki. Staff would continue the social transition despite Mrs. Vitsaxaki's instructions. JA28. And they did. JA29. That means, if Mrs. Vitsaxaki wants to obtain the public benefit of public education, she must violate her deeply held religious beliefs. *See* JA40–41 (describing how the policy violates her religious beliefs). Under a straightforward application of *Carson*, strict scrutiny would apply to those allegations, which the School District cannot meet. *See supra* pp. 35–36.

The district court's contrary conclusion is hard to understand. It viewed the public-benefits argument as "a sort of Establishment Clause issue." JA104. That has never been Mrs. Vitsaxaki's claim. Nor is it how the Supreme Court viewed similar arguments in cases like *Carson* or

58

*Trinity Lutheran.* Mrs. Vitsaxaki's argument is not that the School District "established a religion" or "endorse[d] a religious message." JA104. It is that the School District conditioned a public benefit on Mrs. Vitsaxaki violating her religious beliefs. And to that, the district court gave no answer.

## III. The complaint plausibly alleges that the School District violated Mrs. Vitsaxaki's procedural-due-process rights.

Move to the procedural-due-process claim. That claim has two elements: "the existence of a property or liberty interest that was deprived" and "deprivation of that interest without due process." *Radwan v. Manual*, 55 F.4th 101, 123 (2d Cir. 2022). The latter is obvious here. Mrs. Vitsaxaki was given *no process at all* before the School District socially transitioned her daughter in secret. JA46. She was given no notice, no chance to object, nothing. So the only question is whether the School District deprived her of a protected liberty interest.

Such a liberty interest "may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty.'" *Bangs v. Smith*, 84 F.4th 87, 97 (2d Cir. 2023) (citation omitted). And in the procedural-due-process context, this Court has specifically held that "parents have a constitutionally protected liberty interest in the care, custody and management of their children." *Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012) (cleaned up).

59

Thus, "the Constitution recognizes both a protectible procedural due process interest in parenting a child and a substantive fundamental right to raise one's child." *Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000). "[T]he differences between the procedural interest in raising one's child and the substantive right, and the corresponding scope of the duties imposed on government, are significant." *Id.* Procedural protections apply to all deprivations of protected liberty interests—whether or not that deprivation could pass strict scrutiny. *Id.*

The district court dismissed the procedural-due-process claim based just on a cross-reference to its substantive-due-process analysis. JA116. "This was error because the procedural component of the Due Process Clause protects more than just fundamental rights." *Regino*, 133 F.4th at 967 (citation omitted). As the Ninth Circuit held in *Regino*, Mrs. Vitsaxaki "need not have identified a fundamental right to establish a violation of her procedural due process rights." *Id.*

The complaint specifically alleges that the School District made parenting decisions about Mrs. Vitsaxaki's daughter without her consent and without providing her any procedural protections. *E.g.*, JA17–18, 20–22, 46. "At a minimum, the Fourteenth Amendment demands notice and an opportunity to be heard before a presumptively fit parent can be deprived of his or her right to be informed of and make medical decisions … for his or her child." *Doe v. Uthmeier*, No. 5D2025-1363, 2025 WL 1386707, at *7 (Fla. Dist. Ct. App. May 14, 2025). "By design,"

60

the School District's alleged policy "afford[s] neither." *Id.* That's enough to state a plausible procedural-due-process claim.

## IV.  Mrs. Vitsaxaki has standing to seek declaratory relief.

Finally, turn to whether Mrs. Vitsaxaki has standing to seek declaratory relief. She does. She can seek retrospective declaratory relief.

To be sure, declaratory relief is often prospective. And so a plaintiff cannot "rely on past injury" for standing to seek prospective declaratory relief. *Dorce v. City of New York*, 2 F.4th 82, 95 (2d Cir. 2021) (citation omitted). But there's also retrospective declaratory relief—something *Dorce* does not speak to.

A plaintiff can get a declaration that past conduct was unconstitutional. She can have "standing to seek retrospective declaratory relief." *K.A. v. Barnes*, 134 F.4th 1067, 1075 (10th Cir. 2025) (citation omitted). And she can have that standing for retrospective declaratory relief even if she lacks it for prospective declaratory relief. *See Collins v. Daniels*, 916 F.3d 1302, 1315 (10th Cir. 2019) ("Collins has standing to seek damages and retrospective declaratory relief based on the alleged violation of her Eighth and Fourteenth Amendment rights; but Collins's claims for prospective declaratory and injunctive relief are moot."). Put differently, even when there's no standing for prospective relief, "but a claim for damages remains, a declaratory judgment as a predicate to a

damages award can survive." *Crue v. Aiken*, 370 F.3d 668, 677 (7th Cir. 2004).

That is just the case here. Mrs. Vitsaxaki has standing to seek retrospective declaratory relief for the same reason that she has standing to seek damages: for the School District's past actions infringing on her constitutional rights. The district court erred, because it did not account for the distinction between retrospective and prospective declaratory relief. JA98–99.

\* \* \*

The district court got it wrong at nearly every step. A school district cannot socially transition a 12-year-old girl without her parents' knowledge or consent. And it especially can't do so and actively conceal its actions. Yet the School District here did all three based on official policy. That violated Mrs. Vitsaxaki's fundamental right to direct her daughter's upbringing, education, and healthcare. It violated her free-exercise rights. And it violated her procedural-due-process rights. Mrs. Vitsaxaki and her daughter deserved more; our Constitution demands nothing less.

# CONCLUSION

The Court should reverse the decision below and remand for further proceedings.

Dated: June 5, 2025

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Katherine L. Anderson
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
kanderson@ADFlegal.org

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

Respectfully submitted,

/s/ *Vincent M. Wagner*
Vincent M. Wagner
Laurence J. Wilkinson
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
(571) 707-4655
vwagner@ADFlegal.org
lwilkinson@ADFlegal.org

Raymond J. Dague
DAGUE LAW OFFICE
4874 Onondaga Road
Syracuse, NY
(315) 422-2052
Raymond@DagueLaw.com

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because this brief contains 13,948 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

/s/ *Vincent M. Wagner*
*Counsel for Plaintiff-Appellant*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2025, I electronically filed the fore-going brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate ACMS system. I certify that all participants in the case are registered ACMS users, and that service will be accomplished by the ACMS system.

/s/ *Vincent M. Wagner*
*Counsel for Plaintiff-Appellant*