# 25-952

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

JENNIFER VITSAXAKI,

*Plaintiff-Appellant,*

v.

SKANEATELES CENTRAL SCHOOL DISTRICT; SKANEATELES CENTRAL SCHOOLS' BOARD OF EDUCATION,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of New York
Case No. 5:24-cv-01155

## JOINT APPENDIX

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

Vincent M. Wagner
Laurence J. Wilkinson
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
vwagner@ADFlegal.org
lwilkinson@ADFlegal.org

Katherine L. Anderson
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
kanderson@ADFlegal.org

Raymond J. Dague
DAGUE LAW OFFICE
4874 Onondaga Road
Syracuse, NY 13215
(315) 422-2052
raymond@daguelaw.com

*Counsel for Appellant*

Jeremy M. Sher
BOND, SCHOENECK & KING, PLLC
350 Linden Oaks – Third Floor
Rochester, NY 14625
(585) 362-4846
jsher@bsk.com

Kate I. Reid
BOND, SCHOENECK & KING, PLLC
One Lincoln Center
Syracuse, NY 13202
(315) 218-8628
kreid@bsk.com

*Counsel for Appellees*

## TABLE OF CONTENTS

| Document Description | ECF No. | Appendix Page |
|---|---|---|
| **VOLUME 1** | | |
| District Court Docket | | JA001-4 |
| Plaintiff's Verified Complaint | 1 | JA005-49 |
| Plaintiff's Complaint Exhibit 1 - Email from Viggiano 2-10-21 | 1-1 | JA050 |
| Plaintiff's Complaint Exhibit 2 - LGBTQ Trans resource guide | 1-2 | JA051-76 |
| Plaintiff's Complaint Exhibit 3 - Gender Support Plan | 1-3 | JA077-78 |
| Plaintiff's Complaint Exhibit 4 - Email from Powers 5-12-21 | 1-4 | JA079-80 |
| Plaintiff's Complaint Exhibit 5 - Board Policy-7552 Student Gender Identity | 1-5 | JA081-84 |
| Memorandum Decision and Order granting Defendants' Motion to Dismiss | 32 | JA085-116 |
| Judgment in a Civil Case granting Motion to Dismiss and dismissing Complaint | 33 | JA117-118 |
| Notice of Appeal | 34 | JA119-121 |

APPEAL,CLOSED

# U.S. District Court
## Northern District of New York - Main Office (Syracuse) [NextGen CM/ECF Release 1.8 (Revision 1.8.3)] (Syracuse)
## CIVIL DOCKET FOR CASE #: 5:24-cv-00155-DNH-ML

Vitsaxaki v. Skaneateles Central School District et al
Assigned to: Judge David N. Hurd
Referred to: Magistrate Judge Miroslav Lovric
Cause: 42:1983 Civil Rights Act

Date Filed: 01/31/2024
Date Terminated: 03/20/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 01/31/2024 | 1 | COMPLAINT against Skaneateles Central School District, Skaneateles Central Schools' Board of Education (Filing fee $405 receipt number ANYNDC-6600050) filed by Jennifer Vitsaxaki. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Civil Cover Sheet)(khr) (Entered: 02/01/2024) |
| 02/01/2024 | 2 | Summons Issued as to Skaneateles Central Schools' Board of Education. (Attachments: # 1 Summons issued as to Skaneateles Central School District)(khr) (Entered: 02/01/2024) |
| 02/01/2024 | 3 | NOTICE OF ADMISSION REQUIREMENT as to Party Plaintiff; Attorney Katherine L. Anderson, Email address is kanderson@ADFlegal.org. Phone number is 480-444-0020. Admissions due by 2/15/2024. (khr) (Entered: 02/01/2024) |
| 02/01/2024 | 4 | NOTICE OF ADMISSION REQUIREMENT as to Party Plaintiff; Attorney Vincent M. Wagner, Email address is vwagner@ADFlegal.org. Phone number is 571-707-4655. Admissions due by 2/15/2024. (khr) (Entered: 02/01/2024) |
| 02/01/2024 | 5 | G.O. 25 FILING ORDER ISSUED: Initial Conference set for 6/26/2024 10:00 AM before Magistrate Judge Miroslav Lovric. Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 6/20/2024. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) (khr) (Main Document 5 replaced on 2/1/2024) (khr, ). (Entered: 02/01/2024) |
| 02/01/2024 | | TEXT NOTICE: The Initial Conference scheduled for 6/26/2024 at 10:00AM before Magistrate Judge Miroslav Lovric, will be held via Microsoft Teams Teleconferencing. The Courtroom Deputy will send a teams link to the parties to participate. (jdc ) (Entered: 02/01/2024) |
| 02/02/2024 | 6 | MOTION for Limited Admission Pro Hac Vice of Katherine L Anderson Filing fee $100, receipt number ANYNDC-6602921. **[THIS DOCUMENT IS RESTRICTED AND VIEWABLE BY COURT USERS ONLY]** (Attachments: # 1 Supplement, # 2 Declaration, # 3 Proposed Order/Judgment) Motions referred to Miroslav Lovric. (Dague, Raymond) (Entered: 02/02/2024) |
| 02/02/2024 | 7 | MOTION for Limited Admission Pro Hac Vice of Vincent M Wagner Filing fee $100, receipt number ANYNDC-6602995. **[THIS DOCUMENT IS RESTRICTED AND VIEWABLE BY COURT USERS ONLY]** (Attachments: # 1 Declaration, # 2 Supplement, # 3 Proposed Order/Judgment) Motions referred to Miroslav Lovric. (Dague, Raymond) (Entered: 02/02/2024) |

JA001

| | | |
|---|---|---|
| 02/05/2024 | 8 | ORDER granting 6 Motion for Limited Admission Pro Hac Vice. *Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account.* **This is the only notice you will receive concerning this requirement. <u>You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.</u>** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Counsel is reminded that, once the above is accomplished, a NOTICE OF APPEARANCE MUST BE FILED IN THIS ACTION or you will not receive electronic notifications in the case. Signed by Magistrate Judge Miroslav Lovric on 2/5/2024. (jdc ) (Entered: 02/05/2024) |
| 02/05/2024 | 9 | ORDER granting 7 Motion for Limited Admission Pro Hac Vice. *Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account.* **This is the only notice you will receive concerning this requirement. <u>You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.</u>** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Counsel is reminded that, once the above is accomplished, a NOTICE OF APPEARANCE MUST BE FILED IN THIS ACTION or you will not receive electronic notifications in the case. Signed by Magistrate Judge Miroslav Lovric on 2/5/2024. (jdc) (Entered: 02/05/2024) |
| 02/05/2024 | 10 | AFFIDAVIT of Service for Summons, Verified Complaint, Exhibits, Civil Cover Sheet, PHV Instructions, and General Order #25 *for Skaneateles Central School District* served on Eric Knuth, Superintendent on 02/05/2024, filed by Jennifer Vitsaxaki. (Cortman, David) (Entered: 02/05/2024) |
| 02/05/2024 | 11 | AFFIDAVIT of Service for Summons, Verified Complaint, Exhibits, Civil Cover Sheet, PHV Instructions, and General Order #25 *for Skaneateles Central Schools' Board of Education* served on Eric Knuth, Superintendent on 02/05/2024, filed by Jennifer Vitsaxaki. (Cortman, David) (Entered: 02/05/2024) |
| 02/05/2024 | | ***Answer due date updated for Skaneateles Central School District answer due 2/26/2024; Skaneateles Central Schools' Board of Education answer due 2/26/2024. (khr) (Entered: 02/05/2024) |
| 02/07/2024 | 12 | NOTICE OF APPEARANCE by Katherine L. Anderson on behalf of Jennifer Vitsaxaki (Anderson, Katherine) (Entered: 02/07/2024) |
| 02/07/2024 | 13 | NOTICE OF APPEARANCE by Vincent M. Wagner on behalf of Jennifer Vitsaxaki (Wagner, Vincent) (Entered: 02/07/2024) |
| 02/15/2024 | 14 | NOTICE OF APPEARANCE by Suzanne M. Messer on behalf of Skaneateles Central School District, Skaneateles Central Schools' Board of Education (Messer, Suzanne) (Entered: 02/15/2024) |
| 02/15/2024 | 15 | NOTICE OF APPEARANCE by Kate I. Reid on behalf of Skaneateles Central School District, Skaneateles Central Schools' Board of Education (Reid, Kate) (Entered: 02/15/2024) |
| 02/15/2024 | 16 | Letter Motion from Suzanne M. Messer for Skaneateles Central School District, Skaneateles Central Schools' Board of Education requesting Extension of Time to answer or otherwise respond to complaint submitted to Judge Miroslav Lovric . (Attachments: # 1 Exhibit(s) Stipulation)(Messer, Suzanne) (Entered: 02/15/2024) |

JA002

| | | |
|---|---|---|
| 02/16/2024 | 17 | ORDER granting 16 Letter Request for an Extension of Time for Defendant's to Answer. Defendant's answer is now due on or before 3/27/2024. Signed by Magistrate Judge Miroslav Lovric on 2/16/2024. (jdc) (Entered: 02/16/2024) |
| 03/26/2024 | 18 | NOTICE OF APPEARANCE by Jeremy M. Sher on behalf of All Defendants (Sher, Jeremy) (Entered: 03/26/2024) |
| 03/27/2024 | 19 | MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Skaneateles Central School District, Skaneateles Central Schools' Board of Education. Motion returnable before Judge David N. Hurd, MOTION to Dismiss for Failure to State a Claim filed by Skaneateles Central School District, Skaneateles Central Schools' Board of Education. Motion returnable before Judge David N. Hurd Response to Motion due by 4/17/2024. Reply to Response to Motion due by 4/24/2024 (Attachments: # 1 Memorandum of Law) (Sher, Jeremy) (Entered: 03/27/2024) |
| 03/28/2024 | 20 | TEXT ORDER: In light of the filing of Motion to Dismiss 19 , the Rule 16 Initial Conference scheduled for 6/26/2024 before Magistrate Judge Miroslav Lovric, and the conference related deadlines, are all STAYED without date. SO ORDERED by U.S. Magistrate Judge Miroslav Lovric on 3/28/2024. (jdc ) (Entered: 03/28/2024) |
| 04/05/2024 | 21 | Letter Motion from David A. Cortman for Jennifer Vitsaxaki requesting Extension of Deadlines to Respond and Reply regarding Defendants' Motion to Dismiss submitted to Judge Miroslav Lovric . (Attachments: # 1 Stipulation)(Cortman, David) (Entered: 04/05/2024) |
| 04/09/2024 | 22 | ORDER granting 21 Letter Request, 21 Letter Motion from David A. Cortman for Jennifer Vitsaxaki requesting Extension of Deadlines to Respond and Reply regarding Defendants' Motion to Dismiss 19 . Response to Motion due by 5/17/2024. Reply to Response to Motion due by 6/7/2024. Signed by Judge David N. Hurd on 4/9/2024. (khr) (Entered: 04/09/2024) |
| 05/17/2024 | 23 | RESPONSE in Opposition re 19 Motion to Dismiss/Lack of Subject Matter Jurisdiction,,, Motion to Dismiss for Failure to State a Claim,, filed by Jennifer Vitsaxaki. (Cortman, David) (Entered: 05/17/2024) |
| 06/07/2024 | 24 | REPLY to Response to Motion re 19 Motion to Dismiss/Lack of Subject Matter Jurisdiction,,, Motion to Dismiss for Failure to State a Claim,, filed by Skaneateles Central School District, Skaneateles Central Schools' Board of Education. (Sher, Jeremy) (Entered: 06/07/2024) |
| 06/25/2024 | 25 | NOTICE by Jennifer Vitsaxaki re 19 MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Skaneateles Central School District, Skaneateles Central Schools' Board of Education. Motion returnable before Judge David N. Hurd MOTION to Dismiss for Failure to State a Claim filed by Skaneateles Central School District, Skaneateles Central Schools' Board of Education. Motion returnable before Judge David N. Hurd *(Supplemental Authority)* (Cortman, David) (Entered: 06/25/2024) |
| 07/10/2024 | 26 | RESPONSE in Support re 19 Motion to Dismiss/Lack of Subject Matter Jurisdiction,,, Motion to Dismiss for Failure to State a Claim,, *Responding to Plaintiff's Surreply,* filed by Skaneateles Central School District, Skaneateles Central Schools' Board of Education. (Sher, Jeremy) (Entered: 07/10/2024) |
| 10/25/2024 | 27 | NOTICE OF APPEARANCE by Laurence J. Wilkinson on behalf of Jennifer Vitsaxaki (Wilkinson, Laurence) (Entered: 10/25/2024) |
| 01/31/2025 | 28 | NOTICE by Jennifer Vitsaxaki re 19 MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Skaneateles Central School District, Skaneateles Central Schools' Board of Education. Motion returnable before Judge David N. Hurd MOTION to Dismiss |

JA003

| | | for Failure to State a Claim filed by Skaneateles Central School District, Skaneateles Central Schools' Board of Education. Motion returnable before Judge David N. Hurd *(Supplemental Authority)* (Cortman, David) (Entered: 01/31/2025) |
|---|---|---|
| 02/26/2025 | [29](#) | NOTICE by Skaneateles Central School District, Skaneateles Central Schools' Board of Education *regarding First Circuit decision in Foote v. Ludlow School Committee* (Sher, Jeremy) (Entered: 02/26/2025) |
| 03/04/2025 | [30](#) | NOTICE by Jennifer Vitsaxaki re [29](#) Notice (Other) *Response* (Cortman, David) (Entered: 03/04/2025) |
| 03/19/2025 | [31](#) | NOTICE by Skaneateles Central School District, Skaneateles Central Schools' Board of Education re [19](#) MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Skaneateles Central School District, Skaneateles Central Schools' Board of Education. Motion returnable before Judge David N. Hurd MOTION to Dismiss for Failure to State a Claim filed by Skaneateles Central School District, Skaneateles Central Schools' Board of Education. Motion returnable before Judge David N. Hurd *(Supplemental Authority)* (Sher, Jeremy) (Entered: 03/19/2025) |
| 03/20/2025 | [32](#) | MEMORANDUM DECISION and ORDER: ORDERED that 1. The defendants motion to dismiss the complaint (Dkt. No. 19) is GRANTED; and 2. The plaintiffs complaint (Dkt. No. 1) is DISMISSED. The Clerk of the Court is directed to file a judgment accordingly and close the file. IT IS SO ORDERED. Signed by Judge David N. Hurd on 3/20/2025. (ham) (Entered: 03/20/2025) |
| 03/20/2025 | [33](#) | JUDGMENT: IT IS ORDERED AND ADJUDGED: ORDERED that 1. The defendants motion to dismiss the complaint (Dkt. No. 19) is GRANTED; and 2. The plaintiffs complaint (Dkt. No. 1) is DISMISSED. IT IS SO ORDERED.All of the above pursuant to the order of the Honorable David N. Hurd, dated March 20, 2025. (ham) (Entered: 03/20/2025) |
| 04/15/2025 | [34](#) | NOTICE OF APPEAL as to [33](#) Judgment, [32](#) Order on Motion to Dismiss/Lack of Subject Matter Jurisdiction,, Order on Motion to Dismiss for Failure to State a Claim, by Jennifer Vitsaxaki. Filing fee $ 605, receipt number ANYNDC-7099970. (Cortman, David) (Entered: 04/15/2025) |
| 04/16/2025 | [35](#) | ELECTRONIC NOTICE AND CERTIFICATION sent to US Court of Appeals re [34](#) Notice of Appeal. (ham) (Entered: 04/16/2025) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/30/2025 13:35:03 | | | |
| **PACER Login:** | K5L5Anderson09 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:24-cv-00155-DNH-ML |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF NEW YORK
### SYRACUSE DIVISION

|  |  |
|---|---|
| **JENNIFER VITSAXAKI**, | No. <u>5:24-cv-00155 (DNH/ ML)</u> |
| *Plaintiff,* | |
| v. | **VERIFIED COMPLAINT** |
| **SKANEATELES CENTRAL SCHOOL DISTRICT**; **SKANEATELES CENTRAL SCHOOLS' BOARD OF EDUCATION**, | |
| *Defendants.* | |

## INTRODUCTION

1.    Jennifer Vitsaxaki trusted that the counselors, teachers, and other employees of the Skaneateles Central School District would share with her any information she needed to help her daughter Jane,[1] then 12 years old, to thrive. So Mrs. Vitsaxaki quickly turned to them when her daughter began struggling with anxiety and depression related to school—at times, even refusing to leave home. Again and again, she asked School District employees whether they had noticed anything troubling about her daughter during the school day. Perhaps there was a bullying problem? Perhaps an academic cause? But everyone with whom Mrs. Vitsaxaki spoke reassured her. No one had noticed a bullying problem, nor anything else worrying about her daughter.

2.    Those repeated reassurances concealed the truth. While school officials kept telling Mrs. Vitsaxaki that there was nothing to report, a school counselor was regularly meeting with her daughter and her peers to address ongoing bullying suffered by Mrs. Vitsaxaki's daughter, Jane, and other girls in the group. But worse than

---

[1] Mrs. Vitsaxaki's daughter's name has been changed to Jane in this Complaint to protect her privacy.

that, the School District began treating her as if she were a boy, without telling her mother, just as it had done with several other girls in her grade. The same counselor instructed school staff to treat Mrs. Vitsaxaki's daughter as though she were a boy by referring to her with a boy's name and the third-person plural pronouns "they" and "them"—part of a controversial psychosocial intervention often called "social transition." Then, a school psychologist, who told school staff to keep their actions secret from Mrs. Vitsaxaki, began meeting with Jane regularly without Mrs. Vitsaxaki's knowledge. Yet no one informed Mrs. Vitsaxaki that the School District had made any of these decisions about and taken all of these actions toward her daughter.

3.     Not one School District employee notified Mrs. Vitsaxaki or sought her consent before socially transitioning her daughter. Worse, although those employees knew about the School District's actions, they told Mrs. Vitsaxaki nothing. School staff carefully used Jane's given name and female pronouns when speaking with Mrs. Vitsaxaki, and they repeatedly said everything was fine, all the while treating Jane as a boy and sending her resources for medical transition behind Mrs. Vitsaxaki's back.

4.     For months, School District employees concealed this information about the well-being of Mrs. Vitsaxaki's daughter—sensitive information about the girl's struggles with gender. And for months, Jane's mental condition got worse. She resisted going to school. She was anxious. She became increasingly negative, especially when speaking about herself. At one point, and at her daughter's request, Mrs. Vitsaxaki even took a job as a bus driver to learn more about what could be causing her daughter's distress. By concealing from Mrs. Vitsaxaki this important information about her daughter, the School District betrayed Mrs. Vitsaxaki's trust. It also violated the U.S. Constitution.

5.     Eventually, one staff member could no longer stomach the School District's deception of Mrs. Vitsaxaki and urged the principal to come clean. When he

2

finally did, Mrs. Vitsaxaki was shocked. She and her husband, Jane's father, met with the School District. They directed the School District to stop taking any further action without their consent and sought open communication with the teachers to understand what had happened. But the principal told them School District policy required employees to deceive them, and despite assurances to the contrary, the deception continued. Left with no other options, Mrs. Vitsaxaki withdrew her daughter from the School District.

6.     Like all parents, Mrs. Vitsaxaki has a fundamental right to direct the upbringing, education, and healthcare of her children. It is "perhaps the oldest of the fundamental liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.). And that right is inconsistent with the deceptive, heavy-handed, and disruptive intervention that the School District perpetrated against Mrs. Vitsaxaki's daughter— an intervention that gravely interfered with her ability to raise her daughter and contradicted her religious beliefs.

7.     Ultimately, parents—not school employees or other government officials—ought to decide how to resolve a child's questions about sensitive topics like identity and gender confusion. Parents like Mrs. Vitsaxaki know their children better than anyone else. And parents, not school employees, will be there for a child in the long run, when the consequences of these decisions become fully apparent.

8.     By violating these principles, the School District violated Mrs. Vitsaxaki's constitutional rights. Therefore, she brings this civil-rights lawsuit for damages and declaratory relief to vindicate those rights.

## PARTIES

9.     Plaintiff Jennifer Vitsaxaki is the mother of three children, including Jane, who attended schools in the Skaneateles Central School District from 2017–2021.

3

10.     Mrs. Vitsaxaki and Jane are U.S. citizens who reside in Skaneateles, New York.

11.     Michael Vitsaxakis, Jane's father and Mrs. Vitsaxaki's husband, currently resides in Greece for work-related reasons and is not a plaintiff in this case, although he shares Mrs. Vitsaxaki's concerns about Jane and objects to the School District's decision to secretly transition her without their consent or knowledge.

12.     Defendant Skaneateles Central School District (also called Skaneateles Central Schools, and hereinafter, "the School District") is a central school district organized according to the provisions of New York Education Law Article 37. *See* N.Y. Educ. Law § 1801 *et seq.*; Skaneateles Cent. Sch. Dist. Policy Manual 1110, http://go.boarddocs.com/ny/skan/Board.nsf/goto?open&id=BHFM7T59BED7.

13.     The School District operates four schools, including Skaneateles Middle School.

14.     Under New York law, the School District is a "public corporation" capable of suing or being sued. N.Y. Const. art. X, § 5; *Woods v. Rondout Valley Cent. Sch. Dist. Bd. Of Educ.*, 466 F.3d 232, 239–40 (2d Cir. 2006) (clarifying that a New York central school district is capable of being sued).

15.     Defendant Skaneateles Central Schools' Board of Education (hereinafter, "the School Board") is the Board of Education for the School District and organized according to the laws of the state of New York. *See* N.Y. Educ. Law § 1804 (establishing duties of board of education for a central school district).

16.     Under New York law, the School Board is a "body corporate," capable of suing or being sued. N.Y. Educ. Law § 1701; *Woods*, 466 F.3d at 240, 251.

17.     The School District and the School Board are political subdivisions of the State of New York.

18.     Mrs. Vitsaxaki and Jane reside within the geographic boundaries served by the School District's schools.

19. Jane was enrolled in schools operated by the School District from the 2017–2018 school year, when she was in the fourth grade, until the end of the 2020–2021 school year, when she was in the seventh grade, after which Mrs. Vitsaxaki withdrew her from Skaneateles Middle School.

20. While Jane was a student at Skaneateles Middle School, School District employees acted, pursuant to School District policy, practice, usage, and custom, to treat Jane as a boy by referring to her with a masculine name and the third-person plural pronouns "they" and "them."

21. School District employees treated Jane as a boy without first seeking consent to do so from Mrs. Vitsaxaki—or even notifying Mrs. Vitsaxaki of these actions—and took steps to conceal these actions.

22. When School District employees failed to notify Mrs. Vitsaxaki or seek her consent, and when they took steps to conceal their actions, they acted pursuant to School District policy, practice, usage, and custom.

## JURISDICTION AND VENUE

23. This civil-rights action raises federal questions under the First and Fourteenth Amendments to the U.S. Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

24. This Court has original subject-matter jurisdiction over this action. 28 U.S.C. §§ 1331, 1343.

25. Venue is proper in this District Court and Division, because the parties reside in this Division, 28 U.S.C. § 1391(b)(1), (c)(2); and because the events giving rise to Mrs. Vitsaxaki's claims occurred within this Division, *id.* § 1391(b)(2). *See* N.D.N.Y. L.R. 3.3.

26. Those same facts grant this Court personal jurisdiction over Defendants. *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163–64 (2d Cir. 2010).

5

27.     This Court has authority to award declaratory relief, 28 U.S.C. § 2201–02; *see* Fed. R. Civ. P. 57; damages, 28 U.S.C. § 1343; and costs and attorneys' fees, 42 U.S.C. § 1988; *see* Fed. R. Civ. P. 54.

## FACTUAL BACKGROUND

### I.     After years living in Greece, the Vitsaxaki family relocates to upstate New York.

28.     Jennifer Vitsaxaki grew up in New Jersey, and she met her husband, Michael Vitsaxakis, a Greek citizen, while they were both attending colleges in Rhode Island.

29.     After finishing college, Jennifer and Michael decided to move back to Greece where they were married and began raising their family, which eventually grew to three daughters.

30.     Jane spent the first nine years of her life in Greece, where her primary language was Greek—both at home and in school—and she was deeply connected to her Greek family and community.

31.     The Vitsaxakis intended to stay and continue raising their daughters in Greece, but when the Greek economy collapsed everything changed for them.

32.     The Vitsaxakis realized they could not continue to raise their children in Greece.

33.     In 2017, because Mrs. Vitsaxaki and their three girls were U.S. citizens, they came to live with her parents in Skaneateles, New York, while Mr. Vitsaxakis continued to live and work in Greece.

34.     The Vitsaxakis family's unforeseen return to the United States—necessary as it was—disrupted life for the entire family.

35.     The girls had to adapt to a new culture, including learning to go through each day speaking primarily English instead of Greek.

6

JA010

36.    Mr. Vitsaxakis's employment required him to travel frequently in Asia and Europe. The family hoped to ride out the economic crisis and reconnect, but in the meantime, Mr. Vitsaxakis made frequent, extended trips to be with the family in Skaneateles.

37.    The COVID-19 pandemic and associated lockdowns led the family to be separated for longer periods than anticipated, and Mr. Vitsaxakis, due to work, continues to live and work primarily in Greece with trips to visit his family.

38.    The family's circumstances left Mrs. Vitsaxaki as the primary contact with the School District when concerns about Jane arose.

## II.    Mrs. Vitsaxaki's daughter, struggling to adapt to her new life, begins to meet with an elementary school counselor to address her anxiety.

39.    In August 2017, after relocating to Skaneateles, the Vitsaxakis enrolled Jane into the Skaneateles Central School District, where she was a fourth grader at State Street Elementary School.

40.    During that first year, Mrs. Vitsaxaki noticed that Jane was having difficulty adapting to her new school.

41.    In particular, English was a second language for Jane, and Mrs. Vitsaxaki worried about her English proficiency, which appeared to affect Jane's ability to integrate into her new life in the United States, including at school.

42.    Mrs. Vitsaxaki saw Jane struggling to relate to her classmates in English, and classes that she had previously excelled in suddenly became a challenge.

43.    Jane loved school in Greece, but in America she was far less enthusiastic about school.

44.    To help Jane adapt to her American school, Mrs. Vitsaxaki worked closely with Jane's fourth-grade teacher.

45.    Mrs. Vitsaxaki found a variety of ways to support Jane.

7

46.     For example, Mrs. Vitsaxaki began coaching Jane's team for "Odyssey of the Mind"—an international program that hosts an academic competition focused on creative problem-solving—so she could see first-hand how Jane was doing at school and provide support.

47.     Little by little, Jane began to adapt to fourth-grade life at State Street Elementary.

48.     But the transition to fifth grade brought renewed challenges.

49.     Jane found herself in an entirely new class with a new teacher and new classmates.

50.     Jane's established friendships evaporated.

51.     And Jane's new teacher had to learn how to navigate the cultural differences Jane was experiencing.

52.     As the year progressed, Mrs. Vitsaxaki watched her daughter's struggles intensify, including struggles with anxiety and panic attacks—eventually, even resistance to attending school at all.

53.     Again, Mrs. Vitsaxaki reached out to Jane's school, speaking with her teacher and principal about Jane's well-being.

54.     Around this same time, Mrs. Vitsaxaki also started working with the school counselor, who began seeing Jane regularly and providing her with coping mechanisms like breathing exercises and notes for her locker to reduce her anxiety.

55.     Despite the counselor's support, many of Jane's struggles persisted, and her anxiety never fully subsided throughout fifth grade.

### III. A middle-school counselor does not disclose to Mrs. Vitsaxaki important details about her daughter's school experience, including regular meetings with Jane and her classmates.

56. When Jane entered sixth grade at Skaneateles Middle School in August 2019, Mrs. Vitsaxaki worried that Jane would experience a repeat of fifth grade and again struggle to incorporate into a new class and now a new school.

57. Before school started, therefore, Mrs. Vitsaxaki spoke with the middle-school guidance counselor, Christopher Viggiano, and the school psychologist, Vicky Powers, to share her concerns about Jane's anxiety and academic struggles.

58. Mr. Viggiano and Ms. Powers assured her that they would keep an eye on Jane and provide support to Jane as needed in coordination with Mrs. Vitsaxaki.

59. Despite Mrs. Vitsaxaki's efforts, Jane's condition deteriorated even further as a sixth grader.

60. Jane suffered increased anxiety and depression, gained weight, became withdrawn, and began referring to herself with demeaning adjectives.

61. Jane continued to resist going to school in the morning, to the point that some days it was almost impossible for Mrs. Vitsaxaki to get Jane to go to school.

62. Mrs. Vitsaxaki suspected bullying, so she raised that suspicion with school staff, including Mr. Viggiano, Ms. Powers, and Michael Caraccio, the middle-school principal.

63. Each time Mrs. Vitsaxaki raised Jane's social anxiety or her own bullying concerns, school staff assured her not to worry—that Jane was doing just fine at school and with her classmates.

64. Meanwhile, despite these assurances from Mr. Viggiano and others, Jane was being bullied, and at least Mr. Viggiano was aware of it because he was meeting frequently with Jane and fellow students about conflict with her peers.

65.     Throughout sixth grade, Mr. Viggiano regularly removed Jane from lunch, activity periods, and occasionally classes, to discuss conflict and bullying with her peers—unbeknownst to Mrs. Vitsaxaki.

66.     Mr. Viggiano met with other students in the group as well to try to resolve conflict among the girls, and he regularly made the students apologize to each other.

67.     Mr. Viggiano's frequent meetings with Jane and her peers did not resolve ongoing bullying issues that continued to fester within the group, yet Mr. Viggiano still did not disclose these issues or his frequent meetings to Mrs. Vitsaxaki.

68.     During this time period, Mrs. Vitsaxaki continued to ask Mr. Viggiano and others about Jane's well-being at school, including direct questions to Mr. Viggiano about whether Jane was experiencing bullying and whether he was talking with Jane about any conflicts with her peers.

69.     Mrs. Vitsaxaki also shared with Mr. Viggiano stories that Jane was telling her about concerning incidents and behavioral issues among her peers.

70.     Despite Mrs. Vitsaxaki's direct questions about bullying from or conflict with Jane's peers, Mr. Viggiano never disclosed to Mrs. Vitsaxaki that he met regularly with Jane and her peers to address ongoing social issues.

71.     Mrs. Vitsaxaki didn't learn until much later that Mr. Viggiano was regularly meeting with Jane and her peers during this time, and that she had been right all along: Jane *was* being bullied.

72.     Having been assured that bullying was not happening at school, Mrs. Vitsaxaki thought if there was no social cause for Jane's attitude and behavior, including her resistance to going to school, then maybe the cause was developmental.

73.     Consequently, in late 2019, Mrs. Vitsaxaki requested a formal evaluation of Jane by the middle school to look for any educational or developmental issues impacting her academics and behavior.

10

JA014

74.     Mr. Viggiano and Ms. Powers participated in this evaluation along with other middle-school staff members.

75.     As part of the process, Mrs. Vitsaxaki spoke with Ms. Powers several times, providing detailed, private information about Jane's behavior as well as her own concerns about her daughter.

76.     When the evaluation wrapped up in January 2020, school staff told Mrs. Vitsaxaki that they had concluded Jane did not have any educational or developmental issues and issued a report confirming this conclusion.

77.     The School District informed Mrs. Vitsaxaki that her daughter was not eligible for any academic support.

78.     The conflict and bullying with Jane's peers continued through the end of the sixth-grade school year—as did Mr. Viggiano's meetings with the students— unbeknownst to Mrs. Vitsaxaki.

79.     Around this time—also unbeknownst to Mrs. Vitsaxaki—various classmates of Jane, as well as other students in the school and Jane's grade, began experimenting with new "gender identities," including identities associated with names and pronouns that were different than their legal names and did not correspond to their biological sex.

80.     Mrs. Vitsaxaki was not aware that Jane's peers were experimenting with new gender identities or that Jane was exposed to the topic at the time.

81.     By spring, a number of Jane's peers, including at least two of Jane's classmates, had adopted new names, pronouns, and gender identities at school.

82.     When these students formally asked school staff to refer to them at school by different names and incorrect pronouns—ones not associated with their biological sex—the school quickly agreed. Mrs. Vitsaxaki was unaware this was happening to Jane's peers at the time.

11

83.     In later conversations, Mrs. Vitsaxaki discovered that the School District did not inform other parents before beginning to refer to their children at school by incorrect names and pronouns.

84.     In fact, School District policy prohibited school staff from disclosing information about students' use of incorrect names and pronouns at school unless the parents already knew or the student requested that their parents be told.

85.     Then in March 2020, the middle school shut down because of the COVID-19 pandemic, and Jane began taking virtual classes at home until the end of the school year in May 2020.

86.     While Jane was taking classes at home, Mrs. Vitsaxaki watched her demeanor change for the better.

87.     She noticed that Jane's anxiety and depression subsided, and she seemed to have a much better outlook and appeared happier outside of the school environment.

88.     Mrs. Vitsaxaki was relieved to see this change in her daughter. Unfortunately, it did not last.

## IV.    Despite Mrs. Vitsaxaki's repeated requests for information, School District employees do not inform her when they begin to refer to her daughter with a masculine name and plural pronouns.

89.     In September 2020, Jane returned to in-person seventh-grade classes at the middle school, and her anxiety, resistance to going to school, and other struggles returned with in-person schooling; indeed, they got worse as the year went on.

90.     Around this time, Jane, who was now 12 years old, asked Mrs. Vitsaxaki to become a bus driver so that Mrs. Vitsaxaki could take her to school.

91.     Increasingly concerned about her daughter's well-being, Mrs. Vitsaxaki agreed and began the School District's bus driver training.

92.     Mrs. Vitsaxaki hoped that driving the school bus would give her an added opportunity to connect with her daughter, while providing added support to Jane on her trips to school.

93.     Meanwhile, Mr. Viggiano and Ms. Powers were pulling Jane from lunch and from classes for counseling sessions to talk about conflict with her peers and, eventually, about experimentation with new gender identities.

94.     Jane also began regularly meeting with Vicky Wolfganger, the school nurse.

95.     School staff did not ask Mrs. Vitsaxaki's permission for these counseling sessions or nurse visits with her daughter, and they did not tell Mrs. Vitsaxaki about any of these meetings at the time the meetings were occurring.

96.     As seventh grade continued, Jane learned more about gender identity and watched peers ask the School District to refer to them by different names and incorrect pronouns, which school officials quickly did.

97.     Mrs. Vitsaxaki later found out that as more and more of Jane's peers were exploring new gender identities, Jane also began to view online content about different gender identities and watch YouTube videos about the topic.

98.     In early 2021, as some of her peers had already done, Jane went to Mr. Viggiano—without Mrs. Vitsaxaki's knowledge—and asked that staff at the middle school refer to her by a different name and pronouns based on a new gender identity.

99.     After that request, Mr. Viggiano, Ms. Powers, and the school social worker, Michele Rogala, met with Jane to discuss the request and her embrace of a new gender identity.

100.    These School District staff members encouraged and facilitated Jane's use of different names and pronouns at school without giving any notice to Mrs. Vitsaxaki—let alone seeking her consent.

JA017

101. In fact, School District staff told Jane that her parents did not need to be notified, and the school would only disclose the information to the people Jane asked them to tell.

102. During this time, Mrs. Vitsaxaki noticed that in addition to Jane's recurring struggles, she was experiencing several physical ailments including insomnia and stomach pains.

103. Mrs. Vitsaxaki also noticed that Jane had gained more weight; was continuing to refer to herself in very negative, unkind terms; and was extremely reluctant to go to school.

104. Mrs. Vitsaxaki repeatedly spoke with Jane's school counselors and teachers, asking whether they were seeing anything at school that could be causing or contributing to Jane's worsening struggles.

105. The consistent answer was, "No."

106. School District staff, including Mr. Viggiano and Ms. Powers, told Mrs. Vitsaxaki that they saw no struggles at school or anything that could explain what Mrs. Vitsaxaki was observing in Jane at home.

107. On February 10, 2021, after a counseling session with Jane, Mr. Viggiano emailed several staff members at the middle school to inform them that they should call Jane a different name (a typically masculine name with the same initial as her correct, legal name), and use the third-person plural pronouns "they" and "them" rather than the female pronouns "she" and "her."

108. In that February 10 email, Mr. Viggiano wrote:

> [masculine name] has already talked with their [sic] close friends about it. Michele [Rogala] and I will follow up with her after break to see what the plan is for discussing this change with their [sic] parents.

Ex. 1.

14

109.    After that email, middle-school staff consistently referred to Jane with the masculine name and the third-person plural pronouns "they" and "them" without telling Mrs. Vitsaxaki or obtaining her consent. In fact, they hid it from her.

110.    The same School District staff, which included Mr. Viggiano, Ms. Powers, Ms. Rogala, Principal Caraccio, and Jane's teachers, all carefully referred to Jane by her given name and female pronouns whenever they spoke with Mrs. Vitsaxaki, while calling Jane by a masculine name and incorrect pronouns at school.

111.    This went on for months and over numerous conversations with Mrs. Vitsaxaki as Mrs. Vitsaxaki continued to ask Jane's teachers, Mr. Viggiano, Ms. Powers, and other school staff about her daughter's well-being, academics, and anxiety.

## V.    Still telling Mrs. Vitsaxaki nothing, School District employees increase the time they spend discussing gender with her daughter.

112.    After changing Jane's name and pronouns at school, Ms. Powers and Ms. Rogala increased the frequency of their meetings with Jane to two or three times a week, both alone and in group sessions including other students with whom they would discuss their new gender identities.

113.    Jane became frustrated with the frequency of these sessions, both because their purpose was often unclear and because they required her to frequently miss lunch or even classroom instruction, and she felt as though she could not decline to attend them.

114.    During these sessions, School District staff encouraged Jane and her peers in their new gender identities.

115.    Around this same time, Ms. Rogala, the school social worker, also started an "LGBTQ club" at lunch, which she encouraged Jane and others to attend.

116.    Ms. Rogala used the LGBTQ club to encourage Jane and other students to "socially transition," a controversial practice that can include, among other actions, changing how a person dresses or grooms herself or which private facilities she uses

15

(like restrooms or locker rooms), along with adopting names and pronouns other than those associated with a person's sex.

117.   For example, Jane was told that her biological sex was something that she could choose to change as a solution to difficulties that she was facing.

118.   In addition to encouraging Jane and other club members to "socially transition"—including to change their names and pronouns at school—Ms. Rogala gave Jane resources on "medical transition" that included information and details on clinics she could contact in the area that offered medical interventions with the goal of "medically transitioning." *See* Ex. 2.

119.   The resources included contact information for counselors, pediatricians, surgeons, a nearby gender clinic, as well as information on where to obtain "breast binders" and other medical devices associated with "medical transition" for gender dysphoric youth.

120.   The resources also introduced Jane and other students to "The Q Center," an LGBT resource hub run by ACR Health that encourages and connects youth to resources aimed at advancing medical transition, with or without parental consent or knowledge.

121.   Neither Ms. Rogala nor any other School District staff informed Mrs. Vitsaxaki about Jane's participation in this LGBTQ club or the information about medical transition that she was receiving there.

122.   Neither Ms. Rogala nor any other School District staff informed Mrs. Vitsaxaki or sought her consent to give Jane resources and contact information for doctors to pursue a "medical transition."

123.   At one point, a friend asked Jane to purchase a "chest binder" that the friend could use to hide the prominence of her breasts and make her appear more masculine.

124.   Jane used the resources Ms. Rogala provided to investigate such a purchase, but she ultimately did not make the purchase.

## VI.   Mrs. Vitsaxaki brings her persistent concerns to some of her daughter's teachers, who don't inform her of the School District's actions.

125.   During this time, Jane's grades in several of her classes suffered because her focus was directed away from schoolwork, and she missed class as a result of counseling meetings—meetings that Jane felt unable to decline and that Mrs. Vitsaxaki still didn't know about.

126.   Jane also made frequent visits to the school nurse, Ms. Wolfganger, without Mrs. Vitsaxaki's knowledge or consent, complaining of tiredness.

127.   Even without knowledge of the counseling sessions or nurse visits, Mrs. Vitsaxaki's concerns about her daughter continued to increase as Jane became increasingly anxious, sad, and resistant to going to school.

128.   Mrs. Vitsaxaki continued to discuss her concerns with school staff, including Mr. Viggiano and Ms. Powers, and with Jane's teachers, including her English teacher, Lauren Pohl, and her math teacher, Keith Lamphere.

129.   Despite Mrs. Vitsaxaki's questions, Jane's teachers and counselors still did not tell her that they had facilitated a social transition for Jane at school or that they were regularly addressing Jane by an incorrect, masculine name, and by the third-person plural pronouns "they" and "them."

130.   For example, in April 2021, Mrs. Vitsaxaki had specific conversations with Ms. Pohl regarding Ms. Pohl's concern that Jane had cheated on an assignment.

131.   Mrs. Vitsaxaki's older daughter had previously been in Ms. Pohl's class, so Mrs. Vitsaxaki and Ms. Pohl knew each other well.

132.   During their discussion, Mrs. Vitsaxaki asked Ms. Pohl about Jane's well-being at school: Was Ms. Pohl seeing anything unusual about Jane because cheating seemed so out of character?

133.    Ms. Pohl did not disclose to Mrs. Vitsaxaki any of Jane's identity strug-gles, how the School District had changed the name and pronouns it used for Jane, or Jane's frequent meetings with the counselors.

134.    Ms. Pohl was aware of these events, because she was a recipient of Mr. Viggiano's February 10, 2021, email telling School District staff to use a different name and pronouns for Jane.

135.    Instead of disclosing any of this, Ms. Pohl reassured Mrs. Vitsaxaki that she did not share Mrs. Vitsaxaki's concerns about Jane, and Ms. Pohl used Jane's given name and female pronouns when speaking with Mrs. Vitsaxaki.

136.    Mrs. Vitsaxaki also had specific, extended conversations with Jane's math teacher, Mr. Lamphere, during which she asked him about Jane's well-being, including whether he had observed any signs of Jane's struggles at school.

137.    Like Ms. Pohl, Mr. Lamphere also received Mr. Viggiano's February 10 email.

138.    Yet like Ms. Pohl, Mr. Lamphere also brushed aside Mrs. Vitsaxaki's concerns.

139.    Mr. Lamphere referred to Jane by her given name and female pronouns and did not tell Mrs. Vitsaxaki that, all this time, her daughter's teachers had been referring to her by a masculine name and third-person plural pronouns.

140.    For several months, Jane's teachers continued to use Jane's given name and female pronouns when speaking about Jane to Mrs. Vitsaxaki, while they were simultaneously using the masculine name and third-person plural pronouns when speaking with Jane.

18

**VII.   The School District finally reveals to Mrs. Vitsaxaki that it has re-
ferred to her daughter with a masculine name and third-person plural
pronouns for months without her knowledge.**

141.   In April 2021, Ms. Powers completed a "Gender Support Plan" for Jane
that was consistent with Mr. Viggiano's February 10 email informing School District
staff they should use a masculine name and third-person plural pronouns for Jane.

142.   The final plan is dated April 23, 2021, and notes in relevant part that:

(a)   Family were not considered supportive, and Jane was "not ready to tell
family";

(b)   There was "no solid plan" to "come out" to family;

(c)   Staff were asked to use "[masculine name]/they/them" when speaking to
her, but use Jane's legal name when speaking with family;

(d)   There was a discussion of the "risk of accidentally outing student at
home";

(e)   Friends were considered supportive and aware of the name and pronoun
changes;

(f)   All middle-school staff were to be informed, including substitutes, cafe-
teria staff, and physical education teachers;

(g)   The name that was to appear in the yearbook (and be seen by the
Vitsaxakis) was to be Jane's legal name;

(h)   "GSA support" was discussed as an option for Jane.

Ex. 3.

143.   In other words, the School District's use of a masculine name and third-
person plural pronouns for Jane was publicly known to most of the school community,
with a notable exception: the Vitsaxakis.

144.   On May 11, Michael Caraccio, the principal at Jane's school, called Mrs.
Vitsaxaki to discuss Jane.

19

145.    Unbeknownst to Mrs. Vitsaxaki, Mr. Caraccio had her on speakerphone, with Jane listening in to the conversation. Mr. Caraccio did not initially tell Mrs. Vitsaxaki that Jane was in the room.

146.    Mr. Caraccio proceeded to inform Mrs. Vitsaxaki that the School District had begun to socially transition Jane and created a staff team to facilitate that transition.

147.    This included creating a Gender Support Plan for Jane and changing Jane's name and pronouns at school, Mr. Caraccio told Mrs. Vitsaxaki.

148.    Mr. Caraccio made clear that School District employees took all of these actions in accordance with School District policy.

149.    Initially, Mrs. Vitsaxaki objected in strong terms to the School District's actions and corrected Mr. Caraccio when he referred to Jane using the incorrect masculine name and third-person plural pronouns "they" and "them."

150.    But Mrs. Vitsaxaki eventually realized that Jane was listening to the conversation and was caught off-guard and alarmed that Mr. Caraccio had not informed her that Jane was listening in as they discussed Jane's situation.

151.    When she realized Jane was listening, Mrs. Vitsaxaki sought to console her daughter before ending the call.

152.    Mr. Caraccio's call was the first time Mrs. Vitsaxaki had ever heard anyone raise questions about Jane's gender. Jane had never indicated to her parents any gender incongruence or confusion about her gender.

153.    Mrs. Vitsaxaki had been in close contact with Jane's school counselors and teachers since fourth grade, and they had never mentioned any questions about Jane's gender.

154.    After ending the call, Mrs. Vitsaxaki emailed Mr. Caraccio and asked for another phone call to talk with him without Jane present.

155.   Jane continued attending the middle school in person for the next few days before switching to online schooling from May 17, 2021, through the end of the school year.

156.   In the last few days of in-person attendance before switching to online schooling, school staff continued to meet with Jane without the knowledge of Mrs. Vitsaxaki.

## VIII.  Mrs. Vitsaxaki approaches School District staff after discovering their deception, asking them to explain their actions.

157.   On May 12, 2021, after Mr. Caraccio's conversation with Mrs. Vitsaxaki, Ms. Powers emailed several staff members at the Middle School to update them about Jane.

158.   In the email, Ms. Powers wrote, using the masculine name for Jane instead of the girl's correct name:

> I wanted to reach out re: [masculine name]. As you know, [masculine name] had not come "out" to they's [sic] family as of yesterday. A lot transpired this week that pushed the issue along. [masculine name]'s mother was communicating with some of you, Chris Viggiano and me. It was getting increasingly difficult to balance [masculine name]'s readiness and privacy with [masculine name]'s mother's right to know what has been going on here at school with [masculine name]'s name and pronoun changes. We have consulted with a school attorney along the way to help us navigate the most appropriate and safe approach to these disclosures … . In a nutshell, it came to a head yesterday following conversations with [masculine name] and her mother. Mike, with [masculine name], called [masculine name]'s mother and disclosed what was going on. It has offered some relief in that [masculine name] does not have to dance around the issue or avoid altogether, as well as, we at school do not have to any longer either.

Ex. 4.

159.   In the following days, Mr. Caraccio sent Mrs. Vitsaxaki a copy of the Gender Support Plan that the School District had created for Jane and suggested in

JA025

a follow-up telephone conversation that Mrs. Vitsaxaki meet with Jane's "gender support team" to provide her with further information.

160. Mr. Vitsaxakis shared Mrs. Vitsaxaki's concerns about what had been happening to Jane at school and arranged to be present for meetings with the school.

161. On May 18, both Mr. and Mrs. Vitsaxakis met with that "gender support team," comprised of Mr. Viggiano, Ms. Powers, Ms. Rogala, Ms. Wolfganger, and Mr. Caraccio.

162. During the meeting, the Vitsaxakis learned for the first time that Jane had regularly met with a number of school staff members and discussed gender identity issues, during which meetings she felt pushed towards using a different name and incorrect pronouns.

163. While the "gender support team" apologized about the situation, they explained to the Vitsaxakis that they had consulted with the school attorney and acted in accordance with School District policy in concealing all the information about Jane's situation from the Vitsaxakis.

164. The Vitsaxakis also learned during that meeting that Mr. Caraccio chose to finally disclose the School District's social transition of Jane only after one of her teachers had pressured him to inform her parents.

165. This teacher, Jane's English teacher Ms. Pohl, had told Mr. Caraccio that she was uncomfortable with how the School District was forcing her to deceive Mrs. Vitsaxaki about Jane's circumstances.

166. In the meeting, Mrs. Vitsaxaki asked the School District to stop referring to Jane by any names or pronouns while she worked to better understand the situation with her daughter.

167. Both Mr. and Mrs. Vitsaxakis were concerned about Jane's medical condition in light of Mr. Caraccio's revelations and wanted to understand if there was any medical issue (such as a hormone imbalance) that needed attention.

22

JA026

168.   Despite Mr. Caraccio saying that the school would stop using any names or pronouns for Jane, some school staff continued to use the masculine name for Jane while she was enrolled in online schooling.

169.   After meeting with the "gender support team," Mrs. Vitsaxaki sought to speak with several of Jane's teachers about Jane's academic struggles and what had transpired over the past few months.

170.   Many of Jane's teachers did not respond to Mrs. Vitsaxaki's requests to speak, and those who did were evasive and provided little to no insights.

171.   Mrs. Vitsaxaki later learned that middle-school staff had been instructed to involve Mr. Caraccio in the conversations if they were uncomfortable with the school's position.

172.   Mrs. Vitsaxaki did have one short conversation on June 9, 2021, with Mr. Lamphere, Jane's math teacher, who was very apologetic about the situation but said he and Jane's other teachers were simply following the instructions of the middle-school administration.

173.   On June 16, Mrs. Vitsaxaki met with the School District's superintendent, Eric Knuth, and its attorney, Randy Ray.

174.   During that meeting, Mr. Knuth and Mr. Ray defended the actions of the middle-school staff and administration and denied that there had been any wrongdoing by them.

175.   Instead, Mr. Knuth and Mr. Ray confirmed that middle-school staff and administrators had correctly followed School District policy in their handling of Jane's situation, including in their decision not to inform Mrs. Vitsaxaki or seek her consent prior to treating her daughter as a boy by referring to her by an incorrect name and pronouns.

176. Mr. Knuth and Mr. Ray did not offer any alternative solutions for Jane, despite Mrs. Vitsaxaki's requests for alternatives both at the time and later in writing.

177. Eventually, Mrs. Vitsaxaki was told that no one from the School District would respond to her requests for further information on the instructions of the School District attorney.

## IX. Mrs. Vitsaxaki withdraws her daughter from the School District and enrolls her in private school, where things begin to improve.

178. It took some time before Jane began to speak with Mrs. Vitsaxaki about what had happened.

179. Notably, Jane would only talk to Mrs. Vitsaxaki about gender-identity issues in English, as opposed to Greek, which indicated to Mrs. Vitsaxaki that Jane was not using her own words to describe the issue.

180. Jane told Mrs. Vitsaxaki there were many other girls in her grade who had experienced similar struggles over their identity—around seven of them were in the group counseling sessions.

181. For three of these girls, the School District had similarly begun to use different names and pronouns at school without any notice to or consent from their parents.

182. Jane also revealed to Mrs. Vitsaxaki that when the School District began to use a different name and pronouns for her, she suffered severe harassment and ostracization from other students, which compounded her difficulties.

183. Mrs. Vitsaxaki understood from her discussions with School District staff that, in accordance with School District policy, they would continue to refer to Jane by an incorrect, masculine name and third-person plural pronouns, regardless of Mrs. Vitsaxaki's wishes or direction.

24

184.   Illustrating this, notwithstanding Mrs. Vitsaxaki's request that School District staff stop using the masculine name and the third-person plural pronouns, some staff continued to use that name and those pronouns for Jane during online classes after she stopped attending school in person.

185.   Over the summer of 2021, Mrs. Vitsaxaki arranged for Jane to return to Greece to be with Mr. Vitsaxakis, who shared Mrs. Vitsaxaki's concerns about Jane, and made arrangements for their daughter to see a therapist while she was there.

186.   For the 2021–2022 school year, Mrs. Vitsaxaki enrolled Jane into a private school in Syracuse where she repeated the seventh grade.

187.   As time went on, Mrs. Vitsaxaki saw a noticeable improvement in Jane's demeanor and physical health.

188.   Jane's enrollment in the private school has had logistical and financial ramifications for Mrs. Vitsaxaki.

189.   The private school is 25 miles away from the Vitsaxaki home, which requires additional transportation and scheduling. This regularly requires four trips to and from school each day, which is a 3–4 hour time commitment, plus any additional transport for extra-curricular activities.

190.   Moreover, the tuition fees for the private school vary year-to-year but are currently $12,660/year.

191.   The costs of travel to and tuition for this private school are among the financial harms that the School District's actions caused to Mrs. Vitsaxaki.

192.   Since Mrs. Vitsaxaki withdrew Jane from the School District, she has seen marked and continued overall improvement in Jane's morale, outlook, health, and well-being as she integrated into a new school environment.

193.   Notably, Jane has not expressed any desire to have a masculine name or to use pronouns other than those that align with her biological sex.

194.    Jane still continues to work through the School District's treatment of her and her mother, which had a traumatic effect on her.

195.    Jane's grades have improved, and she is involved in basketball and or-chestra as a cellist.

196.    Mrs. Vitsaxaki's relationship with her daughter continues to improve, but the School District's actions permanently altered their family dynamic.

## X.    When School District staff violated Mrs. Vitsaxaki's constitutional rights, they acted pursuant to School District policy.

197.    In socially transitioning Jane without Mrs. Vitsaxaki's knowledge or consent, School District staff acted pursuant to Policy 7552, adopted by the School District in 2018 and entitled "Student Gender Identity" (the "Policy"). *See* Ex. 5.

198.    The Policy states that "the District will maintain the confidentiality of student information and records."

199.    As relevant here, the Policy first describes how the School District will maintain records for students whom it socially transitions at school:

> If a transgender or GNC [*i.e.*, "[g]ender nonconforming"] student has not officially changed his or her name, but wishes to be referred to by a different name that corresponds to their gender identity, the District may create or change unofficial records to reflect the name and gender identity that the student consistently asserts at school. On state standardized tests, certain reports to the New York State Education Department, and when necessary to ensure appropriate and coordinated medical care, however, the District will use the student's legal name and gender. Any student identification cards *will be issued with the name reflecting the gender identity* the student consistently asserts at school. The District *will maintain records with the student's assigned birth name and gender in a separate, confidential file.*

*Id.* at 1–2 (emphasis added).

200.    Although the Policy expresses a desire that School District employees "endeavor to engage the student and his or her parents or guardians, as appropriate, in an effort to agree upon a plan that will accommodate the student's individual needs

26

at school," the Policy makes clear that the School District will, in certain circum-
stances, conceal information from parents like Mrs. Vitsaxaki:

> Transgender and GNC students have the right to discuss and convey
> their gender identity and expression openly and to decide *when, with*
> *whom, and how much to share* this confidential information. The plan
> may therefore include when and how to initiate the student's preferred
> name and associated pronoun use and if, when, and how this is commu-
> nicated to others.

*Id.* at 2 (emphasis added).

201.   Finally, the Policy states that "District staff will use the name and pro-
noun that corresponds to the gender identity the student consistently asserts at
school." *Id.* at 2.

202.   Nothing in the Policy requires parental consent—or even notification—
before socially transitioning a student by using a name and pronouns that are not
associated with the student's biological sex.

203.   To the contrary, the Policy requires School District staff to determine,
as part of developing a Gender Support Plan for a student, whether to inform that
student's parents or seek their consent.

204.   When School District employees treated Jane as a boy by using a mas-
culine name and third-person plural pronouns without informing Mrs. Vitsaxaki or
seeking her consent, and when concealing those actions from her, they acted pursuant
to the Policy and School District customs, practices, and usages.

## XI.   The School District recklessly attempted to "socially transition" Mrs. Vitsaxaki's daughter without her knowledge or consent.

205.   By using a masculine name and incorrect pronouns for Jane, the School
District and its employees engaged in a psychosocial intervention for gender dyspho-
ria sometimes called "social transition." *See Mirabelli v. Olson*, No. 3:23-CV-00768,
2023 WL 5976992, at *5–7 (S.D. Cal. Sept. 14, 2023) (describing nature of social

27

JA031

transition and summarizing evidence supporting cautious approach to it, particularly without parental involvement).

206.   Gender dysphoria is a health diagnosis defined in the DSM-5, requiring multiple criteria for adolescents including clinically significant distress and other "strong" symptoms sustained for at least six months.[2]

207.   Diagnosis is complex, and children or adolescents presenting for diagnosis very commonly suffer from other clinical mental health conditions, such as anxiety and depression, which may lead to misdiagnosis.[3]

208.   Professional organizations generally agree that a thorough psychiatric evaluation by a qualified mental health professional is essential for accurate diagnosis.[4]

209.   Professional organizations also generally agree that other mental health conditions should be addressed before any decision is made about transition.[5]

210.   Gender dysphoria has historically been a very rare phenomenon, impacting almost exclusively small numbers of prepubertal boys and adult men.[6]

211.   In recent years, a very different phenomenon has exploded, with very large numbers of adolescents—the majority girls—asserting that they suffer from gender dysphoria, which is referred to as "adolescent onset" or "rapid onset" gender dysphoria.[7]

---

[2] Am. Psychiatric Ass'n, *Diagnostic and statistical manual of mental disorders* (5th ed. 2013) at 452–53, https://doi.org/10.1176/appi.books.9780890425596.

[3] Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, J. of Clinical Endocrinology & Metabolism (2017) 102(11), at 3876; Levine et al., *Reconsideration of Informed Consent for Transidentified Children, Adolescents, and Young Adults*, J. Sex & Marital Therapy (2022) at 3, 5.

[4] Hembree et al., (2017) at 3876.

[5] *Id.*

[6] Zucker, *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues*, Archives of Sexual Behavior (2019) at 1–2.

[7] Littman, *Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria*, PLoS ONE, 13(8) e0202330 (2018) at 3–5.

28

JA032

212. The cause of this new trend is unknown. Many experts believe that social influences including social media and peer group pressure are playing an important role in leading girls to identify as the opposite sex.[8]

213. Increasing numbers of young women who were transitioned during adolescence are now regretting those decisions, detransitioning (that is, identifying as female once again), and speaking out to say that they were misled, misdiagnosed, and harmed by those adults who encouraged and assisted them to identify as male.[9]

214. School staff who lack appropriate training are not qualified to diagnose gender dysphoria.

215. There is no agreed "standard of care" for treating prepubertal children or adolescents who suffer from gender dysphoria, and there is large disagreement among doctors and mental health professionals in the United States and Europe on this question.[10]

216. Children who struggle with gender dysphoria often seek professional intervention, including assistance with social transition, which typically includes changes in the use of names and pronouns.[11]

217. Absent parental consent, school staff are not authorized to treat either gender dysphoria or comorbid mental health conditions in children.

218. Indeed, school staff are not authorized to provide even the most basic healthcare, such as providing aspirin to children, without express parental consent.

---

[8] *Id.*; Selin Davis, *A Trans Pioneer Explains Her Resignation from the US Professional Association for Transgender Health,* Quillette (Jan. 6, 2022), https://quillette.com/2022/01/06/a-transgender-pioneer-explains-why-she-stepped-down-from-uspath-and-wpath/.

[9] *See generally* Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, Archives of Sexual Behavior (2021).

[10] Levine & Abbruzzese, *Current Concerns About Gender-Affirming Therapy in Adolescents*, Current Sexual Health Reports (2023) at 6.

[11] Zucker, *Different strokes for different folks*, Child & Adolescent Mental Health, (2020) 25(1), at 1.

JA033

219.    The involvement of parents is essential for obtaining a thorough psychi-
atric evaluation of a child, obtaining and supporting treatment of potential preexist-
ing mental health conditions, and treating gender dysphoria.[12]

220.    Leading a child or adolescent to conceal important life changes from his
or her parents, and to lead a "double life" presenting different identities at home and
at school, imposes a serious risk of worsening the mental health of the child, as oc-
curred here.[13]

221.    No medical organization recommends subjecting children or adolescents
to social transition without the knowledge of their parents.

222.    All studies that have claimed to show any improvement in mental health
following social transition suffer severe methodological defects, and an independent
and thorough systematic review commissioned by the English National Health Ser-
vice determined that all such studies are of "very low quality."[14]

223.    A new and far more thorough study of all patients treated for gender
dysphoria in Denmark since 2000 found no improvement in mental health following
the beginning of social transition for gender dysphoria.[15]

224.    There is no evidence that social transition is lifesaving. While adoles-
cents who suffer from gender dysphoria also suffer from a range of other serious

---

[12] World Prof'l Ass'n for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People* (Version 8) at S58, https://www.tandfonline.com/doi/pdf/10. 1080/ 26895269.2022.2100644.S58.

[13] Selin Davis, *A Trans Pioneer Explains Her Resignation from the US Professional Association for Transgender Health*, Quillette (Jan. 6, 2022), https://quillette.com/2022/01/06/a-transgender-pioneer-explains-why-she-stepped-down-from-uspath-and-wpath/.

[14] Nat'l Inst. for Health & Care Excellence, *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria* (2021) at 4, https://arms.nice.org.uk/re-sources/hub/1070905/attachment; Nat'l Inst. for Health & Care Excellence, *Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria* (2021) at 4, https://arms.nice.org.uk/resources/hub/1070871/attachment.

[15] Glintborg et al., *Gender-affirming treatment and mental health diagnoses in Danish transgender persons: a nationwide register-based cohort study,* European J. of Endocrinology (2023) 189, at 342–43.

30

mental health conditions and high rates of suicidal thoughts, no study has found that any form of transition—whether social or medical—reduces the rate of suicide in these young people.[16]

225.   It is well known that among prepubertal children who suffer gender dysphoria, the vast majority will desist from suffering dysphoria and become comfortable with their biological sex by adulthood *but only if they do not socially transition*.[17]

226.   Experts who disagree on many things agree that social transition is a powerful psychosocial intervention that greatly reduces the chances that the young person will cease experiencing gender dysphoria and become comfortable with his or her biological sex.[18]

227.   In other words, some evidence shows that social transition "locks" the child into discomfort with his or her biological sex (that is, entrenches rather than cures gender dysphoria), and greatly increases the likelihood that the child will continue on to puberty blockers, cross-sex hormones, or both.[19]

228.   As a result, social transition puts the child on a difficult-to-escape pathway to medicalized transition that will expose the young person to risks of serious harms that are either known to exist or are well recognized as potential risks but have not been meaningfully studied. These risks of harm include lifelong sterility, failure to develop and be able to enjoy healthy sexual responses and relationships, impaired brain development, weakened bones, increased risk of cardiovascular

---

[16] Levine (2023) at 3–4.

[17] Zucker, *The Myth of Persistence: Response to "A Critical Commentary on Follow-Up Studies & 'Desistance' Theories about Transgender & Gender Non-Conforming Children" by Temple Newhook et al.*, 19:2 Int'l J. of Transgenderism (2018) 231, at 7.

[18] Zucker (2020) at 2; Hembree et al. (2017) at 3879.

[19] Cass, *Independent review of gender identity services for children and young people: Interim report* (2022) at 38, https://cass.independent-review.uk/publications/interim-report/.

JA035

illness, broken family relationships and social isolation in adult life, dependence on regular hormone shots, and more.[20]

229.    Instead of benefits, studies that have tracked individuals into life after transition—life a decade or more later—have found strikingly high rates of mental illness, suicide, and mortality from a variety of causes.[21]

230.    The School District's policy and its actions here contravene the evidence showing the need to include parents when adolescents are struggling with gender confusion or gender dysphoria.

231.    By using a masculine name and third-person plural pronouns for Jane, the School District was recklessly engaging in a psychosocial intervention that increased the odds Jane would continue to struggle with gender confusion.

## XII.    The School District's actions violated Mrs. Vitsaxaki's sincerely held religious beliefs and her parental rights.

232.    Mrs. Vitsaxaki's Christian faith and religious beliefs are central to the way she lives her life and raises her family.

233.    Mrs. Vitsaxaki was raised in a Catholic household, but after marrying Mr. Vitsaxakis, joined the Greek Orthodox Church.

234.    On marrying Mr. Vitsaxakis, Mrs. Vitsaxaki committed to raising her children in the Greek Orthodox faith, a weighty commitment that Mrs. Vitsaxaki took seriously.

235.    Mrs. Vitsaxaki's beliefs are founded on the Bible and the teachings of Jesus Christ.

236.    Mrs. Vitsaxaki strives to live out her Christian faith daily by incorporating it into her work, home, and family life.

---

[20] Cass (2022) at 36–38; Levine, *Informed Consent for Transgendered Patients*, J. Sex & Marital Therapy (2018) at 5–9.

[21] Levine (2023) at 1; Glintborg et. al. (2023) at 342–43.

32

237.   While Mrs. Vitsaxaki does not impose her Christian beliefs on anyone, her faith informs her sincerely held religious beliefs that shape and govern her views about human nature, childrearing and the parent-child relationship, sexuality, and gender identity, among other topics.

238.   Mrs. Vitsaxaki believes that God created the family and charged parents with the primary responsibility of raising, guiding, and caring for their children.

239.   Mrs. Vitsaxaki believes that parents and family play an essential role in maintaining a child's physical and mental health and well-being.

240.   Mrs. Vitsaxaki believes that she has a God-given responsibility to provide for and participate in all aspects of her children's upbringing and in a way that is consistent with her faith.

241.   This responsibility extends not just to spiritual growth and training, but also to education and physical, mental, and emotional health.

242.   Mrs. Vitsaxaki's faith also teaches that God created two sexes, male and female, and that these two sexes are a core part of God's intended design for humanity.

243.   Mrs. Vitsaxaki believes that each of us is born with a fixed biological sex that is a gift from God; it is not an arbitrary imposition subject to change.

244.   Mrs. Vitsaxaki's sincerely held religious beliefs prevent her from personally affirming or communicating views about human nature and gender identity that are contrary to her beliefs.

245.   Mrs. Vitsaxaki also believes that referring to a child using pronouns that are inconsistent with the child's biological sex is harmful to the child because to do so communicates a message to and about the child that is untrue and can impact the child's future physical and emotional health.

246.    Mrs. Vitsaxaki's faith also dictates the advice and guidance she believes she must provide to her children on any number of difficult or potentially life-altering decisions, in whatever arenas those difficulties or challenges may arise.

247.    Mrs. Vitsaxaki believes that, because of children's inexperience and immaturity, they often do not appreciate the long-term consequences of their actions and consequently need the advice and counsel of their parents to reach sound decisions.

248.    Mrs. Vitsaxaki believes that she must protect her children from making potentially irreversible and life-changing decisions that her children may later regret.

249.    Mrs. Vitsaxaki believes that children should not be encouraged to undertake "social transition" because of the complexity of the issues involved and children's inability to thoroughly assess the long-term consequences of such actions.

250.    Mrs. Vitsaxaki will not encourage any of her children on a path that distances the child from her biological sex, including the use of incorrect pronouns, which would communicate that the child's sex is subject to change.

251.    Instead, Mrs. Vitsaxaki believes that the best approach to resolve any discomfort with biological sex is to get her child the noninvasive therapeutic support necessary to identify and address the underlying cause of the discomfort, while continually affirming: (a) that her child is "fearfully and wonderfully made," *Psalm* 139:14; (b) that God's love for her child is unfailing and never-ending; and (c) that Mrs. Vitsaxaki's love for her child is unfailing and never-ending.

252.    As a parent, Mrs. Vitsaxaki believes she is called to walk with her children through any struggles, reminding her children that they are loved.

253.    Regardless of her children's feelings, beliefs, or actions about their sex or gender, Mrs. Vitsaxaki will never stop loving her children, nor love them any less.

34

## CAUSES OF ACTION

254.   All the acts, policies, and practices alleged in this Complaint and attributed to Defendants were undertaken and maintained under color of law.

255.   Pursuant to School District policy, practices, customs, and usages, Defendants socially transitioned Jane without notifying Mrs. Vitsaxaki or seeking her consent and while concealing their actions from Mrs. Vitsaxaki.

256.   The policies, practices, customs, and usages that led Defendants to socially transition Jane without notifying Mrs. Vitsaxaki or seeking her consent and while concealing their actions from Mrs. Vitsaxaki remain in full force and effect.

257.   The actions Defendants took to socially transition Jane without notifying Mrs. Vitsaxaki or seeking her consent and while concealing their actions from Mrs. Vitsaxaki are not narrowly tailored to a compelling governmental interest.

258.   The actions Defendants took to socially transition Jane without notifying Mrs. Vitsaxaki or seeking her consent and while concealing their actions from Mrs. Vitsaxaki are not rationally related to a legitimate government purpose.

259.   By failing to grant any process to Mrs. Vitsaxaki before socially transitioning Jane, Defendants denied Mrs. Vitsaxaki due process of law.

## FIRST CAUSE OF ACTION
### Free Exercise of Religion
### (U.S. Const., amends. I, XIV; 42 U.S.C. § 1983)

260.   Mrs. Vitsaxaki repeats and realleges each of the allegations in paragraphs 1–259 of this Complaint.

261.   The First Amendment, incorporated against the States by the Fourteenth Amendment, bars state laws "prohibiting the free exercise [of religion]." U.S. Const., amend. I; *see id.*, amend. XIV.

262.   Mrs. Vitsaxaki's free-exercise rights include the right to raise her children in accordance with her religious beliefs and the right to direct her children's

35

JA039

education and upbringing consistent with her religious beliefs, including on identity, sex, gender, and fundamental questions of existence like how her children should identify themselves. *E.g.*, *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020); *Emp. Div., Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 881–82 (1990); *Parham v. J.R.*, 442 U.S. 584, 590 (1979); *Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 518 (1925).

263.   By referring to Jane with a masculine name and incorrect pronouns without notifying Mrs. Vitsaxaki or seeking her consent and by concealing these actions from Mrs. Vitsaxaki, Defendants substantially burdened Mrs. Vitsaxaki's ability to exercise her religion.

264.   Mrs. Vitsaxaki was substantially burdened in the exercise of her religion because Defendants subjected her daughter to a social transition that directly violates her beliefs and concealed these actions from her.

265.   Mrs. Vitsaxaki was substantially burdened in the exercise of her religion because Defendants' concealment of their social transition of Jane interfered with her ability to counteract Defendants' message that people can change their sex.

266.   During the three-month (at a minimum) period that Defendants were concealing from Mrs. Vitsaxaki the actions taken to socially transition Jane, Mrs. Vitsaxaki was unable to exercise her religion by choosing to educate Jane in an environment that would not have undermined her religious beliefs.

267.   The First Amendment bars application of even a neutral, generally applicable law to religiously motivated action when that action implicates parents' right to direct the upbringing and education of their children.

268.   Because Defendants have substantially burdened Mrs. Vitsaxaki's right to exercise her religion by directing her daughter's upbringing and education, Defendants' actions receive strict scrutiny.

269.    Defendants' actions also receive strict scrutiny because they were neither neutral towards religion nor generally applicable.

270.    Defendants consider whether to notify parents of a social transition on a case-by-case basis.

271.    Applying that instruction to Mrs. Vitsaxaki required Defendants to take Mrs. Vitsaxaki's individualized circumstances into consideration when deciding whether to notify her that Defendants were referring to Jane by a masculine name and third-person plural pronouns.

272.    The discretionary nature of this inquiry renders Defendants' actions neither neutral nor generally applicable.

273.    Because Defendants' actions interfere with Mrs. Vitsaxaki's First Amendment right to direct her children's education and upbringing, and because those actions are neither neutral toward religion nor generally applicable, they receive strict scrutiny.

274.    Defendants' actions burdening Mrs. Vitsaxaki's First Amendment rights fail strict scrutiny because they are not narrowly tailored to any compelling interest—indeed, not even rationally related to a legitimate interest.

275.    Defendants performed their actions burdening Mrs. Vitsaxaki's First Amendment rights pursuant to School District policy.

276.    Defendants' violation of Mrs. Vitsaxaki's First Amendment rights has caused her to suffer damages, including but not limited to the cost of Jane's private school tuition, transportation to that school, and other damages.

37

JA041

## SECOND CAUSE OF ACTION
### Fundamental Right to Direct Child's
### Upbringing, Education, and Healthcare
### (U.S. Const., amend. XIV; 42 U.S.C. § 1983)

277.   Mrs. Vitsaxaki repeats and realleges each of the allegations contained in paragraphs 1–259 of this Complaint.

278.   The Fourteenth Amendment prohibits the States from "mak[ing] or enforc[ing] any law which shall abridge the privileges or immunities of citizens of the United States," and from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1.

279.   This Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

280.   Among the fundamental rights and liberty interests the Constitution protects is "the [liberty] interest of parents in the care, custody, and control of their children"—"perhaps the oldest of the fundamental liberty interests recognized" by the Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.).

281.   This includes parents' fundamental rights to establish a home and bring up children, including by directing their children's upbringing, education, and healthcare.

282.   The fundamental right of parents to direct the upbringing, education, and healthcare of their children is "objectively, 'deeply rooted in this Nation's history and tradition.'" *Glucksberg*, 521 U.S. at 720–21 (citation omitted); *see Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999).

283.   Fundamental parental rights have deep common-law roots. *See, e.g.*, 1 William Blackstone, *Commentaries on the Laws of England* *446–53 (describing the rights of parents at common law in England), http://bit.ly/3leX7za; 2 James Kent,

38

JA042

*Commentaries on American Law* \*189–217 (10th ed. 1860) (same, in the United States), https://bit.ly/3ttTN79.

284.   Fundamental parental rights have long encompassed matters related to education that sweep beyond formal schooling, including parents' right to guide their children through difficult and potentially life-altering decisions, like how to address gender confusion or shape a child's core identity.

285.   Parents' fundamental right to guide their children's upbringing, education, and healthcare reaches its peak on matters of great importance.

286.   Questions about children's identity as male or female, what that identity means for their lives, and whether they can or should change that identity are important matters that fall within parents' right to counsel their children and direct their upbringing, education, and healthcare.

287.   Parental involvement is essential to adequately address the multifaceted nature of a child's gender confusion or gender dysphoria.

288.   The Constitution requires courts to presume that parents will act in the best interests of their children.

289.   Cutting parents out of decisions concerning these important issues is inconsistent with that presumption and deprives parents of the opportunity to counter influences on their children that they find inimical to their religious beliefs or the values they wish to instill in their children.

290.   By referring to Jane with a masculine name and third-person plural pronouns without notifying Mrs. Vitsaxaki or seeking her consent and while concealing these actions from Mrs. Vitsaxaki, Defendants interfered with and denied Mrs. Vitsaxaki's fundamental right to direct the upbringing, education, and healthcare of her daughter about important topics like her identity as a young woman.

291.   Defendants also interfered with and denied Mrs. Vitsaxaki her fundamental right to direct the upbringing, education, and healthcare of her daughter by

preventing her from counteracting Defendants' messages about sex and gender and from counseling her about important decisions like whether she should socially transition at school, receive therapy related to gender confusion, or take some other course of action.

292.   During the three-month (at a minimum) period that Defendants were actively concealing from Mrs. Vitsaxaki their actions to socially transition Jane, Defendants interfered with Mrs. Vitsaxaki's fundamental right to direct the upbringing, education, and healthcare of Jane, because she lacked the knowledge necessary to exercise her right to choose to educate Jane in an environment that would not have undermined her religious beliefs.

293.   Additionally, the Constitution generally requires parental consent to any decisions involving children's healthcare.

294.   Deciding how best to help a child struggling with gender confusion or gender dysphoria is the sort of decision for which the Fourteenth Amendment requires parental consent.

295.   When referring to Jane with a masculine name and third-person plural pronouns, Defendants engaged in so-called "social transition," which is a psychotherapeutic intervention for gender dysphoria that scientific evidence demonstrates has a powerful psychological effect on the development and outcomes of a child.

296.   By socially transitioning Jane without notifying Mrs. Vitsaxaki or seeking her consent, Defendants denied Mrs. Vitsaxaki her fundamental right to direct her daughter's healthcare related to the important topic of gender confusion or gender dysphoria.

297.   Additionally, because social transition makes it more likely that a child's gender confusion or gender dysphoria will persist into adulthood, Defendants' actions burdened Mrs. Vitsaxaki's exercise of her right to direct Jane's healthcare.

298.    Strict scrutiny applies to Defendants' violation of Mrs. Vitsaxaki's fundamental right to direct the upbringing, education, and healthcare of her daughter.

299.    Defendants' actions violating Mrs. Vitsaxaki's fundamental rights are neither narrowly tailored to any compelling interest nor rationally related to a legitimate interest.

300.    Defendants performed their actions violating Mrs. Vitsaxaki's fundamental rights pursuant to a policy, practice, custom, and usage of the School District.

301.    Defendants' violation of Mrs. Vitsaxaki's fundamental rights has caused her to suffer damages, including but not limited to the cost of Jane's private school tuition, transportation to that school, and other damages.

### THIRD CAUSE OF ACTION
### Deprivation of Liberty without Due Process
### (U.S. Const., amend. XIV; 42 U.S.C. § 1983)

302.    Mrs. Vitsaxaki repeats and realleges each of the allegations contained in paragraphs 1–259 of this Complaint.

303.    The U.S. Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1.

304.    In general, procedural-due-process principles protect persons from deficient procedures that lead to the deprivation of cognizable liberty interests.

305.    To establish a procedural-due-process violation, Mrs. Vitsaxaki needs to show that she has been deprived of a liberty interest, and that such deprivation occurred without adequate procedural protections. *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012).

306.    The liberty interest of parents in "the care, custody, and control of their children … is perhaps the oldest of the fundamental liberty interests." *Troxel*, 530 U.S. at 65 (plurality op.).

41

JA045

307.   The parental right also encompasses the right to direct a child's healthcare, and therefore an infringement of that right can violate a parent's right to procedural due process. *Phillips v. Cnty. of Orange*, 894 F. Supp. 2d 345, 375 (S.D.N.Y. 2012).

308.   Parents' procedural-due-process rights are violated if parental consent or a court authorization is not obtained before government conduct that can cause physical or psychological injury to a child, unless the child is in imminent danger.

309.   Defendants deprived Mrs. Vitsaxaki of a cognizable liberty interest when they referred to Jane by a masculine name and third-person plural pronouns without notifying Mrs. Vitsaxaki or seeking her consent and when they concealed those actions.

310.   Those actions attempted to "socially transition" Jane, a psychotherapeutic intervention that has a powerful psychological effect on the development of an adolescent.

311.   Defendants' actions were sufficiently invasive to trigger procedural safeguards.

312.   But Defendants failed to give, or even attempt to give, notice to Mrs. Vitsaxaki of their intent to "socially transition" Jane.

313.   Defendants also deprived Mrs. Vitsaxaki of a hearing or an opportunity to object to Defendants' actions towards her daughter.

314.   Defendants did not provide Mrs. Vitsaxaki with *any* procedural protection whatsoever before depriving her of a cognizable liberty interest.

315.   Instead, Defendants took steps to deceive Mrs. Vitsaxaki about their actions to socially transition Jane, which removed any possibility of process before or during the deprivation of her liberty interest.

316.   Defendants violated Mrs. Vitsaxaki's right to procedural due process.

42

JA046

317. Defendants performed their actions violating Mrs. Vitsaxaki's procedural-due-process rights pursuant to a policy, practice, custom, and usage of the School District.

318. Defendants' violation of Mrs. Vitsaxaki's procedural-due-process rights has caused her to suffer damages, including but not limited to the cost of Jane's private school tuition, transportation to that school, and other damages.

## PRAYER FOR RELIEF

Mrs. Vitsaxaki respectfully requests that this Court enter judgment against Defendants and provide her the following relief:

A.  A declaration that the School District's policy facially and as applied to Mrs. Vitsaxaki violates her First and Fourteenth Amendment rights under the United States Constitution;

B.  Nominal damages, compensatory damages, and such other damages to which Mrs. Vitsaxaki may be entitled;

C.  Mrs. Vitsaxaki's reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

D.  All other further relief to which Mrs. Vitsaxaki may be entitled.


Dated: January 31, 2024                          Respectfully submitted,


                                                 s/ David A. Cortman
Raymond J. Dague                                 David A. Cortman
N.D.N.Y. Bar Roll No. 505622                     N.D.N.Y. Bar Roll No. 502661
**Dague & Martin, P.C.**                         **Alliance Defending Freedom**
4874 Onondaga Rd.                                1000 Hurricane Shoals Road N.E.,
Syracuse, NY 13215                                  Suite D1100
Tel:  (315) 422-2052                             Lawrenceville, Georgia 30043
Fax: (315) 474-4334                              Tel:  (770) 339-0774
raymond@daguelaw.com                             Fax: (770) 339-6744
                                                 dcortman@ADFlegal.org

43

JA047

Katherine L. Anderson*
Arizona Bar No. 33104
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
Tel:  (480) 444-0020
Fax: (480) 444-0028
kanderson@ADFlegal.org

Vincent M. Wagner*
Virginia Bar No. 98663
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
Tel:  (571) 707-4655
Fax: (571) 707-4656
vwagner@ADFlegal.org

*Attorneys for Plaintiff*

\* Motion for Limited Admission *Pro Hac Vice* forthcoming

JA048

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the factual allegations in paragraphs 1–22, 28–204, 232–253 of the foregoing are true and correct to the best of my knowledge, and that these statements are based on my personal knowledge.

Executed on January 30, 2024.

_____
Jennifer Vitsaxaki

45

**From:** Viggiano, Chris
**Sent:** Wednesday, February 10, 2021 2:27 PM
**To:** Usifer, Lori Jean; Kerr, Lisa; Pohl, Lauren; Lamphere, Keith; Murphy, Jessica; O'Hara, Colleen; Musumeci, Scott; Webster, Kate; Midgley Scuderi, Sarah; Williams, Paige; Veverka, Karen; Whiting, Jeri; Stagnitta, Scott; Anna, Colleen
**Cc:** King, Jill; Rogala, Michele; Powers, Vicky; Wolfanger, Jennifer; Caraccio, Mike
**Subject:** ▨Legal Name▨ Vitsaxaki

↗ **Masculine Name**

FYI. ▨Legal Name▨ came to me and Michele to inform us that she would like to be called ▨▨ with her preferred pronouns **they/them.** ▨▨ has already talked with their close friends about it. Michele and I will follow up with her after break to see what the plan is for discussing this change with their parents.

**Masculine Name**
Chris Viggiano
MS Counselor
315-291-2244

"If you were to kick the person responsible for your problems, you wouldn't sit down for a week."
-Smerconish

CONFIDENTIALITY NOTICE: This email is intended only for its addressee and may contain information that is p
disclosure. If you have received this email message in error, please immediately delete this email transmission and r

1

JA050

# EXHIBIT 2

JA051



# Trans Resource Guide

Updated 02/2021



JA052

# Recommended Therapists

Ahmy Brock  MA LMFT- Solid Ground Wellness
5900 N. Burdick St Suite 201 E. Syr NY 13207
315-836-3787  Or 315 416-7572

Angel Chambers .LMSW - Brownell Center
1045 James St Suite 100 Syracuse NY
315-472-4471

Briana Lewis, LMFT
Family Counseling Services
201 Cedar Street, Oneida
315-280-0400

Briana Mason MA, LMFT
Alkira Marriage and Family Therapy, PC
6700 Kirkville Road
Building B Suite 103B
East Syracuse, New York 13057
(315) 640-3680

Britton Tarris, MSW
The Neighborhood Center
624 Elizabeth Street Utica NY 13501
315-272-2600



# Therapist Cont.

Brynn Rogers, MA, LMFT
Connect Therapy Services, PLLC
5900 North Burdick St Ste 102A
Medical Center East
East Syracuse, New York 13057
(315) 364-0087

Caitlin Dawson Brown MS, LMHC
50 Presidential Plaza
Suite LL4
Syracuse, New York 13202
(315) 828-0361

Crystal Hoban, LPMFT, MA, Child Therapy CAS
Child Advocacy Center of Oswego
163 South 1st Street
Fulton, NY
(315) 592-4453

Daran Shipman LMFT
530 Oak Street Syracuse NY 13203
315-744-8279


054

# Therapist Cont.

Danielle McDonough, MHC
Community Health and Behavioral Services
1427 Genesee St. Utica, NY 13501
(315) 798-8868 ext. 2166


Deb Coolhart, Phd, LMFT
Fayetteville, NY 13066
315 445-2154

Donna Farchione MA,MS, LMFT
Anahata Marriage & Family Therapy
6858 E Genesee St
Fayetteville, New York 13066
(315) 400-4601


Elizabeth Franger, LMFT
Liberty Resources Integrated Health Care
1045 James Street
Syracuse NY 13203
(315) 472-4471

Gender Wellness Center at Susquehanna Family Practice
FoxCare Center, Suite 103
5432 State Highway 7
Oneonta, NY 13820
Doctors, Mental Health and Surgical Providers
607-431-5757

the Q center

A055

# Therapist Cont.

Helen Johnson, LCSW
112 Dewitt Street
Suite 205A
Syracuse, New York 13203
(315) 506-4886
* Teletherapy


Jenna DeRidder MA, LPMFT
Harvest House
Clinton Hall
110 N. Cayuga Street
4th Floor, Suite 3
Ithaca, NY 14850
(315) 663-7060


Jennifer Coppola, MS, MA, LPMFT
315 South Crouse Ave, Suite 302
Syracuse NY 13210
315-414-9743


Jim Feinberg LCSW-R CH.T
404 Oak Street
Syracuse NY 13203
718-412-8126
* Teletherapy


056

# Therapist Cont.

Karrie Damm, LMFT
CNY Marriage & Family Therapy Place, PLLC
792 N. Main St., Suite 200E
North Syracuse, NY 13212
(315) 299-6975

Kathryn Sowards, Phd, LMFT
5900 N. Burdick St Suite 102 east  E Syracuse NY 13207
315-382-6427
* Trauma Work

Kevin K. Johnson, MD
Crouse Medical Practice 475 Irving Ave Suite 418
Syracuse, NY 13210
Psychiatry, Addiction Medicine, Transgender Health
(315) 766-1104

Lindsey Widrig, LMFT
CNY Marriage & Family Therapy Place
792 N Main St Suite 200E
North Syracuse, New York 13212
(315) 801-9434

Mary Kate Lenihan MA, LMFT
Curious Heart Counseling
24 Lake Street
Dryden, New York 13053
(855) 286-2210



# Therapist Cont.

Meaghan Malaney, LMFT
530 Oak Street Syracuse NY 13203
315-571-0752

Meghan MCDonough, MFT
Community Health and Behavioral
Services1427 Genesee St Utica NY
13501(315) 798 – 8868 ext. 2246

Montinique McEachern, MEd, LPMFT
Connect Therapy Services, PLLC
5900 N. Burdick St. Suite 102 A
East Syracuse NY 13057
315-400-2483

Molly Lizzio, LMFT
Courage & Connection Counseling
528 Oak Street
Syracuse, NY 13203
(315)313-4703

Moonhawk River Stone, M.S.LMHC
1448 Dalton Drive
Schenectady, NY 12309
518-506-1261



A058

# Therapist Cont.

Paul Batkin MA, LMFT
731 James St. Suite 430
Syracuse NY 13203
(315) 466-9889

Rhea Parks, LMFT
825 Northway Street
Syracuse New York, 13224
315-243-1083

Syracuse University Couple & Family Therapy Center
Peck Hall 601 East Genesee Street Syracuse NY
315-443-3023
*Trans Team

Tiffany McLallen MA, LMHC
Meghan McRae PSY. D
Rubenzahl, Knudsen & Associates
22670 Summit Drive Suite 2, Watertown, NY 13601
315-788-3332
&
7785 North State Street, Suite 150 Lowville NY 13367
315-376-5255



4059

# Therapist Cont.

Tara Lennox, LCSW-R.
119 Sherman Street, Suite 3
Watertown, NY
315-816-4389


Tristan Martin, PhD, LMFT
4500 Pewter Ln
Manlius, NY 13104
(315) 640-4285


University of Rochester
Department of Adolescent Medicine
Gender Health Services
601 Elmwood Avenue Box 690
Rochester, NY 14642
(585) 275-2964


Dr. Wanda Fremont MD
Adolescent Psychiatry SUNY Upstate
713 Harrison Street Syracuse NY 13210
315-464-3100



# Primary Care Physicians

Catherine B. Fessenden, NP
Upstate Family and Preventive Medicine
2nd Floor, 90 Presidential Plaza
Syracuse, NY 13202
315 464-4686

Dr. Errol McKenzie
Family Medicine Associates Of Fayetteville
212 Highbridge St. Suite C
Fayetteville, NY 13066
315-637-0477

Dr. George Gluz
University Internist
Suite 1
550 Harrison Street
Syracuse, NY 13202
(315)464-5240

Dr. Lori Anderson
The Synergy Center
4500 Pewter Lane, Bldgs 8 & 9
Manlius, NY 13104
(315) 692.2037



061

# Primary Care Physicians Continued

Dr. Michael Mincolla
Dr. Anthony Malvasi, D.O.
CNY Family Care LLP
4939 Brittonfield Parkway
East Syracuse, NY 13057-9208
(315) 463-1600


Dr. Kristen Pfau
3922 Fennell Street
PO Box 70
Skaneateles, NY 13152
(315) 685-0908


Teri Strine, RN MSN FNP-C
Crouse Medical Practice at Brittonfield
5000 Brittonfield Parkway, Suite A100
East Syracuse, NY 13057
(315) 449-3800


Inclusive Health Services
Physicians' Office Building
Suite 211,
725 Irving Avenue
Syracuse, NY 13210
(315) 878-7554



062

# Cross Hormone Providers

Dr. Karen Teelin
Upstate Pediatric and Adolescent Center
90 Presidential Plaza Syracuse NY 13202
Up to age 21
315-464-5831

Josln Diabetes Center
3229 East Genesee Street Syracuse NY 13214
315-464-5726
18 and up

Planned Parenthood
Informed Consent 18 and up
1120 E. Genesee Street Syracuse NY 13210
866-600-6886
135 Walnut Street Corning NY
607-962-4686
Plattsburgh Clinic
66 Brinkerhoff Street Plattsburg, NY 12901
518-561-4430
160 Stone Street Watertown, NY 13601
315-788-8065

Dr. Todd Lentz
Course Medical Practice
739 Irving Ave
Syracuse NY 13210
315-479-5070


A063

# Cross Hormone Provider Cont.

Dr. Dayal Raja
Slocum Dickson
1729 Burrstone Rd
New Hartford, NY 13413
315-798-1400

# Gynecologist

Dr. Mark Billison
Family Care Medical Group
5100 West Taft Road Liverpool NY 13088
Suite 2J
315-452-2968
*Also does cross hormones

Dr. Krislyn Flint
Woman's Health Associates
139 Fields Drive Oneida NY 13421
315-363-9380


1064

# Surgeons

Dr. Anthony Deboni
CNY Surgery Center
4403 Medical Center Drive Fayetteville, NY 13066
315-663-0112
Breast Augmentation or Removal


Dr. Christine McGinn
Gender Wellness Center Papillon
18 Village Row Logan Square Lower York Road (202)
New Hope, PA 18938 Suite 43
215-693-1199
Gender Confirmation Surgery, Counseling, Hormones, Hair Removal

Dr. Daniel Medalie
Cleveland Plastic Surgery
25700 Science Park Drive Landmark Centre, Suite
190 Beachwood, OH 44122
Phone: 216-393-9924
OR
Mount Sinai
275 Seventh Avenue
New York, NY 10011
212-604-1730
Breast Augmentation and Removal, FtM Bottom
Surgeries



# Surgeons Continued

Dr. Deana Paley, DO,
Samaritan Medical Center
629 Washington Street,
Watertown, NY 13601
315-755-3650
Top Surgery (18+)


Dr. Dmitry Nikolausky
Upstate Urology
750 East Adams Street
Syracuse, NY 13210
315-464-1500


Dr. Prashant Upadhyaya
Upstate Health Care Center
90 Presidential Plaza
Syracuse, NY 13202
315-464-8224
Breast Augmentation and Removal



# Electrolysis

Electrolysis Professionals
218 Luddington Street
Syracuse, NY 13206
www.electrolysisprofessionalscny.com
315-431-9580

Amber Heisey
Trubliss Wellness Spa
709 North Main Street , North Syracuse 13212
315-635-5122

Electrolysis By Stefania
5975 Court St Road Syracuse NY 13206
315-657-3725

Pam Dausman
Ivy League Electrolysis
719 East Genesee Street Syracuse NY 13210
Room 206
315-378-7042

Merle Trogman
Accredited Electrolysis Studio
6647 Kirkville Road East Syracuse NY 13057
315-463-5016

# Voice Modification

Voice and Communication Modification Program
For People in the Transgender Community
Ewing Clinic Ithaca College
202 Smiddy Hall
607-274-3714

the Q center 67

# Binders

The Ties That Bind
CNY Binder Donation/Exchange Program
www.tiesthatbindcny.org

Gc2b
www.gc2b.co

Underworks
www.underworks.com

Syracuse University Couple & Family Therapy Center
Binder Exchange Program
315-443-9405

* The Q Center has a limited supply for youth that attend group

# Clothing Lines

Rubies
Form Fitting Clothing for Trans Girls
www.rubyshines.com

Leolines
www.Etsy.com

Old Navy
Gender Neutral Line
www.oldnavy.gap.com



# Faith Communities

## All Saints Church
1340 Lancaster Ave
Syracuse, NY 13210
(315) 472-9934

## All Souls UU Church
1330 Gotham St,
Watertown, NY 13601
(315) 788-2742

## First Unitarian Universalist
## Society of Syracuse
109 Waring Rd,
Syracuse, NY 13224
(315) 446-5940

## Grace Church
6 Elizabeth St,
Utica, NY 13501
(315) 733-7575

## Hendricks Chapel @ Syracuse University
West Zone
Syracuse, NY 13244
(315) 443-2901
chapel@syr.edu


069

# Faith Communities
# Continued

## May Memorial
## Unitartian Universalist Society
3800 E Genesee St,
Syracuse, NY 13214
(315) 446-8920

## Plymouth Congregational Church
232 E. Onondaga Street,
Syracuse, NY 13202
(315) 474-4836

## University United Methodist Church
324 University Ave,
1085 E Genesee St,
Syracuse, NY 13210
(315) 475-7277

## Westminister Presbyterian Church
17 William St,
Auburn, NY 13021
(315) 253-3331



# Community Resources

## The Q Center

835  Hiawatha Blvd W.  Syracuse NY 13204
315-475-2430
Services Include: Case Management, HIV testing,
Support groups for youth and parents,
social events, cultural competency training
and advocacy service

Hilary Avallone Ext.2515
Regional Program Coordinator

Ashley Davis Ext. 2461
CNY Program Coordinator &
Syringe Exchange Program

Talia Shenandoah   Ext. 2457
Youth Development Specialist

Karen Fuller Ext.2412
Family Peer Advocate

Annabelle Fears Ext.2405
LGBTQ Rapid ReHousing Program



# Community Resources

## Transgender Alliance of CNY

Service Organization for Transgender Community
of Central and Upstate NY
www.facebook/tgacny/

## SAGE Upstate

Promotes Health and Well-being of Older LGBTQ Adults and Allies
431 East Fayette Street Syracuse NY 13202
Kim Dill Executive Director
315-478-1923
www.sageupstate.org

## Syracuse University LGBT Resource Center

khristian kemp-delisser Director
750 Ostrom Ave Syracuse NY 13244
315-443-3983
lgbt.syr.edu

## Identity
206 State Street
Binghamton, NY 13901
607-651-9120
www.idyouth.org



# Community Resources Cont.

## The Center
73 Main Street
Cortland, NY 13045
607-756-8970
www.cortlandprevention.org

## PFLAG Oswego County
Oswego County Opportunities Inc.
Midtown Plaza, Oswego
Contact Debbie Danby
315-342-7532 ext 1603
ddaby@oco.org

## Black Cuse Pride

Focused on providing a safe and
confidential environment to the inner-city
LGBTQ community as well as offering
networking opportunities, health
information and peer support. We are the
voice of the LGBTQ inner-city community.
(315) 863-4539

## CNY Pride
The mission of CNY Pride is to serve the Central New
York lesbian, gay, bisexual, and transgender and queer
(LGBTQ) community and their allies.
PO Box 6608 Syracuse, NY 13217
(315) 210-8690



073

# National Resources

## Philadelphia Trans Wellness Conference
## a Program of The Mazzoni Center

Hosts Yearly Convention
www.mazzonicenter.org/tans-health

## TYFA Trans Youth Family Allies

Helping children and families with gender identity and expression
www.imatyfa.orgwww.facebook.com/imatyfa.org
888-462-8932

## Transparenting In CNY

Facebook Page Providing   positive news stories,
articles, and opinion pieces for parents and
caregivers of transgender youth
www.facebook.com/transparenting/

## Campus Pride

An organization for student leaders and
campus groups working to create a safer
college environment for LGBTQ students
www.campuspride.org

# Crisis Support

The Trevor Project
Provides crisis intervention and suicide prevention
services to  (LGBTQ) young people under 25
www.thetrevorproject.org
1-866-488-7386



074

# Crisis Support Cont.

Trans Life Line
Grassroots hotline and microgrants 501(c)(3) non-profit
organization offering direct emotional and financial
support to trans people in crisis – for the trans
community, by the trans community.
www.translifeline.org
US (877) 565-8860
Canada (877) 330-6366

# Culturally Competent Hair Styist

www.safeinmychair.com
Offers a directory of stylists, barbers, makeup artists
and entire salons that have declared themselves ready
to be there for you

Cliptomania Salon
314 W Manlius St
East Syracuse, NY 13057
cliptomaniasalon@gmail.com
(315) 437-7616

Moments Enchanted Salon & Day Spa
612 Oswego St
Liverpool, NY 13088
(315) 937-6906



A075

# Legal Aid

## Volunteer Lawyers Project of Onondaga County,INC

221 South Warren Street Suite 320 Syracuse NY 13202

315-579-2576

Assistance with name changes,

gender marker changes and passport applications

## Just Roots Consulting

Milo Primeaux, Esq. (he/him)

Law Office of Milo Primeaux, Esq.

P.O. Box 665, Dansville, NY 14437-0665

(585) 612-1071

## Empire Justice Center

Telesca Center for Justice

One West Main Street Suite 200 Rochester, NY 14614

585-295-5721

Human Rights Laws, name and document changes

*****DISCLAIMER*****

This resource guide was put together with recommendations from Q members. This is not an all inclusive list, it is meant to be a tool to assist you in finding affirming providers.  If you wish to recommend someone you have had a positive experience with or have had a negative experience with a provider listed

please contact

Karen Fuller @ Kfuller@acrhealth.org

315 475-2430 ext 2412

the Q center

# EXHIBIT 3

JA077

**SCSD Gender Support Plan--CONFIDENTIAL**

Legal Name [legal name] _Vitsaxaki_        Date: _4/23/21_

Student's preferred name? [masculine name]        Add to Schooltool? ☐ Yes  ☑ No

Assigned Sex at Birth ☐ Male  ☑ Female       Gender: _no gender_ Pronouns: _they/them_

Are guardians / any family aware?

☐ Yes—Are they supportive?

☑ No— Why not? _except cousin; not ready to tell family_

Is there a plan to come out to them? _no solid plan @ this time_

How can we support? _calling me_ [masculine name]_/they/them_

Which name do we use when speaking with guardians? [legal name]

☑ Discussed risk of accidentally outing student at home.

Are friends / peers aware?

☑ Yes—Are they supportive? _yes_

☐ No— Why not?

Is there a plan to come out to them? _Friend group knows of name_
_preference @ this time and_
How can we support? _same way_ _pronouns_

Plan to inform teachers / staff: [masculine name] _wishes to direct all "outings" @ this time_

☑ Student led plan: _Student wanted to inform teachers_

☐ Counselor led plan:_____

☐ Counselor follow up:   ☐ none needed    ☑ email to teachers-date: _5/4/21_

☐ Staff to be Informed

☐ Only grade level staff (include office, nurse, library, aides)

☑ All MS staff? (include office, nurse, library, aides)

☑ Teachers to inform substitutes? _yes_

☐ Bus driver  ☑ Cafeteria staff  ☐ Athletic Dept / Coaches: _just PE teachers_

Bathroom / Locker facilities- Special Considerations / changes

☑ No

☐ Yes:_____

Name in yearbook (if timing allows) ☑ Legal Name  ☐ Preferred Name

Additional Considerations: _Talked about GSA support._ [masculine name]
_Offered continued support as_
[masculine name] _did_
_navigates this process for self._
_not want to move forward @ this time._     JA078

# EXHIBIT 4

JA079

**From:** Powers, Vicky
**Sent:** Wednesday, May 12, 2021 11:15 AM
**To:** Pohl, Lauren; Lamphere, Keith; Usifer, Lori Jean; Murphy, Jessica; O'Hara, Colleen; Musumeci, Scott; Kerr, Lisa; Webster, Kate; Caraccio, Mike; Midgley Scuderi, Sarah; Williams, Paige; Veverka, Karen; Whiting, Jeri; Stagnitta, Scott; Anna, Colleen; Rogala, Michele; Viggiano, Chris; Wolfanger, Jennifer
**Subject:** Legal Name masculine name Vitsaxaki

Hi Everyone,

I wanted to reach out re: ▓ As you know, ▓ had not come "out" to they's family as of yesterday. A lot transpired this week that pushed the issue along. ▓s mother was communicating with some of you, Chris Viggiano and me. It was getting increasingly difficult to balance ▓s readiness and privacy with ▓s mother's right to know what has been going on here at school with ▓s name and pronoun changes. We have consulted with a school attorney along the way to help us navigate the most appropriate and safe approach to these disclosures. The law is ambiguous, which often left us with more questions than answers. In a nutshell, it came to a head yesterday following conversations with ▓ and her mother. Mike, with ▓ called ▓s mother and disclosed what was going on. It has offered some relief in that ▓ does not have to dance around the issue or avoid altogether, as well as, we at school do not have to any longer either. ▓s mother is aware and supportive of ▓s courage and feelings. Some hurdles still exist, especially at home, but ▓s feeling a bit better about the situation. Please reach out with any concerns or questions. Please continue to support ▓ as you have and my hope is that you see a positive shift in they, living as they want to be.

Best,

Vicky

CONFIDENTIALITY NOTICE: This email is intended only for its addressee and may contain information that is privileged, confidential, or otherwise protected from disclosure. If you have received this email message in error, please immediately delete this email transmission and notify us by telephone of this error. 788HGC3dXXQ167

1

JA080

# EXHIBIT 5

7/22/2021

Board Docs® Policy 7552: Student Gender Identity



| | |
|---|---|
| Book | Skaneateles Central School District Policy Manual |
| Section | 7000 Students |
| Title | Student Gender Identity |
| Code | 7552 |
| Status | Active |
| Adopted | July 17, 2018 |

## SUBJECT: STUDENT GENDER IDENTITY

All students need a safe and supportive educational environment to progress academically and developmentally. The District is committed to fostering a safe learning environment for all students, free from discrimination and harassment on the basis of sex, gender, gender identity, gender nonconformity, and gender expression. In accordance with applicable law, regulations, and guidelines, the District will ensure that students have equal access to all school programs, facilities, and activities. The District will assess and address the specific needs of each student on a case-by-case basis.

**Key Terms**

Generally, District personnel should use the language that individual students are using to describe their own gender identity, appearance, or behavior. The most commonly used terms are:

Cisgender: a person whose gender identity corresponds to their assigned sex at birth.

Gender: actual or perceived sex, typically with reference to social and cultural differences rather than physiological ones.

Gender expression: the ways a person conveys their gender identity to others, such as through behavior, appearance, clothing, hairstyle, activities, voice, and mannerisms.

Gender identity: a person's inner sense or psychological knowledge of being male, female, neither, or both.

Gender nonconforming (GNC): describes someone whose gender identity or gender expression does not conform to social or stereotypical expectations of a person with that gender assigned at birth. This is also referred to as gender variant or gender atypical.

Transgender: someone whose gender identity is different than their gender assigned at birth.

Transition: the process by which a person socially or physically aligns their gender expression more closely to their gender identity than their assigned sex at

JA082

birth.

## Records

As required by law, the District will maintain the confidentiality of student information and records. If a transgender or GNC student has officially changed his or her name, as demonstrated by court order or birth certificate, the District will change its official and unofficial records, as needed, to reflect the change. The District will maintain records with the student's assigned birth name in a separate, confidential file.

If a transgender or GNC student has not officially changed his or her name, but wishes to be referred to by a different name that corresponds to their gender identity, the District may create or change unofficial records to reflect the name and gender identity that the student consistently asserts at school. On state standardized tests, certain reports to the New York State Education Department, and when necessary to ensure appropriate and coordinated medical care, however, the District will use the student's legal name and gender. Any student identification cards will be issued with the name reflecting the gender identity the student consistently asserts at school. The District will maintain records with the student's assigned birth name and gender in a separate, confidential file.

## Names and Pronouns

When apprised of a student's transgender or GNC status, the District will endeavor to engage the student and his or her parents or guardians, as appropriate, in an effort to agree upon a plan that will accommodate the student's individual needs at school. Transgender and GNC students have the right to discuss and convey their gender identity and expression openly and to decide when, with whom, and how much to share this confidential information. The plan may therefore include when and how to initiate the student's preferred name and associated pronoun use and if, when, and how this is communicated to others. District staff will use the name and pronoun that corresponds to the gender identity the student consistently asserts at school.

## Restrooms and Locker Rooms

The District will allow a transgender or GNC student to use the restroom and locker room that corresponds to the student's consistently expressed gender identity at school. Any student requesting increased privacy or other accommodations when using bathrooms or locker rooms will be provided with a safe and adequate alternative, but they will not be required to use that alternative.

## Physical Education and Sports

Physical education is a required part of the District's curriculum. Where these classes are sex-segregated, students will be allowed to participate in a manner consistent with their gender identity. Students will likewise be allowed to participate in intramural activities consistent with their gender identity.

Upon written notification that a transgender or GNC student would like an opportunity to participate in the District's interscholastic athletics program consistent with his or her gender identity, the District will determine his or her eligibility in accordance with applicable law, regulations, and guidelines. The District will confirm the student's asserted gender identity with documentation it considers appropriate from a parent or guardian, counselor, doctor, psychologist, psychiatrist, or other medical professionals. The student's gender identity should be the same as the identity used for District registration and other school purposes.

The District's athletic director will notify opposing team athletic directors or the New York State Public High School Athletic Association if a student needs any accommodations during competitions. Any appeal regarding the District's eligibility decision will be directly to the Commissioner of Education.

## Other Activities

Generally, in other circumstances where students may be sex-segregated, such as overnight field trips, students may be permitted to participate in accordance with the gender identity that the student consistently asserts at school. Student privacy concerns will be addressed individually and on a case-by-case basis in accordance with District policy and applicable law, regulations, and guidelines.

## Dress Code and Team Uniforms

JA083

Transgender or GNC students may dress in accordance with their gender identity or expression, within the parameters of the District's dress code. The District will not restrict students' clothing or appearance on the basis of gender.

The District's dress code applies while its athletes are traveling to and from athletic contests. Athletes will have access to uniforms that are appropriate for their sport.

Family Educational Rights and Privacy Act (FERPA), 20 USC Section 1232g
34 CFR Part 99
Title IX of the Education Amendments of 1972
Education Law Article 2 and Sections 2-d, 11(7), 3201-a
8 NYCRR Section 100.2

NOTE: Refer also to Policies #3410 -- Code of Conduct
                              #3420 -- Anti-Harassment and Anti-Discrimination
                              #7550 -- Dignity for all Students
                              #7551 -- Sexual Harassment of Students
                              #7553 -- Hazing of Students
                              #8242 -- Civility, Citizenship, and Character Education/Interpersonal Violence Prevention Education

Adopted: 7/17/18

https://go.boarddocs.com/ny/skan/Board.nsf/goto?open&id=BHFN7Z5E984F

JA084

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JENNIFER VITSAXAKI,

                Plaintiff,

              -v-                5:24-CV-155

SKANEATELES CENTRAL SCHOOL
DISTRICT; SKANEATELES CENTRAL
SCHOOLS' BOARD OF EDUCATION,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
|---|---|
| ALLIANCE DEFENDING<br>   FREEDOM<br>Attorneys for Plaintiff<br>1000 Hurricane Shoals Road, NE<br>Suite D1100<br>Lawrenceville, GA 30078 | DAVID A. CORTMAN, ESQ.<br>KATHERINE L. ANDERSON, ESQ.<br>LAURENCE J. WILKINSON, ESQ.<br>VINCENT M. WAGNER, ESQ. |
| DAGUE & MARTIN, P.C.<br>Attorneys for Plaintiff<br>4784 Onondaga Road<br>Syracuse, NY 13215 | RAYMOND J. DAGUE, ESQ. |
| BOND, SCHOENECK<br>  & KING, PLLC<br>Attorneys for Defendants<br>One Lincoln Center<br>Syracuse, NY 13202 | JEREMY M. SHER, ESQ.<br>KATE I. REID, ESQ.<br>SUZZANE M. MESSER, ESQ. |

DAVID N. HURD
United States District Judge

## MEMORANDUM DECISION and ORDER

## I. INTRODUCTION

This case stems from a policy implemented by the Skaneateles Central School District and the Skaneateles Central School District's Board of Education (collectively, the "district") that permits students to use their preferred name and pronouns at school. Dkt. No. 1. Under the policy, the district permits students to determine when, how, and if to notify their parents of their decision to elect a chosen name and/or pronouns at school. *Id*.

One of plaintiff Jennifer Vitsaxaki's ("Mrs. Vitsaxaki") children, a seventh-grade student in the district, identified in this action as Jane Doe ("Doe"), sought support from the district and elected to use a preferred name and gender-neutral pronouns. Dkt. No. 1. The district obliged and set up an appointment with the school's counselor, psychologist, and social worker to discuss this decision with Doe. *Id*. After their meeting, the school counselor informed the district's faculty and staff that they were to address Doe by Doe's preferred name and pronouns in accordance with Doe's wishes. *Id*.

After a few months, the school's psychologist worked with Doe to complete a "Gender Support Plan." Dkt. No. 1. The central aim of the Plan was to document the support requested by the student. *Id*. When asked how the

JA086

district could best support them, Doe requested only that the district's faculty and staff refer to Doe by Doe's preferred name and pronouns. *Id.*

The Plan detailed not only Doe's preferred name and pronouns but indicated that Doe did not yet have a plan to reveal this decision to go by a preferred name and pronouns—and by extension Doe's gender identity—to family. Dkt. No. 1. Mrs. Vitsaxaki was thus unaware of Doe's decision. *Id.* The Plan further indicated that in order to avoid "outing," or revealing, Doe's decision regarding Doe's preferred name and pronouns to Doe's family against Doe's wishes, the district should refer to Doe by Doe's legal name when speaking with family. *Id.*

In May of that year, Mrs. Vitsaxaki learned of the Plan and of Doe's decision to use Doe's preferred name and pronouns at school. Dkt. No. 1. Mrs. Vitsaxaki strongly objected. *Id.* Doe was switched to online schooling for the remainder of the school year. *Id.* During that time, Doe continued to meet with school staff to discuss gender identity. *Id.* Mrs. Vitsaxaki was unaware of these meetings. *Id.*

After learning of these meetings, Mrs. Vitsaxaki requested that the district refrain from referring to Doe by Doe's preferred name or pronouns while she worked to better understand the situation with Doe herself. Dkt. No. 1. The district obliged. *Id.* Thereafter, Mrs. Vitsaxaki withdrew Doe

JA087

from the district and enrolled Doe in a private school for the following school year. *Id.*

On January 31, 2024, Mrs. Vitsaxaki filed this 42 U.S.C. § 1983 action against the district. Dkt. No. 1. Mrs. Vitsaxaki's three-count verified complaint asserts claims for violations of the Free Exercise Clause as well as substantive and procedural Due Process Clause violations stemming from the districts actions under the Policy. *Id.* According to Mrs. Vitsaxaki, the district infringed upon her free exercise of her chosen religion and upon her fundamental right to control various aspects of Doe's upbringing, healthcare, and education when it took actions under the Policy without her knowledge or consent. *Id.* In addition to money damages, Mrs. Vitsaxaki has sought declaratory relief declaring the Policy unconstitutional on its face and as applied to her. *Id.*

The district has moved to dismiss Mrs. Vitsaxaki's verified complaint pursuant to Federal Rules of Civil Procedure ("Rule(s)") 12(b)(1) and (6). Dkt. No. 19. Mrs. Vitsaxaki has opposed. Dkt. No. 23. The motion has been fully

- 4 -

JA088

briefed,[1] Dkt. Nos. 24–26, 28–31, and will be considered on the basis of the parties' submissions without oral argument.[2]

## II.  <u>BACKGROUND</u>

Mrs. Vitsaxaki grew up in New Jersey and later moved to Greece with her husband, a Greek citizen, after finishing college.  Ver. Compl. ¶¶ 28–29.  While living in Greece, Mrs. Vitsaxaki and her husband began raising a family.  *Id*. ¶ 29.  Mrs. Vitsaxaki and her husband have three children including Doe.  *Id*. ¶¶ 29–30.  Doe lived in Greece until age nine.  *Id*.

In 2017, after the Greek economy collapsed, Mrs. Vitsaxaki and her children relocated to live in Skaneateles, New York.  Ver. Compl. ¶¶ 9–10, 31–33.  The children were forced to quickly adapt to a new culture and to speaking primarily English instead of their native Greek.  *Id*. ¶ 35.  The children began attending public school in Skaneateles.  *Id*. ¶ 39.

Doe began fourth grade in the district in August of 2017.  Ver. Compl. ¶ 39.  Doe had trouble both adapting to school and relating to new, English-speaking classmates.  *Id*. ¶¶ 40–42.  Doe's challenges worsened in fifth grade.

---

[1]  The parties have each filed notices of supplemental authority with the Court.  Dkt. Nos. 25, 28–31.  The district argues that plaintiff's first notice of supplemental authority, Dkt. No. 25, is an improper surreply.  Dkt No. 26.  While the Local Rules of the Northern District of New York do not permit parties to file a surreply without leave, N.D.N.Y. L.R. 7.1(a)(1), there is no such requirement for notices of supplemental authority.  "[I]t is fairly standard practice for parties to occasionally send letters or to otherwise file supplemental authority after briefing is complete."  *Delgado v. Ocwen Loan Servicing, LLC*, 2016 WL 4617159, at *7 (E.D.N.Y. Sept. 2, 2016).  Accordingly, the Court has reviewed the authorities the parties have brought to the Court's attention.

[2]  The district's request for oral argument, Dkt. No. 19, is denied.

- 5 -

*Id.* ¶¶ 48–55.  Doe developed anxiety and began seeing the school counselor to work on coping mechanisms.  *Id.* ¶¶ 48–55.  These problems persisted as Doe continued along in school in the district.

In 2018, the district adopted policy 7552, titled "Student Gender Identity" (the "Policy").[3]  Ver. Compl. ¶ 197.  Under the Policy, school "staff will use the name and pronoun that corresponds to the gender identity the student consistently asserts at school."  *Id.* ¶ 201.  The Policy further provides that:

> [t]ransgender and [gender non-conforming] students have the right to discuss and convey their gender identity and expression openly and to decide *when, with whom, and how much to share* this confidential information. The plan may therefore include when and how to initiate the student's preferred name and associated pronoun use and if, when, and how this is communicated to others.

*Id.* ¶ 199.

In September 2020, Doe began seventh grade, and the district resumed in-person instruction.  Ver. Compl. ¶ 89.  During the school year, Doe began to have questions about gender identity.  *Id.* ¶¶ 93–97.  In early 2021, Doe informed the school guidance counselor, Christopher Viggiano ("Viggiano"), that Doe wanted to use a different name and pronouns to reflect Doe's gender identity.  *Id.* ¶ 98.  Doe also requested that school staff members use Doe's

---

[3]  A copy of the policy is included as Exhibit 5 to the Verified Complaint.  Ex. 5 to Ver. Comp., Dkt. No. 1-5.

desired first name and gender-neutral pronouns. *Id.* In response to Doe's request, Viggiano and the school psychologist, Vicky Powers ("Powers"), along with the school social worker, Michele Rogala ("Rogala"), met with Doe to discuss Doe's "new" gender identity and preferences. *Id.* ¶ 99. After a counseling session, Viggiano emailed school staff members to inform them of Doe's desired name and to use the gender-neutral pronouns "they and them" to refer to Doe instead of traditional feminine or masculine pronouns. *Id.* ¶ 107. However, when speaking with Mrs. Vitsaxaki about Doe, school staff members referred to Doe by Doe's legal name and traditional feminine pronouns. *Id.* ¶ 110.

During this time, Doe's anxiety and depression continued, and Doe remained reluctant to go to school. Ver. Compl. ¶ 102. When Mrs. Vitsaxaki asked the school counselors if they believed there was anything happening at school that could be causing or contributing to Doe's struggles, she was told "no." *Id.* ¶ 104.

Meanwhile, Doe was attending meetings with Powers and Rogala during which they discussed Doe's gender identity. Ver. Compl. ¶ 112. At times, other students also experiencing changes in their gender identities would attend. *Id.* Rogala also began hosting an "LGBTQ club" during the students' lunch hour. *Id.* ¶ 116. During LGBTQ club meetings, Rogala discussed the concepts of socially and medically transitioning one's gender with students

and provided them with literature on the subjects including local resources such as counselors, pediatricians, surgeons, and a nearby gender clinic. *Id.* ¶¶ 116–18.

Doe's grades in several classes began to suffer. Ver. Compl. ¶ 125. According to Mrs. Vitsaxaki, Doe's attention was being diverted away from school and Doe was missing classes in order to attend weekly counseling sessions. *Id.* Mrs. Vitsaxaki discussed her concerns regarding Doe's grades with Viggiano and Powers, as well as several of Doe's teachers. *Id.* ¶¶ 128–38. But Mrs. Vitsaxaki's concerns were dismissed, and she was told that nothing out of the ordinary was happening at school that might be affecting Doe's academic performance or mental health. *Id.*

That April, Powers completed a "Gender Support Plan" in accordance with the Policy.[4] Ver. Compl. ¶ 141. The Gender Support Plan noted that while friends were supportive of Doe's gender identity and preferred name and pronouns, Doe's family was not. *Id.* ¶ 142. The Gender Support Plan further noted that there was a risk of accidentally "outing" Doe, *i.e.*, revealing Doe's gender identity before Doe was ready, to Doe's family. *Id.* Staff were asked to use Doe's preferred name and pronouns when speaking to Doe, but to use Doe's legal name and feminine pronouns when speaking to Mrs. Vitsaxaki

---

[4] Doe's Gender Support Plan is included as Exhibit 3 to the Verified Complaint. Ex. 3 to Ver. Compl., Dkt. No. 1-3.

about Doe. *Id*. The Gender Support Plan also noted that Doe's legal name, rather than Doe's preferred name, would appear in the school yearbook and that there was no "plan" for Doe to come out to family at that time. *Id*. This left Mrs. Vitsaxaki and her husband in the dark about Doe's gender identity, and, according to Mrs. Vitsaxaki, made her and her husband the "last to know." *Id*. ¶ 143.

But on May 11, 2021, Doe's school principal, Michael Caraccio ("Caraccio"), called Mrs. Vitsaxaki to discuss Doe. Ver. Compl. ¶ 144–45. Unbeknownst to Mrs. Vitsaxaki, Doe was sitting in the room with Caraccio. *Id*. ¶ 144. During the call, Caraccio informed Mrs. Vitsaxaki that the district had been referring to Doe by Doe's preferred name and pronouns and had created a Gender Support Plan for Doe. *Id*. ¶ 146–47. Caraccio underscored that each of the district's actions had been taken pursuant to the Policy. *Id*. ¶ 148. Mrs. Vitsaxaki objected to the terms of the Policy and to the districts actions concerning Doe's gender expression at school. *Id*. ¶ 149. When Mrs. Vitsaxaki realized that Doe had been listening to their conversation, she attempted to console Doe and requested a follow-up call with Caraccio without Doe present. *Id*. ¶¶ 151, 154. The following day, Powers emailed several school staff members at the district to inform them that Caraccio had

disclosed Doe's gender identity and Gender Support Plan to Mrs. Vitsaxaki .[5]
*Id*. ¶ 158.

On May 17, 2021, Doe was switched to online instruction for the
remainder of the school year.  Ver. Compl. ¶ 156.  The following day, Mrs.
Vitsaxaki and her husband met with the district's "gender support team" that
it had created for Doe.  *Id*. ¶ 161.  During the meeting, Mrs. Vitsaxaki and
her husband learned for the first time the total number of the meetings Doe
had attended during the school year to discuss gender identity.  *Id*. ¶ 162.
Mrs. Vitsaxaki and her husband instructed school staff members to cease
using Doe's preferred name and pronouns while they dealt with the situation
at home.  *Id*. ¶ 166.

Mrs. Vitsaxaki and her husband then set out to speak with Doe's teachers
to find out what had been happening at school while they were unaware of
Doe's apparent gender identity struggles.  Ver. Compl. ¶ 169.  But many of
Doe's teachers were hesitant to discuss the issue, while others did not
respond to Mrs. Vitsaxaki 's inquiries at all.  *Id*. ¶ 170.  Upon meeting with
the district's superintendent and its attorney, Mrs. Vitsaxaki was informed
that the district had merely followed the terms of the Policy in its treatment

---

[5]  Caraccio emailed plaintiff a copy of Doe's Gender Support Plan on May 13, 2021.  Ver. Compl.
¶ 159.

of Doe at school. *Id*. ¶¶ 174–75. School staff continued to use Doe's preferred name and pronouns during Doe's online instruction. *Id*. ¶ 168.

Mrs. Vitsaxaki has since withdrawn Doe from the district and enrolled Doe in a private school for the 2021–22 school year. Ver. Compl. ¶ 186. According to Mrs. Vitsaxaki , she has observed noticeable improvement in Doe's demeanor, morale, health, and outlook. *Id*. ¶¶ 187, 192. In addition, Doe has not expressed a desire to be called by a preferred name or use gender-neutral pronouns. *Id*. ¶193.

But enrolling Doe in private school was not without financial strain on Mrs. Vitsaxaki and her husband. Ver. Compl. ¶ 188. Tuition for the private school cost the family $12,660 annually, and is the private school located twenty-five (25) miles from the Vitsaxakis's home. *Id*. ¶¶ 188–91.

## III. <u>LEGAL STANDARD</u>

### A. <u>Rule 12(b)(1)</u>

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Forjone v. Dep't of Motor Vehicles*, 414 F. Supp. 3d 292, 297–98 (N.D.N.Y. 2019) (cleaned up). Rule 12(b)(1) motions may be either *facial* or *fact-based*. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016).

Facial Rule 12(b)(1) motions are "based solely on the allegations of the complaint . . . and exhibits attached to it[.]" *Id.*  To resolve a facial motion, the district court must "determine whether the pleading alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Id.* (cleaned up).  In doing so, the district court "must accept the complaint's allegations as true and draw all reasonable inferences in favor of the plaintiff." *Wagner v. Hyra*, 518 F. Supp. 3d 613, 623 (N.D.N.Y. 2021) (quoting *Nicholas v. Trump*, 433 F. Supp. 3d 581, 586 (S.D.N.Y. 2020)).

By contrast, a defendant who makes a fact-based Rule 12(b)(1) motion submits extrinsic evidence.  *Carter*, 822 F.3d at 57.  If defendant's extrinsic evidence reveals a dispute of fact whether jurisdiction is proper, plaintiff must proffer evidence to controvert defendant's evidence.  *Id.* To resolve a fact-based motion, the district court must then make findings of fact to determine whether plaintiff has standing to sue.  *Id.*

## B.  Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, the complaint's factual allegations must be enough to elevate the plaintiff's right to relief above the level of speculation.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  So while legal conclusions can provide a framework for the complaint, they must be supported with meaningful allegations of fact.  *Ashcroft v. Iqbal*, 556 U.S.

662, 679 (2009).  In short, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

To assess this plausibility requirement, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  In doing so, the court generally confines itself to the facts alleged in the pleading, any documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV.  DISCUSSION

Mrs. Vitsaxaki's verified complaint sets forth three *Monell*[6] claims for violations of Mrs. Vitsaxaki's free exercise of religion, substantive due process rights, and procedural due process rights.  Ver. Compl. ¶¶ 260–318.  The district has moved to dismiss the verified complaint in its entirety.  Defs.' Mem., Dkt. No. 19-1 at 7.[7]  Briefly stated, the district argues that because

---

[6]  Plaintiffs causes of action are pleaded as § 1983 claims.  Ver. Compl. ¶¶ 260–318.  But plaintiff has not named any individual defendants.  Ordinarily, § 1983 liability may only attach to the actions of individual state actors acting under the color of state law.  § 1983.  However, under an exception identified by the United States Supreme Court, plaintiffs may bring claims for municipal liability predicated upon a "policy or custom" that inflicted the injury alleged.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).  Mrs. Vitsaxaki challenges the validity of a public school's school policy.  Ver. Compl. ¶¶ 255–56.  Accordingly, plaintiff has properly asserted a *Monell* claim.  The Court will thus proceed to analyze the merits of the district's motion to dismiss plaintiff's *Monell* claims.

[7]  Pagination corresponds to CM/ECF header.

- 13 -

JA097

Mrs. Vitsaxaki has since withdrawn Doe from the district, Mrs. Vitsaxaki

lacks standing to seek declaratory relief. *Id*. The district further argues that

Mrs. Vitsaxaki has failed to plausibly allege Free Exercise Clause claim or

Due Process Clause claims on the basis of the Policy. *Id*. at 7–9.

### A. <u>Standing to Seek Declaratory Relief</u>

At the outset, the district challenges Mrs. Vitsaxaki's standing to seek

declaratory relief declaring the Policy unconstitutional. Defs.' Mem. at 20–

21. The district points out that prior to commencing her lawsuit, Mrs.

Vitsaxaki withdrew Doe from the district, thus, depriving Mrs. Vitsaxaki of

standing to sue for prospective relief. *Id*.

Article III limits the Court's jurisdiction to "hear only 'cases or

controversies.'" *N.C. ex rel. Chu v. Rosa*, 2024 WL 4870487, at *2 (N.D.N.Y.

Nov. 22, 2024) (quoting *Grinnell v. U.S. Env't Prot. Agency*, –F. Supp. 3d–,

2024 WL 2945718, at *5 (N.D.N.Y. June 6, 2024)). There is a case or

controversy where the plaintiff can demonstrate—consistent with the degree

of evidence required at the stage of the litigation—an 'actual or imminent,

concrete and particularized injury-in-fact that is fairly traceable to the

challenged action of the defendant and is likely to be redressed by a favorable

judicial decision.'" *Id*. at *2–3 (quoting *Grinnell*, –F. Supp. 3d–, 2024 WL

2945718, at *5).

But where *declaratory relief* is sought, the plaintiff may not "rely on past injury to satisfy the injury requirement but must show a likelihood that they will be injured in the future." *Dorce v. City of N.Y.*, 2 F.4th 82, 95 (2d Cir. 2021) (cleaned up). "Such an allegation of future injury will be sufficient only if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Id.* (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

Upon review, Mrs. Vitsaxaki lacks standing to pursue the declaratory relief she seeks. Mrs. Vitsaxaki asserts that the district injured her via certain constitutional deprivations that occurred during the spring of 2021. Ver. Compl. ¶¶ 28–231. Mrs. Vitsaxaki further asserts that she removed Doe from the district following the 2020–21 school year. *Id.* ¶ 186. Notably, Mrs. Vitsaxaki does not allege that she intends to re-register Doe as a student in the district in the future. Thus, Mrs. Vitsaxaki has not alleged that she anticipates any future harm from the district. Accordingly, Mrs. Vitsaxaki 's claim for declaratory relief will be denied.

However, Mrs. Vitsaxaki has also sought money damages for her *Monell* claims. Accordingly, the Court will continue to analyze the merits of Mrs. Vitsaxaki's substantive claims.

**B. Free Exercise Clause**

Mrs. Vitsaxaki has brought a *Monell* claim alleging that the school district violated the Free Exercise Clause of the First Amendment, both on its face and as-applied to Mrs. Vitsaxaki,[8] when it referred to Doe by Doe's preferred name and gender-neutral pronouns without her knowledge or consent.  Ver. Compl. ¶¶ 260–76.  Mrs. Vitsaxaki asserts that her free exercise of religion was substantially burdened when she was unable to direct the upbringing and education of her child to "counteract" the school district's implicit messaging that "people can change their sex." *Id*. ¶ 265.

The district argues that Mrs. Vitsaxaki's Free Exercise Clause claim must be dismissed because she has not plausibly alleged how the Policy substantially burdened her free exercise of religion.  Def.'s Mem. at 21–22.  The district further argue that the Policy is a neutral, generally applicable, and rationally related to the state's legitimate interest of protecting the "physical and emotional well-being of youth, including students." *Id*. at 21–27 (internal quotation marks omitted).

---

[8] "In facial challenges, the challenger must establish that no set of circumstances exists under which the Act would be valid. . .[i]n as-applied challenges, [p]laintiffs must simply prove that the statute is unconstitutional as applied to the litigant's actual conduct." *Vermont Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 187 (D. Vt. 2024) (citations omitted).  But [w]here [p]laintiffs fail to state an as-applied challenge, any associated facial challenge necessarily fails as well." *Home for Aged of Little Sisters of the Poor v. McDonald*, 711 F. Supp. 3d 81, 101 (N.D.N.Y. 2024), *appeal withdrawn sub nom. Home for Aged of Little Sisters of Poor v. McDonald*, 2024 WL 3803195 (2d Cir. Mar. 22, 2024).  Thus, the Court will review the allegations of the Verified Complaint under the as-applied standard.

JA100

Taking the district's arguments in turn: first the district argues that Mrs. Vitsaxaki has not plausibly alleged *how* the Policy substantially burdened her free exercise of religion. Defs.' Mem. at 21–22. The district argues that Mrs. Vitsaxaki's assertions that her religious beliefs were burdened by her child's decisions to use a different name and pronouns at school without her knowledge cannot sustain a Free Exercise claim because she has not alleged that the Policy was either (1) directed to "impugn" her religious practices; or (2) depriving her of the ability to practice of her religion. *Id.* Rather, Mrs. Vitsaxaki "remained free to instruct" her child at home regarding her chosen religious beliefs. *Id.* at 22 (internal quotations omitted).

This argument confuses the baseline "trigger" for the Free Exercise Clause—the sincerity of Mrs. Vitsaxaki's religious beliefs—with the type of intrusion that the government regulation itself poses on those beliefs. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) ("Under this Court's precedents, a plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not "neutral" or "generally applicable."). The Court is satisfied that Mrs. Vitsaxaki has plausibly alleged the existence of a sincerely held religious belief, namely her Greek Orthodox faith. Ver. Compl. ¶¶ 232–53. Mrs. Vitsaxaki asserts that the district's actions taken pursuant to the Policy—

- 17 -

JA101

permitting Doe to use a preferred names and pronouns and to receive school counseling regarding gender identity questions—were in direct contradiction of her religious views concerning gender and biological sex.  *Id.*

But the Court's analysis does not stop here.  While Mrs. Vitsaxaki has plausibly alleged that the Policy burdened the free exercise of her religious beliefs, "[n]ot all burdens on religion are unconstitutional." *Bowen v. Roy*, 106 S.Ct. 2147, 2153, 476 U.S. 693, 702 (1986) (citation omitted).  That is, the Court must next determine the appropriate level of scrutiny under which the Policy must be analyzed to determine whether it is violative of the Free Exercise Clause.

When the government implements a regulation that is *both* neutral and generally applicable, the regulation is subjected to rational basis review.  *See Ass'n of Jewish Camp Operators v. Cuomo*, 470 F. Supp. 3d 197, 217–18 (N.D.N.Y. 2020) (Suddaby, J.).  Under this level of scrutiny, the regulation will be deemed constitutional where it is rationally related to a legitimate government interest.  *See id.*  However, where the government's regulation is not neutral and generally applicable, the regulation will be subjected to strict scrutiny.  *See id.*  That is, the government must demonstrate that the regulation is narrowly tailored to advance a *compelling* government interest. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).

JA102

While the district argues that the Policy is neutral and generally applicable, Mrs. Vitsaxaki argues that the Policy must satisfy strict scrutiny—not rational basis scrutiny—for several reasons. Pl.'s Opp'n at 14–20. According to Mrs. Vitsaxaki, the Policy must meet strict scrutiny because it (1) *conditioned* the availability of an otherwise available public benefit; (2) is not neutral and generally applicable; and (3) it implicates Mrs. Vitsaxaki's substantive due process rights, thus presenting a *hybrid* First Amendment claim. *Id.* However, for the reasons discussed below, these arguments must be rejected.

First, Mrs. Vitsaxaki argues that by implementing the Policy, the school district has conditioned the availability of public schooling on her "willingness to allow it to install contrary 'moral standards' and 'beliefs'" in her child. Pl.'s Opp'n at 16. Mrs. Vitsaxaki argues in doing so, the district has "'effectively penalized the free exercise of religion' in a way demanding strict scrutiny." *Id.* (citing *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 780 (2022)). Mrs. Vitsaxaki relies on Supreme Court precedent reinforcing the notion that parents may not be compelled to educate their children in a secular environment or excluded from receiving public benefits on account of their religious beliefs. *See e.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 235 (1972) (holding that Wisconsin's compulsory education law was violative of the Free Exercise Clause as applied to Amish parents); *Carson*, 596 U.S. at 789

- 19 -

JA103

(107 of 124), Page 107 of 124
Case: 25-952, 06/05/2025, DktEntry: 23.1, Page 107 of 124
Case 5:24-cv-00155-DNH-ML    Document 32    Filed 03/20/25    Page 20 of 32

(holding that Maine's exclusion of "non-sectarian" schools from its tuition assistance program violated the Free Exercise Clause).

However, Mrs. Vitsaxaki does not allege that she was compelled to educate her child in a secular environment. Nor does Mrs. Vitsaxaki allege that she was otherwise excluded from utilizing the benefits of public school on account of her religion. In fact, the verified complaint alleges that upon learning of the school district's Policy, she elected to send her child to a private, religious school that was more aligned with her religious beliefs. Unlike the law challenged in *Yoder*, Mrs. Vitsaxaki has challenged a school Policy that permits students to utilize chosen names and pronouns. At best, Mrs. Vitsaxaki's argument can be understood to present a sort of Establishment Clause issue: has the school established a religion or has it endorsed or promoted a religious message?

While Mrs. Vitsaxaki alleges that the policy inherently endorses a particular world view, a Policy that permits students to use preferred names and pronouns cannot be said to promote or endorse a religious message nor establish a particular religious practice. Nor does Mrs. Vitsaxaki allege that it does. Mrs. Vitsaxaki merely alleges that the choices available to students who choose to take advantage of the Policy runs afoul of her own religious beliefs. Thus, the Policy is unlike the laws at issue in *Yoder* or *Carson* and

Mrs. Vitsaxaki's verified complaint does not set forth a plausible Establishment Clause violation.

Next, Mrs. Vitsaxaki argues that the policy must be treated with strict scrutiny because it is not neutral and generally applicable. Mrs. Vitsaxaki asserts that the discretionary nature of the Policy renders it not generally applicable. *Id.*

In *Fulton v. City of Philadelphia*, the Supreme Court held that the city's use of discretion when determining whether to refer children in foster care to certain foster care agencies was not generally applicable and thus, subject to strict scrutiny. 593 U.S. 522, 535–41 (2021). In *Fulton*, the city utilized a standard foster care contract that included language prohibiting agencies from discriminating against prospective foster families on the basis of their sexual orientation. *Id.* at 535. However, the contract also included language that empowered the city's Commissioner of the Department of Human Services to make exceptions for certain non-compliant agencies. *Id.*

Importantly, the Commissioner retained sole discretion to grant or deny such an exception. *Id.* The Court explained that because the Commissioner retained discretion to decide whether to apply the restriction on certain agencies, and not others, rendered the contract not generally applicable and subject to strict scrutiny. *Id.* at 537 ("The creation of a formal mechanism for granting exceptions renders a policy not generally applicable[.]").

Mrs. Vitsaxaki argues that like the contract at issue in *Fulton*, the Policy provides the school district with discretion to decide to conceal a student's decision to use a preferred name and/or pronouns from parents. *Id.* at 18. Mrs. Vitsaxaki alleges that the school district "determines" whether to notify parents of a student's decision on a "case-by-case" basis. Ver. Compl. ¶¶ 269–71. However, while Mrs. Vitsaxaki alleges that the Policy permits the *school district* to determine whether to inform parents of a student's decision under the policy on a case-by-case basis, the Policy itself—appended to the verified complaint—provides some clarity.

The Policy states that "[t]ransgender and [gender non-conforming] students have the right to discuss and convey their gender identity and expression openly and to decide when, with whom, and how much to share this confidential information." Ex. 5 to the Ver. Compl. at 3. Instead of the district, it is the *student* who drives the decision-making process in each case to determine when and with whom to discuss whether they have elected to use a preferred name and/or pronouns at school—not the school district. *Id.* Thus, the Policy does not provide the school district with the kind of discretionary decision making that would otherwise render the Policy not generally applicable.

Finally, Mrs. Vitsaxaki argues that she has presented a "hybrid" claim that is subject to heightened scrutiny. Pl.'s Opp'n at 20. Upon review, this

JA106

argument must be rejected.  In support of this argument, Mrs. Vitsaxaki relies on the Supreme Court's language in *Employment Division v. Smith* that appears to carve out certain "hybrid" claims involving the "Free Exercise Clause in conjunction with other constitutional protections" as requiring heightened scrutiny.  494 U.S. 872, 881–81 (1990) (citations omitted).  However, the Second Circuit has expressly rejected this language as *dicta*. *Leebaert v. Harrington*, 332 F.3d 134, 143 (2d Cir. 2003) (citing *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001)) ("*Smith*'s 'language relating to hybrid claims is dicta and not binding on this court.'").  Thus, in this Circuit heightened scrutiny is not applied to these so-called hybrid rights claims.  *See We the Patriots USA, Inc. v. Conn. Office of Early Childhood Dev.*, 76 F.4th 130, 159 (2d Cir. 2023) (citing *Leebaert*, 332 F.3d at 143).

In sum, Mrs. Vitsaxaki has not plausibly alleged that the Policy is subject to strict scrutiny.  Therefore, the Policy must instead withstand rational basis scrutiny to pass constitutional muster.  That means that the Court must next determine whether Mrs. Vitsaxaki has plausibly alleged that the Policy fails to meet rational basis scrutiny.

A review of the Policy itself reveals that it is aimed at "fostering a safe learning environment for all students, free from discrimination and harassment on the basis of sex, gender, gender identity, gender

- 23 -

JA107

nonconformity, and gender expression." Ex. 5 to the Ver. Compl. at 2. Thus, the Court is satisfied that the Policy, which enables students to use their preferred name and/or pronouns is rationally related to the school district's legitimate interest in promoting a safe learning environment for its students.

Therefore, the Policy satisfies rational basis review as-applied to Mrs. Vitsaxaki.[9]  Accordingly, Mrs. Vitsaxaki's Free Exercise claim, brought both as-applied and on its face, will be dismissed.

## C. <u>Substantive Due Process Clause Claims</u>

Next, Mrs. Vitsaxaki has asserted a substantive due process claim against the district. Ver. Compl. ¶¶ 277–301. Mrs. Vitsaxaki asserts that the Policy, both as-applied to Mrs. Vitsaxaki and on its face, violated her fundamental liberty interest to direct the upbringing, education, and healthcare of her children when it referred to Doe by Doe's preferred name and gender-neutral pronouns without her knowledge or consent. *Id*. ¶¶ 290–96.

The district offers two arguments in favor of dismissal. *First*, the district argues that Mrs. Vitsaxaki's substantive due process claim must be dismissed because it is coextensive with her free exercise claim and like her free exercise claim, must be dismissed. Def.'s Mem. at 28. The district

---

[9]  As discussed above, "[w]here [p]laintiffs fail to state an as-applied challenge, any associated facial challenge necessarily fails as well[,]" and the Court has reviewed the sufficiency of the Verified Complaint on an as-applied basis. *Home for Aged of Little Sisters of the Poor*, 711 F. Supp. 3d at 101. Plaintiff has failed to state a plausible as-applied challenge to the Policy under the Free Exercise Clause, thus, the Court need not separately address the facial challenge.

JA108

argues that Mrs. Vitsaxaki is asserting her parental rights to raise Doe according to her *religious* beliefs, and that the dismissal of Mrs. Vitsaxaki's free exercise claim demands the dismissal of her related substantive due process claim. *Id.   Second*, the district argues that Mrs. Vitsaxaki has not plausibly alleged that the Policy infringed upon her fundamental liberty interest in making healthcare decisions for her children because she has not plausibly alleged that the district's actions under the Policy constituted healthcare decisions. *Id*. at 30–31. The district argues that Mrs. Vitsaxaki has not alleged that the district diagnosed or treated Doe, or that the district's actions were taken as part of a "treatment plan" for Doe. *Id*.

To determine whether Mrs. Vitsaxaki has plausibly alleged that the Policy violated her fundamental rights, the Court must first determine whether Mrs. Vitsaxaki has identified a fundamental right. Mrs. Vitsaxaki cites broadly her fundamental liberty interest to direct the upbringing, education, and healthcare of her children. *Id.* ¶¶ 290–96.

"[T]he Supreme Court has repeatedly held that parents have a liberty interest 'in the care, custody, and control of their children.'" *We The Patriots USA, Inc. v. Connecticut Off. of Early Childhood Dev.*, 76 F.4th 130, 159 (2d Cir. 2023), *cert. denied,* 144 S. Ct. 2682 (2024) (quoting *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000)). These parental *rights* include the "high duty to recognize symptoms of illness and to seek and follow medical advice."

*Parham v. J. R.*, 442 U.S. 584, 602 (1979).  The Court has not, however, defined the bounds of parental rights.

However, within the Second Circuit, the scope of parental rights has been limited in the education context.  Most recently, in *We the Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*, the Second Circuit held that "there is not a parental right, absent a violation of the Religion Clauses, to 'direct *how* a public school teaches their child.'"  76 F.4th 130, 159 (2d Cir. 2023), *cert. denied,* 144 S. Ct. 2682 (2024) (quoting *Skoros v. City of N.Y.*, 437 F.3d 1, 41 (2d Cir. 2006)).

As discussed *supra*, Mrs. Vitsaxaki has not plausibly alleged that the Policy nor the district's actions taken in accordance with the Policy were violative of the Free Exercise Clause or the Establishment Clause.  Thus, under *We the Patriots*, Mrs. Vitsaxaki may not broadly assert her right to direct Doe's upbringing to challenge the manner of instruction employed by the district.  *See Skoros*, 437 F.3d at 41 (quoting *Leebaert v. Harrington*, 323 F.3d 134, 141 (2d Cir. 2003)) ("[A] parent cannot invoke a separate 'fundamental right . . . to tell a public school what his or her child will and will not be taught.'").

Mrs. Vitsaxaki takes issue with the implicit messaging behind the policy, that a person's gender identity can be "changed."  *See* Ver. Compl. ¶ 243.  She alleges that the Policy infringes upon her parental rights to counsel Doe on

JA110

important decisions such as identity. *Id.* ¶¶ 285–86. But Mrs. Vitsaxaki's verified complaint—and copies of the Policy annexed to the verified complaint—describe a Policy that operates more like a civility code that extends the kind of decency students should expect at school: such as being called the name they ask to be called.[10] This strikes at the heart of the subject and manner of instruction a school district is entitled to implement for its students. *See Skoros,* 437 F.3d at 41 (2d Cir. 2006) (quoting *Goss v. Lopez*, 419 U.S. 565, 578 (1975)) ("[T]he broad spectrum of public education issues is generally 'committed to the control of state and local authorities.'").

Next, Mrs. Vitsaxaki has failed to plausibly allege that the district violated her fundamental right to make certain healthcare decisions for Doe when it referred to Doe by Doe's preferred name and gender-neutral pronouns. The Verified Complaint discusses at length the diagnosis of "gender dysphoria," Ver. Compl. ¶¶ 206–13, however, nowhere does Mrs. Vitsaxaki allege that the district attempted to diagnose or "treat" Doe. Rather, Mrs. Vitsaxaki alleges only that the district provided Doe with in-school resources such as counseling and access to a "gender support team." As the First Circuit recently opined in *Foote v. Ludlow Sch. Comm.*, where it considered nearly identical allegations at the pleading stage, merely *labeling*

---

[10] Mrs. Vitsaxaki also alleges that Doe received counseling and educational resources. Ver. Compl. ¶¶ 112–18.

the district's actions as medical treatment is not enough to transform the actions into treatment.  128 F.4th 336, 349–501 (1st Cir. 2025).  Mrs. Vitsaxaki's allegations merely attempt to cast the kind of mental health resources traditionally offered to adolescents in public schools as a special form of mental health "treatment" solely due to the nature of the discussions the district had with Doe: conversations pertaining to gender identity and expression.  In short, Mrs. Vitsaxaki does not plausibly allege that the district diagnosed or treated Doe or that the district violated her right to make healthcare decisions on Doe's behalf.

Finally, Mrs. Vitsaxaki asserts that by concealing its actions, the district violated her parental rights.  But this argument, too, fails.  Mrs. Vitsaxaki's theory is this: by concealing Doe's gender expression at school, the district effectively prevented Mrs. Vitsaxaki from exercising her parental rights to raise Doe and educate Doe at home the way she saw fit.  But Supreme Court precedent provides parents with no such right to information.  In fact, as the First Circuit observed in *Foote*, the Supreme Court has long held that there is "no affirmative right to governmental aid." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).  In other words, there is no notice requirement imposed on the government to apprise parents of their rights—only a limitation on the ways it may intrude upon those rights.

(116 of 124), Page 116 of 124
Case: 25-952, 06/05/2025, DktEntry: 23.1, Page 116 of 124
Case 5:24-cv-00155-DNH-ML   Document 32   Filed 03/20/25   Page 29 of 32

Further, as other circuits have observed in this context, parents "remain free to strive to mold their child according to the [their] own beliefs, whether through direct conversations, private educational institutions, religious programming, homeschooling, or other influential tools." *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 355 (1st Cir. 2025) (citing *Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256 266 (3d Cir. 2007)). Thus, Mrs. Vitsaxaki has not plausibly alleged that the district violated her parental rights based on a "concealment" theory. Simply put, she remained free to exercise her parent rights at home.

After determining whether the government conduct alleged restricted a fundamental right, the Court must next apply the appropriate level of constitutional scrutiny. "[T]he level of scrutiny" to which a governmental regulation is subject turns on the nature of the right at issue." *Andre-Rodney v. Hochul*, 618 F. Supp. 3d 72, 82 (N.D.N.Y. 2022) (citation omitted). As relevant here, when the right allegedly infringed "is fundamental, we apply strict scrutiny, and the governmental regulation must be narrowly tailored to serve a compelling state interest." *Goe v. Zucker*, 43 F.4th 19, 30 (2d Cir. 2022) (citation omitted). When the right allegedly infringed is "not fundamental, we apply rational basis review, and the governmental regulation need only be reasonably related to a legitimate state objective." *Id.* (citation omitted).

JA113

Mrs. Vitsaxaki has not plausibly alleged that the district's actions taken under the Policy restricted a fundamental right. As discussed, plaintiffs may not assert their parental rights broadly to curtail the manner of instruction of a school district. Mrs. Vitsaxaki also fails to plausibly allege that the district restricted her right to make medical decisions for Doe or that it violated her parental rights by concealing its support of Doe at school from her. *Supra.* Therefore, rational basis review will apply to the district's actions under the policy. That is, the Policy must be rationally related to some legitimate state interest. *Supra.* The text of the Policy states that the district is "committed to fostering a safe learning environment for all students, free from discrimination and harassment on the basis of sex, gender, gender identity, gender nonconformity, and gender expression." Ex. 5 to the Ver. Compl. at 2. Therefore, the Policy satisfies rational basis review. To be sure, the district's desire to maintain a safe learning environment itself is a *compelling* justification for the Policy. *See Sable Commc'ns of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989) ("We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors."). Thus, Mrs. Vitsaxaki has not plausibly alleged that the Policy fails to satisfy rational basis review.[11] Accordingly, this claim will be dismissed.

---

[11] As discussed, where plaintiff has failed to state a plausible as-applied challenge to the Policy under the Due Process Clause, the Court need not separately address the facial challenge. *See Home for Aged of Little Sisters of the Poor*, 711 F. Supp. 3d at 101.

JA114

## C. **Procedural Due Process Claim**

Finally, Mrs. Vitsaxaki has asserted a procedural due process claim against the district.  Ver. Compl. ¶¶ 302–18.  Mrs. Vitsaxaki alleges that the district failed to provide her with adequate procedural protections when it deprived her of her liberty interest to direct the care, custody, and control of her children.  *Id.*  The district argues that dismissal of this claim is required for the same reasons that Mrs. Vitsaxaki's substantive due process claim fails: she has failed to plausibly allege that she was deprived of a "liberty, or property interest protected by the Due Process Clause."  Def.'s Mem. at 31.

"A procedural due process claim requires proof of two elements: '(1) the existence of a property or liberty interest that was deprived; and (2) deprivation of that interest without due process.'" *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 619 (S.D.N.Y. 2016) (quoting *Bryant v. N.Y. State Educ. Dept.*, 692 F.3d 202, 218 (2d Cir. 2012)).  Thus, the first step in the analysis is to determine whether Mrs. Vitsaxaki has plausibly alleged a constitutional deprivation.  *Id.*

Again, Mrs. Vitsaxaki bases her procedural due process claim upon a deprivation of her parental rights to direct the care, custody, and control of Doe.  Ver. Compl. ¶¶ 306–07.  Mrs. Vitsaxaki alleges that she was deprived of her liberty interests when the district referred to Doe by Doe's preferred

JA115

name and gender-neutral pronouns without her knowledge or consent. *Id.* ¶ 308–09.

For the reasons discussed above, Mrs. Vitsaxaki has not identified plausible deprivations of her parental rights by the district. *Supra.* Therefore, Mrs. Vitsaxaki has not plausibly alleged a procedural due process claim based on the same theory of constitutional deprivation. Accordingly, this claim must also be dismissed.

## V.  CONCLUSION

Therefore, it is

ORDERED that

1.  The defendant's motion to dismiss the complaint (Dkt. No. 19) is GRANTED; and

2.  The plaintiff's complaint (Dkt. No. 1) is DISMISSED.

The Clerk of the Court is directed to file a judgment accordingly and close the file.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  March 20, 2025
         Utica, New York.

- 32 -

JA116

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

## <u>JUDGMENT IN A CIVIL CASE</u>

**Jennifer Vitsaxaki**
            Plaintiff

            vs.                                    **CASE NUMBER: 5:24-cv-155 (DNH/ML)**

**Skaneateles Central School District,**
**Skaneateles Central Schools' Board of Education**
            Defendant(s)


 **Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED:

ORDERED that
1.  The defendant's motion to dismiss the complaint (Dkt. No. 19) is GRANTED; and
2.  The plaintiff's complaint (Dkt. No. 1) is DISMISSED.
IT IS SO ORDERED.

All of the above pursuant to the order of the Honorable **David N. Hurd**, dated March 20, 2025.


DATED: March 20, 2025

                                    Clerk of Court


                                    s/_____
                                    Heather Merritt
                                    Deputy Clerk

JA117

# Federal Rules of Appellate Procedure
## Rule 4. Appeal as of Right

### (a) Appeal in a Civil Case.

1. (1) *Time for Filing a Notice of Appeal.*

(A) In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from.

(B) The notice of appeal may be filed by any party within 60 days after entry of the judgment or order appealed from if one of the parties is:

(i) the United States;
(ii) a United States agency;
(iii) a United States officer or employee sued in an official capacity; or
(iv) a current or former United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf — including all instances in which the United States represents that person when the judgment or order is entered or files the appeal for that person.

(C) An appeal from an order granting or denying an application for a writ of error *coram nobis* is an appeal in a civil case for purposes of Rule 4(a).

(2) *Filing Before Entry of Judgment.* A notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry.

(3) *Multiple Appeals.* If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later.

(4) *Effect of a Motion on a Notice of Appeal.*

(A) If a party timely files in the district court any of the following motions under the Federal Rules of Civil Procedure, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:

(i) for judgment under Rule 50(b);

(ii) to amend or make additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment;

(iii) for attorney's fees under Rule 54 if the district court extends the time to appeal under Rule 58;

(iv) to alter or amend the judgment under Rule 59;

(v) for a new trial under Rule 59; or

(vi) for relief under Rule 60 if the motion is filed no later than 28 days after the judgment is entered.

(B)(i) If a party files a notice of appeal after the court announces or enters a judgment—but before it disposes of any motion listed in Rule 4(a)(4)(A)—the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

(ii) A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A), or a judgment's alteration or amendment upon such a motion, must file a notice of appeal, or an amended notice

of appeal—in compliance with Rule 3(c)—within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion.

(5) *Motion for Extension of Time.*

(A) The district court may extend the time to file a notice of appeal if:

(i) a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and

(ii) regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause.

(B) A motion filed before the expiration of the time prescribed in Rule 4(a)(1) or (3) may be ex parte unless the court requires otherwise. If the motion is filed after the expiration of the prescribed time, notice must be given to the other parties in accordance with local rules.

(C) No extension under this Rule 4(a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later.

(6) *Reopening the Time to File an Appeal.* The district court may reopen the time to file an appeal for a period of 14 days after the date when its order to reopen is entered, but only if all the following conditions are satisfied:

(A) the court finds that the moving party did not receive notice under Federal Rule of Civil Procedure 77 (d) of the entry of the judgment or order sought to be appealed within 21 days after entry;

(B) the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice under Federal Rule of Civil Procedure 77 (d) of the entry, whichever is earlier; and

(C) the court finds that no party would be prejudiced.

(7) *Entry Defined.*

(A) A judgment or order is entered for purposes of this Rule 4(a):

(i) if Federal Rule of Civil Procedure 58 (a) does not require a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79 (a); or

(ii) if Federal Rule of Civil Procedure 58 (a) requires a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a) and when the earlier of these events occurs:

• the judgment or order is set forth on a separate document, or

• 150 days have run from entry of the judgment or order in the civil docket under Federal Rule of Civil Procedure 79 (a).

(B) A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58 (a) does not affect the validity of an appeal from that judgment or order.

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF NEW YORK
## SYRACUSE DIVISION

| | |
|---|---|
| **JENNIFER VITSAXAKI**, | Case No. 5:24-cv-00155-DNH-ML |
| *Plaintiff,* | Hon. David N. Hurd |
| v. | |
| **SKANEATELES CENTRAL SCHOOL DISTRICT**; **SKANEATELES CENTRAL SCHOOLS' BOARD OF EDUCATION**, | |
| *Defendants.* | |

## PLAINTIFF'S NOTICE OF APPEAL

Plaintiff Jennifer Vitsaxaki appeals to the United States Court of Appeals for the Second Circuit from the memorandum decision and order (ECF No. 32) and the final judgment (ECF No. 33) dismissing her complaint entered on March 20, 2025.

JA119

Dated: April 15, 2025

Respectfully submitted,

s/ *David A. Cortman*

Katherine L. Anderson*
Arizona Bar No. 33104
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
kanderson@ADFlegal.org

David A. Cortman
N.D.N.Y. Bar Roll No. 502661
**Alliance Defending Freedom**
1000 Hurricane Shoals Road N.E.,
   Suite D1100
Lawrenceville, Georgia 30043
(770) 339-0774
dcortman@ADFlegal.org

Vincent M. Wagner*
Virginia Bar No. 98663
Laurence J. Wilkinson
N.D.N.Y. Bar Roll No. 705823
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-4655
vwagner@ADFlegal.org
lwilkinson@ADFlegal.org

Raymond J. Dague
N.D.N.Y. Bar Roll No. 505622
**Dague & Martin, P.C.**
4874 Onondaga Rd.
Syracuse, New York 13215
(315) 422-2052
raymond@daguelaw.com

* Admitted *pro hac vice*

*Counsel for Plaintiff*

2

JA120

## CERTIFICATE OF SERVICE

I certify that on April 15, 2025, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel of record for all parties.

s/ *David A. Cortman*
David A. Cortman
N.D.N.Y. Bar Roll No. 502661
Alliance Defending Freedom
1000 Hurricane Shoals Road N.E.,
  Suite D1100
Lawrenceville, Georgia 30043
(770) 339-0774
dcortman@ADFlegal.org

*Counsel for Plaintiff*

JA121