# No. 25-952

## In the United States Court of Appeals
## for the Second Circuit

———————————

JENNIFER VITSAXAKI

*Plaintiffs-Appellant*,

v.

SKANEATELES CENTRAL SCHOOL DISTRICT, SKANEATELES CENTRAL SCHOOLS'
BOARD OF EDUCATION

*Defendants-Appellees*.

———————————

On Appeal from the U.S. District Court
Northern District of New York
Case No. 5:24-cv-01155

———————————

**BRIEF OF *AMICUS CURIAE* ABIGAIL MARTINEZ
IN SUPPORT OF APPELLANTS AND REVERSAL**

———————————

Jeffrey C. Mateer
Keisha T. Russell
Tiffany D. Dunkin
  *Counsel of Record*
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy, Ste 1600
Plano, TX 75075
(972) 941-4444
*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* Abigail Martinez is an individual.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................................ii

TABLE OF AUTHORITIES ...........................................................iv

INTEREST OF *AMICUS CURIAE* ......................................................1

SUMMARY OF ARGUMENT ..........................................................6

ARGUMENT ....................................................................7

I.    The Free Exercise Clause protects parents' freedom to direct their children's education and their ability to impart their sincere religious beliefs without governmental interference...................................7

II.   Skaneateles' policy substantially burdens the sincerely held religious beliefs of families from many different faith groups, including Jewish, Hindu, Muslim, and Christian families.........................................14

CONCLUSION ..................................................................24

CERTIFICATE OF COMPLIANCE ...................................................25

CERTIFICATE OF SERVICE.........................................................26

# TABLE OF AUTHORITIES

**Cases**

*A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*,
611 F.3d 248 (5th Cir. 2010) .............................................................20

*Arnold v. Bd. of Educ. of Escambia Cnty., Ala.*,
880 F.2d 305 (11th Cir. 1989) ..........................................................10

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982)...........................................................................9

*Ben-Levi v. Brown*,
136 S. Ct. 930 (2016)........................................................................20

*C.N. v. Ridgewood Bd. of Educ.*,
430 F.3d 159 (3d Cir. 2005) .............................................................12

*Espinoza v. Montana Dep't of Revenue*,
591 U.S. 464, (2020)...........................................................................8

*Gonzales v. Mathis Indep. Sch. Dist.*,
No. 2:18-cv-43, 2018 WL 6804595 (S.D. Tex. Dec. 27, 2018) .........20

*Green v. Miss U.S. of Am., LLC*,
52 F.4th 791 (9th Cir. 2022) .............................................................13

*Gruenke v. Seip*,
225 F.3d 290 (3d Cir. 2000) ........................................................10, 14

*Holt v. Hobbs*,
574 U.S. 352 (2015)..........................................................................20

*Mirabelli v. Olson*,
761 F. Supp. 3d 1317 (S.D.Cal. 2025).............................................12

*Morse v. Frederick*,
551 U.S. 393 (2007).........................................................................22

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020)..............................................................8, 19, 20

iv

*Pierce v. Society of Sisters*,
    268 U.S. 510 (1925) ........................................................................8

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ......................................................................23

*S.E. v. Grey*,
    No. 3:24-cv-01611-L-SBC, 2025 WL 1387061, (S.D. Cal. May 12, 2025) .......12

*Tatel v. Mt. Lebanon Sch. Dist.*,
    752 F. Supp. 3d 512 (W.D. Pa. 2024) ................................................12

*Tatel v. Mt. Lebanon Sch. Dist.*,
    637 F. Supp. 3d 295 (W.D. Pa. 2022) .........................................11, 22

*Thomas* v. *Rev. Bd. of Ind. Emp. Sec. Div.*,
    450 U.S. 707 (1981) ..................................................................16, 21

*W. Va. Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ........................................................................9

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ...............................................................passim

## Other Authorities

Asma Afsaruddin, *Muslim Views on Education: Parameters, Purview, and
    Possibilities*, 44 J. CATH. LEGAL STUDIES 143 (2005) ...............19, 20

Baptist Faith and Message (2000) ......................................................16

Catholic Catechism, No. 2333 ..........................................................15

Catholic Catechism, No. 2361 ..........................................................16

*Chastity, Chaste,* The Church of Jesus Christ of Latter-Day Saints ...........16

Christopher Yuan, *Gender Identity and Sexual Orientation,* THE GOSPEL
    COALITION ................................................................................15

Defending Education, *List of School District Transgender – Gender Nonconforming Student Policies* (Last updated Apr. 21, 2025) ...........................7

*Deuteronomy* 6:7 ................................................................................17

*Dharma Sastra*, Vol. 6 Manu Sanskrit ..................................................18

Dr. Sikiru Gbena Eniola, *An Islamic Perspective of Sex and Sexuality: A Lesson for Contemporary Muslims*, 12 IOSR JOURNAL OF HUMANITIES AND SOCIAL SCIENCE 2 (May–Jun. 2013) .............................................16

First Liberty Institute, *Public Comment on Section 1557 NPRM* (Oct. 3, 2022)....15

"Gender and Sexuality," *Religion Library: Hinduism*, PATHEOS............................18

*Genesis* 1:27 ..............................................................................17

*"In the Beginning…" Healing our Misconceptions*, Orthodox Church of America 15

*Issues in Jewish Ethics: Homosexuality*, JEWISH VIRTUAL LIBRARY .....................16

Maimonides, Mishne Torah, Hilkhot Talmud Torah ...............................................17

*Male, Female, or Other: Ruling of a Transgender Post Sex Change Procedures*, AMERICAN FIQH ACADEMY (May 2, 2017) ....................................................19

*Marriage in Islam*, Why Islam? Facts About Islam (March 5, 2015)..............16, 19

Marwan Ibrahim Alkaysi, MORALS AND MANNERS IN ISLAM: A GUIDE TO ISLAMIC ADAB 60-61 (1986) ...........................................................................19

*Raising Children as Good Hindus*, HINDUISM TODAY (Apr. 1, 2021)....................18

Stephen B. Levine, E. Abbruzzese & Julia W. Mason (2022) *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, Journal of Sex & Marital Therapy, 48:7 .............................................................3

*Surah Al-Hujurat* 49:13 .................................................................19

vi

*Surah Nur* 24:31 ...................................................................................19

*The Cass Review: Independent Review of Gender Identity Services for Children and Young People ("Cass Review")* (Apr. 2024)...................................................3

"Transgender Students – Ensuring Equity and Nondiscrimination," Arcadia Unified School District Policy Bulletin (Apr. 16, 2015) ......................................2

Transcript of Oral Argument, *Mahmoud v. Taylor*, No. 24-297 (U.S. Apr. 22, 2025) ....................................................... 22

*Women are the Twin Halves of Men*, Observer News Service, (March 9, 2017)....16

Yehuda Shurpin, *Why Are Women Exempt From Certain Mitzvahs?*, Chabad.org 17

## INTEREST OF *AMICUS CURIAE*[1]

*Abigail Martinez* is a bereaved mother from California, who lost her daughter Yaeli Galdamez to suicide in September 2019. Ms. Martinez is a devout Christian who immigrated from El Salvador as a teen and raised four children as a single mother in southern California. She shares her family's tragic story in hopes that other families will not experience similar heartache from harmful school policies that exclude parents and pressure vulnerable minors to pursue gender transitions, often at the expense of their mental and physical health.



*Yaeli (right) and her mother Abigail Martinez.*
*Photos courtesy of Abigail Martinez.*

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than *amicus*' counsel—contributed money that was intended to fund preparing or submitting the brief.

Ms. Martinez urges this Court to consider the consequences of its decision for the Vitsaxaki family, especially their minor child Jane, and for families around the country who face similar situations.

In 2015, the Arcadia Unified School District adopted a policy requiring staff to use preferred names and pronouns for transgender students without parental notification or permission or any "medical or mental health diagnosis or treatment threshold."[2] Like the Skaneateles Central School District's policy in this case, the Arcadia district directed staff to keep students' actual or perceived gender identity "private" from parents.

Also in 2015, Ms. Martinez' teenage daughter Yaeli, a student in Arcadia Unified School District, began questioning her sexuality. She was bullied in middle school and struggling with depression, but this questioning was new. School staff told Yaeli to clandestinely join the LGBTQ club, where she was persuaded that the only way to be happy was to change her gender. An older transgender student, also a female transitioning to male, convinced Yaeli that her depression was because she was transgender. Doubling down on the social pressure, Yaeli's school psychologist also encouraged her to pursue a gender transition instead of treating her depression, which was now severe. Ms. Martinez tried to advocate for her daughter's mental

---

[2] "Transgender Students – Ensuring Equity and Nondiscrimination," Arcadia Unified School District Policy Bulletin (Apr. 16, 2015), https://1.cdn.edl.io/93AmzJRTCq6suoldNojjDs08MNuS39NaH7QaZaDgRKhXY2pU.pdf.

health and recalls, "the school staff should have helped me, but they became my worst enemy." When Yaeli was hospitalized after attempting suicide, her former principal came to the hospital and pressured Ms. Martinez to call her daughter "Andrew," blaming Ms. Martinez and scornfully asking, "Is it too hard for you to call your child a new name?"[3]

At age 16, Yaeli ran away from home. The people at school pushing Yaeli's gender transition convinced her that the only way to get cross-sex hormones was to accuse her mother of abuse. Those accusations would land Yaeli in foster care, where the state would pay for gender-transition treatments without parental consent. Soon after, the California Department of Child and Family Services (DCFS) placed Yaeli in a group home. DCFS simultaneously placed Ms. Martinez on a child abuse registry even though it allowed her to continue raising her other three children.

---

[3] "The 'transition or die' narrative, whereby parents are told that their only choice is between a 'live trans daughter or a dead son' (or vice-versa), is both factually inaccurate and ethically fraught. . . it hurts the minority who are at risk, and who, as a result of such misinformation, *may forgo evidence-based suicide prevention intervention in the false hopes that transition will prevent suicide*." Stephen B. Levine, E. Abbruzzese & Julia W. Mason (2022) *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, Journal of Sex & Marital Therapy, 48:7, 713, https://www.tandfonline.com/doi/pdf/10.1080/0092623X.2022.2046221 (emphasis added); *see also The Cass Review: Independent Review of Gender Identity Services for Children and Young People ("Cass Review")* at 22, 179, 195 (Apr. 2024), https://perma.cc/3QVZ-9Y52

After a recommendation from the school psychologist, a judge ruled that Yaeli could receive cross-sex hormones, ignoring Ms. Martinez' pleas to instead treat her underlying depression. Meanwhile, Ms. Martinez was shut out of Yaeli's life, only allowed one hourly visit per week, and her visits were heavily monitored by members of RISE, an activist group from the Los Angeles LGBT Center who told her to "have a funeral for your daughter and adopt your son." "I was told not to talk about God," Martinez recalls. "They told me if you do that, you'll never see your daughter."



*Family visit at the group home for Yaeli's 17th birthday.*
*Photos courtesy of Abigail Martinez.*

By age 19, Yaeli was sent to an independent living situation but continued to struggle with deep depression and poverty. Desperate for food, she reached out to her mom who immediately brought her groceries. In response, Yaeli texted, "Mom, I wanted to cry because no matter what you're always there for me." Yaeli also told her mom she understood that she would never be able to become a boy, and that the cross-sex hormone treatments were causing her severe pain in her bones. Yet instead of receiving the care and medical treatment that Yaeli needed for her severe depression, the state gave her testosterone and took her away from her mom—the one source of support she knew she could always count on.

After a grueling legal battle, Ms. Martinez was absolved of all claims of abuse and removed from the child abuse registry. But it was too late. Two months later, Yaeli committed suicide by lying down on the tracks in front of a train. Her death was so gruesome that the funeral home was not able to show her body to Ms. Martinez.

After Yaeli's tragic death, Ms. Martinez requested meetings with the school staff and state workers who advised Yaeli, but no one responded. She eventually filed a civil lawsuit against the school district and DCFS. In response, DCFS admitted that they "aggressively pursued the implementation of inclusive, gender-affirming laws, policies, and supportive services for LGBTQ+ youth." According to the Arcadia Unified School District, "a claim suggesting our school or a staff

member did not properly treat a student's severe depression is both completely inaccurate and troubling as our schools and staff would not be authorized or medically qualified to treat clinical depression." Yet the district thought itself medically qualified to facilitate Yaeli's transition behind her mother's back and even advocate that she be removed from her home absent any evidence of abuse.

The legal system's utter failure to provide any adequate response, let alone remedy, only compounded the Martinez family's grief. "To them, my child was a number in the system. It's all political," said Ms. Martinez. "I want them to change this broken system, not to play with our children's lives, to give them what they really need. Not to go for what they believe. I don't want any other parent to suffer and go through what I've been going through. This pain doesn't have a beginning or end."

## SUMMARY OF ARGUMENT

Government policies that exclude parents from their children's lives have devastating consequences. When these policies influence a child's sexuality and gender, fundamental First Amendment rights are at stake.

The First Amendment provides robust protection for religious exercise, which includes parents' ability to bring up their children in accordance with their sincere religious beliefs. The Skaneateles Central School District's policy imposes a substantial burden on the sincere religious beliefs of the Vitsaxaki family and

6

families from a wide variety of faith traditions, including Muslim, Jewish, Hindu, and Christian families.

The First Amendment rights of amicus Abigail Martinez, whose daughter was unduly and undoubtedly influenced by an agenda-driven public school, of the Vitsaxaki family, and of the parents in over 1,000 school districts around the country adopting similar policies[4] are in need of judicial protection. Amicus urges this Court to uphold free exercise rights and consider the impact of such policies on religious families nationwide.

## ARGUMENT

### I.     The Free Exercise Clause protects parents' freedom to direct their children's education and their ability to impart their sincere religious beliefs without government interference.

The Free Exercise Clause provides robust protection for the religious liberty of families seeking to raise their children in accordance with their sincere religious beliefs. *See Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972) (parental rights regarding religious upbringing are "specifically protected by the Free Exercise Clause," "[l]ong before . . . universal formal education"). *Yoder* reaffirmed the Court's holding in *Pierce v. Society of Sisters*, describing it "as a charter of the rights of

---

[4] Defending Education, *List of School District Transgender – Gender Nonconforming Student Policies* (Last updated Apr. 21, 2025)*,* https://defendinged.org/investigations/list-of-school-district-transgender-gender-nonconforming-student-policies/.

parents to direct the religious upbringing of their children." *Yoder*, 406 U.S. at 233 (citing *Pierce*, 268 U.S. 510, 534–35 (1925)) ("The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.") The Court in *Yoder* drew a direct connection between parental rights and religious beliefs, explaining that "[t]he duty to prepare the child for 'additional obligations,' referred to by the Court, must be read to include the inculcation of moral standards, [and] religious beliefs." *Id.* at 233.

Parental rights are closely linked with free exercise rights and are especially strong for religious families seeking to teach their faith to the next generation. For nearly 100 years, the Supreme Court has reaffirmed the "enduring American tradition" of "the rights of parents to direct 'the religious upbringing' of their children." *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 486 (2020) (quoting *Yoder*, 406 U.S. at 213–214); *see also Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 754–56 (2020) (describing how many religious traditions entrust parents with primary responsibility for imparting their faith to their children without government interference). Not only does the First Amendment protect parents' freedom to teach their faith to their children, but for many this is a religious obligation at the core of the parents' own religious exercise.

Any infringement of these First Amendment rights is subject to strict scrutiny. *See Yoder*, 406 U.S. at 215 ("[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."). While the Court in *Yoder* did not face a situation where minor children disagreed with their Amish parents' decision to forgo the later years of public education, the Court observed that "such an intrusion by a State into family decisions in the area of religious training would give rise to grave questions of religious freedom comparable to those raised here." *Id.* at 231–32.

Courts have consistently recognized the link between parental rights and free exercise rights in the context of public-school policies, especially regarding religious families. The Supreme Court has recognized that "the discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 864 (1982); *see also W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) ("Boards of Education . . . have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual[.]").

9

Especially in cases involving gender identity or pregnancy—where "the situation raises profound moral and religious concerns"—public schools may not "depriv[e] the parents of the opportunity to counter influences on the child the parents find inimical to their religious beliefs or the values they wish instilled in their children." *Arnold v. Bd. of Educ. of Escambia Cnty., Ala.*, 880 F.2d 305, 313–14 (11th Cir. 1989) (holding that school officials violated the Constitution when they coerced minor into abortion without parents' knowledge); *see also Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000) (recognizing that "[i]t is not educators, but parents who have primary rights in the upbringing of children," when swim coach revealed student's pregnancy against family's wishes).

These enduring principles apply here. Public schools may not interfere with the foundational relationship between parents and children, especially in areas such as sexuality where religious beliefs are at stake. Simply because policies like the Skaneateles Central School District's are new and unprecedented in their dramatic scope does not give courts a free pass to explain away or ignore constitutional law that has protected parental rights for the past century. Here, the complaint alleges the Skaneateles officials interfered with the Vitsaxaki family's liberty interest. Even though the school psychologist knew that Jane's family had sincere religious objections, she still asked staff to refer to Jane by different pronouns. JA143. And though Mrs. Vitsaxaki "asked the School District to stop referring to Jane by any

10

names or pronouns," JA26, "some school staff continued to use the masculine name for Jane." JA27. Like the school officials in Arcadia Unified School District who refused to provide the mental health support that Ms. Martinez knew her daughter needed and pushed Yaeli toward gender transition instead, Skaneateles officials willfully went against the Vitsaxakis' beliefs and direction, creating a direct conflict between the parents and the district. Like Yaeli, Jane was caught in the crossfire, which damaged the family relationship potentially beyond repair. *See* JA28. The district court turned a blind eye to such actions, but this Court must not. Policies that exclude parents from sensitive medical and mental health decisions regarding their minor children violate the law with devastating consequences.

In *Tatel v. Mt. Lebanon School District*, a federal court recently vindicated parents' free exercise claims based on their "sincerely held religious beliefs about sexual or gender identity and the desire to inculcate those beliefs in their children." 637 F. Supp. 3d 295, 330 (W.D. Pa. 2022), *clarified on denial of reconsideration*, 675 F. Supp. 3d 551 (W.D. Pa. 2023). There, a first-grade teacher advocated her own agenda and beliefs about gender identity despite parents' objections. She told her six-year-old students to keep conversations secret, and the school district refused to provide notice and opt-out rights regarding the classroom discussions, as it did for other non-religious topics. *Id.* at 326. Contrasting the parents' religious teachings that "humans are created beings who must accept their

place in a larger reality" with the transgender movement's assertion that "human beings are autonomous, self-defining entities who can impose their internal beliefs about themselves on the exterior world," the court recognized the "contradictions between these worldviews." *Id.* at 321. The court emphasized that "parents, not schools, have the primary responsibility to inculcate moral standards, religious beliefs, and elements of good citizenship," especially "[w]ith respect to important matters that strike at the heart of parenting (such as inculcation of religious beliefs or teachings contrary to the parents' religious beliefs)." *Id.* at 323 (citing *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 (3d Cir. 2005)). Later, the court ruled that the school district violated the parents' free exercise rights and granted summary judgment in favor of the parents who objected to the policy based on their religious beliefs. *Tatel v. Mt. Lebanon Sch. Dist.*, 752 F. Supp. 3d. 512, 568 (W.D. Pa. 2024).

In *Mirabelli v. Olson*, another federal court held that gender-manipulation policies which exclude parents "implicate[] the heartland of parental protection under the substantive Due Process Clause" and the Free Exercise Clause, upholding both claims. 761 F. Supp. 3d 1317, 1333 (S.D. Cal. 2025) ("By concealing a child's gender health issues from the parents, parents are precluded from exercising their religious obligations to raise and care for their child at a time when it may be highly significant, because they are kept uninformed . . . ."); *see also S.E. v. Grey*, No. 3:24-cv-01611-L-SBC, 2025 WL 1387061, at *14 (S.D. Cal. May 12, 2025 (requiring

12

parental notice and opt-out from gender identity instruction in mentoring program, and finding that "[l]aws intended to 'eliminat[e] discrimination against LGBTQ individuals' . . . are generally insufficient to meet strict scrutiny.") (quoting *Green v. Miss U.S. of Am., LLC,* 52 F.4th 773, 791 (9th Cir. 2022)).

Here, Skaneateles' policy and practice of excluding parents from sensitive decisions about their children's physical and mental health interferes with religious exercise in multiple ways: (1) school staff are instructed to "affirm" a child's questioning of their gender identity or desire to change genders, in direct conflict with the religious beliefs their family may hold; (2) school staff are prevented from disclosing a child's experimentation with gender identity unless the child gives the school permission, thus excluding parents from any involvement; and (3) school staff interfere with the instruction that religious parents seek to provide to their children by allowing and encouraging students to undergo gender transitions without their parents' knowledge or consent. This policy violates the Free Exercise Clause by interfering with religious parents' historically rooted and constitutionally protected ability to raise their children in accordance with their sincere beliefs. The Skaneateles Central School District Board might wish to be "empowered, as parens patriae, to 'save' a child from himself or his [religious] parents" so that "the State will in large measure influence, if not determine, the religious future of the child." *Yoder*, 406 U.S. at 232. But that is a power the Constitution does not permit the

government to wield. The policy sets students and parents at odds by *requiring* parental exclusion and allowing the student total control over sensitive decisions about gender identity. JA106 ("it is the *student* who drives the decision-making process in each case"). Like the teacher's actions in *Tatel*, the policy sends the message that students can define their own gender and reality, apart from their parents' knowledge or guidance. JA106. These actions violate the Supreme Court's holding that it is the parents' responsibility to inculcate "moral standards, religious beliefs, and elements of good citizenship." *Yoder*, 406 U.S. at 233. As the Third Circuit held in *Gruenke*, "when such collisions [between parental rights and public school policies] occur, the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest." 225 F.3d at 305. Here, Skaneateles' policy triggers strict scrutiny, and it cannot hope to pass muster because its parental exclusion policy is maximally restrictive of parents' First Amendment rights. Thus, the policy violates the Free Exercise Clause.

## II. Skaneateles' policy substantially burdens the sincerely held religious beliefs of families from many different faith groups, including Jewish, Hindu, Muslim, and Christian families.

Religions from diverse cultures and geographic regions assert—as they have for millennia—that sex is an objective, binary category that cannot be changed by

14

self-perception or medical intervention.[5] Millions of Christians worldwide hold to this belief. Catholic teaching makes clear that "[e]veryone, man and woman, should acknowledge and accept his sexual identity" and that "[p]hysical, moral, and spiritual difference and complementarity are oriented toward the goods of marriage and the flourishing of family life."[6] The Orthodox Church of America teaches that "[o]ur sexuality begins with our creation," and "[t]he Bible says 'Male and female He created them' (Gen. 1:27)."[7] Within the Protestant tradition, most denominations believe the Bible's teaching that God created humans male and female in His image, and that this reality cannot be changed based on perceived gender identity, including but not limited to the Anglican Church, Assemblies of God, the Church of God in Christ, the Lutheran Church, the Presbyterian Church in America, and Southern Baptists.[8] For millions of Christians, including amicus Ms. Martinez and the Vitsaxaki family, "[p]arents are to teach their children spiritual and moral values and

---

[5] *See, e.g.,* Christopher Yuan, *Gender Identity and Sexual Orientation,* The Gospel Coalition, https://www.thegospelcoalition.org/essay/gender-identity-and-sexual-orientation/.

[6] Catholic Catechism, No. 2333, https://www.usccb.org/sites/default/files/flipbooks/catechism/562/#zoom=z.

[7] *"In the Beginning…" Healing our Misconceptions*, Orthodox Church of America, https://www.oca.org/the-hub/two-become-one/session-2-in-the-beginning-.-.-.-healing-our-misconceptions (quoting *Genesis* 1:27).

[8] For a complete list of sources, *see* First Liberty Institute, *Public Comment on Section 1557 NPRM* (Oct. 3, 2022), at 4-9, https://perma.cc/97NU-VCMZ (detailing religious beliefs of 20 faith groups on sex and gender).

to lead them, through consistent lifestyle example and loving discipline, to make choices based on biblical truth."[9]

But these religious beliefs are not just the province of traditional trinitarian Christianity. Sacred texts that define beliefs on marriage, sexuality, chastity, and sex as binary (male and female) include not only the Catholic Catechism[10] and the Bible, but also the Quran,[11] Hadith,[12] the Torah,[13] and the Book of Mormon.[14] The First Amendment provides robust protection for religious believers who adhere to these faiths, as well as for individuals who do not participate in a specific religious tradition but who hold sincere religious beliefs about the body, sexuality, marriage, and gender.[15]

---

[9] Baptist Faith and Message (2000), https://bfm.sbc.net/bfm2000/#xviii.

[10] Catholic Catechism, No. 2361, https://www.usccb.org/sites/default/files/flipbooks/catechism/569/#zoom=z.

[11] *Marriage in Islam*, Why Islam? Facts About Islam (March 5, 2015), https://www.whyislam.org/social-issues/marriage-in-islam/; *Women are the Twin Halves of Men*, Observer News Service, (March 9, 2017), https://kashmirobserver.net/2017/03/09/women-are-the-twin-halves-of-men/.

[12] Dr. Sikiru Gbena Eniola, *An Islamic Perspective of Sex and Sexuality: A Lesson for Contemporary Muslims*, 12 IOSR JOURNAL OF HUMANITIES AND SOCIAL SCIENCE 2 (May–Jun. 2013), at 2028, https://www.iosrjournals.org/iosr-jhss/papers/Vol12-issue2/C01222028.pdf.

[13] *Issues in Jewish Ethics: Homosexuality*, JEWISH VIRTUAL LIBRARY, https://www.jewishvirtuallibrary.org/homosexuality-in-judaism.

[14] *Chastity, Chaste,* The Church of Jesus Christ of Latter-Day Saints, https://www.churchofjesuschrist.org/study/scriptures/tg/chastity?lang=eng.

[15] *See Thomas* v. *Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981).

16

For example, millions of Jewish Americans follow traditional *halachic* teaching that is rooted in Jewish law dating back three millennia. The Torah is very clear about the divine creation of human beings as distinctly male and female.[16] Observant Jews are careful to follow the timeless prescriptions of the Torah and Talmud and to respect their specific commands regarding sexual purity and holiness. The Torah does not recognize the possibility of changing the sex or gender. "This distinction between women and men is also reflected in the role parents have in determining the identity of their child. The essence of Jewishness is determined by the mother, whereas the particulars of Jewishness, such as tribal identity, are determined by the father."[17] Jews also believe they are under a biblical obligation to teach their children God's commandments.[18] This is an obligation of the highest order, for "the world exists only by virtue of the breath coming from the mouths of children who study Torah."[19]

---

[16] *Genesis* 1:27, The Contemporary Torah, Sefaria ("And God created humankind in the divine image, creating it in the image of God—creating them male and female.") https://www.sefaria.org/Genesis.1.27?lang=bi&aliyot=0.

[17] Yehuda Shurpin, *Why Are Women Exempt From Certain Mitzvahs?*, Chabad.org, https://www.chabad.org/library/article_cdo/aid/4407982/jewish/Why-Are-Women-Exempt-From-Certain-Mitzvahs.htm.

[18] *See Deuteronomy* 6:7, The Contemporary Torah, Sefaria ("Impress them upon your children. Recite them when you stay at home and when you are away, when you lie down and when you get up.") https://www.sefaria.org/Deuteronomy.6.7?lang=bi&aliyot=0.

[19] Maimonides, Mishne Torah, Hilkhot Talmud Torah 1:2; 2:1, 3, https://www.sefaria.org/Mishneh_Torah%2C_Torah_Study.2?lang=bi.

For Hindu Americans, their sacred texts, culture, and values emphasize marriage and child-rearing as a parent's highest righteous (*Dharmic*) duty. Hindu teaching makes clear that men and women have distinct identities and roles, and that sexual activity belongs within the confines of heterosexual marriage.[20] It is only within heterosexual marriage that sexual behavior aligns with *dharma* or righteous living.[21] Hindus also believe that a parent's rights and responsibilities in child-rearing are sacred and must be protected against government infringement. "Parents are indeed the first guru . . . [t]he child's deepest impressions come from what the parents do and say."[22] Hindu legal texts (*Dharmaśāstras*) dating back two millennia provide detailed instructions regarding the rights and responsibilities of both parents in child-rearing and the importance of child welfare in society. Thus, parental instructions on a *Dharmic* life, without government interference, are essential to a child's education.

For Muslim Americans, both sacred writings and specific teachings make clear that men and women are two distinct biological sexes with important differences and relationships toward one another. The Quran makes this clear: "O

---

[20] *See, e.g.,* Dharma Sastra, Vol. 6 Manu Sanskrit, Chapter III, pp. 80–93, https://archive.org/details/dharmasastra-with-english-translation-mn-dutt-6-vols-20-smritis/Dharma%20Sastra%20Vol%206%20Manu%20Sanskrit/page/80/mode/2up.

[21] "Gender and Sexuality," Religion Library: Hinduism, PATHEOS, https://www.patheos.com/library/hinduism/ethics-morality-community/genderand-sexuality.

[22] *Raising Children as Good Hindus*, HINDUISM TODAY (Apr. 1, 2021), https://www.hinduismtoday.com/magazine/apr-may-jun-2021/raising-children-asgood-hindus/.

humanity! Indeed, We created you from a male and a female."[23] Both Shi'ah and Sunni Muslims hold to the words of the Prophet Mohammad (pbuh), who has stated that "men and women are twin halves of each other."[24] Muslims' belief that sex is binary, fixed, and immutable is closely linked to the creation narrative. Islamic teaching does not recognize alternate gender identities, because even when someone changes his or her outer appearance or receives hormones or surgery, there is no fundamental change in biology at the cellular level and thus "the rulings of that [biological] sex continue to apply."[25] As a matter of religious obedience, Muslims must observe decency (*ihtisham*), which prevents a Muslim female from sharing a restroom with the opposite biological sex, modesty (*hijab*), which includes behavior as well as dress, and seclusion (*khalwa*), which means a man and woman who are unrelated and unmarried cannot be alone together in an enclosed space.[26] Muslims also believe that "the acquisition of at least rudimentary knowledge of religion and its duties [is] mandatory for the Muslim individual."[27] This obligation, which applies

---

[23] Surah Al-Hujurat 49:13, https://quran.com/en/al-hujurat/13.

[24] *Marriage in Islam*, Why Islam? Facts About Islam (March 5, 2015), https://www.whyislam.org/social-issues/marriage-in-islam/.

[25] *Male, Female, or Other: Ruling of a Transgender Post Sex Change Procedures*, AMERICAN FIQH ACADEMY (May 2, 2017), http://fiqhacademy.com/res03/.

[26] *See, e.g.*, Surah Nur 24:31 (describing concept of hijab); Marwan Ibrahim Alkaysi, MORALS AND MANNERS IN ISLAM: A GUIDE TO ISLAMIC ADAB 60-61 (1986) (describing restroom obligations).

[27] *Our Lady of Guadalupe*, 591 U.S. at 755 (citing Asma Afsaruddin, *Muslim Views on Education: Parameters, Purview, and Possibilities*, 44 J. CATH. LEGAL STUDIES 143, 143–44 (2005)).

19

to parents as they raise children, comes from the Prophet Muhammad, who proclaimed that "'[t]he pursuit of knowledge is incumbent on every Muslim.'"[28]

Government officials are likely to misunderstand the beliefs and practices of religious families, and public-school administrators are no exception. *See, e.g., A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 260–61 (5th Cir. 2010) (school officials questioned Native American student's belief in "keep[ing] his] hair long and in braids as a tenet of [his] sincere religious beliefs"); *Gonzales v. Mathis Indep. Sch. Dist.*, No. 2:18-cv-43, 2018 WL 6804595, at *4 (S.D. Tex. Dec. 27, 2018) (school officials argued that students' traditional religious promesa (promise) was not "religious" or "an established tenet of their Catholic faith"). It is unconstitutional for government officials to question the merits of an individual or family's sincerely held religious beliefs. *Holt v. Hobbs*, 574 U.S. 352, 362 (2015); *see also Ben-Levi v. Brown*, 136 S. Ct. 930, 934 (2016) (Alito, J., dissenting from cert. denial) ("[T]he government cannot define the scope of personal religious beliefs.").

The Skaneateles Central School District's policy allowing government officials to ascertain whether parents are "supportive" of a child's perceived gender identity creates a very clear danger of making false or unfair assumptions based on the family's religious beliefs. *See* JA23. The policy not only invites but *requires*

---

[28] *Id.*

government officials to evaluate parents' moral and religious beliefs. *See* JA23–24. Such an analysis violates the First Amendment under *Holt* and *Thomas*. 450 U.S. at 715–16 (government actors must not second-guess or "undertake to dissect" sincere religious beliefs, because they "are not arbiters of scriptural interpretation").

Religious parents are increasingly labeled as "non-affirming" or "non-supportive" by school officials. Ms. Martinez experienced these *ad hominem* attacks when school officials repeatedly shut her out of Yaeli's life. Despite Ms. Martinez' consistent, loving support of Yaeli and her advocacy that Yaeli receive the mental health support she desperately needed, Arcadia Unified resorted to personal attacks instead of reasoned logic. This is a dangerous trend that is having an unconstitutional chilling effect on the religious expression of students and families. For example, parents may discourage a student from wearing religious attire or disclosing his or her family's religious tradition at school in fear that school officials will determine that the parents will not be "supportive" of their child because of their religious beliefs.

This practice erodes the crucial, formative relationship between children and their parents, which the Supreme Court has protected for nearly 100 years. *Yoder*, 406 U.S. at 213–14. And it ignores the fact that most religious parents are uniquely equipped to provide helpful guidance and support for their child, as they know their child best and can lovingly address influences such as peer pressure and mental

21

health challenges. Yet if their children's most difficult struggles are concealed from them by the government, loving parents like Ms. Martinez and Mrs. Vitsaxaki *cannot* provide the support that their children need, especially when encountering bullying or harassment at school. For all these reasons, the policy violates the Free Exercise Clause in a way that disproportionately harms religious families.

As many courts have recognized, parental rights do not evaporate when parents send their children to public school. *Morse v. Frederick*, 551 U.S. 393, 424 (2007) (Alito, J., concurring) ("It is a dangerous fiction to pretend that parents simply delegate their authority—including their authority to determine what their children may say and hear—to public school authorities.") Indeed, such an approach would "be fundamentally unfair to parents who in reality do not have that choice." *Tatel*, 637 F. Supp. 3d at 324–25. As Justices Alito and Barrett recently observed, most parents cannot afford alternatives to compulsory public school. Transcript of Oral Argument at 51, 138, *Mahmoud v. Taylor*, No. 24-297 (U.S. Apr. 22, 2025); *see also Morse*, 551 U.S. at 424 ("[m]ost parents, realistically, have no choice but to send their children to a public school and little ability to influence what occurs in the school.") And "[c]onstitutional rights should not be analyzed in a way that benefits only socially and economically advantaged persons," that is, parents who can afford private school or homeschooling on a single income. *Tatel*, 637 F. Supp. 3d at 325.

22

The Supreme Court has consistently recognized that "[f]amily relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619–20 (1984). These strong "personal bonds" "act as critical buffers between the individual and the power of the State." *Id.* When school policies and practices destroy these bonds by actively concealing critical information from parents and creating conflict between parents and their minor children, not only is the Constitution violated, but families are torn apart. This Court should heed the concerns of religious parents like Mrs. Vitsaxaki and the dire consequences of policies and practices that destroy the trust and bond between a child and her parents, so that Yaeli's tragic story is never repeated again.

## CONCLUSION

For all of these reasons, the Court should reverse the district court's ruling.

*Respectfully submitted*,

/s/ *Tiffany D. Dunkin*
Jeffrey C. Mateer
Keisha T. Russell
Tiffany D. Dunkin
    *Counsel of Record*
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy, Ste 1600
Plano, TX 75075
(972) 941-4444
tdunkin@firstliberty.org
*Counsel for Amicus Curiae*

June 12, 2025

24

**CERTIFICATE OF COMPLIANCE**

I, Tiffany D. Dunkin, hereby certify that:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 5142 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f);

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14.

June 12, 2025

*/s/ Tiffany D. Dunkin*
Tiffany D. Dunkin
*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2025, this document filed through the CM/ECF/ACMS system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

June 12, 2025

*/s/ Tiffany D. Dunkin*
Tiffany D. Dunkin
*Counsel for Amicus Curiae*
