# 25-0952-cv

## United States Court of Appeals

### for the

## Second Circuit

JENNIFER VITSAXAKI,

*Plaintiff-Appellant,*

— v. —

SKANEATELES CENTRAL SCHOOL DISTRICT,
SKANEATELES CENTRAL SCHOOLS' BOARD OF EDUCATION,

*Defendants-Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

JEREMY M. SHER
BOND, SCHOENECK & KING PLLC
*Attorneys for Defendants-Appellees*
350 Linden Oaks, 3rd Floor
Rochester, New York 14625
(585) 362-4700

CP COUNSEL PRESS    (800) 4-APPEAL • (514707)

# Table Of Contents

**Page**

Statement of Issues.............................................................. 1

Preliminary Statement.......................................................... 1

Summary of the Complaint ................................................... 2

    A.    The District's Student Gender Identity Policy................................ 3

    B.    Doe Requests That the District Use a Different Name and Pronouns Without Informing Vitsaxaki ........................ 7

    C.    Doe's Gender Support Plan ......................................... 12

    D.    Vitsaxaki Becomes Aware of the District's Use of Doe's Preferred Name and Pronouns............................... 13

    E.    Vitsaxaki Withdraws Doe from the District ................................. 16

    F.    Vitsaxaki's Section 1983 Claims..................................... 16

    G.    The District Court Dismisses the Complaint................................ 18

Argument ......................................................................... 22

    1.    Vitsaxaki Lacks Standing to Seek Declaratory Relief ................... 22

    2.    The Policy Is Subject to Rational Basis Review under the Free Exercise Clause ....................................... 24

        2.1.    The Policy Does Not Substantially Interfere with or Pose a Real Threat to Religious Upbringing ................. 26

        2.2.    The Policy Is Generally Applicable............................ 32

    3.    Vitsaxaki Fails to State a Substantive Due Process Claim............. 38

        3.1.    Vitsaxaki's Hybrid Rights Challenge Fails................................ 39

        3.2.    Vitsaxaki Fails to Identify an Applicable Fundamental Right That Could Alter the Standard of Review ... 41

3.2.1. The Policy Does Not Implicate Any Recognized Unenumerated Right ................................. 43

3.2.1.1. The Policy Receives Rational Basis Review Even If It "Implicates Healthcare Matters" .............. 47

3.2.1.2. The Policy Receives Rational Basis Review Even If It May Require Nondisclosure ......... 50

3.3. The Policy Does Not Shock the Conscience .............................. 54

4. The Policy Satisfies Rational Basis Review ................................... 56

5. Vitsaxaki Fails to State a Procedural Due Process Claim ............... 57

Conclusion ................................................................. 59

Certificate of Compliance with Federal Rule of Appellate Procedure 32(a) ... 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anspach v. City of Philadelphia*,
   503 F.3d 256 (3d Cir. 2007)..................................................51, 52

*Arnold v. Bd. of Educ.*,
   880 F.2d 305 (11th Cir. 1989).................................50, 51, 52, 53

*Bartell v. Lohiser*,
   215 F.3d 550 (6th Cir. 2000) ...................................................... 58

*Blau v. Fort Thomas Pub. Sch. Dist.*,
   401 F.3d 381 (6th Cir. 2004) ...................................................... 48

*Bowen v. Roy*,
   476 U.S. 693 (1986) .................................................................... 30

*Brandon v. Royce*,
   102 F.4th 47 (2d Cir. 2024) ........................................................ 25

*Carson ex rel. O.C. v. Makin*,
   596 U.S. 767 (2022) ..............................................................19, 31

*City of Canton v. Harris*,
   489 U.S. 378 (1989) .................................................................... 37

*Cleburne v. Cleburne Living Ctr., Inc.*,
   473 U.S. 432 (1985) .................................................................... 45

*Collins v. Daniels*,
   916 F.3d 1302 (10th Cir. 2019).................................................. 23

*Crue v. Aiken*,
   370 F.3d 668 (7th Cir. 2004) ...................................................... 24

*Cruzan v. Dir., Mo. Dep't of Health*,
   497 U.S. 261 (1990) .................................................................... 47

iii

*Dep't of State v. Muñoz*,
  602 U.S. 899 (2024) ................................................................ 45

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
  489 U.S. 189 (1989) ............................................................. 52, 53

*Deshawn E. by Charlotte E. v. Safir*,
  156 F.3d 340 (2d Cir. 1998) .................................................... 23

*Diei v. Boyd*,
  116 F.4th 637 (6th Cir. 2024) ................................................. 24

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ............................................................. 42, 45

*Doe ex rel. Doe v. Boyertown Area Sch. Dist.*,
  897 F.3d 518 (3d Cir. 2018) .................................................. 56, 57

*Doe v. Del. Valley Reg'l High Sch. Bd. of Educ.*,
  No. 24-00107 (GC) (JBD),
  2024 U.S. Dist. LEXIS 29292 (D.N.J. Feb. 21, 2024) ............................. 57

*Doe v. Franklin Square Union Free Sch. Dist.*,
  100 F.4th 86 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 570 (2024) ........... passim

*Doe v. Uthmeier*,
  No. 5D2025-1363,
  2025 Fla. App. LEXIS 3751 (Fla. Dist. Ct. App. May 14, 2025) .............. 59

*Dorce v. City of New York*,
  2 F.4th 82 (2d Cir. 2021) ..................................................... 22, 24

*Employment Div. v. Smith*,
  494 U.S. 872 (1990) ............................................................ 25, 26

*Espinoza v. Mont. Dep't of Revenue*,
  591 U.S. 464 (2020) .............................................................. 31

*Foote v. Ludlow Sch. Comm.*,
  128 F.4th 336 (1st Cir. 2025) ............................................... passim

*Fox v. Bd. of Trs.*,
  42 F.3d 135 (2d Cir. 1994) ...................................................... 23

*Fulton v. City of Philadelphia,*
   593 U.S. 522 (2021) ........................................................................33, 35

*Goss v. Lopez,*
   419 U.S. 565 (1975) ............................................................................. 29

*Grimm v. Gloucester Cnty. Sch. Bd.,*
   972 F.3d 586 (4th Cir. 2020) ...........................................................56, 57

*Gruenke v. Seip,*
   225 F.3d 290 (3d Cir. 2000).......................................................50, 51, 53

*H.L. v. Matheson,*
   450 U.S. 398 (1981) ............................................................................. 51

*Immediato v. Rye Neck Sch. Dist.,*
   73 F.3d 454 (2d Cir. 1996) ................................................................... 44

*J.S. v. Blue Mt. Sch. Dist.,*
   650 F.3d 915 (3d Cir. 2011) (en banc).................................................. 51

*K.A. v. Barnes,*
   134 F.4th 1067 (10th Cir. 2025)............................................................ 23

*K.D. v. White Plains Sch. Dist.,*
   921 F. Supp. 2d 197 (S.D.N.Y. 2013) .................................................. 59

*Kane v. De Blasio,*
   19 F.4th 152 (2d Cir. 2021) .................................................................. 35

*Kanuszewski v. Mich. Dep't of Health & Human Servs.,*
   927 F.3d 396 (6th Cir. 2019) ...........................................................23, 44

*Leebaert v. Harrington,*
   332 F.3d 134 (2d Cir. 2003).............................................................38, 42

*Littlejohn v. Sch. Bd.,*
   132 F.4th 1232 (11th Cir. 2025).......................................................54, 55

*Mahmoud v. Taylor,*
   No. 24-297, 2025 U.S. LEXIS 2500, __ S. Ct. __ (June 27, 2025).......passim

v

*Marcavage v. City of New York,*
689 F.3d 98 (2d Cir. 2012) ............................................................22, 24

*Matter of Cody VV. (Brandi VV.),*
226 A.D.3d 24 (3d Dep't 2024) ............................................................ 56

*Meyer v. Nebraska,*
262 U.S. 390 (1923) ............................................................ 42

*Miller v. McDonald,*
130 F.4th 258 (2d Cir. 2025) (per curiam) ..............................25, 34, 38, 39

*Monell v. Dep't of Soc. Servs.,*
436 U.S. 658 (1978) ............................................................ 36, 37, 38

*Outlaw v. City of Hartford,*
884 F.3d 351 (2d Cir. 2018)............................................................37, 38

*Parents for Privacy v. Barr,*
949 F.3d 1210 (9th Cir. 2020)............................................................32, 35

*Parham v. J.R.,*
442 U.S. 584 (1979) ............................................................46, 47

*Phillips v. City of New York,*
775 F.3d 538 (2d Cir. 2015) (per curiam) .............................................. 41

*Pierce v. Soc'y of Sisters,*
268 U.S. 510 (1925) ............................................................ 42

*Radwan v. Manuel,*
55 F.4th 101 (2d Cir. 2022) ............................................................ 57

*Regino v. Staley,*
133 F.4th 951 (9th Cir. 2025) ............................................................ 58

*Sable Commc'ns of Cal., Inc. v. FCC,*
492 U.S. 115 (1989) ............................................................ 56

*Skoros v. City of New York,*
437 F.3d 1 (2d Cir. 2006) ............................................................passim

vi

*Southerland v. City of New York*,
  680 F.3d 127 (2d Cir. 2012)................................................................43, 58

*Tenenbaum v. Williams*,
  193 F.3d 581 (2d Cir. 1999)................................................................44, 48

*Torcivia v. Suffolk County*,
  17 F.4th 342 (2d Cir. 2021) ...............................................................37, 38

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017) ........................................................................ 31

*Troxel v. Granville*,
  530 U.S. 57 (2000) (plurality op.) ......................................................41, 42

*United States v. Myers*,
  426 F.3d 117 (2d Cir. 2005)............................................................... 43

*United States v. Skrmetti*,
  222 L. Ed. 2d 136, __ S. Ct. __ (2025) ...............................................45, 49

*Vesely v. Ill. Sch. Dist. 45*,
  669 F. Supp. 3d 706 (N.D. Ill. 2023)................................................... 57

*We The Patriots USA, Inc. v. Conn. Office of Early Childhood Dev.*,
  76 F.4th 130 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 2682 (2024) .........passim

*W. Va. Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ........................................................................32, 45

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ........................................................................ 22

*Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*,
  680 F. Supp. 3d 1250 (D. Wyo. 2023)................................................... 49

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ........................................................................passim

**Other Authorities**

Fed. R. Civ. P. 12(b)(1) ................................................................. 18

Fed. R. Civ. P. 12(b)(6) ................................................................. 18

## Statement of Issues

1.  Whether the District Court properly dismissed the claim of Plaintiff-Appellant Jennifer Vitsaxaki ("Vitsaxaki") that Defendants-Appellees Skaneateles Central School District and Skaneateles Central Schools' Board of Education (together, the "District") violated Vitsaxaki's rights under the First Amendment Free Exercise Clause through the District's actions under its Student Gender Identity Policy (the "Policy," JA81-84 (Compl. Ex. 5)), which required the District to honor the preferred name, pronouns, and privacy requests of Vitsaxaki's daughter "Jane Doe."

2.  Whether the District Court properly dismissed Vitsaxaki's claim that the District's actions under the Policy violated Vitsaxaki's fundamental parental rights under the Fourteenth Amendment Due Process Clause.

3.  Whether the District Court properly dismissed Vitsaxaki's claim that the District's actions under the Policy violated Vitsaxaki's procedural due process rights under the Fourteenth Amendment Due Process Clause.

4.  Whether the District Court properly dismissed Vitsaxaki's demand for a declaratory judgment as to the above claims for lack of standing.

## Preliminary Statement

The central question on this appeal is whether Vitsaxaki states a claim that a school district policy that requires staff to honor students' requests regarding the

use and nondisclosure of preferred names and pronouns, but does not encourage students one way or another regarding whether they use or disclose different names and pronouns, violates the Free Exercise or Due Process Clauses.

This Court's and the Supreme Court's precedents on free exercise and parental rights in the context of education answer this question in the District's favor. A viewpoint-neutral policy that governs how staff must respond to students' name, pronoun, and privacy requests does not violate the Free Exercise Clause, any unenumerated parental right, or the right to procedural due process, including when District staff honor a student's request for nondisclosure to parents. To hold otherwise would be to find that the Constitution affirmatively obligates schools to report children who request to be called different names and pronouns to their parents or caregivers, a result that, contrary to precedent, would weaponize the Free Exercise and Due Process Clauses against schools and student privacy.

### Summary of the Complaint

The Complaint hinges on Vitsaxaki's allegations that, acting pursuant to its Student Gender Identity Policy and Doe's requests, the District called Doe by a "typically masculine name" and "the third-person plural pronouns 'they' and

2

'them'" without informing Vitsaxaki or obtaining her consent. JA18 (Compl. ¶ 107) (emphasis added).[1]

Vitsaxaki falsely implies that the Complaint alleges something far more invasive than honoring Doe's requests regarding use of a typically masculine name, they/them pronouns, and nondisclosure, claiming no fewer than thirteen times in her Brief that the District "treated her daughter as a boy" or "socially transition[ed Doe] to the opposite gender." Vitsaxaki Br. at 2, 5; *see id.* at ix, 4, 7-8, 10, 20, 22, 24, 48, 50. In reality, the Complaint only alleges that Doe asked the District to use a typically masculine name and they/them pronouns without notifying Vitsaxaki, and the District complied with Doe's requests pursuant to its Policy.

## A. The District's Student Gender Identity Policy

At the heart of this action is "Policy 7552, adopted by the School District in 2018 and entitled 'Student Gender Identity.'" JA30 (Compl. ¶ 197). Vitsaxaki attaches a copy of the Policy, taken from the District Policy Manual, to the Complaint. *Id.*; JA82-84 (Compl. Ex. 5). Vitsaxaki alleges that the District violated her free exercise, substantive due process, and procedural due process rights when, acting pursuant to the Policy, it called Doe by Doe's preferred name and

---

[1] Vitsaxaki's submissions redact and never provide Doe's "typically masculine name." JA18 (Compl. ¶ 107); *see* JA78 (Gender Support Plan).

pronouns without Vitsaxaki's knowledge or consent. JA30-31 (Compl. ¶¶ 197-204); JA40 (Compl. ¶¶ 263-65); JA43-45 (Compl. ¶¶ 290-97); JA46-47 (Compl. ¶¶ 309-17).[2]

The Policy begins with this summary:

> All students need a safe and supportive educational environment to progress academically and developmentally. The District is committed to fostering a safe learning environment for all students, free from discrimination and harassment on the basis of sex, gender, gender identity, gender nonconformity, and gender expression. In accordance with applicable law, regulations, and guidelines, the District will ensure that students have equal access to all school programs, facilities, and activities. The District will assess and address the specific needs of each student on a case-by-case basis.

JA82 (Policy at 1).

The Policy proceeds to a "Key Terms" section, which includes the following language that is relevant to this action:

> Generally, District personnel should use the language that individual students are using to describe their own gender identity, appearance, or behavior. The most commonly used terms are: . . .

> Gender: actual or perceived sex, typically with reference to social and cultural differences rather than physiological ones.

> Gender expression: the ways a person conveys their gender identity to others, such as through behavior, appearance, clothing, hairstyle, activities, voice, and mannerisms.

---

[2] Vitsaxaki also claims that the District "acted pursuant to . . . School District customs, practices, and usages," but does not identify any such "customs, practices, and usages" other than the Policy. JA31 (Compl. ¶ 204).

4

> Gender identity: a person's inner sense or psychological knowledge of being male, female, neither, or both.
>
> Gender nonconforming (GNC): describes someone whose gender identity or gender expression does not conform to social or stereotypical expectations of a person with that gender assigned at birth. . . .
>
> Transgender: someone whose gender identity is different than their gender assigned at birth. . . .

*Id.*

The Policy contains the following language relevant to the Complaint regarding the District's communications with transgender or gender nonconforming students and their parents. Emphasis in this language below is taken from quotations in the Complaint.

> **Records**
>
> As required by law, the District will maintain the confidentiality of student information and records . . . .
>
> If a transgender or GNC student has not officially changed his or her name, but wishes to be referred to by a different name that corresponds to their gender identity, the District may create or change unofficial records to reflect the name and gender identity that the student consistently asserts at school. On state standardized tests, certain reports to the New York State Education Department, and when necessary to ensure appropriate and coordinated medical care, however, the District will use the student's legal name and gender. Any student identification cards *will be issued with the name reflecting the gender identity* the student consistently asserts at school. The District *will maintain records with the student's assigned birth name and gender in a separate, confidential file.*

5

**Names and Pronouns**

When apprised of a student's transgender or GNC status, the District will endeavor to engage the student and his or her parents or guardians, as appropriate, in an effort to agree upon a plan that will accommodate the student's individual needs at school. Transgender and GNC students have the right to discuss and convey their gender identity and expression openly and to decide *when, with whom, and how much to share* this confidential information. The plan may therefore include when and how to initiate the student's preferred name and associated pronoun use and if, and when, and how this is communicated to others. District staff will use the name and pronoun that corresponds to the gender identity the student consistently asserts at school.

JA83 (Policy at 2) (*quoted in* JA30-31 (Compl. ¶¶ 198-201) (emphasis in Complaint)). Vitsaxaki does not challenge any other sections of the Policy.

Thus, the Policy does not instruct staff to encourage students to choose different names and pronouns. Nor does the Policy instruct staff to encourage students to keep their preferred names and pronouns private from family members. Instead, the Policy directs staff on how to respond to students' requests regarding names, pronouns, and privacy. If a student tells District staff that they wish to be called by a different name or pronouns, the Policy requires District staff to honor the student's request. Similarly, if a student does not want the District to share their preferred name and pronouns with family members, the Policy requires District staff to honor the student's request as well. The Policy does not provide any factors for determining whether to inform parents of a student's preferred name and pronouns other than the student's own wishes. As the

6

Complaint itself recognizes, the Policy's central principle is that "students have the right to discuss and convey their gender identity and expression openly and to decide *when, with whom, and how much to share* this confidential information." JA31 (Compl. ¶ 200 (quoting JA83 (Policy at 2) (emphasis in Complaint)).

## B. Doe Requests That the District Use a Different Name and Pronouns Without Informing Vitsaxaki

Doe was twelve years old and a seventh-grade student at Skaneateles Middle School, which the District operates, during the time period relevant to Vitsaxaki's claims. JA5, 8-9 (Compl. ¶¶ 1, 13, 19).[3]

Vitsaxaki alleges that Doe had struggled with adapting to going to school in the District after enrolling there in fourth grade, in part because English was not Doe's first language. JA11 (Compl. ¶¶ 39-42). Doe suffered from anxiety and resisted going to school in fifth and sixth grade. JA12 (Compl. ¶¶ 48-55); JA13 (Compl. ¶¶ 59-61). Vitsaxaki does not allege that the Policy had anything to do with Doe's struggles prior to seventh grade, or that the District used a different name or pronouns for Doe prior to seventh grade.

In sixth grade, some students in Doe's classes and school "began experimenting with new 'gender identities,' including identities associated with names and pronouns that were different than their legal names and did not correspond to

---

[3] Because the Complaint refers to Doe as female, the District will do the same in this motion.

7

their biological sex." JA15 (Compl. ¶ 79). When some of these students "formally asked school staff to refer to them at school by different names and incorrect [sic] pronouns—ones not associated with their biological sex—the school quickly agreed." JA15 (Compl. ¶ 82). In such cases, the Policy "prohibited school staff from disclosing information about students' use of incorrect [sic] names and pronouns at school unless the parents already knew or the student requested that their parents be told." JA16 (Compl. ¶ 84). At the time, Vitsaxaki was unaware of Doe's peers using different names and pronouns, potentially without their parents' knowledge. JA15 (Compl. ¶ 82).

In seventh grade, Doe's "anxiety, resistance to going to school, and other struggles returned with in-person schooling; indeed, they got worse as the year went on." JA16 (Compl. ¶ 89). The middle school guidance counselor, Christopher Viggiano, and school psychologist, Vicky Powers, pulled Doe "from lunch and from classes for counseling sessions to talk about conflict with her peers and, eventually, about experimentation with new gender identities" without Vitsaxaki's knowledge. JA17 (Compl. ¶ 93); *see* JA13 (Compl. ¶ 57); JA17 (Compl. ¶ 95). The Complaint does not describe what Viggiano and Powers said about "experimentation with new gender identities" or who initiated discussion about gender identities. Doe "also began regularly meeting with Vicky

8

Wolfganger, the school nurse," but the Complaint does not allege why Wolf-ganger and Doe met or what they discussed. JA17 (Compl. ¶ 94).

"As seventh grade continued, [Doe] learned more about gender identity and watched peers ask the School District to refer to them by different names and incorrect [sic] pronouns, which school officials quickly did." JA17 (Compl. ¶ 96). Doe "also began to view online content about different gender identities and watch YouTube videos about the topic." JA17 (Compl. ¶ 97).

"In early 2021, as some of her peers had already done, [Doe] went to Mr. Vig-giano—without Mrs. Vitsaxaki's knowledge—and asked that staff at the middle school refer to her by a different name and pronouns based on a new gender identity." JA17 (Compl. ¶ 98). Viggiano, Powers, and the school social worker, Michele Rogala, met to discuss Doe's request. JA17 (Compl. ¶ 99). Unidentified District staff told Doe that "her parents did not need to be notified, and the school would only disclose the information to the people [Doe] asked them to tell." JA18 (Compl. ¶ 101). The Complaint does not allege that the District en-couraged Doe to use a different name or pronouns, that the District encouraged Doe not to tell Vitsaxaki about Doe's different name or pronouns, or that the Policy directed any such conduct.

On February 10, 2021, Viggiano "emailed several staff members at the mid-dle school to inform them" that they should call Doe by a particular "typically

9

masculine name" and refer to Doe with they/them pronouns. JA18 (Compl. ¶ 107); *see* JA50 (Feb. 10, 2021 Email, Compl. Ex. 1). The email stated: "FYI, [redacted] came to me and Michele to inform us that she would like to be called [redacted] with her preferred pronouns they/them. [Redacted] has already talked with their close friends about it. Michele and I will follow up with her after break to see what the plan is for discussing this change with their parents." JA50.

The Complaint characterizes the District's honoring of Doe's request to go by a typically masculine name and they/them pronouns as "a psychosocial intervention for gender dysphoria sometimes called 'social transition.'" JA31 (Compl. ¶ 205). The Complaint repeatedly uses "social transition" to refer to the District honoring Doe's choice to go by a typically masculine name and they/them pronouns at school. The Complaint does not allege that Doe had or was diagnosed with gender dysphoria.

After Viggiano sent her February 10, 2021 email, "middle-school staff consistently referred to [Doe] with the [typically] masculine name" and they/them pronouns "without telling Mrs. Vitsaxaki or obtaining her consent." JA19 (Compl. ¶ 109). When speaking with Vitsaxaki, District staff "referred to [Doe] by her given name and female pronouns," while calling Doe by her preferred name and pronouns at school. JA19 (Compl. ¶ 110). This occurred in

10

"numerous conversations with Mrs. Vitsaxaki as Mrs. Vitsaxaki continued to ask [Doe's] teachers, Mr. Viggiano, Ms. Powers, and other school staff about her daughter's well-being, academics, and anxiety." JA19 (Compl. ¶ 111).

After Doe asked to be called by a typically masculine name and they/them pronouns, Powers and Rogala met more frequently with Doe and other students "with whom they would discuss their new gender identities." JA19 (Compl. ¶ 112). Rogala "started an 'LGBTQ club' at lunch, which she encouraged [Doe] and others to attend." JA19 (Compl. ¶ 115). Through the LGBTQ club, Rogala encouraged Doe "and other students to 'socially transition,' a controversial process that can include, among other actions, changing how a person dresses or grooms herself or which private facilities she uses (like restrooms or locker rooms), along with adopting names and pronouns other than those associated with a person's sex." JA19-20 (Compl. ¶ 116). "For example, [Doe] was told that her biological sex was something that she could choose to change as a solution to difficulties that she was facing." JA20 (Compl. ¶ 117). Rogala also gave Doe "resources on 'medical transition' that included information and details on clinics she could contact in the area that offered medical interventions with the goal of 'medically transitioning.'" JA20 (Compl. ¶ 118) (citing JA51-076 (Compl. Ex. 2)). Vitsaxaki was unaware of these interactions with Rogala. JA20 (Compl. ¶¶ 121-22). The Complaint does not allege that the Policy directed Rogala to

11

give any advice or resources to Doe, or that Doe contacted or used any of those resources.

## C. Doe's Gender Support Plan

"In April 2021, Ms. Powers completed a 'Gender Support Plan' for [Doe] that was consistent with Mr. Viggiano's February 10 email informing School District staff that they should use a masculine name and [they/them] pronouns for [Doe]." JA23 (Compl. ¶ 141) (citing J077-78, Gender Support Plan dated Apr. 23, 2021 (the "Plan"), Compl. Ex. 3).

The Plan included the "typically masculine name" as Doe's preferred name, gave "they/them" as Doe's pronouns, and stated "no gender" for Doe's gender. JA78 (Plan). The Plan stated that Doe's family, except Doe's cousin, was not "aware" and that Doe was "not ready to tell family." *Id.* In response to the question "Is there a plan to come out to them [i.e., family]," the Plan stated: "no solid plan @ this time." *Id.* Further, Doe specified in the Plan that the District should use Doe's legal name "when speaking with guardians," and the Plan included a checked box corresponding to "Discussed risk of accidentally outing student at home." *Id.* The Plan checked "Legal Name" for the name that would appear in Doe's yearbook entry. *Id.* In response to the question "How can we support?", Doe answered in the Plan: "calling me [by the typically masculine name]/they/them." *Id.*

12

The Plan checked "yes" to the questions of whether Doe's friends and peers were "aware" and "supportive," stating "Friend group knows of name preference @ this time and pronouns." *Id.* In response to the question "How can we support" regarding friends and peers, Doe answered in the Plan: "same way." *Id.*

In a section involving teachers and staff, the Plan stated that "[typically masculine name] wishes to direct all 'outings' @ this time," the Plan was a "Student led plan," and "student wanted to inform teachers" as well as all middle school staff, substitute and PE teachers, and cafeteria staff. *Id.* The Plan checked "no" for "Bathroom / Locker facilities – Special Considerations / changes." *Id.* The Plan concluded as follows: "Offered continued support as [typically masculine name] navigates this process for self. [Typically masculine name] did not want to move forward @ this time." *Id.*

## D. Vitsaxaki Becomes Aware of the District's Use of Doe's Preferred Name and Pronouns

On May 11, 2021, Vitsaxaki was informed during a phone call with Doe's principal, Michael Caraccio, that the District had created a Gender Support Plan for Doe and was using Doe's preferred name and pronouns at school, "in accordance with School District Policy." JA24 (Compl. ¶ 148); *see* JA23-24 (Compl. ¶¶ 144, 147). The call was on speakerphone "with [Doe] listening in to

the conversation. Mr. Caraccio did not initially tell Mrs. Vitsaxaki that [Doe] was in the room." JA24 (Compl. ¶ 145). Vitsaxaki "objected in strong terms" to the District's use of Doe's preferred name and pronouns until "she realized [Doe] was listening," at which point she "sought to console her daughter before ending the call." JA24 (Compl. ¶¶ 149, 151).

The next day, Powers "emailed several staff members at the Middle School to update them about [Doe]." JA25 (Compl. ¶ 157). The email stated that Caraccio, with Doe present, had disclosed "what was going on" regarding Doe's preferred name and pronouns to Vitsaxaki. JA25 (Compl. ¶ 158 (quoting JA79-80 (Powers May 12, 2021 Email, Compl. Ex. 4)). Powers wrote: "As you know, [typically masculine name] had not come 'out' to they's [sic] family as of yesterday. . . . It has offered some relief in that [typically masculine name] does not have to dance around the issue or avoid altogether, as well as, we at school do not have to any longer either." JA80 (Powers May 12, 2021 Email).

"In the following days, Mr. Caraccio sent Mrs. Vitsaxaki a copy of the Gender Support Plan . . . and suggested in a follow-up telephone conversation that Mrs. Vitsaxaki meet with Doe's 'gender support team' to provide her with further information." JA25-26 (Compl. ¶ 159). On May 18, 2021, Doe's parents met with Viggiano, Powers, Rogala, Caraccio, and Wolfganger, where they "learned for the first time that Doe had regularly met with a number of school

14

staff members and discussed gender identity issues, during which meetings she felt pushed towards using a different name and incorrect [sic] pronouns." JA26 (Compl. ¶ 162). The Complaint does not allege how the District "pushed" Doe "towards using a different name" and pronouns. *Id.* Nor does the Complaint allege, or the Policy state, that the Policy permits or encourages any such "pushing."

At the meeting, "[t]he Vitsaxakis also learned . . . that Mr. Caraccio chose to finally disclose the School District's social transition of [Doe] only after one of her teachers had pressured him to inform her parents." JA26 (Compl. ¶ 164); *see* JA26 (Compl. ¶ 165). The Complaint does not allege whether Doe agreed to the District's disclosure of Doe's preferred name and pronouns to the Vitsaxakis.

"In the meeting, Mrs. Vitsaxaki asked the School District to stop referring to [Doe] by any names or pronouns [sic] while she worked to better understand the situation with her daughter." JA26 (Compl. ¶ 166). Caraccio agreed to Vitsaxaki's request. JA27 (Compl. ¶ 168). However, Vitsaxaki believed from other discussions with District staff and teachers' references to Doe during online schooling that the District would continue to use Doe's preferred name and pronouns against Vitsaxaki's wishes. JA28 (Compl. ¶¶ 183-84).

On June 16, 2021, Vitsaxaki "met with the School District's superintendent, Eric Knuth, and its attorney, Randy Ray." JA27 (Compl. ¶ 173). Knuth and Ray

15

"confirmed that middle-school staff and administrators had correctly followed School District policy in their handling of [Doe's] situation, including in their decision not to inform Mrs. Vitsaxaki or seek her consent prior to" using Doe's preferred name and pronouns. JA27 (Compl. ¶ 175).

### E. Vitsaxaki Withdraws Doe from the District

"For the 2021-2022 school year, Mrs. Vitsaxaki enrolled [Doe] into a private school in Syracuse where she repeated the seventh grade." JA29 (Compl. ¶ 186). Since withdrawing from the District, "[Doe] has not expressed any desire to have a masculine name or to use pronouns other than those that align with her biological sex," JA29 (Compl. ¶ 193), and Doe's "morale, outlook, health, and well-being" have improved, JA29 (Compl. ¶ 192).

Taking Doe to the private school "requires additional transportation and scheduling," JA29 (Compl. ¶ 189), as well as tuition, JA29 (Compl. ¶ 190).

### F. Vitsaxaki's Section 1983 Claims

Relevant to her first count for violation of her First Amendment free exercise rights, Vitsaxaki's Greek Orthodox faith instills her with the beliefs that "God created two sexes, male and female" and "each of us is born with a fixed biological sex that is a gift from God; it is not an arbitrary imposition subject to change." JA37 (Compl. ¶¶ 242-43); *see* JA36 (Compl. ¶¶ 233-34). Vitsaxaki's religious beliefs "prevent her from personally affirming or communicating views

16

about human nature and gender identity that are contrary to her beliefs." JA37 (Compl. ¶ 244). Vitsaxaki alleges that "[b]y referring to [Doe] with a [typically] masculine name and incorrect [sic] pronouns without notifying Mrs. Vitsaxaki or seeking her consent and by concealing these actions from Mrs. Vitsaxaki, Defendants substantially burdened Mrs. Vitsaxaki's ability to exercise her religion." JA40 (Compl. ¶ 263). She further alleges that the District's actions "were neither neutral towards religion nor generally applicable" because the Policy "required [the District] to take Mrs. Vitsaxaki's individualized circumstances into consideration when deciding to notify her that Defendants were referring to [Doe] by a [typically] masculine name and third-person plural pronouns." JA41 (Compl. ¶¶ 269, 271). Vitsaxaki does not allege that the District knew about or considered her religious beliefs at any time.

For her second count, Vitsaxaki alleges that the District's use of Doe's preferred name and pronouns without Vitsaxaki's knowledge or consent "interfered with Mrs. Vitsaxaki's fundamental right" under the Fourteenth Amendment Due Process Clause "to direct the upbringing, education, and healthcare of [Doe], because she lacked the knowledge necessary to exercise her right to choose to educate [Doe] in an environment that would not have undermined her religious beliefs." JA44 (Compl. ¶ 292); see JA42 (Compl. ¶¶ 278-81)). Vitsaxaki also alleges that "Defendants denied Mrs. Vitsaxaki her fundamental right to

17

direct her daughter's healthcare related to the important topic of gender confusion or gender dysphoria." JA44 (Compl. ¶ 296).

For her third count, Vitsaxaki alleges that the same conduct by the District violated Vitsaxaki's right to procedural due process under the Fourteenth Amendment because its actions—referring to Doe "by a [typically] masculine name and third-person plural pronouns" without Vitsaxaki's knowledge or consent, JA46 (Compl. ¶ 309)—"were sufficiently invasive to trigger procedural safeguards" that the District failed to provide to Vitsaxaki, JA46 (Compl. ¶ 311); *see* JA45 (Compl. ¶¶ 303-05). Vitsaxaki alleges that the District "deprived Mrs. Vitsaxaki of a cognizable liberty interest" without "any possibility of process before or during the deprivation of her liberty interest." JA46 (Compl. ¶¶ 309, 315).

Vitsaxaki seeks "[a] declaration that the School District's policy facially and as applied to Mrs. Vitsaxaki violates her First and Fourteenth Amendment rights under the U.S. Constitution" and money damages. JA47 (Compl. Prayer for Relief § A).

## G. The District Court Dismisses the Complaint

The District moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). JA88 (Mem. Dec. & Order ("Dec.") at 4).

The district court (Hurd, J.) granted the motion and dismissed the Complaint. JA116 (Dec. at 32).

First, the district court found that Vitsaxaki "lacks standing to pursue the declaratory relief she seeks" because she had removed Doe from the District and "has not alleged that she anticipates any future harm from the [D]istrict." JA99 (Dec. at 15).

The district court next confronted Vitsaxaki's arguments that the Policy violated the Free Exercise Clause's principle "that parents may not be compelled to educate their children in a secular environment or excluded from receiving public benefits on account of their religious beliefs." JA103 (Dec. at 19) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 235 (1972); *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 780 (2022)). The court found that "Mrs. Vitsaxaki does not allege that she was compelled to educate her child in a secular environment" because she "merely alleges that the choices available to students who choose to take advantage of the Policy run[] afoul of her own religious beliefs." JA104 (Dec. at 20).

The district court then found that the Policy was neutral and generally applicable. In response to Vitsaxaki's argument that the Policy was not generally applicable because it was "discretionary," JA105 (Dec. at 21), the court found that under the Policy, "it is the *student* who drives the decision-making process in each case to determine when and with whom to discuss whether they have elected to

19

use a preferred name and/or pronouns at school—not the school district." JA106 (Dec. at 22) (citing the Policy). "Thus," the court concluded, "the Policy does not provide the school district with the kind of discretionary decisionmaking that would otherwise render the Policy not generally applicable." *Id.*

The district court also "rejected" Vitsaxaki's argument that she had "presented a 'hybrid' claim that is subject to heightened scrutiny," finding that the Second Circuit does not apply heightened scrutiny to "hybrid rights claims." JA106-07 (Dec. at 22-23).

Accordingly, the district court applied rational basis review to the Policy. The court concluded that "the Policy, which enables students to use their preferred name and/or pronouns is rationally related to the school district's legitimate interest in promoting a safe learning environment for its students." JA108 (Dec. at 24).

In assessing Vitsaxaki's substantive due process claim, the district court observed that under Second Circuit precedent, "there is not a parental right, absent a violation of the Religion Clauses, to 'direct *how* a public school teaches their child.'" JA110 (Dec. at 26) (quoting *We The Patriots USA, Inc. v. Conn. Office of Early Childhood Dev.*, 76 F.4th 130 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 2682 (2024)). Since Vitsaxaki had not plausibly alleged a free exercise violation, "under *We The Patriots*, Mrs. Vitsaxaki [could] not broadly assert her right to direct

20

Doe's upbringing to challenge the manner of instruction employed by the district." JA110 (Dec. at 26). The district court also found that because the Policy "extends the kind of decency students should expect at school: such as being called the name they asked to be called," the Policy "strikes at the heart of the subject and manner of instruction a school district is entitled to implement for its students." JA111 (Dec. at 27).

The district court also rejected Vitsaxaki's claim that "conversations pertaining to gender and identity" and use of Doe's preferred name and pronouns constituted "mental health 'treatment'" that could intrude on "her fundamental right to make certain healthcare decisions for Doe." JA111-12 (Dec. at 27-28). Further, the court rejected Vitsaxaki's argument "that by concealing its actions, the district violated her parental rights," concluding that "Supreme Court precedent provides parents with no such right to information." JA112 (Dec. at 28). For these reasons, the court found that Vitsaxaki had "not plausibly alleged that the district's actions taken under the Policy restricted a fundamental right" that could trigger heightened scrutiny and dismissed her substantive due process claim. JA114 (Dec. at 30).

Finally, the district court addressed Vitsaxaki's procedural due process claim. The court found that because Vitsaxaki had "not identified plausible deprivations of her parental rights by the district," she had "not plausibly alleged a

procedural due process claim based on the same theory of constitutional deprivation." JA116 (Dec. at 32). As a result, the court dismissed Vitsaxaki's procedural due process claim and granted the District's motion to dismiss in its entirety. *Id.*

## Argument

The Court should affirm the district court's order in its entirety. The Court should affirm dismissal of Vitsaxaki's declaratory judgment claim for lack of standing. (Point 1, *infra*.) The Court should affirm dismissal of Vitsaxaki's claims that the Policy violates Vitsaxaki's constitutional free exercise (Point 2, *infra*) and substantive due process rights (Point 3, *infra*), as the Policy receives and satisfies rational basis review (Point 4, *infra*). Finally, the Court should affirm dismissal of Vitsaxaki's procedural due process claim for failure to allege deprivation of a constitutionally-protected liberty interest. (Point 5, *infra*.)

## 1. Vitsaxaki Lacks Standing to Seek Declaratory Relief

A declaratory judgment is a form of "*prospective* relief" for which a plaintiff "must demonstrate a 'certainly impending' future injury." *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). For this reason, a plaintiff lacks standing to seek a declaratory judgment based on past injury. *See Dorce v. City of New York*, 2 F.4th 82, 95 (2d Cir. 2021) ("Where, as here, plaintiffs seek . . . declaratory relief, they 'cannot

22

rely on past injury . . . but must show a likelihood that [they] will be injured in the future.'" (quoting *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998) (alteration in original))) (*partially quoted in* Vitsaxaki Br. at 61); *accord Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396, 406 (6th Cir. 2019) ("Past harm . . . does not entitle a plaintiff to seek . . . declaratory relief.") (*cited in* Vitsaxaki Br. at 33). Thus, when a student has already left a school district that is allegedly responsible for an injury, a plaintiff ordinarily cannot seek a declaratory judgment against that district with respect to the past injury. *See Fox v. Bd. of Trs.*, 42 F.3d 135, 140 (2d Cir. 1994).

Here, Vitsaxaki voluntarily removed Doe from the District and enrolled Doe in private school. As a result, Vitsaxaki cannot face impending injury from the District's Policy and lacks standing to seek a declaratory judgment.

In arguing that she may pursue declaratory relief anyway, Vitsaxaki relies on a pair of Tenth Circuit cases that refer to "retrospective declaratory relief" in the context of suits against state officials. These cases affirmed dismissal of the plaintiffs' complaints, rendering their references to "retrospective declaratory relief" dicta that cannot override Second Circuit precedent. *K.A. v. Barnes*, 134 F.4th 1067, 1071 (10th Cir. 2025); *Collins v. Daniels*, 916 F.3d 1302, 1308 (10th Cir. 2019) (*both cited in* Vitsaxaki Br. at 61).

23

Vitsaxaki also claims that "even when there's no standing for prospective relief, 'but a claim for damages remains, a declaratory judgment as a predicate to a damages award can survive.'" Vitsaxaki Br. at 61-62 (quoting *Crue v. Aiken*, 370 F.3d 668, 677 (7th Cir. 2004)). Another Court of Appeals has recognized this quote from *Crue* as "little more than an inartful description of the fact that a liability determination must accompany any damages award, not that such a declaration is available as a separate remedy." *Diei v. Boyd*, 116 F.4th 637, 643 (6th Cir. 2024). Thus, all *Crue* holds is that a plaintiff may seek a determination of liability for past injury—relief that is different than the declaratory judgment Vitsaxaki seeks here.

Vitsaxaki lacks standing to seek a declaratory judgment because she does not and cannot allege any future harm. *See Dorce*, 2 F.4th at 95; *Marcavage*, 689 F.3d at 103. The Court should affirm dismissal of Vitsaxaki's declaratory judgment claim.

## 2. The Policy Is Subject to Rational Basis Review under the Free Exercise Clause

The Policy does not impose any moral instruction on students or make any consideration of religious viewpoint. Instead, it directs District staff to honor students' individual requests concerning the use and disclosure of preferred names and pronouns. As a result, even assuming for this appeal that the Policy burdens Vitsaxaki's religious exercise, it is subject to rational basis review.

A claim that a school policy unconstitutionally burdens religious exercise undergoes a layered analysis. First, under the Supreme Court's June 27, 2025 decision in *Mahmoud v. Taylor*, the Court determines whether the policy "would 'substantially interfer[e] with the religious development' of the child, or pose 'a very real threat of undermining' the religious beliefs and practices the parent wishes to instill in the child." No. 24-297, 2025 U.S. LEXIS 2500, at *6-7, __ S. Ct. __ (June 27, 2025) (quoting *Yoder*, 406 U.S. at 218 (1972)). If it does not, the court then considers whether the policy is neutral and generally applicable. *See id.* at *60 (citing *Employment Div. v. Smith*, 494 U.S. 872, 878-79 (1990)); *Brandon v. Royce*, 102 F.4th 47, 55 (2d Cir. 2024) (*cited in* Vitsaxaki Br. at 50).

A school policy that indirectly burdens religious exercise is only subject to strict scrutiny if it substantially interferes with or really threatens to undermine a child's religious upbringing, or is not neutral and generally applicable. *Id.* at *60-61. However, if the policy does not substantially interfere with or pose a real threat to religious upbringing, and the policy is neutral and generally applicable, the policy's "burden on religion is constitutional if the [policy] passes the relatively low hurdle of rational basis review—that the state has chosen a means for addressing a legitimate government interest rationally related to achieving that goal." *Miller v. McDonald*, 130 F.4th 258, 265 (2d Cir. 2025) (per curiam) (*cited in* Vitsaxaki Br. at 52); *see also Mahmoud*, 2025 U.S. LEXIS 2500, at *60

("Under our precedents, the government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable." (citing *Smith*, 494 U.S. at 878-79)).

### 2.1. The Policy Does Not Substantially Interfere with or Pose a Real Threat to Religious Upbringing

In *Mahmoud*, the Supreme Court found that a school policy triggers strict scrutiny when it imposes a free exercise burden "of the same character as that in *Yoder*." 2025 U.S. LEXIS 2500, at *60. *Yoder*, in turn, struck down a state law that required children to attend public school through age sixteen and thus significantly impaired the religious upbringing of Amish children, whose parents did not want to expose them to "worldly influences in terms of attitudes, goals, and values contrary to [their] beliefs." *Mahmoud*, 2025 U.S. LEXIS 2500, at *40 (quoting *Yoder*, 406 U.S. at 218); *see id.* at *30-31. The *Yoder* Court found that the Free Exercise Clause forbids government from compelling individuals, "under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Yoder*, 406 U.S. at 218.

Under *Mahmoud*, a burden "of the same character as that in *Yoder*" may exist when a policy "impose[s] upon children a set of values and beliefs that are 'hostile' to their parents' religious beliefs" and "exert upon children a psychological 'pressure to conform' to their specific viewpoints." *Mahmoud*, 2025 U.S. LEXIS 2500, at *46-47 (quoting *Yoder*, 406 U.S. at 211). In such cases, a policy

26

"present[s] the same kind of 'objective danger to the free exercise of religion' that [the Court] identified in *Yoder*." *Id.* at *47 (quoting *Yoder*, 406 U.S. at 218).

Central to the Supreme Court's holding in *Mahmoud* was its determination that a school board introduced a curriculum that was "unmistakably normative" and "designed to present certain values and beliefs" about sex and gender identity to young students. *Id.* at *41. Specifically, the board introduced "a variety of 'LGBTQ+-inclusive' storybooks into the elementary school curriculum" that, when combined with "associated educational instructions provided to teachers," were "designed to 'disrupt' children's thinking about sexuality and gender," *id.*, at *11, and "provide children with 'a new perspective not easily contravened by their parents,'" *id.* at *80 n.7. Further, the board's instructions to teachers encouraged them "to correct the children and accuse them of being 'hurtful' when they express[ed] a degree of religious confusion." *Id.* at *49. The Court noted that "young, impressionable children . . . are likely to accept without question any moral messages conveyed by their teachers' instruction," *id.* at *42, even if those messages are "contrary to the religious principles that the parents in this case wish to instill in their children," *id.* at *44. "Teaching young children about sexual and gender identity in ways that contradict parents' religious teachings," the Court concluded, "undermines those parents' right to 'direct the religious upbringing of their children." *Id.* at *79-80 (quoting *Yoder*, 406 U.S. at 218).

27

Thus, the school district likely violated the Free Exercise Clause by not giving parents notice and opt-out rights regarding the challenged materials. *Id.* at *41.

Here, the Policy does not remotely resemble the kind of real threat to undermine religious upbringing identified in *Mahmoud* and *Yoder* because it is not normative or prescriptive, does not impose any particular values or beliefs, and does not coerce or pressure students in any way. Unlike the storybooks and lesson plans in *Mahmoud*, the Policy does not teach, instruct, or provide any form of moral guidance at all, let alone seek to "disrupt" beliefs about sex and gender that students may learn from their parents. *Id.* at *11. It does not encourage students to make any requests concerning names, pronouns, or privacy, suggest that students should request that the District not tell parents or caregivers about students' preferred names and pronouns, or impose any requirements on students. Instead, it is purely responsive and only applies if and when a student affirmatively asks to be called by a preferred name and pronouns at school. Thus, the Policy obligates the District to honor *students' own beliefs and requests* regarding names, pronouns, and privacy, rather than impose beliefs on or make requests to students.

Because the Policy only governs how the District must respond to name, pronoun, and privacy requests initiated by students themselves, the Policy falls within "the broad spectrum of public education issues [that are] generally

28

'committed to the control of state and local authorities'" and do not implicate the Free Exercise Clause. *Skoros v. City of New York*, 437 F.3d 1, 41 (2d Cir. 2006) (quoting *Goss v. Lopez*, 419 U.S. 565, 578 (1975)). The Policy addresses what the Complaint identifies as a recurring phenomenon: students requesting to use different names and pronouns at school for personal reasons. *See, e.g.*, JA15, 17 (Compl. ¶¶ 79-81, 96-97) (alleging that other students in Doe's school began using preferred names and pronouns in school); JA17 (Compl. ¶ 97) (alleging that in seventh grade, Doe "began to view online content about different gender identities and watch YouTube videos about the topic"). The Complaint does not allege that the Policy causes students to request the use of different names or pronouns, or causes students to keep such choices private.

Further, the Policy does not state that the District must never disclose students' name and pronoun choices. Nor does it state that the District should deceive parents about such choices or encourage children to choose different names and pronouns. Instead, the Policy requires the District to determine whether and to what extent a student choosing a different name and pronouns wants the District to inform parents, and follow the student's wishes. JA83 (Policy at 2). Because the Policy does not seek to influence students' beliefs about gender expression and identity and only directs the District on how to respond to students' requests, the Policy is not "the same kind of 'objective danger to the

29

free exercise of religion' that [the Court] identified in *Yoder*." *Mahmoud*, 2025 U.S. LEXIS 2500, at \*47 (quoting *Yoder*, 406 U.S. at 218).

The alternative Vitsaxaki demands is that the Free Exercise Clause compels schools to "out" children to their parents when they ask to be called by different names and pronouns. This result would turn the Free Exercise Clause on its head. The Free Exercise Clause forbids "coercive . . . classroom instruction" that contradicts parents' religious guidance. *Id.* at \*48. Nothing in *Mahmoud* or the Supreme Court's other free exercise precedents holds that the First Amendment forces schools to take affirmative steps to act in accordance with parents' religious views, such as reporting students' name and pronoun choices to parents over such students' wishes. In short, the Free Exercise Clause does not command schools to reject students' requests for privacy regarding their preferred name and pronouns. *See Skoros*, 437 F.3d at 39 ("Just as government may not compel any person to adopt a prescribed religious belief or form of worship, no person may 'require the Government <u>itself</u> to behave in ways that the individual believes will further his or her spiritual development or that of his or her family.'" (quoting *Bowen v. Roy*, 476 U.S. 693, 699-700 (1986))).

Vitsaxaki also contends that the District "conditioned [her] receipt of a public benefit on her violating her religious beliefs." Vitsaxaki Br. at 52. Vitsaxaki relies on a trio of Supreme Court decisions that prohibit states from denying generally-

available funding to religious institutions on account of their religious nature. *See Carson*, 596 U.S. 767 (holding that a state cannot exclude religious schools from a private school tuition assistance program); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020) (holding that a state cannot exclude religious schools from a school scholarship aid program); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017) (holding that a state cannot exclude a religious organization from a grant program for resurfacing playgrounds) (*all cited in* Vitsaxaki Br. at 57). But *Mahmoud* clarifies that Vitsaxaki cannot use this "conditioning" argument as another discrete ground for applying strict scrutiny.

In *Mahmoud*, the Supreme Court relied on the concept of "conditioning" to reject "the suggestion that any parents who are unhappy about the instruction in question can simply place their children in private school or . . . educate them at home." 2025 U.S. LEXIS 2500, at *56 (internal quotation marks omitted). The Court found that asking parents who face a *Yoder*-like burden from a public school program to choose between enduring the burden or removing their children from the school impermissibly conditions the availability of "a public benefit . . . on parents' willingness to accept a burden on their religious exercise." *Id.* at *57 (citing *Trinity Lutheran Church*, 582 U.S. at 462). Thus, *Mahmoud* described "conditioning" as the "effect" of programs that require parents to choose between compromising their children's religious upbringing and taking their

31

children out of public school, *id.* at \*37 (citing *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ("*Barnette*")), not as a separate ground for applying strict scrutiny.

As described above, the Policy is noncoercive and imposes no teaching or instruction that could contradict the religious values Vitsaxaki seeks to instill in Doe. It neither teaches nor promotes any ideology, and thus does not pose the type of burden identified in *Mahmoud* and *Yoder*.

### 2.2. The Policy Is Generally Applicable

The next question is whether the Policy is neutral and generally applicable. Vitsaxaki does not dispute that the Policy is neutral. She only contends that it is not generally applicable.

"A law is generally applicable when it treats similar conduct similarly, without regard to whether the conduct is religiously motivated." *We The Patriots*, 76 F.4th at 145. Thus, "the question of general applicability addresses whether a law treats religious observers unequally." *Parents for Privacy v. Barr*, 949 F.3d 1210, 1235 (9th Cir. 2020). A law is not generally applicable "in at least two circumstances: first, where it 'invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions,' and second, where it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar

way.'" *We The Patriots*, 76 F.4th at 145 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021)).

Here, the District's Policy "does not give government officials discretion to decide" whether to honor a student's decisions regarding names, pronouns, and privacy. *Id.* at 150. Instead, as the Complaint emphasizes, the Policy leaves these decisions to the student: "Transgender and GNC students have the right . . . to decide *when, with whom, and how much to share* this confidential information. . . . District staff will use the name and pronoun that corresponds to the gender identity the student consistently asserts at school." JA30-31 (Compl. ¶¶ 200-01 (emphasis in original) (quoting the Policy at 2)). Even on appeal, Vitsaxaki emphasizes that "the School District's staff *must* 'use the name and pronoun that corresponds to the gender identity the student consistently asserts at school,'" Vitsaxaki Br. at 13 (quoting JA78 (Policy) (emphasis in original)), and that "the policy required staff" to use Doe's preferred name and pronouns, *id.* at 52. Vitsaxaki cannot plausibly dispute that the Policy is generally applicable when her claim hinges on the Policy's lack of exemptions.

To argue against general applicability, Vitsaxaki makes two errors. First, Vitsaxaki misstates the Policy. In claiming that the Policy "vested staff with discretion whether to inform parents of a social transition," Vitsaxaki Br. at 20, Vitsaxaki contradicts both her own arguments and the Policy's "plain language,"

33

*id.* at 53. The Policy, as Vitsaxaki elsewhere admits, leaves the question of whether to tell family about a student's preferred name and pronouns up to the student. As a result, despite her attempts to read discretionary terms into the Policy, Vitsaxaki cannot identify any language in the Policy that "grants discretion for staff not to give notice, not to obtain consent, and to actively hide a social transition from any parent." *Id.* at 36; *see id.* at 53.

Similarly, while Vitsaxaki alleges that the Policy is not generally applicable because "Defendants consider whether to notify parents . . . on a case-by-case basis," JA41 (Compl. ¶ 270), a plain reading of the Policy demonstrates that its "case-by-case" aspect refers to whether and to whom a particular student permits the District to divulge such information. Similarly, a plain reading of the Policy's statements that the District "will endeavor to engage the student and his or her parents or guardians, as appropriate," and that a gender plan "may . . . include when and how to initiate the student's preferred name and associated pronoun use and if, when, and how this is communicated to others," demonstrate that the District will disclose a student's preferred name and pronouns only if the student deems it appropriate. Vitsaxaki Br. at 53-54 (quoting JA83 (Policy at 2)). In other words, the Policy "does not create a system in which school officials are given improper discretion to evaluate the reasons given" for a student's name, pronoun, and privacy requests. *Miller*, 130 F.4th at 269.

Similarly, the Policy is devoid of any "formal system of entirely discretionary exceptions" that could render it "not generally applicable." *Fulton*, 593 U.S. at 536. And because the Policy vests decisionmaking power in the student and requires the District to honor the student's decisions, the Policy is uniform. *Cf. Kane v. De Blasio*, 19 F.4th 152, 169 (2d Cir. 2021) (finding that arbitrators did not follow a uniform process in determining whether to grant religious accommodations from vaccine mandates) (*cited in* Vitsaxaki Br. at 53).

Further, the Policy is generally applicable because, "in seeking to create a safe, non-discriminatory school environment for transgender [and gender nonconforming] students," the Policy does not "selectively impose[] certain conditions or restrictions only on religious conduct." *Parents for Privacy*, 949 F.3d at 1236. Under the Policy, the District must respect students' privacy instructions without regard to the religious beliefs of students or the families. In fact, the Complaint does not allege, and the Policy and Doe's Gender Support Plan do not indicate, that the District ever considered whether Vitsaxaki held religious views or what they were. Because the Policy makes no distinction between "religious and non-religious conduct," it is generally applicable. *Parents for Privacy*, 949 F.3d at 1236.

Finally, Vitsaxaki claims that the Policy is discretionary because the District "informed [her] about [Doe's] social transition after one of [Doe's] teachers

pressured Mr. Caraccio," the principal, and the Complaint alleges that it was Caraccio who then chose to inform Vitsaxaki (with Doe present), not Doe. Vitsaxaki Br. at 55 (citing JA26). Vitsaxaki also notes that after Caraccio told her about Doe's preferred name and pronouns, Powers, the school psychologist, emailed District staff that "it was difficult balancing [Doe's] 'readiness and privacy' with Mrs. Vitsaxaki's 'right to know,'" and that "after consulting with the school attorney, the *School District* decided on 'the most appropriate and safe approach to the disclosure.'" *Id.* (citing JA25). Vitsaxaki concludes that this email "confirms the plain language of the policy: the School District had that discretion [to tell Vitsaxaki about Doe's preferred name and pronouns] the whole time." *Id.* at 56.

Crucially, as described above, the Policy's "plain language" says the opposite, as it gives the District no discretion to override a student's nondisclosure request. And nowhere does the Complaint allege that the District informed Vitsaxaki of Doe's preferred name and pronouns over Doe's wishes. Instead, the Complaint is silent about whether Doe wanted Caraccio to alert Vitsaxaki, only mentioning that Doe was present with Caraccio and listening to his call with Vitsaxaki. *See* JA23-24 (Compl. ¶¶ 144-47).

In addition, Vitsaxaki agrees that her claims are governed by the "policy or custom" requirement of *Monell v. Department of Social Services*, 436 U.S. 658, 694

36

(1978), "because she 'challenges the validity of a public school's school policy.'" Vitsaxaki Br. at 21 (quoting JA97 (Dec. at 13 n.6)). Vitsaxaki correctly states that to survive dismissal, the Complaint must plausibly allege that the Policy "and the actions taken under it violated [her] constitutional rights." *Id.* at 22. Because the Policy gives students control over disclosure of their name and pronoun requests to parents, any disclosure that the District made to Vitsaxaki without Doe's permission would have violated the Policy. Such a deviation from the Policy would preclude Vitsaxaki from making the required showing under *Monell*: that there was "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). In other words, Vitsaxaki cannot state a claim based on allegations of individual actions that would have been contrary to the Policy, such as telling Vitsaxaki about Doe's preferred name and pronouns without Doe's consent. *See Torcivia v. Suffolk County*, 17 F.4th 342, 363-64 (2d Cir. 2021).

The *Monell* standard also defeats Vitsaxaki's suggestion that the District violated her rights by encouraging Doe to use a different name and pronouns through Rogala's LGBTQ club or meetings with Viggiano and Powers. Vitsaxaki Br. at 7, 9. The Policy does not direct District personnel to encourage students to take on new names and pronouns or provide students with advice

and resources regarding gender transition. Any such actions by District staff would have gone beyond the scope of the Policy and cannot give rise to liability under *Monell*. *See Torcivia*, 17 F.4th at 363-64; *Outlaw*, 884 F.3d at 373.

In summary, because the Policy uniformly requires the District to honor students' requests regarding names, pronouns, and privacy, and does not allow the District to disregard such requests, the Policy is generally applicable and receives rational basis review, which it satisfies. (*See* Point 4, *infra*.)

### 3. Vitsaxaki Fails to State a Substantive Due Process Claim

Vitsaxaki devotes much of her brief to urging the Court to invent an unenumerated fundamental right that would have required the District to inform her that Doe requested to be called by a preferred name and pronouns at school. In doing so, Vitsaxaki fails to acknowledge, let alone refute, this Court's holding that "there is not a parental right, absent a violation of the Religion Clauses, to 'direct *how* a public school teaches their child.'" *We The Patriots*, 76 F.4th at 159 (quoting *Skoros*, 437 F.3d at 41); *see also Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 351 n.19 (1st Cir. 2025) (collecting cases, including *Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2003), to show that "[t]his principle has been recognized in most circuits for decades"). This Court has applied this principle to educational policies that go well beyond classroom instruction, ranging from vaccination requirements in *We The Patriots* and *Miller*, masking requirements in

*Doe v. Franklin Square Union Free School District*, 100 F.4th 86 (2d Cir. 2024) ("*Franklin Square*") (*cited in* Vitsaxaki Br. at 46), *cert. denied*, 145 S. Ct. 570 (2024), and holiday displays in *Skoros*. The Policy is no different, and Vitsaxaki fails to allege any ground for subjecting it to a higher level of scrutiny than it receives under her Free Exercise claim: rational basis review.

### 3.1.  Vitsaxaki's Hybrid Rights Challenge Fails

This Court treats complaints that bring both free exercise and substantive due process challenges to neutral and generally applicable laws as "hybrid right claims" that "are generally not viewed as viable." *Miller*, 130 F.4th at 270. Vitsaxaki "recognizes that this Court has held that it does 'not apply heightened scrutiny to 'hybrid rights' claims.'" Vitsaxaki Br. at 52 n.5 (citing *We The Patriots*, 76 F.4th at 159). This Court's treatment of hybrid rights claims remains good law after *Mahmoud*, which expressly declined to consider such claims. 2025 U.S. LEXIS 2500, at *62 n.14. As a result, the district court correctly found that Vitsaxaki's substantive due process claim was subject to rational basis review.

Vitsaxaki argues that her "parental-rights claim is different" from the vaccination mandate challenge in *We The Patriots* because her claim "does not depend on her religious beliefs having been violated," Vitsaxaki Br. at 39, and instead turns on her secular rights to "direct the upbringing, education, and healthcare" of her child, *id.* (quoting JA43 (Compl. ¶¶ 290-91)). Vitsaxaki's own

Complaint says otherwise. *See* JA44 (Compl. ¶ 292) (alleging violation of Vitsaxaki's "fundamental right to direct the upbringing, education, and healthcare of [Doe], because [Vitsaxaki] lacked the knowledge necessary to exercise her right to choose to educate [Doe] in an environment that would not have undermined her religious beliefs"). In any case, Vitsaxaki mischaracterizes *We The Patriots* and other applicable decisions in which this Court declined to apply strict scrutiny to parental rights claims brought with free exercise claims. These decisions establish that a school policy subject to rational basis review under the Free Exercise Clause does not receive heightened scrutiny because a parent also challenges the policy on secular grounds.

In *We The Patriots*, this Court applied rational basis review to Connecticut's repeal of its religious exemption from school vaccination requirements even though the plaintiffs claimed a violation of "the fundamental liberty interest in childrearing protected by the Fourteenth Amendment" by "completely inter-fer[ing] with [parents'] right to decide what is best for their children's health *and* to raise them according to their religious beliefs." 76 F.4th at 159 (internal quotation marks omitted, emphasis added). Further, at least one plaintiff objected to vaccination because she believed a previous vaccination seriously harmed one of her children, establishing that even a parent's alleged fear of injury to their child from an educational policy is insufficient to trigger strict scrutiny under a

fundamental rights analysis. *Id.* at 142; *see also Phillips v. City of New York*, 775 F.3d 538, 541 (2d Cir. 2015) (per curiam) (affirming dismissal of constitutional challenges to public school vaccination mandates where the plaintiff raised both religious and secular objections, including her concern that vaccination could kill her child). And in *Franklin Square*, this Court dismissed the plaintiff's parental rights challenge to a school mask mandate even though the plaintiff did not raise a free exercise claim at all. 100 F.4th at 97-98. Such decisions recognize "the broad discretion of schools to manage academic and administrative functions" beyond the literal act of teaching classes, and the Due Process Clause does not require public schools to "offer students an educational experience tailored to the preferences of their parents." *Foote*, 128 F.4th at 352.

In short, the Court should follow its established precedent on hybrid rights claims and dismiss Vitsaxaki's fundamental parental rights claim.

### 3.2. Vitsaxaki Fails to Identify an Applicable Fundamental Right That Could Alter the Standard of Review

Aside from her failure to address this Court's hybrid rights decisions, Vitsaxaki fails to identify any established unenumerated right that could trigger something more than rational basis review.

Citing *Troxel v. Granville*, 530 U.S. 57 (2000) (plurality op.), which struck down a "breathtakingly broad" child visitation statute that allowed anyone to petition a court for child visitation rights and obtain such rights if the court

41

deemed to be in the best interest of the child, *id.* at 67, Vitsaxaki argues that "[p]arents have a fundamental right 'to make decisions concerning the care, custody, and control of their children,'" Vitsaxaki Br. at 25 (quoting *Troxel*, 530 U.S. at 65). This Court, however, has "cautioned that the Supreme Court 'left the scope of that right undefined.'" *We The Patriots*, 76 F.4th at 159 (quoting *Leebaert*, 332 F.3d at 142). In fact, this Court has considered and rejected Vitsaxaki's argument that a line of Supreme Court parental rights decisions—beginning with *Meyer v. Nebraska*, 262 U.S. 390 (1923) (striking down a law that prohibited teaching grade school children languages other than English) and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) (striking down a law that mandated public school attendance), and ending with *Troxel*—grants parents a fundamental childrearing right to intervene in educational policy. *Cf. Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 256 (2022) (citing *Pierce* and *Meyer* as recognizing "the right to make decisions about the education of one's children") (*cited in* Vitsaxaki Br. at 25-26). Specifically, this Court found that *Pierce* "and [its] progeny do not begin to suggest the existence of a fundamental right of every parent to tell a public school what his or her child will and will not be taught," and that "recognition of such a fundamental right . . . would make it difficult or impossible for any public school authority to administer school curricula responsive to the overall educational needs of the community and its children." *Leebaert*, 332 F.3d

at 141. Thus the Court's conclusion that "there is not a parental right, absent a violation of the Religion Clauses, to 'direct *how* a public school teaches their child'" and its application of that rule to educational policies that are not limited to in-class teaching (such as vaccination and masking). *We The Patriots*, 76 F.4th at 159 (quoting *Skoros*, 437 F.3d at 41). As a result, when Vitsaxaki argues that *We The Patriots* is inapplicable because the District's "conduct here had nothing to do with how a school teaches," but how Doe "was *cared for*," Vitsaxaki Br. at 37, she fails to acknowledge that this Court has consistently applied rational basis review to educational policies that govern not only the teaching of students, but also their care while in school, such as the Policy.

### 3.2.1.  The Policy Does Not Implicate Any Recognized Unenumerated Right

The Complaint does not implicate the fundamental parental rights identified in Supreme Court and this Court's precedents. This Court has found that fundamental rights may be infringed when government separates parents from their children. *See Southerland v. City of New York*, 680 F.3d 127, 153 (2d Cir. 2012) (removal of children from their parent) (*cited in* Vitsaxaki Br. at 59); *United States v. Myers*, 426 F.3d 117, 121 (2d Cir. 2005) (prohibition on a father's unsupervised access to his child). Fundamental rights may also be infringed when government engages in "intrusions upon the bodily integrity of the child or other conduct with clinical significance—whether through a medical procedure, examination,

43

or hospitalization." *Foote*, 128 F.4th at 350; *see Kanuszewski*, 927 F.3d at 403-04 (collection and testing of infants' blood samples); *Tenenbaum v. Williams*, 193 F.3d 581, 587 (2d Cir. 1999) (gynecological examination of child for signs of abuse). These child separation and bodily intrusion cases exist independently from this Court's education precedents, which refuse to invent an unenumerated childrearing right to override school policies. *See Franklin Square*, 100 F.4th at 98 (finding that cases involving the institutionalization or physical examination of children are "readily distinguishable" from a parental rights challenge to a school mask mandate). Thus, this Court has consistently reaffirmed that, notwithstanding parents' fundamental right to make decisions regarding their children's care, "parents 'have no constitutional right to provide their children with . . . education unfettered by *reasonable* government regulation,'" *id.* (quoting *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 461 (2d Cir. 1996)), a standard that invokes rational basis review, *see Immediato*, 73 F.3d at 462 ("[W]here, as here, parents seek for secular reasons to exempt their child from an educational requirement and the basis is a claimed right to direct the 'upbringing' of their child, rational basis review applies.").

Vitsaxaki's arguments to the contrary fail to acknowledge not only the Second Circuit's precedents in this area, but also the Supreme Court's recent and repeated holdings about—or not about—unenumerated rights. The Supreme

44

Court has admonished courts to be cautious in recognizing the existence of un-enumerated rights, *see Dobbs*, 597 U.S. at 292 (finding that the Constitution does not confer a right to abortion), and expanding their scope, *see Dep't of State v. Muñoz*, 602 U.S. 899, 910 (2024) (finding that the fundamental right to marriage does not include a right for a citizen to reside with their noncitizen spouse in the United States) (*cited in* Vitsaxaki Br. at 23-24, 35, 45). And in the Supreme Court's most recent analyses of parents' rights to direct their children's education and healthcare, the Court did not mention unenumerated rights at all. *See Mahmoud*, 2025 U.S. LEXIS 2500, at *128 ("[T]he Court's analysis makes no mention of substantive due process rights or the Fourteenth Amendment Due Process Clause.") (Sotomayor, J., dissenting); *United States v. Skrmetti*, 222 L. Ed. 2d 136, 150, __ S. Ct. __ (2025) (finding that government prohibition of gender-affirming care for minors does not "burden[] a fundamental right" or otherwise qualify for heightened scrutiny (quoting *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985))). In fact, *Mahmoud* refutes Vitsaxaki's argument that *Yoder* and *Barnette* are unenumerated fundamental rights cases, *cf.* Vitsaxaki Br. at 25, 28, 31, 36-37, as *Mahmoud* solely addresses both cases as involving coercive con-duct that interferes with religious upbringing in violation of the Free Exercise Clause, s*ee Mahmoud*, 2025 U.S. LEXIS 2500, at *4.

45

Nor has the Supreme Court held that schools are constitutionally obligated to conform all policies to "a 'presumption' that parents will 'act in the best interests of their children,'" Vitsaxaki Br. at 26 (quoting *Parham v. J.R.*, 442 U.S. 584, 602-03 (1979)), or must "rebut" that presumption any time they enact policies with which parents disagree, *id.* at 36 (citing *Parham*, 442 U.S. at 604). While Vitsaxaki misleadingly cites *Parham* as making it "clear that parents have the right to make judgments as to their children's 'need for medical care or treatment,'" *id.* at 41-42 (quoting *Parham*, 442 U.S. at 603), *Parham* found that a state's medical review process for committing children to mental health institutions at their parents' request complied with due process, *Parham*, 442 U.S. at 587, 620. While the Court observed that parents are presumed to act in their children's best interests, the Court also found "that the child's rights and the nature of the commitment decision are such that parents cannot always have absolute and unreviewable discretion to decide whether to have a child institutionalized." *Parham*, 442 U.S. at 604. To the contrary, the Court found that "the risk of error inherent in the parental decision to have a child institutionalized for mental health care is sufficiently great" that due process required a neutral factfinding inquiry to ensure the commitment complied with state law. *Id.* at 606. The presumption that parents act in their children's best interests was one factor the Court considered in holding that due process did not require "a formal, adver-

46

sary, pre-admission hearing," not an affirmative command that government accommodate parents' childrearing beliefs. *Id.* at 603. In fact, the Supreme Court rejected Vitsaxaki's argument that *Parham* creates "a constitutional requirement that the State recognize [parental] decisionmaking," cautioning that "constitutional law does not work that way." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 286 (1990).

Nonetheless, Vitsaxaki attempts to liken the Policy to cases where a court found a violation of an unenumerated parental right based on two arguments: that the Policy "implicates healthcare matters," Vitsaxaki Br. at 31, and permits "active concealment" of a student's preferred name and pronoun use from parents or caregivers, *id.* at 34. Both arguments fail.

### 3.2.1.1.  The Policy Receives Rational Basis Review Even If It "Implicates Healthcare Matters"

Vitsaxaki argues extensively that when the District agrees to call a student by their preferred name and pronouns, the District engages in "a decision with clear healthcare implications." Vitsaxaki Br. at 40. Even assuming the truth of this argument, the fact that an educational policy might have "healthcare implications" does not subject it to strict scrutiny. This Court has repeatedly rejected substantive due process challenges to school-related policies that unquestionably comprised or impacted healthcare, including school vaccination mandates and masking, as addressed above. And because virtually every school policy may

have some impact on children's health—including curriculum, transportation, start and end times, discipline, homework, testing, sanitation, air conditioning and heating, meals, lockdown drills, and protections from bullying—Vitsaxaki's healthcare-based argument would effectively place all school administration under judicial review. *See Foote*, 128 F.3d at 352 (noting that questions of school administration "are generally 'committed to the control of state and local authorities'" (quoting *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 396 (6th Cir. 2004))). Therefore, even assuming that the Policy affects healthcare, it no more implicates fundamental rights than other constitutionally permissible educational policies governing vaccinations and masking. *See Franklin Square*, 100 F.4th at 97 (finding "that wearing a mask does not constitute 'medical treatment'" but, "even if it did, the School District did not infringe any fundamental right to refuse medical treatment by denying [the plaintiff's] exemption to the mask mandate for" the plaintiff's child).

Second, the Policy does not represent a bodily intrusion that triggers heightened scrutiny under precedents such as *Tenenbaum*. Instead, "using [Doe's] chosen name and pronouns" was "something people routinely do with one another, and which requires no special training, skill, medication, or technology." *Foote*, 128 F.4th at 350. Put differently, "[a]ddressing a person using their preferred name and pronouns simply accords the person the basic level of respect

48

expected in a civilized society generally." *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 680 F. Supp. 3d 1250, 1274 (D. Wyo. 2023) (internal quotation marks omitted). Vitsaxaki has no more of a constitutional right to intervene in the Policy than she does with respect to any of the myriad other school policies that might impact students' health.

Finally, Vitsaxaki claims the Policy endangers children because school staff should never use a student's preferred name and pronouns "without guidance from her properly trained mental health professionals—and certainly not without her parents." Vitsaxaki Br. at 32. But whether Vitsaxaki is right about how schools should respond to students' preferred name and pronoun requests is not a constitutional question. As the Supreme Court recently cautioned, our society leaves questions about the health of transgender and gender nonconforming children "to the people, their elected representatives, and the democratic process." *Skrmetti*, 222 L. Ed. 2d at 160. And in the school context, when there is no Religion Clause infringement at issue, "our pluralistic society assigns . . . administrative decisions to the expertise of school officials, charged with the responsibility of educating children." *Foote*, 128 F.4th at 357.

As a result, Vitsaxaki's failure to state a claim does not turn on whether the Complaint sufficiently alleges that the Policy has "healthcare implications."

49

Vitsaxaki Br. at 40. Even if it does, Vitsaxaki cannot state an unenumerated rights claim that receives more than rational basis review.

### 3.2.1.2.  The Policy Receives Rational Basis Review Even If It May Require Nondisclosure

Vitsaxaki alleges that the District violated her parental rights when, pursuant to the Policy, it "concealed the social transition of [Doe] through deceptive communication," which consisted of using Doe's legal name and she/her pronouns when communicating with Vitsaxaki and not telling Vitsaxaki that Doe had asked to be called by a different name and they/them pronouns at school. *Id.* at 8-9, 43. What Vitsaxaki calls "concealment," then, was the District following Doe's direction not to disclose that Doe had asked to be called by a different name and pronouns. Vitsaxaki fails to offer any basis for the existence of a fundamental right that required the District to override Doe's request for privacy and inform Vitsaxaki.

Vitsaxaki attempts to liken the District's nondisclosure to findings of constitutional violations in *Arnold v. Board of Education*, 880 F.2d 305 (11th Cir. 1989), and *Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000) (*both cited in* Vitsaxaki Br. at 29, 34). These cases are distinguishable because they involved coercive and intrusive conduct. In *Arnold*, "school officials . . . engaged in overt acts to procure an abortion for a student without contacting her parents," including persuading the student to get an abortion and paying for it, which constituted "coercion of a

50

minor to obtain an abortion or to refrain from discussing the matter with her parents in violation of the latter's parental rights." *Anspach v. City of Philadelphia*, 503 F.3d 256, 265 (3d Cir. 2007) (citing *Arnold*, 880 F.2d at 308-09, 313). In *Gruenke*, the court found a sufficiently-alleged parental rights violation where a high school swim team coach forced the plaintiff's daughter to take a pregnancy test and spread rumors about the daughter's pregnancy around her school without informing the plaintiff. *See Anspach*, 503 F.3d at 265-67 (citing *Gruenke*, 225 F.3d at 295-97, 307).

As these cases demonstrate, "[c]ourts have recognized the parental liberty interest only where the behavior of the state actor compelled interference in the parent-child relationship." *Id.* at 262. Thus, the Third Circuit found no parental rights violation where a school district suspended a child for her out-of-school conduct because the district did not prevent the parents "from reaching their own disciplinary decision" or "force her parents to approve or disapprove of [their child's] conduct." *J.S. v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 934 (3d Cir. 2011) (en banc) (*cited in* Vitsaxaki Br. at 30-31, 34). And *Anspach* found no parental rights violation where a city agency provided emergency contraception to a sixteen-year-old to terminate her pregnancy "without notifying her parents, or encouraging her to consult with them." *Anspach*, 503 F.3d at 258; *cf. H.L. v. Matheson*, 450 U.S. 398, 400 (1981) (finding that a state *may* require physicians

51

to notify "the parents of a dependent, unmarried minor girl prior to performing an abortion on the girl") (*cited in* Vitsaxaki Br. at 25). As the *Anspach* court put it, the Due Process Clause may prohibit government from affirmatively interfering with the parent-child relationship, but it does not require state actors to "*assist* [plaintiffs] as parents or affirmatively *foster* the parent/child relationship," *Anspach*, 503 F.3d at 266 (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989)), and there can be no "due process violation when the conduct complained of was devoid of any form of constraint or compulsion," *id.* at 264. Even the *Arnold* court cautioned that it was not "constitutionally mandating" that school counselors disclose students' pregnancy counseling to parents, but was holding "merely that the counselors must not coerce minors to refrain from communicating with their parents." *Arnold*, 880 F.2d at 314. Whether schools should inform parents about their children's decisions, even in instances as significant as abortion, is "a matter of common sense, not constitutional duty." *Id.* Similarly, as the First Circuit recently concluded when affirming dismissal of a fundamental rights challenge to a student gender protocol similar to the Policy, the Due Process Clause "does not require governments to assist parents in exercising their fundamental right to direct the upbringing of their children." *Foote*, 128 F.4th at 355. Because the Policy does not direct the kind of

52

compulsive and coercive conduct at issue in *Arnold* and *Gruenke*, it does not infringe a fundamental parenting right.

Vitsaxaki argues that *Foote* supports her position because the plaintiffs in that case did not sufficiently allege that the defendant school had affirmatively deceived the plaintiffs about their child's "requested name and pronouns." *Foote*, 128 F.4th at 353. But this dicta in *Foote* does not help Vitsaxaki for two reasons. First, the Policy does not direct District staff to engage in "affirmative deception" with parents, such as by falsely telling parents that their child is not using a different name and pronouns at school when they actually are. *Id.* at 354. Instead, it directs staff to honor a student's request not to disclose their preferred name and pronouns, which is just what the Complaint alleges District staff did with regard to Doe. Second, *Foote* finds that such "withholding of information about a student's expression of gender while at school . . . . *does not* state a constitutional deprivation." *Id.* (emphasis added). That is because "the Due Process Clause 'cannot fairly be extended to impose an *affirmative obligation* on the State'" to inform parents of a student's name and pronouns request. *Id.* (quoting *DeShaney*, 489 U.S. at 189) (emphasis added).

The Policy did not violate Vitsaxaki's fundamental rights because it was noncoercive. It only required the District to honor requests that Doe made independently, while leaving Vitsaxaki "free to strive to mold [her] child according

53

to [her] own beliefs." *Id.* at 355. Thus, due process did not require the District to "out" Doe to Vitsaxaki over Doe's request for nondisclosure.

### 3.3. The Policy Does Not Shock the Conscience

This Court's precedents establish that the district court properly dismissed the Complaint under rational basis review. However, if the Court applies the "shocks the conscience" test to Vitsaxaki's claims, the Court should still affirm dismissal.

In a decision Vitsaxaki barely mentions, the Eleventh Circuit affirmed dismissal of claims that application of a school board's Lesbian, Gay, Bisexual, Transgender, Gender Nonconforming and Questioning Support Guide, which was similar to the District's Policy, violated the plaintiffs' "substantive-due-process rights to 'make decisions concerning the care, custody, and control of their children' and to 'direct the medical and mental health decision-making for their children,' as well as their right to familial privacy." *Littlejohn v. Sch. Bd.*, 132 F.4th 1232, 1238 (11th Cir. 2025) (*cited in* Vitsaxaki Br. at 47). As in this case, the *Littlejohn* plaintiffs sued after their child "expressed a desire to socially transition at school" and school staff "met with the child to develop a Student Support Plan" without the plaintiffs' knowledge or consent. *See id.* at 1236. The Eleventh Circuit unequivocally rejected the plaintiffs' arguments that the school's actions violated the plaintiffs' fundamental parenting rights:

54

> [W]e cannot conclude that Defendants' actions with respect to the Littlejohns' child "shocked the conscience." The child was not physically harmed, much less permanently so. Defendants did not remove the Littlejohns' child from their custody. And Defendants did not force the child to attend a Student Support Plan meeting, to not invite the Littlejohns to that meeting, or to socially transition at school. In fact, Defendants did not force the Littlejohns' child to do anything at all. And perhaps most importantly, Defendants did not act with intent to injure. To the contrary, they sought to help the child. Under these circumstances, even if the Littlejohns felt that Defendants' efforts to help their child were misguided or wrong, the mere fact that the school officials acted contrary to the Littlejohns' wishes does not mean that their conduct "shocks the conscience" in a constitutional sense.

*Id.* at 1245 (citations omitted).

*Littlejohn*'s holding resonates in this case regardless of what standard of review the Court applies. Just as in *Littlejohn*, the Policy is noncoercive and non-prescriptive. Therefore, it does not rise to the invasive level of interference with the parent-child relationship, such as bodily intrusions and loss of custody, that implicate unenumerated constitutional rights. *See Foote*, 128 F.4th at 350.

In the end, Vitsaxaki's Complaint should be dismissed regardless of whether the Court applies rational basis review or the shocks the conscience test. Vitsaxaki suggests this herself by arguing that "[t]his case more closely resembles *Foote* than *Littlejohn*," asking the Court to choose between two cases that affirmed dismissal of claims nearly identical to her own. Vitsaxaki Br. at 47.

### 4. The Policy Satisfies Rational Basis Review

Because the Policy does not qualify for any form of heightened review, it is subject to rational basis review, under which it "is afforded a strong presumption of validity and need only be reasonably related to a legitimate state objective." *Franklin Square*, 100 F.4th at 98. The District has "a compelling interest in protecting the physical and psychological well-being of minors." *Foote*, 128 F.4th at 356-57 (quoting *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989)). Further, "[t]hat interest is at its apex when a school board seeks to protect children who are particularly vulnerable, such as transgender minors" who may request to go by different names and pronouns at school. *Id.* at 357 (citing *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528-29 (3d Cir. 2018) ("*Boyertown*")). Transgender students are at increased risk as they "frequently experience harassment" and "physical assault" in school. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 612 (4th Cir. 2020). Thus, "[w]hen transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening." *Boyertown*, 897 F.3d at 529.

Further, the District has a legitimate interest in making school a safe space for transgender and gender nonconforming students to keep their name and pronoun choices private in the event they fear "embarrassment, discomfort, harassment, bullying or even physical violence" in the home. *Matter of Cody VV. (Brandi*

*VV.)*, 226 A.D.3d 24, 28 (3d Dep't 2024) (ordering the sealing of a transgender child's name change records to protect the child from harm). Respecting students' privacy choices "plausibly creates a space for students to express their identity without worrying about parental backlash" and "cultivate[s] an environment where students may feel safe in expressing their gender identity." *Foote*, 128 F.4th at 357. Courts of Appeals have repeatedly recognized that the creation of such a safe environment for transgender and gender nonconforming students yields healthy and positive results for them. *Id.* (citing *Boyertown*, 897 F.3d at 523; *Grimm*, 972 F.3d at 597).

Thus, the Policy "bears a rational relationship to the legitimate objective of promoting a safe and inclusive environment for students. Rational basis review requires nothing more." *Id.*; *accord Doe v. Del. Valley Reg'l High Sch. Bd. of Educ.*, No. 24-00107 (GC) (JBD), 2024 U.S. Dist. LEXIS 29292, at *32-33 (D.N.J. Feb. 21, 2024); *Vesely v. Ill. Sch. Dist. 45*, 669 F. Supp. 3d 706, 714 (N.D. Ill. 2023). For this reason, Vitsaxaki fails to state a free exercise or unenumerated fundamental rights claim.

## 5. Vitsaxaki Fails to State a Procedural Due Process Claim

As Vitsaxaki's cited precedent states, the right to procedural due process arises from the deprivation of constitutionally-protected property rights or liberty interests. *See Radwan v. Manuel*, 55 F.4th 101, 123 (2d Cir. 2022) (*cited in*

Vitsaxaki Br. at 59). Vitsaxaki argues that procedural due process applies to a broader array of liberty interests than just fundamental rights. Vitsaxaki Br. at 60 (citing *Regino v. Staley*, 133 F.4th 951, 967 (9th Cir. 2025)). But Vitsaxaki failed to plausibly allege that the Policy deprived her of any "protected liberty interest." *Id.* at 59. As a result, the Due Process Clause did not entitle her to "notice" or a "chance to object" when Doe requested a different name and pronouns—process that would eliminate the Policy's requirement to honor students' non-disclosure requests. *Id.*

Crucially, Vitsaxaki fails to identify a loss of any constitutionally-protected liberty interest. Her lack of such an interest is clear from the cases she cites. While she claims "a constitutionally protected liberty interest in the care, custody and management of their children" based on *Southerland*, Vitsaxaki Br. at 59, that case addresses a parent's procedural rights when an official seeks to "remove a child from the custody of the parent without consent," *Southerland*, 680 F.3d at 150 (internal quotation marks omitted). Similarly, *Bartell v. Lohiser*, 215 F.3d 550, 553 (6th Cir. 2000) (*cited in* Vitsaxaki Br. at 60), addresses allegations that the defendants "violated various federal and state laws in terminating [the plaintiff's] parental rights to raise her son." These removal and termination cases are so far removed from the Complaint's allegations that Vitsaxaki resorts to citing a case addressing parents' rights under a Florida law requiring notifi-

58

cation to parents before their child has an abortion. *See Doe v. Uthmeier*, No. 5D2025-1363, 2025 Fla. App. LEXIS 3751, at *19-20 (Fla. Dist. Ct. App. May 14, 2025). Since Vitsaxaki only alleges that the District honored Doe's name, pronoun, and nondisclosure requests, Vitsaxaki does not allege a comparable loss of a protected liberty interest.

Thus, Vitsaxaki's procedural due process claim runs into the same problem as her substantive due process claim: Vitsaxaki "assert[s] no liberty interest in the rearing of [her child] that is not encompassed in [her] free exercise claim," which itself fails. *We The Patriots*, 76 F.4th at 159; *see also K.D. v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 215 (S.D.N.Y. 2013) ("[D]istrict courts in this Circuit have repeatedly dismissed procedural due process claims where there is no allegation that the parents were ever deprived of custody over their children."); *Mahmoud*, 2025 U.S. LEXIS 2500, at *41 (addressing a school board's refusal to provide notice and opt-out rights to parents who objected to assigned curriculum under the Free Exercise Clause, not the Due Process Clause). Since Vitsaxaki does not assert a cognizable liberty interest in Doe's use of a preferred name and pronouns at school, Vitsaxaki had no constitutional right to procedural due process when the District agreed to Doe's nondisclosure request.

## Conclusion

The Court should affirm the district court's dismissal of the Complaint.

Dated:  July 10, 2025          **BOND, SCHOENECK & KING, PLLC**

/s/ Jeremy M. Sher

Jeremy M. Sher
*Attorneys for Defendants-Appellees*
350 Linden Oaks, Third Floor
Rochester, New York 14625
(585) 362-4700

**Certificate of Compliance with**
**Federal Rule of Appellate Procedure 32(a)**

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 13,919 words.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word for Microsoft 365 in Calisto MT font, size 14.

Dated: July 10, 2025          **BOND, SCHOENECK & KING, PLLC**

/s/ Jeremy M. Sher
Jeremy M. Sher
*Attorneys for Defendants-Appellees*
350 Linden Oaks, Third Floor
Rochester, New York 14625
(585) 362-4700