# 25-952

## United States Court of Appeals for the Second Circuit

---

JENNIFER VITSAXAKI,

*Plaintiff-Appellant,*

v.

SKANEATELES CENTRAL SCHOOL DISTRICT,
SKANEATELES CENTRAL SCHOOLS' BOARD OF EDUCATION,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Northern District of New York

---

**BRIEF FOR AMICI CURIAE THE STATES OF NEW YORK,
CALIFORNIA, HAWAI'I, ILLINOIS, MAINE, MARYLAND,
MASSACHUSETTS, MINNESOTA, NEW JERSEY, OREGON,
VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA
IN SUPPORT OF AFFIRMANCE**

---

|  |  |
|---|---|
|  | LETITIA JAMES |
|  | *Attorney General* |
|  | *State of New York* |
| BARBARA D. UNDERWOOD | Attorney for Amici Curiae the State of |
| *Solicitor General* | New York et al. |
| JUDITH N. VALE | 28 Liberty Street |
| *Deputy Solicitor General* | New York, New York 10005 |
| KARTIK NARAM | (212) 416-6347 |
| *Assistant Solicitor General* |  |
| *of Counsel* | Dated: July 17, 2025 |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.........................................................................ii

INTRODUCTION AND INTERESTS OF AMICI CURIAE ...................1

ARGUMENT ...........................................................................................4

POINT I

    POLICIES LIKE THE SCHOOL DISTRICT'S ENSURE SAFE
    AND SUPPORTIVE SCHOOLS IN AMICI STATES .........................................4

      A.    Schools Need To Be Able to Design and Implement
           Policies That Ensure Safe and Supportive Environments........4

      B.    Laws and Guidance Issued By New York and Other
           Amici States Balance Important Interests..............................6

POINT II

    THE RIGID FRAMEWORK THAT PLAINTIFF PROPOSES WOULD
    UNDERMINE AMICI STATES' INTERESTS IN MAKING SCHOOLS SAFE
    AND SUPPORTIVE ..................................................................................16

POINT III

    AMICI STATES HAVE STRONG INTERESTS IN SAFE AND SUPPORTIVE
    SCHOOLS FOR ALL STUDENTS, INCLUDING TRANSGENDER AND
    GENDER-NONCONFORMING STUDENTS ................................................20

      A.    Safe and Supportive School Policies Benefit All Students......20

      B.    Safe and Supportive School Policies Are Especially
           Critical for Transgender and Gender Nonconforming
           Students. ...............................................................................24

CONCLUSION .....................................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                  **Page(s)**

*Ambach v. Norwick*,
  441 U.S. 68 (1979)...........................................................5

*Arnold v. Board of Educ. of Escambia Cnty.*,
  880 F.2d 305 (11th Cir. 1989).........................................15

*Bethel Sch. Dist. No. 403 v. Fraser*,
  478 U.S. 675 (1986).........................................................4

*Brown v. Board of Educ.*,
  347 U.S. 483 (1954)......................................................4-5

*East Hartford Educ. Ass'n v. Board of Educ. of Town of E. Hartford*,
  562 F.2d 838 (2d Cir. 1977) ............................................4

*Edwards v. Aguillard*,
  482 U.S. 578 (1987).........................................................5

*Foote v. Ludlow Sch. Comm.*,
  128 F.4th 336 (1st Cir. 2025) (per curiam).....................18

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021).......................................................13

*Gruenke v. Seip*,
  225 F.3d 290 (3d Cir. 2000) ...........................................15

*Immediato v. Rye Neck Sch. Dist.*,
  73 F.3d 454 (2d Cir. 1996) ..............................................5

*In re Cody VV.*,
  226 A.D.3d 24 (3d Dep't 2024).........................................7

*Kane v. De Blasio*,
  19 F.4th 152 (2d Cir. 2021) (per curiam)...................13-14

**Cases**                                                              **Page(s)**

*Littlejohn v. School Bd. of Leon Cnty.*,
    132 F.4th 1232 (11th Cir. 2025) ........................................ 16

*Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*,
    594 U.S. 180 (2021)................................................................ 4

*Mahmoud v. Taylor*,
    No. 24-297, 2025 WL 1773627 (U.S. June 27, 2025)................ 6, 14-15

*Skoros v. City of New York*,
    437 F.3d 1 (2d Cir. 2006) ...................................................... 5

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969)................................................................ 6

*We The Patriots USA, Inc. v. Connecticut Off. of Early*
    *Childhood Dev.*,
    76 F.4th 130 (2d Cir. 2023).................................................... 5

**Statutes**

California Educ. Code § 220....................................................... 8

775 Illinois Comp. Stat.
    5/5/-102.................................................................................. 8
    5/5A-102 ................................................................................ 8

Maine Rev. Stat. Ann.
    tit. 5, § 4553 ......................................................................... 8
    tit. 5, § 4601 ......................................................................... 8

Massachusetts Gen. Laws ch. 76, § 5 ...................................... 8

Minnesota Stat. § 363A.13 ........................................................ 8

New Jersey Stat. Ann. § 10:5-12............................................... 8

iii

**Statutes**                                                 **Page(s)**

New York
    Educ. Law § 11 ................................................................ 8
    Educ. Law § 12 ................................................................ 8
    Exec. Law § 292 .............................................................. 7
    Exec. Law § 296 .............................................................. 7

Oregon Rev. Stat. § 659.850 ................................................ 8

Washington Rev. Code Ann. § 28A.642.010 ......................... 8

**Miscellaneous Authorities**

Am. Psych. Ass'n, *Safe and Supportive Schools Project* (2014),
    https://www.apa.org/pi/lgbt/programs/safe-supportive ..................... 20

Ann P. Haas et al., Am. Found. for Suicide Prevention &
    Williams Inst., *Suicide Attempts Among Transgender and
    Gender Non-Conforming Adults: Findings of the National
    Transgender Discrimination Survey* (Jan. 2014),
    https://williamsinstitute.law.ucla.edu/wp-
    content/uploads/Trans-GNC-Suicide-Attempts-Jan-2014.pdf ........... 26

Caitlin Ryan et al., *Family Rejection as a Predictor of Negative
    Health Outcomes in White and Latino Lesbian, Gay, and
    Bisexual Young Adults*, 123 Pediatrics 346 (2009),
    https://pubmed.ncbi.nlm.nih.gov/19117902/ ..................................... 11

Cal. Dep't of Educ., *Protections for LGBTQ+ Students: AB 1955*
    (last reviewed Jan. 2, 2025), https://www.cde.ca.gov/ci/pl/ab-
    1955-sum-of-prov.asp ....................................................................... 12

Ctrs. for Disease Control & Prevention, *School Connectedness
    Helps Students Thrive* (Nov. 18, 2024),
    https://www.cdc.gov/youth-behavior/school-
    connectedness/?CDC_AAref_Val= ..................................................... 21

**Miscellaneous Authorities**                                    **Page(s)**

GLSEN, *School Climate for LGBTQ+ Students in New York*
(2023), https://maps.glsen.org/wp-
content/uploads/2024/08/GLSEN_2021_NSCS_State_Snapsh
ots_NY.pdf...........................................................................25

Governor's Approval Mem. (June 24, 2021), *in* Bill Jacket for
ch. 158 (2021) ......................................................................7

Haw. Dep't of Educ., *Guidance on Supports for Transgender
Students* (n.d.), https://hawaiipublicschools.org/wp-
content/uploads/Guidance-TransgenderStudents-
Supports.pdf.........................................................................12

Hum. Rts. Campaign, *Gender-Expansive Youth Report* (2018),
https://assets2.hrc.org/files/assets/resources/Gender-
expansive-youth-report-final.pdf........................................12

Isabel Brito et al., *Do You Trust Me? A Systematic Literature
Review on Student-Teacher Trust and School Identification*,
Conference paper for the European Conference on Education
2021 (Sept. 2021), https://papers.iafor.org/wp-
content/uploads/papers/ece2021/ECE2021_60608.pdf......................22

Jenna Howard Terrell et al., *Conceptualizing and Measuring
Safe and Supportive Schools*, 24 Contemporary Sch. Psych.
327 (Aug. 12, 2020),
https://www.researchgate.net/publication/343619376_Concep
tualizing_and_Measuring_Safe_and_Supportive_Schools ...............20

Joseph G. Kosciw et al., GLSEN, *The 2019 National School
Climate Survey: The Experiences of Lesbian, Gay, Bisexual,
Transgender, and Queer Youth in Our Nation's Schools*
(2020), https://www.glsen.org/sites/default/files/2021-
04/NSCS19-FullReport-032421-Web_0.pdf........................28

**Miscellaneous Authorities**                                              **Page(s)**

Joseph G. Kosciw et al., GLSEN, *The 2021 National School
    Climate Survey: The Experiences of LGBTQ+ Youth in Our
    Nation's Schools* (2022),
    https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-
    Full-Report.pdf.................................................................................24-28

Kristina R. Olson et al., *Mental Health of Transgender Children
    Who Are Supported in Their Identities*, 137 Pediatrics 1
    (2016), https://pmc.ncbi.nlm.nih.gov/articles/PMC4771131/ ............29

Laurie Kincade et al., *Meta-Analysis and Common Practice
    Elements of Universal Approaches to Improving Student-
    Teacher Relationships*, 90 Rev. Educ. Rsch. 710 (Aug. 4,
    2020),
    https://journals.sagepub.com/doi/abs/10.3102/0034654320946
    836........................................................................................................22

Linda Darling-Hammond et al., *Implications for Educational
    Practice of the Science of Learning and Development*, 24
    Applied Developmental Sci. 97 (2020),
    https://www.tandfonline.com/doi/full/10.1080/10888691.2018.
    1537791 ....................................................................................20-21, 23

Marina Feijo et al., *Improving School Outcomes for
    Transgender and Gender-Diverse Youth: A Rapid Review*, 9
    Pol'y Insights from Behav. & Brain Scis. 27 (2022),
    https://journals.sagepub.com/doi/abs/10.1177/2372732221106
    8021......................................................................................................23

Mass. Dep't of Elementary & Secondary Educ., *Guidance for
    Massachusetts Public Schools Creating a Safe and
    Supportive School Environment* (2022),
    https://tinyurl.com/jx9a8nsf............................................................13

**Miscellaneous Authorities**                                    **Page(s)**

Megan Tschannen-Moran et al., *Student Academic Optimism: A*
    *Confirmatory Factor Analysis*,
    51 J. Educ. Admin. 150 (Mar. 15, 2013),
    https://www.researchgate.net/publication/275076778_Studen
    t_Academic_Optimism_A_confirmatory_factor_analysis ................. 22

Michael D. Resnick et al., *Protecting Adolescents from Harm:*
    *Findings from the National Longitudinal Study on*
    *Adolescent Health*, 278 J. Am. Med. Ass'n 823 (Sept. 10,
    1997), https://pubmed.ncbi.nlm.nih.gov/9293990/ ............................ 23

Michelle M. Johns et al., *Protective Factors Among Transgender*
    *and Gender Variant Youth: A Systematic Review by*
    *Socioecological Level*, 39 J. Primary Prevention 263 (2018),
    https://pmc.ncbi.nlm.nih.gov/articles/PMC5976555/pdf/nihms
    967022.pdf.................................................................................. 28

Michelle M. Johns et al., *Transgender Identity and Experiences*
    *of Violence Victimization, Substance Use, Suicide Risk, and*
    *Sexual Risk Behaviors Among High School Students — 19*
    *States and Large Urban School Districts, 2017*, Morbidity &
    Mortality Weekly Rep. 67 (2019),
    https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6803a3-
    H.pdf......................................................................................25-26

Monika Platz, *Trust Between Teacher and Student in Academic*
    *Education at School*, 55 J. Phil. Educ. 688 (2021),
    https://academic.oup.com/jope/article/55/4-5/688/6821689 ............... 17

Movement Advancement Project & GLSEN, *Separation and*
    *Stigma: Transgender Youth & School Facilities* (2017),
    https://www.lgbtmap.org/file/transgender-youth-school.pdf ....... 26, 29

Movement Advancement Project, *Safe Schools Laws* (current
    through July 17, 2025), https://www.lgbtmap.org/equality-
    maps/safe_school_laws ................................................................... 12

**Miscellaneous Authorities**                                            **Page(s)**

Nat'l Ctr. on Safe Supportive Learning Env'ts, *About* (n.d.), https://safesupportivelearning.ed.gov/about ...................................... 20

N.Y. State Educ. Dep't, *Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices* (2023), https://www.nysed.gov/sites/default/files/programs/student-support-services/creating-a-safe-supportive-and-affirming-school-environment-for-transgender-and-gender-expansive-students.pdf ...................................................... 8-10, 15, 19

N.Y. State Educ. Dep't, *Guidance to School Districts for Creating a Safe and Supportive School Environment for Transgender and Gender Nonconforming Students* (July 2015), https://www.p12.nysed.gov/dignityact/documents/Transg_GNCGuidanceFINAL.pdf .......................................................... 10

Off. of Elementary & Secondary Educ., *Safe & Supportive Schools*, U.S. Dep't of Educ. (last reviewed Jan. 14, 2025), https://www.ed.gov/about/ed-offices/oese/safe-supportive-schools ................................................................... 20

Riley J. Steiner et al., *Adolescent Connectedness and Adult Health Outcomes*, 144 Pediatrics e20183766 (July 2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC9125410/pdf/nihms-1801768.pdf ............................................................... 23-24

Roxanne M. Mitchell et al., *Student Trust in Teachers and Student Perceptions of Safety: Positive Predictors of Student Identification with School*, Int'l J. Leadership Educ. 1 (May 2016), https://www.tandfonline.com/doi/full/10.1080/13603124.2016.1157211 ................................................................. 21-23

viii

**Miscellaneous Authorities**                                        **Page(s)**

Russell M. Viner et al., *Adolescence and the Social
      Determinants of Health*, 379 Adolescent Health 1641 (Apr.
      2012),
      https://www.thelancet.com/journals/lancet/article/PIIS0140-
      6736(12)60149-4/abstract ............................................................... 23

Sandy E. James et al.*,* Nat'l Ctr. for Transgender Equal., *The
      Report of the 2015 U.S. Transgender Survey* (2016),
      https://transequality.org/sites/default/files/docs/usts/USTS-
      Full-Report-Dec17.pdf ............................................................ 11, 26

Sara Rimm-Kaufman & Lia Sandilos, *Improving Students'
      Relationships with Teachers to Provide Essential Supports
      for Learning*, Am. Psych. Ass'n (updated Mar. 2025),
      https://www.apa.org/education-career/k12/relationships ................. 17

Stephen T. Russell et al., *Promoting School Safety for LGBTQ
      and All Students*, 8 Pol'y Insights from Behav. & Brain Scis.
      160 (Oct. 2021),
      https://pmc.ncbi.nlm.nih.gov/articles/PMC8454913/pdf/nihms
      -1740286.pdf ....................................................................................... 28

Trevor Project, *2024 U.S. National Survey on the Mental Health
      of LGBTQ+ Young People* (2024),
      https://www.thetrevorproject.org/survey-2024/ .................... 11, 24, 26

Trevor Project, *The Trevor Project Research Brief: LGBTQ &
      Gender-Affirming Spaces* (Dec. 2020),
      https://www.thetrevorproject.org/wp-
      content/uploads/2021/07/LGBTQ-Affirming-Spaces_-
      December-2020.pdf ......................................................................... 29

ix

## INTRODUCTION AND INTERESTS OF AMICI CURIAE

In this lawsuit, plaintiff-appellant Jennifer Vitsaxaki challenged the policy of Skaneateles Middle School regarding students who request that school officials refer to the student using a new name and pronouns corresponding with the gender identity asserted by the student.[1] The complaint alleged (among other things) that the school district's policy violated plaintiff's constitutional rights on its face and as applied because it allowed the school to use the name and pronouns requested by plaintiff's child at school without first notifying plaintiff or obtaining her consent. The U.S. District Court for the Northern District of New York (Hurd, J.) dismissed the complaint.

Amici States of New York, California, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Minnesota, New Jersey, Oregon, Vermont, Washington, and the District of Columbia submit this brief in support of affirmance and to explain guidance issued by many of our States

---

[1] The student is identified in this action as Jane Doe. (*See* Joint Appendix (J.A.) 86.)

regarding student gender-identity issues.[2] Amici States have strong interests in ensuring that public schools within our respective jurisdictions remain safe and supportive places for all students regardless of their gender identity. Safe school environments benefit all students and enrich amici States as a whole. Amici States write to emphasize three points.

*First*, we write to explain nonbinding policy guidelines issued by the State of New York regarding student gender-identity issues. Many other amici States have also issued laws and guidelines on these issues. These laws and guidelines aim to foster a safe and supportive school environment for all students, including transgender or gender-nonconforming students. Amici States' laws and guidelines encourage schools to engage with students' parents and to craft a plan that accommodates the students' needs at school. But amici States recognize that it is not always safe to immediately inform a student's parents about a student's asserted gender identity. The guidance emphasizes the importance of respecting

---

[2] Amici States take no position on how defendants-appellees the Skaneateles Central School District and its Board of Education (collectively, the "School District") interpret their own policy or plaintiff's allegations about how they applied the policy here.

2

a student's wishes, including a student's wish not to immediately disclose their gender identity to parents out of concerns about their personal safety or about disapproval or rejection. At the same time, our guidance recognizes that student gender-identity issues should be addressed on a case-by-case basis with the paramount focus on the student's safety.

*Second*, we also write to underscore the dangers of the inflexible approach urged by plaintiff, which would prohibit schools from using the name and pronoun that a student affirmatively requests or from discussing gender identity issues that the student affirmatively raises without first notifying the parent and obtaining their consent. The Constitution requires no such rigid rule. *See* Br. for Defs.-Appellees at 30. And such a categorical rule would severely harm students' safety and well-being and impose significant burdens on public schools in amici States.

*Third*, and finally, a wealth of social science research confirms that safe and supportive school environments catalyze student success. For transgender and gender-nonconforming students in particular, who are often subject to discrimination, harassment, and bullying, an affirming school environment improves learning and overall well-being.

3

## ARGUMENT

## POINT I

### POLICIES LIKE THE SCHOOL DISTRICT'S ENSURE SAFE AND SUPPORTIVE SCHOOLS IN AMICI STATES

**A.   Schools Need To Be Able to Design and Implement Policies That Ensure Safe and Supportive Environments.**

Public schools play a foundational role in American society. They are the "nurseries of democracy," *Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 594 U.S. 180, 190 (2021), because "an educated and enlightened citizenry is a prerequisite to the functioning of any representative democracy," *East Hartford Educ. Ass'n v. Board of Educ. of Town of E. Hartford*, 562 F.2d 838, 842-43 (2d Cir. 1977). The Supreme Court has often extolled the importance of public schools in preparing and training successive generations of students. *See Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986). As a result, "education is perhaps the most important function of state and local governments." *Brown*, 347 U.S. at 493.

Public schools need to be able to shape the school environment to fulfill their critical educational mission, including aspects of the school environment beyond the formal education curriculum. *See Edwards v.*

4

*Aguillard*, 482 U.S. 578, 583 (1987); *see Ambach v. Norwick*, 441 U.S. 68, 78-79 (1979). For example, public schools can enact administrative requirements to ensure student safety, *see We The Patriots USA, Inc. v. Connecticut Off. of Early Childhood Dev.*, 76 F.4th 130, 159 (2d Cir. 2023) (upholding constitutionality of school vaccination requirement), *cert. denied*, 144 S. Ct. 2682 (2024), or require students to venture out into their communities to "focus on learning-by-doing," *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 462 (2d Cir. 1996) (upholding constitutionality of school community service requirement). That is because "the broad spectrum of public education issues is generally 'committed to the control of state and local authorities.'" *Skoros v. City of New York*, 437 F.3d 1, 41 (2d Cir. 2006)) (quoting *Goss v. Lopez*, 419 U.S. 565, 578 (1975)).

Of course, a public school's ability to shape the school environment is subject to restraints imposed by federal law. Public schools must adhere to federal prohibitions against discrimination contained in the Equal Protection Clause and Title IX of the Education Amendments of 1972, for example. And school officials are also subject to constitutional constraints. *See, e.g.*, *Mahmoud v. Taylor*, No. 24-297, 2025 WL 1773627,

at *5 (U.S. June 27, 2025); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969).

Here, many of plaintiff's arguments, if accepted, would strip school officials of the ability to ensure that students remain safe and respected when a student affirmatively requests that school officials not disclose the student's gender identity to the student's parents. Under plaintiff's proposed categorical rule, school officials would be constitutionally required to divulge a student's gender identity to parents in all circumstances regardless of the student's own concerns about their safety, security, and well-being. That is not what the Constitution requires, as defendants explain. *See* Br. for Defs.-Appellees at 30. It would also corrode student-teacher relationships while imposing ill-defined and potentially boundless disclosure obligations on schools.

**B.    Laws and Guidance Issued By New York and Other Amici States Balance Important Interests.**

State laws and guidance for school officials issued by the New York State Department of Education seek to balance parents' involvement in their children's education with the recognition that not all students feel safe or comfortable revealing their gender identity at home. Other amici

6

States seek to strike the same careful balance. As explained below, plaintiff's facial constitutional challenges should be rejected.

The School District adopted its policy against the backdrop of New York's strong public policy supporting transgender and gender-nonconforming individuals. (*See* Mem. of Law in Supp. of Defs.' Mot. to Dismiss at 1 (Mar. 27, 2024), ECF No. 19-1.) *See also In re Cody VV.* , 226 A.D.3d 24, 28 (3d Dep't 2024). New York has enacted stringent antidiscrimination laws that enforce its commitment to safe and supportive schools. For example, the Gender Expression Non-Discrimination Act prohibits public schools from discriminating against students on the basis of their gender identity or expression.[3] The law "ensure[d] expanded protections for transgender and non-binary New Yorkers." Governor's Approval Mem. (June 24, 2021), *in* Bill Jacket for ch. 158 (2021), at 5. Similarly, the Dignity for All Students Act protects students against discrimination, harassment, or bullying on school grounds or at school functions based on their gender identity.[4]

---

[3] *See* N.Y. Exec. Law §§ 292(35), 296(4).

[4] *See* N.Y. Educ. Law §§ 11-12.

7

Other amici States have codified similar protections to achieve safe and supportive school environments and to ensure that students of all gender identities can receive a public education free from discrimination, harassment, and intimidation.[5]

In 2023, the New York State Department of Education issued updated nonbinding guidelines (the "NYSED Guidelines" or "guidelines") designed to help public school administrators foster an environment in which students of all gender identities "feel safe, supported, and included."[6] Because the guidelines are non-binding, school districts within New York retain discretion to develop and implement their own policies. The guidelines provide that "[i]t is essential that schools accept and respect a student's assertion of their own gender identity."[7] The guidelines also

---

[5] *E.g.*, Cal. Educ. Code § 220; 775 Ill. Comp. Stat. 5/5/-102; *id.* 5/5A-102(A)-(B); Me. Rev. Stat. Ann. tit. 5, §§ 4553(9-C), 4601; Mass. Gen. Laws ch. 76, § 5; Minn. Stat. § 363A.13; N.J. Stat. Ann. § 10:5-12(f)(1); Or. Rev. Stat. § 659.850; Wash. Rev. Code Ann. § 28A.642.010.

[6] NYSED, *Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices* 7 (2023) ("NYSED Guidelines"). (For sources available online, all URLs appear in the Table of Authorities. All websites were last visited on July 17, 2025.)

[7] *Id.* at 14.

8

encourage schools "to work closely with the student and their parents/guardians, if given permission by the student to involve them in the planning," to craft a plan in light of the student's gender status.[8] But the guidelines recognize that some students will inform school faculty or staff about their gender identities before informing their own parents due to concerns about their safety or lack of acceptance. These students "do not want or cannot have their parents/guardians know about their transgender status."[9]

The NYSED Guidelines recommend that "[t]hese situations should be addressed on a case-by-case basis, accounting for the student's age and maturity."[10] A school's topmost concern should always be "protecting the health and safety of the student, assuring that the student's gender identity is affirmed and that their privacy and confidentiality are safely

---

[8] *Id.* at 15.

[9] *Id.* at 16.

[10] *Id.* An earlier edition of NYSED guidance emphasized the same point: "These situations must be addressed on a case-by-case basis and will require schools to balance the goal of supporting the student with the requirement that parents be kept informed about their children." NYSED, *Guidance to School Districts for Creating a Safe and Supportive School Environment for Transgender and Gender Nonconforming Students* 5 (July 2015).

9

maintained."[11] In most cases, that means respecting a student's request for privacy. As the guidelines note, "[o]nly the student knows whether it is safe to share their identity with caregivers," so schools must be "cautious about understanding each student's sense of safety and ability to be 'out' at home and school."[12]

As the guidelines also explain, "[p]rematurely disclosing a student's gender identity can have severe consequences for the student."[13] One in ten transgender individuals experience overt violence from a household member, and fifteen percent are forced to leave their home because of their transgender identity.[14] Lesbian, gay, and bisexual young adults who experience parental rejection are more than eight times more likely to report having attempted suicide and nearly six times more likely to report major depressive symptoms.[15]

---

[11] NYSED Guidelines, *supra*, at 16.

[12] *Id.* at 15.

[13] *Id.* at 16.

[14] Sandy E. James et al.*,* Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 65 (2016).

[15] Caitlin Ryan et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, 123 Pediatrics 346, 346 (2009).

10

The guidelines' approach benefits students. Although many transgender and gender-nonconforming youth have supportive families, many others face rejection if forced to "out" themselves at home prematurely. According to the Trevor Project's 2024 mental health survey, only forty percent of LGBTQ+ young people in the U.S. found their home to be an "affirming" space—compared with more than half (fifty-two percent) who found school to be an affirming space.[16] And according to a 2018 Human Rights Campaign report, nearly two-thirds (sixty-four percent) of all gender-nonconforming youth surveyed reported that their families made them feel bad for their gender identity.[17] The "real and perceived fears of rejection" make sharing gender identities with family members "incredibly stressful" for gender-expansive youth.[18]

---

[16] Trevor Project, _2024 U.S. National Survey on the Mental Health of LGBTQ+ Young People_ (2024).

[17] Hum. Rts. Campaign, _Gender-Expansive Youth Report_ 8 (2018) (using "gender-expansive" to describe all respondents whose gender identity did not align with "what is typically associated with the sex they were assigned at birth").

[18] _Id._

11

Other amici States have put forward similar policies or guidelines.[19] California's Department of Education has explained that state law forbids *requiring* school employees to disclose a student's gender identity without the student's consent but, at the same time, "does not mandate non-disclosure."[20] The Hawaii Department of Education has issued guidance noting that "[t]ransgender students' needs can be highly individualized depending upon the circumstances of the student," and that "[e]ach student's needs should be assessed on a case-by-case basis."[21] The Massachusetts Department of Elementary and Secondary Education advises that the best practice is to speak with the student about their name and pronoun usage before discussing a student's gender nonconformity with that student's guardians, while observing that "the needs of

---

[19] *See* Movement Advancement Project, *Safe Schools Laws* (current through July 17, 2025) ("nondiscrimination" tab compiling laws of all states).

[20] Cal. Dep't of Educ., *Protections for LGBTQ+ Students: AB 1955* (last reviewed Jan. 2, 2025).

[21] Haw. Dep't of Educ., *Guidance on Supports for Transgender Students* 1 (n.d.).

12

each transgender or gender-nonconforming student should be assessed and addressed on a case-by-case basis."[22]

Plaintiff suggests that policies espousing this case-by-case approach would violate her First Amendment right to free exercise of religion, because her religious beliefs prohibit gender transition, and trigger heightened judicial scrutiny under *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021). But plaintiff is mistaken. Under the Free Exercise Clause, government policies that are not neutral or not generally applicable are "subject to 'strict scrutiny,' meaning that they must be 'narrowly tailored' to serve a 'compelling' state interest." *Kane v. De Blasio*, 19 F.4th 152, 164 (2d Cir. 2021) (per curiam) (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020)). While a system of individual *exemptions* from an otherwise applicable rule can in some cases invite strict scrutiny under the Free Exercise Clause, "there must be some showing that the exemption procedures allow secularly motivated conduct to be favored over religiously motivated conduct." *Id.*

---

[22] *See* Mass. Dep't of Elementary & Secondary Educ., *Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment* (2022).

at 165. Amici States' recommended approach does not equate to a rule with a system of exemptions, secular or religious. It recommends a uniform rule focused on the safety and circumstances of individual students. There are no exceptions to this approach that are available for secular reasons but not religious ones, so the approach does not endorse favoring secular conduct over religious conduct (or vice versa). Strict scrutiny is therefore not warranted.

In addition, a case-by-case framework would not violate plaintiff's free exercise of religion because such policies do not implicate what the Supreme Court recently called "the potentially coercive nature of classroom instruction." *Mahmoud*, 2025 WL 1773627, at *17 (requiring schools to give parents notice and opportunity to opt out of instruction about LGBTQ+-inclusive storybooks). A policy respecting a student's assertion of gender identity does not impose on students any views on gender identity through a mandatory curriculum. Instead, such policies make available a support system for students who affirmatively raise to school employees a preference to assert a gender identity different from the one assigned to them at birth. That approach is consistent with federal law. *See id.* at *5 (noting that dispute involved content of "school

14

curriculum"). As the NYSED Guidelines advise, "[t]he student is in charge of their gender transition and the school's role is to provide support."[23]

For that reason, a policy respecting students' affirmative choices is not the kind of coercive school practice that infringes on parents' fundamental right to direct their children's upbringing. *Contra* Br. at 29. For example, unlike the cases on which plaintiff relies, there is no plausible allegation that the School District coerced Jane Doe "to refrain from discussing" anything with plaintiff, *Arnold v. Board of Educ. of Escambia Cnty.*, 880 F.2d 305, 312 (11th Cir. 1989), or that the School District forced Jane Doe to submit to medical testing, *Gruenke v. Seip*, 225 F.3d 290, 306-07 (3d Cir. 2000). Indeed, as the Eleventh Circuit recently noted in rejecting a challenge to a similar policy, the school did "not force the [plaintiff's] child to do anything at all." *Littlejohn v. School Bd. of Leon Cnty.*, 132 F.4th 1232, 1245 (11th Cir. 2025).

---

[23] NYSED Guidelines, *supra*, at 16.

15

## POINT II

### THE RIGID FRAMEWORK THAT PLAINTIFF PROPOSES WOULD UNDERMINE AMICI STATES' INTERESTS IN MAKING SCHOOLS SAFE AND SUPPORTIVE

In place of the case-by-case approach recommended by amici States, which protects the interests of both students and parents, plaintiff argues for a rigid constitutional mandate. Plaintiff's constitutional rule would require school officials to always obtain parental consent before discussing gender identity issues with a student who raises such issues or who wishes to be called by a different name. Forcing school officials to divulge a student's gender identity to parents in all circumstances—regardless of the student's own concerns about their safety, security, and well-being—would have damaging effects on students and schools in amici States.

*First*, a compulsory disclosure-and-consent rule would chill open communication between students and school officials. If school faculty and staff must immediately and at all times notify parents about a student's gender identity—heedless of the student's concerns about negative reactions or personal safety—then students are less likely to confide such information in school officials. That breakdown in communication would hurt students. When students can be open with their

16

teachers, they are more engaged in learning and confident in their own abilities.[24] They also benefit from mentorship by school staff, including coaches and guidance counselors. By contrast, disincentivizing discussion about gender-identity issues with trusted adults would compound the stresses that transgender and gender-nonconforming youth already experience at school.

*Second*, the constitutional rule that plaintiff proposes threatens to impose on public schools an ill-defined disclosure regime. In plaintiff's view, the Constitution requires school officials to disclose a student's gender identity to parents because it implicates the student's "care," "upbringing," and "formation or moral education." *See* Br. at 31, 37. But the same could be said about many other actions that a student decides to take during a school day. A student who voices support for transgender rights during a classroom debate or utters profanities on stage in a school play could similarly offend their parents' personal, moral, or religious

---

[24] *See* Monika Platz, *Trust Between Teacher and Student in Academic Education at School*, 55 J. Phil. Educ. 688, 694-95 (2021); Sara Rimm-Kaufman & Lia Sandilos, *Improving Students' Relationships with Teachers to Provide Essential Supports for Learning*, Am. Psych. Ass'n (updated Mar. 2025).

beliefs. If school officials were constitutionally required to track every parent's objections to such activities and then share with parents every piece of information about their children's participation in those activities, the administrative burdens of that protocol would overwhelm school officials.

Plaintiff does not justify such a burdensome rule by arguing that respecting a student's chosen name and pronouns amounts to a medical intervention requiring parental involvement. *See* Br. at 4, 8, 19-20, 32. As the district court correctly observed, plaintiff portrays social transitioning as a controversial medical treatment for gender dysphoria without alleging that the School District ever sought to treat that condition in Jane Doe. (*See* J.A. 111-112.) *See Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 349 (1st Cir. 2025) (per curiam) ("labeling, without more, cannot transform the alleged conduct into a medical intervention"). In effect, policies like the School District's "operate[ ] more like a civility code," honoring students' choices so that they are "called the name they ask to be called." (J.A. 111.) That practice requires no prescription or professional license. And it is different from *medical* transitions, which

18

may include hormone therapy or gender-affirming surgery. Amici States recognize the distinction between social and medical transitioning.[25]

In the end, school faculty and staff may take different approaches to communicating with parents about a student's gender identity, depending on the student's individual needs and circumstances, including inter alia the student's age and maturity. No single approach is always the right one, which is why amici States endorse a case-by-case framework. To command notification in all cases as soon as possible without regard to the possible consequences would be counterproductive, unworkable, and unwise, and it is not required by the Constitution. Because plaintiff's complaint rests on a rigid and absolute rule, which fails to take into account the particular circumstances of each student, the dismissal of the complaint was correct and should be affirmed.

_____

[25] *See* NYSED Guidelines, *supra*, at 14-15; *see also id.* at 11 (distinguishing between "social transition, such as changing name and pronouns," and "medical transition, which may include hormone therapy or gender affirming surgeries").

19

# POINT III

### AMICI STATES HAVE STRONG INTERESTS IN SAFE AND SUPPORTIVE SCHOOLS FOR ALL STUDENTS, INCLUDING TRANSGENDER AND GENDER-NONCONFORMING STUDENTS

## A.  Safe and Supportive School Policies Benefit All Students.

Amici States understand that safe and supportive schools are indispensable to student success.[26] Both amici States' experience and research across multiple scientific fields demonstrate the important role that a safe and supportive educational environment plays in student's development.[27] Schools must ensure not only physical safety but also emotional well-being, connectedness of staff and students, and appropriate school policies.[28] A sense of physical and emotional safety enables

---

[26] This consensus is supported by governmental institutions, *see, e.g.*, Off. of Elementary & Secondary Educ., *Safe & Supportive Schools*, U.S. Dep't of Educ. (last reviewed Jan. 14, 2025); Nat'l Ctr. on Safe Supportive Learning Env'ts, *About* (n.d.), as well as medical organizations, *see, e.g.*, Am. Psych. Ass'n, *Safe and Supportive Schools Project* (2014).

[27] *See* Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Developmental Sci. 97, 97-98 (2020).

[28] *See* Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemporary Sch. Psych. 327, 327-28 (Aug. 12, 2020).

20

learning, while fear and anxiety weaken a student's cognitive capacity and "short circuit the learning process."[29]

At their core, safe and supportive schools rely on strong and authentic relationships between students, faculty, and staff. These school environments foster a student's understanding that both adults and peers at school care about their education and about them as individuals.[30] Schools depend on interpersonal relationships that set students up to succeed.[31]

The student-teacher relationship in particular holds enormous importance in the school environment and significantly influences a student's educational experience. Yet strong and supportive student-teacher relationships do not arise automatically. Research indicates that teachers must first demonstrate caring and goodwill by showing concern about students as people outside of the school context and communicating

---

[29] Darling-Hammond et al., *supra*, at 102.

[30] Ctrs. for Disease Control & Prevention, <u>School Connectedness Helps Students Thrive</u> (Nov. 18, 2024).

[31] *See* Roxanne M. Mitchell et al., <u>Student Trust in Teachers and Student Perceptions of Safety: Positive Predictors of Student Identification with School</u>, 21 Int'l J. Leadership Educ. 1 (May 2016).

openly.[32] And after student-teacher trust is developed, a subsequent breach in that relationship is difficult to repair.[33]

When students share warm, strong, and independent relationships with their teachers, there is a positive effect on the overall school climate and on the students' optimism, academic outcomes, and identification with their school.[34] These positive relationships have been shown to benefit student engagement, academic achievement, self-esteem, and social skills, while reducing a student's likelihood of being suspended or dropping out.[35] Indeed, the presence of a strong, supportive connection to any adult at school (such as a mentor or advisor) is also connected to a

---

[32] *See* Megan Tschannen-Moran et al., *Student Academic Optimism: A Confirmatory Factor Analysis*, 51 J. Educ. Admin. 150, 153 (Mar. 15, 2013).

[33] *See* Mitchell et al., *supra*, at 138.

[34] *See* Tschannen-Moran et al., *supra*, at 168-69; Mitchell et al., *supra*, at 138-39, 148-49; Laurie Kincade et al., *Meta-Analysis and Common Practice Elements of Universal Approaches to Improving Student-Teacher Relationships*, 90 Rev. Educ. Rsch. 710, 711-12 (Aug. 4, 2020).

[35] *See* Kincade et al., *supra*, at 712; Tschannen-Moran et al., *supra*, at 151-54, 157-58, 167-71; Isabel Brito et al., *Do You Trust Me? A Systematic Literature Review on Student-Teacher Trust and School Identification*, Conference paper for the European Conference on Education 2021 (Sept. 2021).

greater likelihood that a student will attend, graduate, and succeed academically.[36] Strong relationships between students and school faculty and staff affect students beyond the individuals involved in the relationship, as students who trust their teachers and administrators are more likely to report unsafe situations involving others and prompt interventions.[37]

A student's sense of connectedness to their school affects much more than just academic achievement.[38] Over two decades of research has demonstrated that school connectedness directly promotes positive outcomes and buffers the negative effects of risk factors related to mental health, violence, sexual behavior, and substance use.[39] Recent work has

---

[36] Darling-Hammond et al., *supra*, at 103.

[37] Mitchell et al., *supra*, at 5.

[38] *See* Russell M. Viner et al., *Adolescence and the Social Determinants of Health*, 379 Adolescent Health 1641, 1647 (Apr. 2012); Marina Feijo et al., *Improving School Outcomes for Transgender and Gender-Diverse Youth: A Rapid Review*, 9 Pol'y Insights from Behav. & Brain Scis. 27, 28 (2022).

[39] *See* Riley J. Steiner et al., *Adolescent Connectedness and Adult Health Outcomes*, 144 Pediatrics e20183766, at 1-2, 6 (July 2019) (author manuscript); Michael D. Resnick et al., *Protecting Adolescents from Harm: Findings from the National Longitudinal Study on Adolescent Health*, 278 J. Am. Med. Ass'n 823, 831 (Sept. 10, 1997).

23

demonstrated that the influence of school connectedness experienced as an adolescent continues to impact students as they become adults, resulting in reduced emotional distress and suicidal ideation, a lower likelihood of physical violence victimization and perpetration, and less prescription or illicit drug use in adulthood.[40]

## B. Safe and Supportive School Policies Are Especially Critical for Transgender and Gender Nonconforming Students.

Providing a safe and supportive school environment is especially important to transgender and gender-nonconforming students. This group experiences discrimination and violence at an unusual and alarmingly high rate.[41] In a 2024 mental health survey, sixty-five percent of transgender and nonbinary young people reported feeling discriminated against due to their gender identity.[42] In New York, survey data show that fifty-one percent of LGBTQ+ students have experienced verbal harassment in school based on their gender expression, while significant

---

[40] *See id.* at 1-2.

[41] *See* Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* xxvii, 93 (2022).

[42] Trevor Project, *supra.*

24

portions of this group have faced online harassment (twenty-eight percent) and physical harassment (sixteen percent).[43] Overall, transgender students are more likely than non-transgender students to report that they feel unsafe at or traveling to and from school, have experienced bullying at school, and have been threatened or injured with a weapon at school.[44] This discrimination, violence, and harassment has been shown to reduce transgender and gender-nonconforming students' sense of connection to their schools and their own sense of belonging as compared to other students.[45]

Discrimination in educational settings can result in severe consequences for transgender and gender-nonconforming youth. Such students who have had negative experiences at school such as bullying and harassment are more likely to be under serious distress, to have

---

[43] GLSEN, *School Climate for LGBTQ+ Students in New York* 2 (2023).

[44] *See* Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Weekly Rep. 67, 69 (2019).

[45] *See* Kosciw et al., *supra*, at xix-xx, 41.

25

experienced homelessness, and to have attempted suicide.[46] Transgender and gender-nonconforming youth also experience significantly higher rates of suicidal thoughts and attempts than the overall U.S. population.[47] A 2024 mental health survey found that forty-six percent of transgender and nonbinary young people reported having "seriously considered attempting suicide in the past year," and twelve percent attempted suicide during that time.[48]

Discrimination, harassment, and stigma based on gender identity also hurt transgender and gender-nonconforming students in the classroom. Transgender students who experienced higher levels of victimization in school as a result of their gender expression have lower grades, are less likely to plan to graduate high school, and are three times more likely to have missed school in a given month.[49] Students who are questioning

---

[46] Johns et al., *supra*, at 70-71; *see* James et al., *supra*, at 131-35.

[47] *See* Ann P. Haas et al., Am. Found. for Suicide Prevention & Williams Inst., *Suicide Attempts Among Transgender and Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey* 2 (Jan. 2014).

[48] Trevor Project, *supra*.

[49] Movement Advancement Project & GLSEN, *Separation and Stigma: Transgender Youth & School Facilities* 4 (2017); Kosciw et al., *supra*, at xix, 35.

their gender identity are also more likely than non-transgender students to miss school because they feel unsafe.[50] Without safe and supportive school environments, transgender and gender-nonconforming students also frequently avoid attending school functions and participating in extracurricular activities.[51]

Safe and supportive school practices can alleviate such harms. Robust data confirm that transgender and gender-nonconforming students who feel safe expressing their gender identity at school are happier, healthier, and more academically successful. Supportive educators have been shown to have an immensely positive influence on transgender and gender-nonconforming students' academic success and emotional well-being. LGBTQ+ students with support from many (eleven or more) supportive staff at their school were less likely to feel unsafe because of their gender expression and sexual orientation, were less likely to miss school because they felt unsafe or uncomfortable, had higher GPAs, were less likely to say they might not graduate high school, and felt greater

---

[50] Kosciw et al., *supra*, at 84, 88.

[51] *Id.* at xv, 11, 84.

27

belonging to their school community.[52] Students at schools with more supportive staff also experience higher levels of self-esteem and lower levels of depression.[53]

Strong and supportive interactions with school personnel have been found to be an important factor in the academic success of transgender and gender-nonconforming youth specifically, in part because such adult interactions were associated with feelings of safety.[54] Transgender and gender-nonconforming youth who had a relationship with a supportive educator were less likely to miss school and less likely to drop out.[55] Transgender students who reported being supported, such as by being addressed by their chosen name and pronouns, also reported mental

---

[52] Joseph G. Kosciw et al., GLSEN, *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* xxiii (2020).

[53] *Id.* at xxii; Stephen T. Russell et al., *Promoting School Safety for LGBTQ and All Students*, 8 Pol'y Insights from Behav. & Brain Scis. 160 (Oct. 2021) (author manuscript).

[54] *See* Kosciw et al., *supra*, at xxii, 66-67.

[55] Michelle M. Johns et al., *Protective Factors Among Transgender and Gender Variant Youth: A Systematic Review by Socioecological Level*, 39 J. Primary Prevention 263 (2018) (author manuscript).

health outcomes analogous to their non-transgender peers.[56] Indeed, gender-affirming environments generally are associated with reduced suicide risk among transgender and gender-nonconforming youth, and gender-affirming school environments in particular were found to have the strongest association with reduced odds of reporting a suicide attempt within the past year of all the spaces studied.[57]

That is why amici States are committed to fostering inclusive, supportive school environments within our jurisdictions that benefit all students, including—as shown by the policy at issue here—transgender and gender-nonconforming youth.

---

[56] Movement Advancement Project & GLSEN, *supra*, at 4; *see* Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics 1, 5 (2016) (finding similar results for transgender children based on parental reports).

[57] Trevor Project, *The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces* 1 (Dec. 2020).

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's judgment below.

Dated:  New York, New York
        July 17, 2025

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Amici Curiae the
State of New York et al.

By:  */s/ Kartik Naram*
     KARTIK NARAM
     Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
KARTIK NARAM
  *Assistant Solicitor General*
    *of Counsel*

28 Liberty Street
New York, NY 10005
(212) 416-6347

*(Counsel listing continues on next page.)*

30

ROB BONTA
  *Attorney General*
  *State of California*
1300 I St.
Sacramento, CA 95814

ANNE E. LOPEZ
  *Attorney General*
  *State of Hawaiʻi*
425 Queen St.
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
115 South LaSalle St.
Chicago, IL 60601

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
  *Attorney General*
  *State of Maryland*
200 Saint Paul Pl.
Baltimore, MD 21202

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of*
  *Massachusetts*
One Ashburton Pl.
Boston, MA 02108

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther
  King Jr. Blvd.
St. Paul, MN 55155

MATTHEW J. PLATKIN
  *Attorney General*
  *State of New Jersey*
Richard J. Hughes Justice Complex
25 Market St.
Trenton, NJ 08625

DAN RAYFIELD
  *Attorney General*
  *State of Oregon*
1162 Court St. N.E.
Salem, OR 97301

CHARITY R. CLARK
  *Attorney General*
  *State of Vermont*
109 State St.
Montpelier, VT 05609

NICHOLAS W. BROWN
  *Attorney General*
  *State of Washington*
P.O. Box 40100
Olympia, WA 98504

BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 6th St., N.W., Ste. 8100
Washington, D.C. 20001